## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002; and<br>NATIONAL RIFLE ASSOCIATION OF<br>AMERICA<br>11250 Waples Mill Rd, 5N<br>Fairfax, VA 22030<br><br>    Plaintiffs,<br><br>v.<br><br>SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency  of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States,<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civ. No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      For decades, U.S. hunters had been able to hunt African elephants in Zimbabwe and import their sport-hunted elephants into the United States.  This hunting and importation supported elephant conservation by increasing the value of African elephants for local communities, discouraging poaching for ivory and/or food, and providing financial resources for elephant protection.  On March 26, 2015, Defendant U.S. Fish and Wildlife Service ("FWS"), an

1

agency of defendant U.S. Department of the Interior, issued a finding that continued its ban on the importation of legally sport-hunted African elephants from Zimbabwe ("2015 Importation Ban"). The FWS posted this new decision on its website. The FWS did not publish the decision in the Federal Register.

2.      With this Complaint, Plaintiffs Safari Club International and the National Rifle Association of America ("SCI/NRA"), challenge the adoption and issuance of the 2015 Importation Ban by Defendants Sally M. R. Jewell, in her official capacity as Secretary of the U.S. Department of the Interior; the U.S. Department of the Interior; Daniel Ashe, in his official capacity as Director of the FWS; and the FWS ("Federal Defendants").

3.      In establishing the 2015 Importation Ban, Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion by:

i.      failing to properly analyze the data received from Zimbabwe and other sources about the status of the elephant population, and conservation and anti-poaching efforts in Zimbabwe; failing to properly account for the role of sport-hunting in elephant conservation; relying on factual errors and unwarranted assumptions; and determining that Zimbabwe elephant conservation and management laws, plans, and strategies that were sufficient from August 22, 1997 through April 3, 2014, no longer provided sufficient proof that the importation of sport-hunted elephants enhances the survival of the species;

ii.     applying an arbitrary standard of enhancement when determining if sport hunting enhances the survival of Zimbabwe's elephants;

iii.    failing to give the public notice of and an opportunity to comment on the change in importation status and standards used for determining enhancement of survival;

iv.    imposing and enforcing a requirement that a finding that enhancement of the survival of the African elephant in Zimbabwe is necessary for the importation of sport-hunted elephants from populations listed on Convention for International Trade in Endangered Species of Wild Fauna and Flora ("CITES") Appendix II without first providing notice of the requirement and an opportunity for the public to comment; and

v.    failing to rebut the statutory presumption that any imports of elephants from Zimbabwe (a threatened, CITES Appendix II species) satisfy all statutory and regulatory requirements for import, including any set up in the regulation that addresses the importation of African elephants.

4.    Federal Defendants' actions in adopting and implementing the 2015 Importation Ban violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

5.    Declaratory and injunctive relief is required to remedy the harm that the adoption and implementation of the 2015 Importation Ban has caused and will continue to cause.

**JURISDICTION AND VENUE**

6.    This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

7.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against agencies of the United States and against officers of agencies of the United States in their official capacities.  Decisions and actions challenged here were made, at least in part, in this District; Safari Club International ("SCI") and the National Rifle Association ("NRA") each maintain an office in this District; no real property is involved.

8.      Members of SCI/NRA are hunters, outfitters, professional hunters, booking agents, taxidermists and others who hunt, guide, arrange for hunts, and otherwise rely on hunting for their personal, professional and conservation interests in African elephants, and who rely on the ability of U.S. hunters to import sport-hunted African elephants from Zimbabwe into the United States to advance those interests.

9.      The judicial review provisions of the APA waive the federal government's sovereign immunity for the claims in this Complaint.  5 U.S.C. § 702.

**PARTIES**

10.      SCI, a nonprofit IRC § 501(c)(4) corporation, has approximately 47,000 members worldwide.  Safari Club's mission is to protect the freedom to hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation, to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

11.      SCI works in coordination with the Safari Club International Foundation ("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and to support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

12.     SCI promotes the principles and practices of sustainable use conservation.  SCI

and SCI members' interests include the sound sustainable use conservation of African elephants

in Zimbabwe.  SCI members have an interest in their ability to hunt those elephants and import

the elephants from successful hunts.  Other SCI members have an interest in selling and guiding

elephant hunts in Zimbabwe to U.S. residents.  Still other SCI members have an interest in

arranging those hunts, performing the taxidermy on sport-hunted elephants from successful

African elephant hunts, and conducting other types of business related to African elephant

hunting in Zimbabwe.  SCI members also have an interest in the continued ability to participate

in the sustainable-use conservation of the African elephant, in the long-term survival of the

African elephant species, and in preventing poaching from threatening the survival of the

species.

13.     SCI and its members are harmed and aggrieved by the continued prohibition of

the importation of legally sport-hunted African elephants from Zimbabwe.  For many, the

opportunity to hunt an elephant in Zimbabwe is an event of a lifetime that will never be repeated.

Most SCI members who want to participate in an African elephant hunt wish to bring back the

elephant from their successful hunt as a prized memento of a treasured experience, and as a way

to respect and appreciate the beauty of the animal.  A hunter's inability to import his or her legally sport-hunted African elephant deprives the hunter of a valuable element of the hunting experience.  A great number of SCI members will not invest in an expensive elephant hunt if they cannot import the symbol of their successful hunt.  Many SCI members booked their upcoming hunts in Zimbabwe years in advance, invested significant funds towards the trip, and have been or will be unable to recover the funds already expended if and when they cancel their bookings.  The 2015 Importation Ban makes it difficult for them to decide whether to cancel their upcoming hunts, plan hunts in the future, or wait until Federal Defendants take action to lift the ban.

14.     Other SCI members are outfitters, professional hunters and booking agents who provide African elephant hunts to U.S. residents.  These SCI members have been and will continue to be harmed and aggrieved by the continued ban on African elephant importation from Zimbabwe for 2015 and beyond.  These SCI members have lost clients and bookings due to the 2015 Importation Ban.  Their livelihoods and ability to remain in business have been drastically affected due to the reduction in the value of elephant hunts, cancellations by U.S. hunters, and the lessened interest of U.S. hunters to book future hunts.

15.     SCI and its members are aggrieved by the harm that the ban on elephant importation is causing to African elephant conservation in Zimbabwe.  SCI members support sustainable-use conservation generally and the role that hunting plays in African elephant conservation specifically.  The 2015 Importation Ban will diminish the number of hunters and outfitting operations present in the field in elephant range in Zimbabwe, which is, consequently, reducing a major deterrent to poaching in these areas.  Fewer U.S. hunters means a reduction in the revenue and elephant meat (contributed by sport hunters) going to local communities in

Zimbabwe.  This loss of a source of income and food increases the incentives for poaching both by those who kill elephants only to sell the ivory and those who kill elephants only to provide food for their families and communities.  This loss of income also makes it harder for outfitters to contribute to the health, welfare and safety of the local communities, including by donating and otherwise providing needed goods and services.

16.     The inability to import sport-hunted elephants and the reduction of demand by U.S. hunters is diminishing the value of elephants.  This loss of value is reducing the tolerance of local communities for the destructive tendencies of elephants and is encouraging local communities to kill the elephants themselves or facilitate their removal by poachers.  SCI members are being harmed by the loss of conservation incentives and the ultimate loss of elephants that will result from the 2015 Importation Ban.

17.     The FWS first banned the importation of elephants that were sport-hunted in Zimbabwe between April 4 and December 31, 2014.  This ban had a negative impact on persons associated with hunting elephants in Zimbabwe and on the elephants themselves due to a reduced number of U.S. hunters in the field, who support conservation and discourage poaching.  The 2014 ban caused the cancellation of hunts, which reduced the money and resources available for elephant conservation and anti-poaching efforts.  It also reduced the funds earned by local community members who provide services to elephant hunters, and reduced the amount of meat that hunters often donate to the local communities.

18.     SCI and its members possess sufficient interests in the subject matter of this litigation to establish standing.  SCI and its members have suffered concrete injury in fact caused by Federal Defendants' 2015 Importation Ban.  A court ruling declaring illegal and enjoining the ban will redress those injuries.  SCI members will be able to import elephants taken in

Zimbabwe in 2015 and beyond.  SCI members will once again import their legally sport-hunted

African elephants, guide hunts, sell hunts, process elephants, and otherwise engage in activities

that are dependent on and/or related to the ability to import African elephants from Zimbabwe.

SCI and its members will be able to continue to participate in activities that help to encourage

African elephant conservation in Zimbabwe and to support and finance activities that discourage

if not prevent poaching.  SCI is an aggrieved party and is entitled to judicial review of the actions

and inactions challenged here under the APA and ESA.

19.     The NRA is a nonprofit corporation incorporated in New York in 1871, operating

under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in

Fairfax, Virginia.  NRA's Federal Affairs Office is located in Washington, D.C.  Its membership

includes approximately 5,000,000 individuals from the United States and many other countries

around the world.  Its purposes and objectives include "[t]o promote hunter safety, and to

promote and defend hunting as a shooting sport and as a viable and necessary method of

fostering the propagation, growth and conservation, and wise use of our renewable wildlife

resources."  (NRA Bylaws Article II Section 5.)

20.     The NRA has a Director of Conservation, Wildlife and Natural Resources

working from its headquarters in Fairfax, Virginia.  The Director's primary responsibility is to

promote the interests of the hunting community in wildlife management, healthy habitats and

sustainable populations to ensure that these wildlife populations continue to be available to be

enjoyed by NRA members and to protect and sustain hunters' legacy as the primary supporters

of wildlife conservation.

21.     NRA and its members have a strong interest in enhancing the survival of African

elephants in Zimbabwe in a manner that promotes proper wildlife management of the species.

NRA members have participated in hunts of African elephants in Zimbabwe.  Others have made substantial investments toward future hunts of African elephants in Zimbabwe that have been placed in jeopardy due to Federal Defendants' 2015 Importation Ban.

22.     Federal Defendants' 2015 Importation Ban will negatively impact NRA members participating in ancillary fields directly related to the hunting of African elephants in Zimbabwe. NRA members involved in the marketing, planning, outfitting and guiding hunts of African elephants in Zimbabwe have been forced to cancel trips and to reevaluate already booked trips, resulting in current and continuous damages.

23.     Federal Defendants' 2015 Importation Ban threatens sustainable-use conservation of the African elephant species, directly impacting and damaging NRA members' interests.  In addition to the concrete injury the bans have on the livelihood of NRA members, the long-term survival of the African elephant faces major complications from the decrease in NRA member conservation efforts that have helped prevent poaching from threatening the survival of the species.  Sustainable-use conservation efforts are of paramount importance to the NRA and its members to ensure a viable population of African elephants in Zimbabwe.

24.     The NRA and its members possess sufficient interests in the subject matter of this litigation to establish standing.  Federal Defendants' 2015 Importation Ban has caused current and continuous injury to NRA members.  A court ruling declaring the ban illegal and enjoining the ban would redress those injuries.  NRA members could once again import their legally sport-hunted African elephants, guide and sell hunts and otherwise engage in activities that are dependent on and/or related to the ability to import African elephants from Zimbabwe.  These activities are important to the NRA and its members because they allow for direct participation and support of the African elephant populations in Zimbabwe through sustainable-use

conservation efforts.  The NRA is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

25.     Defendant Sally M. R. Jewell is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and the decisions made by the parties to CITES within the United States Department of the Interior.  She is sued in her official capacity.

26.     Defendant U.S. Department of the Interior is an agency of the federal government that is authorized to administer and implement the ESA and to administer the decisions made by the parties to CITES.

27.     Defendant Daniel Ashe is the Director of the FWS.  He has responsibility for the administration and implementation of the ESA and the decisions made by the parties to CITES, including the ban on African elephant importation from Zimbabwe for 2015 and beyond.  He is sued in his official capacity.

28.     Defendant FWS is an agency within the Department of the Interior that is authorized to administer and implement the ESA and the decisions made by the parties to CITES.

## RELEVANT LAW

### A.     The Endangered Species Act and the Convention on International Trade in Endangered Species of Wild Fauna and Flora

29.     The ESA provides the FWS with the authority to classify African elephants as a threatened species.  16 U.S.C. §1533(a)(1).

30.     The ESA does not prohibit the importation of sport-hunted animals designated as threatened.  16 U.S.C. §1538(a)(1)(A) (prohibitions apply to endangered species).  Instead, the FWS, acting on behalf of the Secretary of the Interior, promulgates regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

31.     Section 4(d) of the ESA authorizes the FWS to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the FWS may not issue regulations without specifically determining that they are "necessary and advisable for conservation."

32.     In the African Elephant Conservation Act of 1989 ("AECA"), Congress adopted specific legislation intended to focus on the conservation of the species.  16 U.S.C. § 4201 *et seq.* In the AECA, Congress directed the FWS to impose moratoriums against the importation of ivory from countries that did not meet certain criteria, but prohibited the FWS from issuing moratoriums against the importation of sport-hunted elephants:

> Sport-hunted trophies
>
> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary ***shall not establish any moratorium*** under this section, pursuant to a petition or otherwise, which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the importer's principal in an ivory producing country that has submitted an ivory quota.

16 U.S.C. § 4222(e) (emphasis added).

33.     In the AECA, Congress singled out the hunting and importation of African elephants as acts that benefit the survival of the species.  Congress specifically found that "[t]here is no evidence that sport hunting is part of the poaching that contributes to the illegal trade in African elephant ivory, and there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."  16 U.S.C. § 4202(9).

34.     The FWS does not rely on the AECA for its authority to regulate the importation of sport-hunted African elephants; instead, it purports to derive that authority from the ESA. 16 U.S.C. § 4241.

35.     The FWS's regulation of the importation of African elephants relies on decisions made by both Congress, through the authority given to the FWS in the ESA, and by CITES, through resolutions and other decisions.  50 C.F.R. § 23.1.

36.     CITES is an international agreement between governments.  During conferences held between the party members to the agreement, the parties agree upon decisions and adopt resolutions designed to prevent international trade in specimens of wild animals and plants from threatening the survival of those species.

37.     The United States and Zimbabwe are both parties to CITES.

38.     The parties to CITES placed African elephants from Zimbabwe on Appendix II.

39.     Appendix II includes species that the parties to CITES have determined are not presently threatened with extinction, but may become so if their trade is not regulated.  Appendix II also includes species that the parties to CITES consider in need of being regulated so that trade in certain other Appendix I or II species may be effectively controlled.  50 C.F.R. § 23.4.

40.     The ESA and CITES direct the FWS to treat species classified as "threatened" in different ways, depending on whether the species are listed on CITES Appendix I or II.

41.     Article IV of the CITES Treaty and CITES Resolution Conf. 10.3 requires that exporting countries make findings that the proposed trade of species on CITES Appendix II will not be detrimental to the survival of the species (called a non-detriment finding or "NDF").

42.      CITES does not require that the importing country make a NDF for species listed on Appendix II, such as elephants in Zimbabwe.

43.     The ESA states that, for species classified as threatened that are also listed on CITES Appendix II, where the take and exportation of the species comply with all CITES provisions and requirements, a presumption exists that the importation of the species for non-commercial purposes does not violate the ESA or any regulation adopted pursuant to the ESA. 16 U.S.C. § 1538(c)(2).

44.     The FWS's Special Rule for elephants on its face establishes conditions for the importation of sport-hunted elephants, whether they are listed on CITES Appendix I or II.  50 C.F.R. § 17.40(e)(3)(iii).

Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

45.     Due to Section 9(c)(2) (16 U.S.C. § 1538(c)(2)), the FWS must presume that any importation of sport-hunted elephants from Zimbabwe (Appendix II, ESA-threatened species) does not violate the ESA and the Special Rule (a regulation adopted pursuant to the ESA). Among other things, the FWS must presume for all imports of elephants from Zimbabwe that all

the conditions of the Special Rule are met, including a finding that the "killing of the animal whose trophy is intended for import would enhance survival of the species."

46.     The Special Rule cannot overcome the statutory presumption of validity because it is a "regulation" to which the presumption applies.  The FWS must independently rebut the presumption of validity with an affirmative finding based on the facts available at the time of the importation.  It cannot rely on a purported inability to make a positive enhancement finding.

47.     The FWS promulgated the Special Rule in 1978 and amended it in 1992.  43 Fed. Reg. 20499 (May 12, 1978); 57 Fed. Reg. 35473 (Aug. 10, 1992).  That regulation established the condition that the take of the elephant to be imported must enhance the survival of the species.  57 Fed. Reg. 35473 (Aug. 10, 1992).  At the time that the FWS promulgated the Special Rule, all African elephants were listed on CITES Appendix I.  Thus, the Section 9(c)(2) presumption did not apply and the FWS could not be attempting, by adopting the Special Rule, to overcome a presumption that only applied to Appendix II species.  In addition, at the time that the FWS promulgated the Special Rule, the CITES resolution pertaining to the importation of Appendix I species contained a requirement for a determination, by the importing country, that the take of the animal intended for importation would enhance the survival of the species by financially benefitting elephant conservation.

> CITES requirements included a determination that the killing of elephants for
> sport-hunting enhances the survival of the species by providing financial support
> programs for elephant conservation. This requirement is retained in the final
> revised special rule for the import of sport-hunted trophies from threatened
> populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11. (Annex 1).  The FWS's reason for including the enhancement of survival requirement was the parallel obligation adopted by CITES.

48.     Since the FWS promulgated the Special Rule, CITES changed the listing status of African elephants from Zimbabwe from Appendix I to Appendix II.  Consequently, once a species was downlisted to Appendix II, CITES no longer imposed an enhancement of survival requirement for the species.  In addition, at the CITES Conference of the Parties ("COP") 9 in 1994, the parties to CITES amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement entirely from the resolution.  As a result, from that point forward, CITES no longer required an enhancement of survival determination for the importation of sport-hunted elephants from either Appendix I or Appendix II species and, therefore, did not require the finding for elephants from Zimbabwe.

49.     The FWS has made no change to its Special Rule's enhancement of survival finding requirement for the importation of elephants since including those requirements in the rule in 1992, despite the fact that the criteria upon which the FWS based its finding requirement have all disappeared.  The FWS has never explained why the retention of the enhancement requirement is necessary or advisable for the conservation of elephants listed on Appendix II of CITES, or offered the public an opportunity to comment on the retention of the enhancement of survival requirement, despite the fact that the FWS's justification for the imposition of this requirement no longer exists.

50.     The Special Rule also does not address ESA Section 9(c)(2) or its presumption. The adoption of the Special Rule preceded the listing of the elephant in Zimbabwe on CITES Appendix II.  Thus, at the time of the adoption of the Special Rule, the FWS had no reason to determine that the presumption found in Section 9(c)(2) was rebutted, as this presumption only applies to Appendix II species.

15

51.     When the CITES parties transferred African elephants in Zimbabwe to Appendix II in 1997, the FWS did not make an independent or new determination that the Section 9(c)(2) presumption was rebutted or, in particular, that the elephant Special Rule applied to overcome this presumption.  In fact, shortly after the transfer of these elephants to Appendix II, the FWS determined, in accordance with the Special Rule, that the sport-hunting of African elephants in Zimbabwe for the purposes of importation into the United States enhanced the survival of the species.  This conclusion undermines any argument that the Special Rule or anything else at the time rebutted the presumption that any imports from Zimbabwe did not violate the ESA or implementing regulations, including the Special Rule.

52.     The FWS has taken the position that in the absence of a Section 4(d) rule, the importation of a threatened, Appendix II species is allowed under the ESA because of Section 9(c)(2).  The FWS has, by regulation, applied to threatened species almost all of the Section 9 prohibitions applicable to endangered species and retained the authority to exempt some or all of the prohibitions by regulation applicable to a particular threatened species (*i.e.,* by special rule under Section 4(d)).  Thus, a threatened species for which the FWS has not adopted a special rule generally is more heavily regulated than a threatened species for which the FWS has adopted a special rule.  In the absence of a special rule, imports are allowed (presumed not to violate the ESA or regulations) for this more heavily regulated species under Section 9(c)(2).  But with a special rule in place, under the FWS's apparent interpretation that a special rule overcomes the presumption, imports are not allowed, or only allowed with conditions, for this less-heavily regulated species.  In the actions and decisions challenged in this Complaint, the FWS has applied this flawed interpretation to the importation of African elephants from Zimbabwe.

**B.      The Administrative Procedure Act ("APA")**

53.      The APA provides for judicial review of final agency action by persons "aggrieved" by the action.  5 U.S.C. § 702.

54.      It also provides standards applicable when a Federal agency proposes and adopts final rules and regulations.  Those standards include formal notice of the proposed rulemaking and an opportunity to participate in the rulemaking by providing comments through the submission of data, views and/or arguments.  5 U.S.C. § 553; *id.* § 551(4).

55.      The APA authorizes a reviewing court to

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
>> a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. § 706.

## FACTUAL BACKGROUND

56.      African elephants (loxodonta Africana) are found throughout much of Africa.  The majority of African elephants live in southern and eastern Africa, including in Zimbabwe.

57.      Currently, all African elephants are listed as threatened under the ESA.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  All other African elephants are listed on Appendix I of CITES.

58.      In 1977, the FWS was petitioned to list the African elephant as endangered under the ESA.  In 1978, the FWS listed all African elephants as threatened under the ESA.  43 Fed. Reg. 20499 (May 12, 1978).  With the listing, the FWS adopted a regulation that purported to regulate the importation of legally hunted African elephants.  50 C.F.R. § 17.40(e) ("Special Rule").

59.     At the seventh CITES COP in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of members of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved," the NDF.  CITES text, Article III.

60.     The FWS received another petition in 1989 to uplist the African elephant from threatened to endangered status, but rejected it.  57 Fed. Reg. 35473 (Aug. 10, 1992).  The FWS amended the 1978 Special Rule to include a provision that allowed the importation of sport-hunted elephants so long as CITES requirements were fulfilled and the elephant was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time, the parties to CITES required that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  The FWS promulgated the Special Rule to specifically require that same enhancement of survival requirement for the importation of a CITES Appendix I species.  *Id.*

61.     In the Federal Register notice accompanying the amendment to the Special Rule, the FWS also recognized that sport-hunting "provide[s] important revenues for elephant conservation to range states."  *Id.*

62.     The FWS's Division of Scientific Authority ("DSA") is the designated CITES "Scientific Authority" for the United States.  Before the FWS issues a permit for the importation of a CITES Appendix I species, DSA makes a non-detriment finding called an "advice."  The DSA gives the advice to the FWS's Division of Management Authority, which makes the decision whether or not to grant the permit.

63.     At least as early as 1993, the DSA issued general non-detriment advice for African elephants taken from Zimbabwe and South Africa.  Accordingly, the FWS allowed the importation of legally taken sport-hunted elephants into the United States.

64.     At the tenth COP in 1997, the parties to CITES transferred Zimbabwe's elephants from Appendix I to Appendix II.  The FWS adopted this change in 1998.  63 Fed. Reg. 63210 (Nov. 12, 1998); 62 Fed. Reg. 44627 (Aug. 22, 1997).  Since the parties to CITES determined that, for Appendix II species, the importing country need not make its own NDFs to authorize the importation of sport-hunted members of the species, the FWS has not made such findings for Zimbabwe's elephants and has not required hunters who import their legally sport-hunted African elephants from Zimbabwe to apply for or obtain an importation permit from the U.S. CITES text, Article IV; 62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).

65.     In a Federal Register notice published in 1997, the FWS announced that it had made an enhancement finding for African elephants from Zimbabwe.  The notice was based upon a July 2, 1997 "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe" ("1997 Zimbabwe Enhancement Finding").  The Federal Register notice stated that the 1997 Zimbabwe Enhancement Finding would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal Register." *Id.*

66.     Until April 4, 2014, the FWS allowed the importation of sport-hunted elephants from Zimbabwe.  During the eight year period from 2004 to 2011, 1,186 sport-hunted elephants were imported into the United States from Zimbabwe.

67.     Each year, in accordance with CITES, the range states establish a quota for the number of sport-hunted elephants that will be allowed to be exported from their country.  For

2014, Zimbabwe's quota was 500 elephants.  For 2015, Zimbabwe reduced the quota to 380 elephants.

68.     On April 4, 2014, the FWS announced a ban on the importation of sport-hunted elephants taken in Zimbabwe during the 2014 calendar year.

69.     On April 4, 2014, Federal Defendants sent a letter to the Zimbabwe Parks and Wildlife Management Authority, seeking information about the country's elephants.  This was Federal Defendants' first request for information from Zimbabwe in seven years.  On information and belief, during the period between August 22, 1997 and April 4, 2014, Federal Defendants had never indicated to Zimbabwe that they were considering banning the importation of Zimbabwe's elephants.

70.     On April 17, 2014, Zimbabwe responded and sent the information requested by Federal Defendants.

71.     On July 23, 2014, Federal Defendants announced their decision not to lift the importation ban for Zimbabwe ("July 2014 Zimbabwe Enhancement Finding").  The July 2014 Zimbabwe Enhancement Finding stated that the Federal Defendants were unable to make a finding that the importation of sport-hunted elephants from Zimbabwe enhances the survival of the species.

72.     In December 2014, Zimbabwe provided FWS with a substantial amount of additional factual materials concerning elephants in that country, including sport-hunting, anti-poaching, and conservation efforts.  Throughout 2014 and the first few months of 2015, groups and individuals provided FWS with substantial additional factual materials concerning elephants in Zimbabwe.

73.     On March 26, 2015, the FWS adopted and issued the "Enhancement Finding for

African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015."

("2015 Zimbabwe Enhancement Finding").  In it, the FWS determined that, "it is unable to make

a finding that the killing of elephants in Zimbabwe, on or after January 1, 2015, whose trophies

are intended for importation into the United States, would enhance the survival of the African

elephant in the wild."  (Page 1.)  Because of this purported inability to make this finding, the

FWS banned the importation of these elephants into the United States.

74.     The 2015 Zimbabwe Enhancement Finding did not fully analyze (1) the data

received from Zimbabwe and from other sources about the status of the elephant population and

anti-poaching efforts in Zimbabwe; (2) the role that the presence of sport hunters in the field

plays in reducing and discouraging the poaching of elephants in Zimbabwe; and (3) the

economic role that U.S. hunters play in providing Zimbabwe with the financial resources to

combat poaching.  In the 2015 Zimbabwe Enhancement Finding, the FWS did not sufficiently

consider the harm to elephant conservation that will result from the absence of U.S. hunters in

the field and the loss of revenue from U.S. hunters.  They also failed to consider that, instead of

being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S.

hunters reduces the number of elephants illegally killed in Zimbabwe.

75.     In the 2015 Zimbabwe Enhancement Finding, FWS made numerous factual

mistakes and inaccurate assumptions that undermine the basis for their decision that they could

not make an enhancement finding for the import of sport-hunted elephants from Zimbabwe for

2015 and beyond.  The factual mistakes and inaccurate assumptions found in the 2015

Zimbabwe Enhancement Finding include, but are not limited to, that:

(1) FWS received no information on the number of poaching crimes that are prosecuted or the average sentence or penalty (page 8).  In fact, the government of Zimbabwe provided information to the FWS that in 2013, 45 individuals were arrested and convicted for elephant poaching and trade in ivory/horn and that each person received between nine and sixteen years in jail (mandatory nine-year minimum sentence);

(2) FWS relied on a CITES report that noted that 65% of ivory trade between 2006 and 2011 occurred since 2009, "indicating that illegal ivory trade is increasing" (page 10).  This report only showed that more poaching occurred between 2009 and 2011 than the previous three years.  The report offered no data about poaching during the period from 2012 to 2013 – just prior to the commencement of the importation ban, during which poaching may have leveled off or decreased;

(3) FWS contended that Zimbabwe maintained a quota of 500 elephants for 2015 (pages 11 & 13) in spite of the fact that the government of Zimbabwe provided information to the FWS that it had reduced the elephant quota from 500 to 380 in 2015; and

(4) FWS contended that "the number of problem animals may equal or exceed the number of elephants taken through sport-hunting" (page 12), despite the fact that the government of Zimbabwe provided information to the FWS that specifically addressed and denied this assertion.

76.     In the 2015 Zimbabwe Enhancement Finding, the FWS largely disregarded information from Zimbabwe's Communal Areas Management Program for Indigenous Resources ("CAMPFIRE") because the FWS claimed it was unable to determine exactly how much revenue is generated for the CAMPFIRE program from elephant hunting, exactly how those funds are distributed within Zimbabwe, and exactly what portion of CAMPFIRE's budget

comes from US hunters (page 16).  For many years prior to the April 2014 enhancement finding, the FWS did not require such exact information.  The FWS arbitrarily determined that the information provided by CAMPFIRE does not show, along with other factors, that elephant hunting enhances the survival of the species.

77.     The 2015 Zimbabwe Enhancement Finding relied on an incorrect interpretation and application of the phrase "enhance the survival."  The FWS did not determine **whether** the hunting of the elephant bound for importation enhances the survival of the species; instead, it analyzed **how much** enhancement Federal Defendants believe sport hunting contributes.  FWS essentially required proof that the sport-hunting program would **ensure** the survival of the species, not just enhance it.

78.     In the 2014 findings and for this enhancement finding, Federal Defendants never established the standards upon which they measure enhancement of survival for African elephants and did not offer notice of, or an opportunity for the public to formally comment on, the standards or threshold necessary for a positive determination of enhancement for Zimbabwe's elephants, or on the facts giving rise to the determination.

79.     Because U.S. hunters are no longer permitted to import their African elephants legally sport-hunted in Zimbabwe in 2015, some have cancelled their elephant hunts in Zimbabwe, and many more will cancel their hunts.  Instead of having the desired effect – to reduce "additional" take of elephants – the ban is likely to have the opposite effect.  On information and belief, 1) the absence of hunters in the field is removing a major deterrent to poaching; 2) poachers, freed from the risk of being discovered by hunters, outfitters and their staff, are being encouraged to illegally take more rather than fewer elephants; and 3) local residents who have generated income for their families and communities from jobs with hunting

operations and other activities associated with the presence of U.S. hunters are losing that income.  As a consequence, the elephants that local residents protected for the benefit of the hunters are declining in value to local communities.  On information and belief, poachers who offer money for protection from authorities and for the illegal killing of elephants are taking the place of hunters as the source of revenue for local communities.  As a result, more elephants are at risk of being poached and fewer elephants are being protected.

80.     Sport hunters, with the help of their outfitters and professional hunters, donate much of the meat from the elephants they hunt to the local communities.  Poachers do not.  The loss of U.S. hunters means a loss of important food sources for local residents and increases the likelihood that local residents will kill the elephants to feed their families and communities.

81.     Because the U.S. has no authority to control the number of elephants that can be taken or exported from Zimbabwe, the outfitters and professional hunters who depend on elephant hunts for their livelihoods are attempting to sell the cancelled hunts to other, non-U.S. hunters who are still able to import elephants into their home countries.  While some of the elephant hunts will be resold, the revenue generated from U.S. hunters will not be fully recovered.  Although residents of the United States are not the only hunters who pursue elephants in Zimbabwe, U.S. citizens often pay the highest fees for elephant hunts and bring in the most additional revenue to local communities by buying associated goods and services while present for the hunt.  Without the same number of U.S. hunters willing to pay for an elephant hunt, the market price for elephant hunts has and will go down.  The higher the cost of a hunt, the greater the value the animal has to the local community.  As a result, deterring Americans from hunting elephants is lowering the value of the elephants.

82.     Some outfitters and professional hunting businesses in Zimbabwe have suffered and will continue to suffer economic loss from the importation bans that the United States has adopted.

83.     In some areas of Zimbabwe, elephant populations are too large for the local communities to tolerate.  Because elephants damage crops and interfere with agricultural and other businesses, they are deemed a nuisance rather than a conservation asset.  The FWS failed to fully or properly consider the carrying capacity of the various areas of Zimbabwe in concluding that sport-hunting does not enhance the survival of the species.

84.     Sport hunters bring value to the elephant and the revenue generated by sport hunting increases local tolerance for the species.  In addition, sport hunters help reduce overpopulations where they exist.  The loss of the U.S. hunter is eliminating local incentives to tolerate elephant behavior and is encouraging those troubled by elephants to kill the elephants themselves.

85.     Sport hunting discourages many reasons and sources for illegal elephant killings. The presence of U.S. hunters in the field serves as a deterrent to poaching, and in those situations, can reduce the number of elephants illegally taken.  On information and belief, the absence of U.S. hunters in the field leads to increased opportunities to poach elephants in Zimbabwe.

86.     The 2015 Importation Ban affects only U.S. residents who seek to import their sport-hunted elephants into the U.S.  The 2015 Importation Ban does not control the number of elephants taken in Zimbabwe each year.  Consequently, the 2015 Importation Ban punishes those who engage in hunting and who assist in anti-poaching efforts and other elephant conservation strategies, and has little if any beneficial impact on reducing the risks to elephant conservation.

87.     Federal Defendants implemented the 2015 Importation Ban for Zimbabwe to (1) discourage U.S. hunters from travelling to Zimbabwe to hunt elephants; (2) encourage U.S. hunters to cancel their planned elephant hunts in Zimbabwe; and (3) attempt to reduce the number of elephants harvested by U.S. hunters in Zimbabwe.

## CAUSES OF ACTION

### Count I - Violations of the ESA and APA:

**Federal Defendants Illegally Refused to Determine That the Importation of Sport-hunted Elephants from Zimbabwe Enhances the Survival of the Species**

88.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

89.     Federal Defendants continued the ban on the importation of legally hunted African elephants from Zimbabwe without fully analyzing, among other information:  (1) the data received from Zimbabwe and from other sources about the status of the elephant population and anti-poaching efforts in Zimbabwe; (2) the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe; and (3) the economic role that U.S. hunters play in providing Zimbabwe with the financial resources to combat poaching and advance conservation.

90.     Federal Defendants failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters reduces the number of elephants illegally killed in Zimbabwe.

91.     In the 2015 Zimbabwe Enhancement Finding, Federal Defendants made numerous factual mistakes and inaccurate assumptions that undermine the basis for their decision that they could not make an enhancement finding for the import of sport-hunted elephants from Zimbabwe for 2015 and beyond.

26

92.     In the 2015 Zimbabwe Enhancement Finding, Federal Defendants illegally concluded that they could not find that the importation of sport-hunted elephants in Zimbabwe enhances the survival of the species.  In its July 2, 1997 Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe, the Federal Defendants found that Zimbabwe's elephant conservation and management laws, plans, and strategies provided sufficient proof of enhancement and continued to be sufficient proof until April 4, 2014.  These are largely the same laws, plans, and strategies that Federal Defendants found to be insufficient proof in their 2015 Zimbabwe Enhancement Finding (and two findings in 2014).

93.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

94.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

95.     If this Court determines the 2015 Importation Ban to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe after January 1, 2015.  The remedies requested would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count II - Violations of the ESA and APA:

**Federal Defendants Applied an Illegal Standard for Determining Whether Importation of Sport-hunted Elephants from Zimbabwe Enhances the Survival of the Species**

96.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

97.     Federal Defendants failed to adhere to the purpose for which the FWS included the enhancement of survival requirement in the Special Rule for African elephant importation – to determine whether the sport hunting "enhances the survival of the species by providing

financial support programs for elephant conservation." 57 Fed. Reg. 35473, 35485 (Aug. 10,

1992). Instead of focusing on whether the sport hunting enhances the survival of the species,

Federal Defendants based its decision on *how much* sport hunting enhances elephant survival.

Federal Defendants determined that the degree to which sport-hunting enhances the survival was

inadequate. Federal Defendants inappropriately and illegally created and applied a standard that

required that sport hunting would have to ensure the survival of the elephant, rather than simply

enhance it.

98.     These actions were arbitrary and capricious, not in accordance with law, and an

abuse of discretion.

99.     This maladministration of the law by Federal Defendants violated the ESA and

the APA. 5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

100.     If this Court determines the 2015 Importation Ban to be illegal, the Court should

enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe after January 1,

2015. The remedies requested would redress the injuries of SCI/NRA and their respective

members, as outlined in this Complaint.

**Count III – Violations of the ESA and APA:**

**Federal Defendants Illegally Failed to Provide a Notice and Comment Opportunity on the
Importation Ban Decision**

101.     SCI/NRA reallege and incorporate by reference all the allegations of the

paragraphs preceding this Causes of Action section, as though fully set forth below.

102.     Federal Defendants continued the ban on the importation of legally hunted

African elephants from Zimbabwe without first notifying the public of a formal opportunity to

comment on the decision and/or giving the public that formal opportunity.

103.     Federal Defendants have never provided the public with (1) notice of the standards that they have established for an enhancement finding for Zimbabwe's elephants or (2) a formal opportunity to comment to demonstrate Zimbabwe's compliance with those standards.

104.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

105.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

106.     If this Court determines the 2015 Importation Ban to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe after January 1, 2015.  The remedies requested would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## Count IV - Violations of the ESA and APA:

### Federal Defendants Illegally Imposed and Retained an Enhancement of Survival Finding Requirement in the Special Rule Pertaining to Importation of Sport-hunted African Elephants on CITES Appendix II

107.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

108.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened, the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement finding is "necessary and advisable" for African elephant conservation.

109.     On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when all African elephants, including Zimbabwe's, were listed on CITES Appendix I and when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species.  Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) to match that same CITES requirement for Appendix I species.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species and in 1997 CITES downlisted African elephants from Zimbabwe to CITES Appendix II, Federal Defendants have never deleted the enhancement of survival finding requirement from § 17.40(e)(3)(iii).  In addition, Federal Defendants have never published a public notice justifying the enhancement of survival requirement for African elephants listed on CITES Appendix II and have never given the public the opportunity to comment on the requirement.

110.     Despite the fact that the status of the species changed and the FWS's original justification for the requirement disappeared, Federal Defendants have never provided proper justification, notice and an opportunity for comment on its decision to modify the basis for imposing an enhancement of survival requirement on an elephant population listed on CITES Appendix II.

111.     On March 26, 2015, Federal Defendants determined that they could not make an enhancement of survival finding.  This action caused harm to SCI/NRA and their members that did not exist when Federal Defendants first illegally retained the requirement in the Special Rule. This injury did not arise until April 4, 2014 at the earliest, when the FWS first banned imports of elephants from Zimbabwe.

112.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

113.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

114.     If this Court determines the 2015 Importation Ban to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe after January 1, 2015.  The remedies requested would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## Count V - Violation of the ESA and APA:

### Federal Defendants Did Not Address or Rebut the Section 9(c)(2) Presumption that Elephant Imports from Zimbabwe Would Not Violate the ESA or Implementing Regulations, Including the Special Rule

115.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

116.     African Elephants in Zimbabwe are listed as threatened under the ESA.  African Elephants in Zimbabwe are listed on Appendix II of CITES.

117.     The ESA states

**(2)** Any importation into the United States of fish or wildlife shall, if--

> **(A)** such fish or wildlife is not an endangered species listed pursuant to section 1533 of this title but is listed in Appendix II to the Convention,

> **(B)** the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,

> **(C)** the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and

> **(D)** such importation is not made in the course of a commercial activity,

be presumed to be an importation not in violation of any provision of this chapter *or any regulation issued pursuant to this chapter*.

16 U.S.C. § 1538(c)(2) (emphasis added).

118.     Due to Section 9(c)(2) of the ESA (16 U.S.C. § 1538(c)(2)), the FWS must presume that any importation of sport-hunted elephants from Zimbabwe (Appendix II, ESA-threatened species) does not violate the ESA and the Special Rule (a regulation adopted pursuant to the ESA).  Among other things, the FWS must presume for all imports of elephants from Zimbabwe that all the conditions of the Special Rule are met, including a finding that the "killing of the animal whose trophy is intended for import would enhance survival of the species."  The Special Rule itself cannot overcome the presumption of validity because it is a "regulation" to which the presumption applies.  The FWS must independently rebut the presumption of validity with an affirmative finding based on the facts available at the time of the importation.  It cannot rely on a purported inability to make a positive enhancement finding.

119.     The FWS failed to take any of these actions.

120.     The FWS adopted the elephant Special Rule in 1978 and amended it in 1992.  43 Fed. Reg. 20499 (May 12, 1978); 57 Fed. Reg. 35473 (Aug. 10, 1992).  The Special Rule does not address Section 9(c)(2) or its presumption.  The adoption of the Special Rule preceded the listing of the elephant in Zimbabwe on CITES Appendix II.  Thus, assuming that a "special rule" could rebut the presumption, at the time of the adoption of the elephant Special Rule, the FWS had no reason to determine that the presumption found in Section 9(c)(2) was rebutted, as this presumption only applies to Appendix II species.  In any event, the Special Rule does not rebut the presumption.

121.     When the CITES parties transferred African elephants in Zimbabwe to Appendix II in 1997, the FWS did not make an independent or new determination that the Section 9(c)(2)

presumption was rebutted or, in particular, that the elephant Special Rule applied to overcome this presumption.  In fact, shortly after the transfer of these elephants to Appendix II, the FWS determined that the sport-hunting of African elephants in Zimbabwe for the purposes of importation into the United States enhanced the survival of the species.  This conclusion undermines any argument that the Special Rule or anything else at the time rebutted the presumption that any imports from Zimbabwe did not violate the ESA or implementing regulations, including the Special Rule.

122.    The FWS's position creates the non-sensible situation in which a species for which the FWS has not adopted a special rule can be imported without restrictions, but the importation of a species for which the FWS has adopted a special rule is restricted.  The FWS has taken the position that in the absence of a Section 4(d) rule (*i.e.,* a special rule), the importation of a threatened, Appendix II species is allowed under the ESA because of Section 9(c)(2).  The FWS has, by regulation, applied to threatened species almost all of the Section 9 prohibitions applicable to endangered species and retained the authority to exempt some or all of the prohibitions by regulation applicable to a particular threatened species (*i.e.,* by special rule under Section 4(d)).  Thus, a threatened species for which the FWS has not adopted a special rule generally is more heavily regulated than a threatened species for which the FWS has adopted a special rule that authorizes the commission of at least some otherwise prohibited acts.  For the more heavily regulated species, however, imports are allowed (presumed not to violate the ESA or regulations) under Section 9(c)(2) because, under the FWS's theory, no special rule rebuts the presumption.  On the other hand, with a special rule in place, under the FWS's apparent interpretation that a special rule overcomes the presumption, imports are not allowed or only allowed with conditions for the less-heavily regulated species.  In the actions and decisions

challenged in this Complaint, the FWS has applied this flawed interpretation to the importation of African elephants from Zimbabwe and illegally banned imports without rebutting the statutory presumption.

123.    These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

124.    This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538.

125.    If this Court determines the 2015 Importation Ban to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe after January 1, 2015.  The remedies requested would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## PRAYER FOR RELIEF

For the reasons stated above, SCI/NRA respectfully request that the Court grant the following relief:

1.    Declare that Federal Defendants violated the ESA and the APA in banning the importation of African elephants legally hunted in Zimbabwe after January 1, 2015.

2.    Declare that Federal Defendants' decision to suspend the importation of legally sport-hunted African elephants from Zimbabwe on March 26, 2015, was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the import ban decision was invalid.

3.    Enjoin the Federal Defendants from continuing and/or enforcing the ban on importation of elephants legally sport hunted in Zimbabwe in 2015 and beyond.

4.    Award SCI/NRA the costs of litigation, including reasonable attorneys' fees.

5.    Award SCI/NRA such other relief that is just and proper.

Dated this 30th day of June, 2015.

Respectfully submitted,

/s/ Anna M. Seidman

Anna M. Seidman, Esq. (DC Bar No. 417091)
Douglas S. Burdin, Esq. (DC Bar No. 434107)
Jeremy E. Clare, Esq. (DC Bar No. 1015688)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff*
*Safari Club International*

Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff*
*National Rifle Association of America*