MICHAEL RAY HARRIS (DC Bar # CO0049)
JENNIFER BARNES (DC Bar # CO0056)
Friends of Animals
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Telephone: (720) 949-7791
michaelharris@friendsofanimals.org
jenniferbarnes@friendsofanimals.org

*Attorneys for Proposed Defendant-Intervenors*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-CV-00670 (RCL) |
| | ) | |
| SALLY JEWELL, *et al.*, | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| FRIENDS OF ANIMALS, | ) | |
| 777 Post Road, Suite 205 | ) | |
| Darien, CT 06820; | ) | |
| ZIMBABWE CONSERVATION TASK FORCE | ) | |
| 3 Fairbairn Drive, Mount Pleasant, Harare, | ) | |
| Zimbabwe | ) | |
| | ) | |
| Proposed Defendant-Intervenors. | ) | |

## DECLARATION OF PRISCILLA FERAL IN SUPPORT OF FRIENDS OF ANIMALS AND ZIMBABWE CONSERVATION TASK FORCE'S MOTION TO INTERVENE AS DEFENDANTS

I, Priscilla Feral, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge. If called as a witness, I could and would testify to these facts. As to those matters that reflect an opinion, they reflect my personal opinion and judgment on the matter.

2.      I am the president of Friends of Animals ("FoA"). FoA is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. FoA seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living and domestic animals. FoA engages in a variety of advocacy programs in support of these goals. FoA informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine called Act'ionLine, its website, and other reports. FoA has published articles and information advocating for the protection of endangered and threatened species so that they can live unfettered in their natural habitats.  FoA staff regularly consults and communicates with experts, scientists, and organizations worldwide. FoA has approximately 200,000 journal subscribers and members in the United States and internationally.  FoA has a long-standing commitment to protecting animals imperiled due to poaching, sport-hunting, and other animal-exploitation markets.

3.      In my capacity as President of FoA, I oversee FoA's wildlife conservation programs both in the United States and internationally. One such program is FoA's work to help protect threatened and endangered African wildlife species.

4.      Since 1991, FoA has been closely involved in species conservation and recovery projects in Africa. In 1991, FoA received a U.S. Fish and Wildlife Service Grant that it used the for an Anti-Poaching project, whereby we refurbished and shipped forty-one vehicles from excess U.S. Department of Defense repositories to Senegal, Kenya, Mali, Tanzania, Chad, Ghana, Togo, and Gambia. From 1993-1998, FoA funded anti-poaching efforts that included Senegal ranger salaries, M880 vehicles, motorbikes, field equipment, and training. In 1996, FoA delivered a Zenair airplane to the Ghana Wildlife service for the anti-poaching project, as well as trained pilots to fly the planes. In 1999, FoA funded Senegal airport surveillance for illegal wildlife trade and provided ranger salaries, night vision equipment, and vehicle parts. From 2001-2002, as part of its Anti-Poaching Project,

FoA delivered a Piper Super Cub aircraft, a Decathlon Airplane, a Mercedes Uni-mog, and a Toyota Land Cruiser to Kenya and Senegal. FoA also provided GPS units, field equipment, and ranger training to Kenya and Senegal. The vehicles that FoA funded are still being used to fight poaching of endangered species in Africa. From 2001-2005, FoA funded Janis Carter's multi-year chimpanzee survey in Senegal. Starting in 2006, FoA started ongoing work on a Senegal wells project with Janis Carter to stop conflict between chimpanzees and humans over water. Since 2008, FoA has supported the Chimpanzee Rehabilitation Project's operating costs in the Gambia through a partnership with the Gambia Government and Janis Carter at the River Gambia National Park. In 2000, FoA started funding recovery efforts in Senegal for three species of African antelope, including habitat rehabilitation in Ferlo National Park, fencing, ranger post, and supplementary feed assistance. In 2013, FoA contributed $66,000 to the Oryx Fence Project. Since 2000, FoA has raised and contributed over $100,000 to wildlife habitat protection and anti-poaching efforts in Africa. FoA is also engaged in litigation regarding sport hunting of three African antelope species. *Safari Club International v. Jewell*, No. 13-5300 (D.C. Cir.); *Friends of Animals v. Jewell,* Civ. No. 14-0357(BAH) (D.D.C.); *Friends of Animals v. Ashe*, Civ. No. 13-01580 (D.D.C.). FoA continues efforts to support African wildlife, preserve their habitat, and protect them from poaching and legal hunting by American and European trophy hunters.

5.     In particular, FoA members and staff actively seek protection for the African elephant. FoA has been actively involved in African elephant conservation for more than twenty years. FoA drafted the proposal that the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") employed to impose a worldwide ban on trade in elephant ivory, and successfully lobbied against proposals to grant ivory quotas to the southern African countries of Zimbabwe, Namibia, Botswana and South Africa at 11th Conference of the Parties held in Nairobi, Kenya, in April 2000.[1]

---

[1] The ban was partially lifted at the 12th Conference of the Parties to CITES in Santiago, Chile.

6.     I have taken several trips to Africa to work on the conservation of threatened and endangered wildlife, as well as to observe and photograph the wildlife there. On one occasion I traveled to Zimbabwe as an NGO and to lobby delegates at the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES).

7.     Additionally, I intend to ensure that a member of the FoA staff or I continue our regular travels to Africa to see all species our members support and protect, including African elephants. In fact, I have plans to go to Africa every year between November and January to check on the recovery efforts. FoA is also currently establishing an African Wildlife Advisory Committee, which will focus on conserving wildlife, such as African elephants, in their native ranges.

8.     FoA actively opposes sport hunting of African elephants as well as other threatened and endangered species, and has invested substantial time and resources in raising public awareness about the negative impacts of sport hunting, as well as the negative impacts of legalizing the trade or transport of sport-hunted trophies.

9.     Allowing the importation of sport hunted trophies directly harms the animals in the wild, as well as aids in the illegal trafficking of these animals and their parts. Decades of work and research on threatened and endangered animals has confirmed that sport hunting has a direct impact on the ability of the population to recover and thrive. New research and information continues to confirm this causal relationship.

10.     Thus, FoA works to educate the public about the reasons why the theory put forth by some, that sport-hunting for profit helps, is false.  To the contrary, allowing ivory from sport hunted trophies can "create a veneer of legality for the illegal ivory trade and allow illicit products to enter into commerce - the wildlife equivalent of money laundering." Beth Allgood, Marina Ratchford & Peter LaFontaine, *U.S. Ivory Trade: Can A Crackdown On Trafficking Save The Last Titan?* 20 Animal L. 27, 68-69 (2013) (attached hereto as Exhibit A).

11.     Laundering is when an illegally obtained object—money, art, artifacts, or animals—goes through a process to "cleanse" its origin to make it appear legally obtained. Animal laundering is the act of illegally trading, trafficking, or smuggling both live animals and animal parts. It "capitalizes on an asymmetric economic relationship between the source, usually developing countries with fragile and under-funded enforcement capacity… and the demand, wealthy countries with purchasing power." Dener Giovanini, *Taking Animal Trafficking Out of the Shadows*, 1(2) Innovations 25, 28 (2006) (attached hereto as Exhibit B). The United States is typically on the receiving end of laundered animals. Experts estimate that the illegal wildlife trafficking business is a multi-billion dollar industry.

12.     Some hunters argue that sport hunting provides conservation incentives and financial resources for the recovery of these animals. These groups argue that profit made from the hunting could go towards funding conservation measures or that allowing animals and their trophies to enter a legal market reduces the demand for poaching. *See* Erwin Bulte & Richard Damania, A*n Economic Assessment of Wildlife Farming and Conservation*, 19(4) Conservation Biology 1222, 1223-24 (2005) (attached hereto as Exhibit C). However, research to validate this theory does not exist, and globally there are an increasing number of reports suggesting that the impact of sport hunting is far more negative. *See e.g.* Jessica A. Lyons & Daniel J.D. Natusuch, *Wildlife laundering through breeding farms; Illegal harvest, population declines and a means of regulating the trade of green pythons (Morelia viridis) from Indonesia,* Biological Conservation 1 (2011) (attached as Exhibit D); Annecoos Wiersema, *Uncertainty and Markets for Endangered Species under CITES*, 22(3) RECIEL 239-50 (2013) (attached as Exhibit E). Even proponents of trophy hunting as a conservation tool have noted, "[c]orruption affects the trophy hunting industry in Africa on multiple levels." *See* Lindsey et al., *Economic and Conservation Significance of the Trophy Hunting Industry in Sub-Saharan Africa* (2007) (attached as Exhibit G).

13.     There is a profitable market in raw tusks, supplied by hunters who have imported the tusks as sport-hunted trophies. These tusks, in turn, support a market for ivory products.  Exhibit A at 48-49. Thus, hunting trophies facilitate a significant amount of ivory trade in the U.S., which remains a large consumer of elephant ivory products. *Id.* at 67.

14.     Moreover, the availability of legally hunted ivory may confuse consumers by sending a signal that these species are no longer endangered, or it may reduce the stigma associated with consuming or hunting these imperiled species. Exhibit C at 1231. Additionally, a legal market may actually increase demand in the illegal market because prices for illegally-caught animals can go up as legal demand increases. Carolyn Fischer, *The Complex Interactions of Markets for Endangered Species Products*, 48 J. Envtl. Econ. & Mgmt., 926, 930 (2004) (attached hereto as Exhibit F).

15.     FoA has been pressing its concerns over the impact that sport hunting can have on recovery of wild African species in both court and in comments submitted to FWS since at least 1995. Thanks to our persistence, as well as the emerging scientific literature to validate the laundering theory, in 2013, FWS acknowledged that a separate legal status – allowing for the hunt of some animals and not others for endangered species – does in fact pose a risk to wild populations. Indeed, FWS specifically found that captive African antelope in the U.S. can help drive "increased trade in 'laundered' wild caught specimens to feed U.S. or foreign demand." 78 Fed. Reg. 33793 (June 5, 2013).

16.     Through my experience with the recovery of African wildlife, I have learned that the continued protection of the species depends on thinking and working holistically in managing both the physical protections for these animals **and** the laws and regulations that have the ability to either stimulate or prevent the trade of these animals.

17.     While FoA and I have taken measure to control poaching in Africa, it is in the United States where we see one of the greatest potential to curb the demand for ivory, and reduce poaching. The demand for animals creates, and is therefore the cause, of poaching.

Hunting trophies facilitate a significant amount of ivory trade in the U.S., which remains a large consumer of elephant ivory products. Exhibit A at 67.

18.     Lack of the fullest protection for all members of the threatened or endangered species undermines their protection, and allows them to be treated as a commodity, both of which adversely affect FoA and its members' interests in these species as it facilitates their decline.

19.     FWS's current suspension on the import of sport hunted trophies prevents new shipments of ivory from entering the stream of domestic commerce. This promotes FoA's interest in the animals and reduces the chance of their extinction in the near future.

20.     On the other hand, plaintiffs' requested relief – unrestricted importation of sport hunted trophies – would severely undermine FoA's effort to protect the species. FoA has spent considerable time and effort: (1) investigating and reporting on sport-hunting of African wildlife; (2) creating and managing a website and an e-mail/social media alert system; (3) promoting outreach efforts to help raise awareness of sport-hunting to the public and lawmakers; (4) commenting on dozens of applications for permits from FWS to allow the sport-hunting of threatened and endangered animals; and (5) responding to attacks from the hunting industry about our work. If plaintiffs succeed in this litigation, FoA would have to dedicate even more time to these projects and divert resources from other conservation efforts, such as habitat protection.

21.     FoA, its staff, its members, and I have serious and long-term educational, scientific, and moral interest in the elephants, which are the subject of this litigation.  As such, FoA has a substantial amount at stake in this litigation and could assist in this Court in understanding the merits of FWS's findings that sport hunting in Zimbabwe does not enhance the survival of the species.

22.     In accordance with 28 U.S.C. § 1746 and under penalty of perjury, I swear that the foregoing is true and correct. Executed at 777 Post Road, Darien, Connecticut

Date: _Jan. 5, 2015_

Priscilla Feral

**EXHIBIT A**

# ARTICLE: U.S. IVORY TRADE: CAN A CRACKDOWN ON TRAFFICKING SAVE THE LAST TITAN?

**Reporter**: 20 Animal L. 27 (2013)
**Author:** By Beth Allgood, Marina Ratchford and Peter LaFontaine[1]

## Highlight

How shockingly destructive and historically shameful it would be if we did nothing while a great species was criminally slaughtered into extinction. And yet, here we are in the midst of one of the most tragic and outrageous assaults on our shared inheritance that I have seen in my lifetime - where an elephant's dead ivory is prized over its living condition, where corruption feeds on its body and soul, and where money only makes matters worse.

- Senator John Kerry[2]

Rampant poaching has put African elephants on the verge of extinction in the wild, and the United States (U.S.) is complicit in this crisis. Despite the best efforts of federal agencies, porous national borders, legal loopholes, and deep-seated difficulties in law enforcement make the U.S. a major market for illicit ivory. While the White House, the United Nations, and the European Union, along with other voices, are sounding alarms, bold and concrete actions have been slow in coming. The U.S., in particular, is only beginning to acknowledge its own role in the slaughter, and still relies on a patchwork of inadequate laws and regulations to control its domestic ivory trade. The U.S. must quickly put a halt to its domestic ivory trade by adequately funding customs and wildlife inspectors and addressing the problem at every step along the chain of destruction - from the poachers and militants on the ground in Africa, to the international criminal syndicates underwriting the logistics of trafficking, to the consumers whose demand drives the crisis to ever-greater depths. This Article, analyzing never-before released data from the U.S. Fish and Wildlife Service, shines a light on the scope and scale of the underground trade in the U.S., unpacks the problems facing regulators and enforcement officials, and builds the case for a total ban on the commercial ivory trade, which threatens the existence of one of the planet's greatest icons.

[1] © Beth Allgood, Marina Ratchford, and Peter LaFontaine 2013. Beth Allgood is the U.S. Campaigns Director for the International Fund for Animal Welfare (IFAW), where she manages the program portfolio and focuses on the role of the U.S. in global wildlife conservation and animal welfare issues. Marina Ratchford is an international consultant working with nonprofit organizations on wildlife conservation issues. She previously served as the Branch Chief for Latin America and the Caribbean at the U.S. Fish and Wildlife Service (FWS). Peter LaFontaine is a Campaigns Officer for IFAW in Washington, D.C., where he focuses on federal affairs and endangered species issues. The authors would like to thank the FWS Office of Law Enforcement for providing the data used to analyze legal and illegal ivory trade in this Article, and the FWS Office of International Affairs for their review of several elements of this Article. In addition, the authors are grateful for the FWS's valuable review of the data analysis. Thanks also goes to IFAW's Tara Zuardo, Paul Todd, and Nathan Herschler, for researching and writing several memos that informed much of the legal analysis. Finally, credit and appreciation is due to Anna Harbom, Kate Large, Bette Rubin, and Lesley MacGregor, who acted as invaluable research assistants during the development of this Article. For questions about data analysis, please contact the authors at plafontaine@ifaw.org.

[2] Sen. Comm. on For. Rel., Ivory and Insecurity: The Global Implications of Poaching in Africa, 112th Cong. 1 (May 24, 2012) (opening statement of Sen. John F. Kerry) (available at http://www.gpo.gov/fdsys/pkg/CHRG-112shrg76689/pdf/CHRG-112shrg 76689.pdf [http://perma.cc/0JAJJZjSQAL] (accessed Nov. 17, 2013)).

[*29]

# I. INTRODUCTION [2]

 At the turn of the twentieth century, countless herds of elephants roamed the landscapes of Africa and the Indian subcontinent, icons of evolution and the abundance of nature. [3] Today, although elephants remain one of the Earth's most charismatic and majestic animals, their populations have crashed to a fraction of historic numbers as poachers and organized crime syndicates lay siege. [4] The statistics are grim: fewer than half a million elephants may now exist across the entire continent, down from an estimated ten million in 1930. [5] Moreover, "every [fifteen] minutes, on average, an elephant is killed illegally in Africa to feed an insatiable demand for ivory, principally from Asia." [6]  [*30]  And in the last decade, central Africa's total population of forest elephants has fallen 62%, [7] with 11,000 forest elephants killed in one park alone - Gabon's Minkebe National Park. [8] This kill rate exceeds the birth rate - a trend that, if not reversed, could lead to extinction of the African elephant from some regions in the next few years. [9]

It is easy to dismiss this tragedy as the fault of a growing Asian middle class hungry for status symbols. However, as with so many other species lost to memory, we will only find the culprit by looking in our collective mirror. While China is generally considered to be the prime market for illegal ivory, the United States (U.S.) also has a thriving trade in ivory - ranked second in the world according to the

[2] For a list of acronyms used throughout this Article, consult infra appendix A.

[3]   See e.g. Born Free Found., Elephants under Threat, http://www.bornfree.org.uk/campaigns/elephants/elephants-under-threat [http://perma.cc/0GgK2R6Fr1W] (accessed Nov. 17, 2013) (discussing the extraordinary drop in elephant populations in Africa and Asia from 1900 to present).

[4]  Wynne Parry, LiveScience, Mob Wipes Out Elephants, Tigers, and Rhinos, http://www.livescience.com/15263-organized-crime-endangered-species-wildlife.html [http://perma.cc/0Z34Ce89KeC] (July 27, 2011) (accessed Nov. 17, 2013).

[5]   Elephant Database, 2012 Continental Totals ("2013 AFRICA" Analysis), http://www.elephantdatabase.org/preview report/2013 africa/Loxodonta africana/2012/Africa [http://perma.cc/05SKV9NEm8v] (accessed Nov. 17, 2013); E/The Envtl. Mag., Are Elephant Populations Stable These Days? Sci. Am. (Apr. 9, 2009) (available at http://www.scientificamerican.com/article.cfm?id=are-elephant-populations-stable [http://perma.cc/0zbziWRC2Hm] (accessed Nov. 17, 2013)).

[6]   Animal Welfare Inst., Elephant Slaughter Escalates as Illegal Ivory Market Thrives, AWI Quarterly (Winter 2013) (available at http://awionline.org/awi-quarterly/2013-winter/elephant-slaughter-escalates-illegal-ivory-market-thrives [http://perma.cc/09rQFigmhXC] (accessed Nov. 17, 2013)); see also Carl Safina, Blood Ivory, N.Y. Times (Feb. 11, 2013) (available at http://www.nytimes.com/2013/02/12/opinion/global/blood-ivory.html [http://perma.cc/0rQA8gTAdWy] (accessed Nov. 17, 2013)) (pointing out that "if the thirty-eight tons of tusks seized in 2011 represented 10% of illegal ivory, it translates to something over 40,000 elephants killed annually - an elephant every fifteen minutes").

[7]   Naharnet Newsdesk, NGOs: C. Africa Elephant Population Down 62% in 10 Years, http://www.naharnet.com/stories/en/81060 [http://perma.cc/0Hve8AUj6PZ] (Apr. 27, 2013) (accessed Nov. 17, 2013).

[8]   Jean Rovys Dabany, Poachers Kill 11,000 Gabon Elephants in under a Decade, Reuters (Feb. 6, 2013) (available at http://www.reuters.com/article/2013/02/06/us-ga bon-elephants-idUSBRE9150HG20130206 [http://perma.cc/06N5Qy9rxNE] (accessed Nov. 17, 2013)).

[9]  Animal Welfare Inst., supra n. 6.

most recent global survey. [10] And elephants are just one of the many species threatened by the $ 20 billion illegal wildlife trade, along with iconic animals like rhinos, tigers, and chimpanzees. [11]

The impact of the U.S. demand for ivory on the poaching crisis in Africa and Asia is not entirely clear. Inadequate, confusing, and unenforceable laws have made it difficult to tell the difference between legal and illegal ivory in the U.S. market. [12] The burden on the U.S. government to prove that someone is knowingly selling illegal ivory has made prosecution difficult and rarely pursued. [13] This has led to a lack of data on how much of the ivory that is sold on the legal market is actually illegal ivory removed from poached elephants.

[*31]  It is possible, however, to gauge some metrics of American involvement. The authors reviewed both the seizure data provided by the U.S. Fish and Wildlife Service (FWS) through Freedom of Information Act requests and the seizures that resulted from special U.S. government operations related to illegal ivory trade, to determine that a substantial amount of illegal ivory is being intercepted in the U.S. [14] According to the data on border seizures analyzed in this Article, and using INTERPOL's assessment that seized wildlife represents only 10% of actual illegal trade, the authors estimate that the number of combined illegal ivory imports and exports in the U.S. is 3,125 specimens per year. [15] In addition to border seizures, some FWS investigations and special operations highlighted in this Article indicate that the ivory market in the U.S. involves sophisticated schemes, including operatives and partners in the black market ivory trade from multiple countries. [16]

The U.S. has several important statutes governing the ivory trade, including the Endangered Species Act [17] and the African Elephant Conservation Act. [18] However, a complex system of loopholes and exceptions muddies the waters, and once ivory crosses our borders - whether legally or not - current

---

10  Max Fisher, An Alarming Map of the Global Ivory Trade That Killed 17,000 Elephants in One Year, Wash. Post (Mar. 15, 2013) (available at http://www.washington     post.com/blogs/worldviews/wp/2013/03/15/an-alarming-map-of-the-global-ivory-trade-that-killed-17000-elephants-in-one-year [http://perma.cc/0FbEksNYaL3] (accessed Nov. 17, 2013)).

11  See Jeremy Haken, Transnational Crime in the Developing World 11-12, 39-40, 44 (Global Fin. Integrity Feb. 2011) (available at http://www.gfintegrity.org/storage/gfip/documents/reports/transcrime/gfi transnational crime web.pdf [http://perma.cc/0nGNwqkvKc2] (accessed Nov. 17, 2013)) (calculating illegal wildlife trade at as high as $ 26.5 billion: unreported and unregulated fisheries trade estimated between $ 4.2 billion and $ 9.5 billion per year; illegal timber trade as much as $ 7 billion per year; and illicit wildlife trafficking (excluding fisheries and timber) between $ 7.8 billion and $ 10 billion per year).

12  See infra pt. IV (discussing the loopholes that make regulation of the U.S. ivory market difficult).

13  See infra pt. VII (analyzing why prosecution is so difficult and discussing a proposed solution to ease the prosecution's burden).

14  See infra pt. VI (discussing the seizure data provided by the FWS).

15  Infra pt. VI, tbls. 5, 9; see Bryan Christy, Ivory Worship, Natl. Geographic (Oct. 2012) (available at http://ngm.nationalgeographic.com/2012/10/ivory/christy-text [http://perma.cc/0PW44CaHkaX] (accessed Nov. 17, 2013)) (noting that INTERPOL utilizes a rule of thumb "that says seized contraband equals 10% of actual smuggling"); see also Animal Welfare Inst., supra n. 6 ("Customs officers in industrialized countries candidly acknowledge that a seizure rate of 10 percent is considered good for 'general goods' contraband - which includes ivory. (Higher success rates are recorded in intercepting targeted contraband, such as drugs and weapons, which have dedicated teams with specialized training and high-tech detection equipment.)").

16  See infra pt. VI (discussing the trade of ivory on the black market).

17  Endangered Species Act of 1973, 16 U.S.C.§§1531-1544 (2006).

18  African Elephant Conservation Act of 1988, 16 U.S.C.§§4201-4246 (2006).

regulations make it almost impossible to discern legal merchandise from illegal products. [19] Making matters worse, the U.S. is not compliant with the international standards set by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) - the governing body for wildlife trade - to regulate our domestic market. [20] The authors have analyzed these current laws and identified their major weaknesses, as well as the difficulties these loopholes and lack of resources present for adequate enforcement.

[*32]   Despite the paucity of detailed data, it is clear that the U.S. is contributing to the elephant poaching crisis, [21] leaving the question of how we can best reform our laws and policies to stem the tide of wildlife crime. The authors' conclusion is straightforward: the legal trade in ivory has created an unmanageable situation for law enforcement and wildlife officials. The authors analyze several options to address this problem and propose a preferred policy solution: a ban on all commerce in ivory in the U.S. until elephant populations are no longer threatened. The impact of a comprehensive domestic ban would reach beyond our borders to China and other major drivers of the crisis because the United States' status as a global leader still carries significant weight on this issue. [22]

Fortunately, momentum appears to be building for action. President Obama, in a major speech in Tanzania in July 2013, announced an executive order that commits his administration to several important steps. These steps include new financial and technical assistance to African countries to combat poaching and the formulation of a comprehensive U.S. national strategy on wildlife trafficking - to be unveiled in 2014 - that will include both domestic and international solutions. [23] Kicking off the Administration's new efforts in November 2013, the FWS crushed their nearly 6-ton stockpile of seized illegal ivory, with the stated goal of sending "a clear message that the United States will not tolerate ivory trafficking and the toll it is taking on elephant populations, particularly in Africa." [24]

And while American leadership is crucial, other stakeholders are also starting to make important moves. In September 2013, seven African countries and several major international conservation groups made a three-year, $ 80 million Clinton Global Initiative Commitment to Action to catalyze increased global efforts to stop the slaughter of Africa's elephants for their ivory tusks by addressing poaching, trafficking, and demand. [25] And on that same day, heads of state and ministers at the United

---

[19]  See infra pt. IV (discussing the problem of discerning legal from illegal ivory in the U.S.).

[20]  Douglas F. Williamson, Tackling the Ivories: The Status of the US Trade in Elephant and Hippo Ivory 35-36 (TRAFFIC N. Am., World Wildlife Fund 2004) (available at http://assets.worldwildlife.org/publications/425/files/original/Tackling the Ivories .pdf [http://perma.cc/0WfWjjqD6dU] (accessed Nov. 17, 2013)).

[21]  Env. News Serv., U.S. to Crush Six Tons of Contraband Elephant Ivory, http://ens-newswire.com/2013/09/09/u-s-to-crush-six-tons-of-contraband-elephant-ivory [http:
//perma.cc/0VsM6y7qH59] (Sept. 9, 2013) (accessed Nov. 17, 2013).

[22]  Id. ("The U.S.'s leadership two decades ago in limiting domestic trade in ivory prompted action from others around the world … ." (internal quotations omitted)).

[23]  Exec. Or. 13648, 78 Fed. Reg. 40621 (July 5, 2013).

[24]  U.S. Fish & Wildlife Serv., Destruction of U.S. Ivory Stockpile: Questions & Answers 1 (Sept. 2013) (available at http://www.fws.gov/international/pdf/factsheet-ivory-crush-qa.pdf [http://perma.cc/0xcKvCGsbSZ] (accessed Nov. 17, 2013)).

[25]  The Commitment to Action includes the following nations: Botswana, Cote D'Ivoire, Gabon, Kenya, South Sudan, Malawi, and Uganda. Nongovernmental organization partners include the following: African Parks Network, African Wildlife Foundation, Association of Zoos and Aquariums, Conservation International, Frankfurt Zoological Society, Freeland Foundation, Howard Buffett

Nations called for a concerted international [*33] crackdown on wildlife crime. [26] The authors hope this Article serves to inform policymakers and advance the establishing of policies that will help stabilize elephant populations and stop the illegal and inhumane slaughter of elephants.

This Article is divided into eight parts. Part II provides background on the global elephant-poaching crisis. Part III discusses the status of current international and U.S. laws related to the ivory trade. Part IV exposes the difficulties in enforcing the current U.S. laws. Part V presents an analysis of the U.S. ivory market and illegal trade. Part VI analyzes illegal trade in ivory based on seizure data from wildlife inspections at the U.S. border as well as special investigations and operations. Part VII provides recommendations for improving the current situation. Finally, Part VIII provides the conclusion.

## II. BACKGROUND ON THE GLOBAL ELEPHANT POACHING CRISIS [27]

As reported extensively by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and multiple other international organizations, illegal ivory trade activity worldwide is at its highest level in two decades and continues to surge relentlessly, having more than doubled since 2007 and more than tripled since 1998. [28] In 2011, almost 40 tons of smuggled ivory were seized; [29] in December 2012, a 6-ton seizure in Malaysia was one of the largest seizures on record; [30] and in July 2013, 4.5 tons of ivory were confiscated in two separate operations over the span

Foundation, International Conservation Caucus Foundation, International Fund for Animal Welfare, National Geographic, Save the Elephants, the wildlife traffic monitoring network TRAFFIC, WildAid, Wildlife Conservation Society, WildLifeDirect, and World Wildlife Fund. Env. News Serv., Clinton Global Partners Commit $ 80M to Save Africa's Elephants, http://ens-newswire.com/2013/09/26/clinton-global-partners-commit-80m-to-save-africas-elephants [http://perma.cc/4KHH-GUX4] (Sept. 26, 2013) (accessed Nov. 17, 2013).

26  Env. News Serv., Heads of State Call for UN Crackdown on Wildlife Crime, http://ens-newswire.com/2013/09/26/heads-of-state-call-for-un-crackdown-on-wildlife-crime [http://perma.cc/0aqrigtr68n] (Sept. 26, 2013) (accessed Nov. 17, 2013).

27  For more information on the global elephant poaching crisis, as well as the links between ivory trafficking and global criminal and terror activity, consult Intl. Fund for Animal Welfare, Criminal Nature: The Global Security Implications of the Illegal Wildlife Trade 1-20, 22-26 (Intl. Fund for Animal Welfare 2013) (available at http://www.ifaw.org/sites/default/files/IFAW-Criminal-Nature-global-security-illegal-wildlife-trade.pdf [http://perma.cc/0Nbz3pqyk8m] (accessed Nov. 17, 2013)).

28  UN Env. Programme et al., Elephants in the Dust - The African Elephant Crisis: A Rapid Response Assessment 6 (UN Env. Programme 2013) (available at http://www .cites.org/common/resources/pub/Elephants in the dust.pdf [http://perma.cc/HJ3T-39A3] (accessed Nov. 17, 2013)).

29  T. Milliken et. al, The Elephant Trade Information System (ETIS) and the Illicit Trade in Ivory: A Report to the 16th Meeting of the Conference of the Parties to CITES 4 (TRAFFIC Intl. 2013) (available at http://www.cites.org/eng/cop/16/doc/E-CoP16-53-02-02.pdf [http://perma.cc/0Yom7yJZTnP] (accessed Nov. 17, 2013)).

30   TRAFFIC, Massive African Ivory Seizure in Malaysia, http://www.traffic.org/home/2012/12/11/massive-african-ivory-seizure-in-malaysia.html [http://perma.cc/08nYoo48ZSp] (Dec. 11, 2012) (accessed Nov. 17, 2013).

of one week in Kenya, [31] [*34] with similar giant hauls taken by Kenyan authorities in October 2013. [32]

This industrial-scale poaching is of grave concern, even more so because some of the most violent militant groups active today, including some affiliated with al-Qaeda, are thought to be using the proceeds from wildlife trafficking for financial support. [33] In Africa, it has been reported that ivory is funding the Lord's Resistance Army (LRA), [34] Darfur's Janjaweed militia, [35] and Somalia's al-Shabaab, [36] posing a clear global security threat. Government armies from the Congo [37] and Uganda [38] have also been implicated in elephant poaching, and in many parts of Africa, elephant poachers have greatly increased their [*35] capacity to kill the animals with access to military-grade weapons. [39] Increased poaching and mass elephant killings are even taking place in well-protected World Heritage

31  Associated Press, Kenyan Officials Seize Ivory Disguised as Peanuts, http://news.yahoo.com/kenyan-officials-seize-ivory-disguised-peanuts-142215226.html [http://perma.cc/0pbjHPiTPZ6] (July 9, 2013) (accessed Nov. 17, 2013); Agence France-Presse, Kenyan Officials Seize 1.5 Tonnes of Hidden Ivory, http://phys.org/news/2013-07-kenyan-seize-tonnes-hidden-ivory.html [http://perma.cc/0JdcWbEWmn4] (July 3, 2013) (accessed Nov. 17, 2013).

32  Agence France-Presse, Kenya Seizes Ivory as Elephant Slaughter Surges, http://uk.news.yahoo.com/kenya-seizes-ivory-elephant-slaughter-surges-081447625.html [http://perma.cc/0bjQiTpE1t6] (Oct. 9, 2013) (accessed Nov. 17, 2013).

33  H.R. Subcomm. on Fisheries, Wildlife, Oceans, & Insular Affairs, Oversight Hearing: Why Should U.S. Citizens Have to Comply with Foreign Laws, 113th Cong. 8 (July 17, 2013) (testimony of Alexander von Bismarck, Exec. Dir., Envtl. Investigation Agency) (available at http://democrats.naturalresources.house.gov/sites/democrats.  naturalresources.house.gov/files/2013-07-13  FWOIA  vonbismarcktestimony.pdf [http:
//perma.cc/0WA3CEf7nHg] (accessed Nov. 17, 2013)).

34  Jeffrey Gettleman, Elephants Dying in Epic Frenzy as Ivory Fuels Wars and Profits, N.Y. Times A1 (Sept. 4, 2012) (available at http://www.nytimes.com/2012/09/04/world/africa/africas-elephants-are-being-slaughtered-in-poaching-frenzy.html [http://perma.cc/0svygjKQCug] (accessed Nov. 17, 2013)); Kara Moses, The Guardian, Lord's Resistance Army Funded by Elephant Poaching, Report Finds, The Guardian, http:
//www.theguardian.com/environment/2013/jun/04/lords-resistance-army-funded- elephant-poaching [http://perma.cc/0GnCqTeYz5A] (June 4, 2013) (accessed Nov. 17, 2013); UN News Ctr., Head of UN-Backed Treaty Welcomes Security Council Call for Action on LRA-Related Elephant Poaching, http://www.un.org/apps/news/story.asp? NewsID=43843 [http://perma.cc/0LPksHDtUgA] (Dec. 24, 2012) (accessed Nov. 17, 2013).

35  Gettleman, supra n. 34; Keith Somerville, The Ivory Wars: How Poaching in Central Africa Fuels the LRA and Janjaweed, http://africanarguments.org/2013/01/14/the-ivory-wars-how-poaching-in-central-africa-fuels-the-lra-and-janjaweed-%E2%80%93-    by-keith-somerville [http://perma.cc/0vQo37Nt5Lb] (Jan. 14, 2013) (accessed Nov. 17, 2013); Tapang Ivo Tanku, CNN, Cameroon Elephant Slaughter Latest in String of Killings, http://www.cnn.com/2013/03/26/world/africa/cameroon-elephant-poaching [http://perma.cc/0iWW3zQDfZQ] (updated Mar. 27, 2013) (accessed Nov. 17, 2013).

36   Gettleman, supra n. 34; Nir Kalron & Andrea Crosta, Africa's White Gold of Jihad: al-Shabaab and Conflict Ivory, http://elephantleague.org/project/africas-white-gold-of-jihad-al-shabaab-and-conflict-ivory [http://perma.cc/0NXn42wmVJp] (accessed Nov. 17, 2013);   Horand   Knaup   &   Jan   Puhl,   Blood   Ivory:   Brutal   Elephant   Slaughter   Funds   African   Conflicts, http://www.spiegel.de/international/world/blood-ivory-brutal-elephant-slaughter-funds-african-conflicts-a-855237.html [http://perma.cc/0Myyx47Gx DV] (accessed Nov. 17, 2013).

37  Sen. Comm. on For. Rel., Hearing on Ivory and Insecurity: The Global Implications of Poaching in Africa, 112th Cong. 3 (May 9, 2012) (testimony of Tom Cardamone, Managing Dir., Global Fin. Integrity) (available at http://www.foreign. senate.gov/imo/media/doc/Tom Cardamone Testimony.pdf [http://perma.cc/0m4hSiM mgqt] (accessed Nov. 17, 2013)); Gettleman, supra n. 34.

38  Gettleman, supra n. 34.

39  Frederick Gooch, Shoot on Sight 90-91 (Xlibris Corp. 2011); see Gettleman, supra n. 34 (discussing the use of weapons and increased militarization of the underground ivory trade).

Sites. [40] The United Nations (UN) Security Council and the UN Secretary General, [41] along with former U.S. Secretary of State Hillary Clinton, [42] have condemned this devastation and noted that poaching and trafficking of wildlife are among the factors fueling crises in some African countries. [43]

## III. CURRENT INTERNATIONAL AND U.S. LAWS RELATED TO IVORY TRADE

The United States' ivory market is regulated by domestic federal laws, as well as an international accord.

## A. International/CITES

The Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) is the governing framework for global wildlife commerce, including ivory and other elephant parts. [44] CITES lists species under three appendices that define their trade restrictions and conservation status; Appendix I species, such as Asian elephants, [45] are afforded the highest level of protection, while Appendix III species are given the least oversight. [46] In 1976, CITES initially listed African elephants in Appendix III. But in 1977, the organization uplisted them to Appendix II, and in 1989, again uplisted the elephants [*36] at the seventh Conference of the Parties (CoP), [47] as a result of the so-called "Somalia Amendment." [48] However, at the time of the uplisting, the CoP held that certain African states' populations of elephants did not meet the criteria for Appendix I listing. [49] Resolution 7.9 - in the vernacular, "Res. Conf. 7.9" - laid out the process for initiating downlisting efforts, with consideration going to the "status of elephant populations, the effectiveness of conservation measures,

---

[40] Press Release, CITES, CITES Secretary-General Calls for Urgent Action to Protect Elephants in the Dzanga-Sanga National Park from Armed Groups (May 8, 2013) (available at http://www.cites.org/eng/news/pr/2013/20130508 elephant dzanga sanga .php [http://perma.cc/0zExhG7sBA6] (accessed Nov. 17, 2013)); Press Release, UN Educ., Sci. & Cultural Org., The Director-General of UNESCO Expresses Deep Concern at the Rising Violence in the Central African Republic, at the Heart of the Sangha Trinational Site (May 3, 2013) (available at http://whc.unesco.org/en/news/1006 [http://perma .cc/0WG7U3KsUut] (accessed Nov. 17, 2013)).

[41] UN SCOR, 7042nd mtg., UN Doc. S/RES/2121 (2013) (available at http://www.un .org/en/ga/search/view doc.asp?symbol=S/RES/2121%282013%29 [http://perma.cc/6 QMH-T7J5] (accessed Nov. 17, 2013)).

[42] Hillary Rodham Clinton, Sec. of St., Remarks at the Partnership Meeting on Wildlife Trafficking (D.C. Nov. 8, 2012) (transcript available at http://www.state.gov/secretary/rm/2012/11/200294.htm [http://perma.cc/0VhdoG9J8Kp] (accessed Nov. 17, 2013)).

[43] Edith M. Lederer, Associated Press, U.N.: Poaching Threatens Central Africa Peace, http://bigstory.ap.org/article/un-poaching-threatens-central-africa-peace [http://perma.cc/0apqZyzaLT8] (May 21, 2013) (accessed Nov. 17, 2013).

[44] Convention on International Trade in Endangered Species of Wild Fauna and Flora Preamble (Mar. 3, 1973), 27 U.S.T. 1087 (available at http://www.cites.org/eng/disc/E-Text.pdf [http://perma.cc/0599B6sR6Rr] (accessed Nov. 17, 2013)) [hereinafter CITES].

[45] Id. at apps. I, II, & III 14 (June 12, 2013).

[46] Id. at art. II; 50 C.F.R. § 23.4 (2012).

[47] Willem Wijnstekers, The Evolution of CITES 405-06 (7th ed., CITES Secretariat 2003) (available at http://www.cites.org/eng/resources/pub/evolution.pdf [http://perma .cc/03ZRT6kQ2pg] (accessed Nov. 17, 2013)).

[48] Edward B. Barbier et al., Elephants, Economics and Ivory 131 (Earthscan 1990).

[49] Id. at 132.

and the degree of control of the movement of ivory within and through the Parties." [50] These downlistings were essentially a CITES stamp of approval on the countries' conservation efforts and allowed for the sanction of one-off ivory stockpile sales from Botswana, Namibia, and Zimbabwe, which were approved in 1997 and occurred in 1999. [51]

In 1997, the Parties adopted Res. Conf. 10.10, which recommended that ivory carving and importing countries enact comprehensive internal legislative, regulatory, and enforcement measures. [52] Importantly, the Resolution recommended that Parties, including the U.S., "register or license all importers, manufacturers, wholesalers and retailers" dealing in ivory products and that they "establish a nationwide procedure, particularly in retail outlets, informing tourists and other non-nationals that they should not purchase ivory in cases where it is illegal for them to import it into their own home countries." [53] Res. Conf. 10.10 also recommends that Parties introduce recording and inspection procedures to monitor the flow of ivory. [54]

During the twelfth CoP in 2002, the Secretariat adopted a number of other Decisions, including 12.36 to 12.39, which encourage "financial and technical support to strengthen the implementation of Resolution Conf. 10.10" and seek to assess a variety of nations with "active internal [*37] ivory markets." [55] But most importantly, the Parties conditionally approved another one-time sale from South Africa and the three nations that participated in the first one-off sale (Botswana, Namibia, and Zimbabwe). [56] The decision to allow this one-off sale was accompanied by a nine-year moratorium on future ivory trade proposals so the CITES Secretariat and the Parties could monitor the effects of the legal trade on poaching and African elephant populations. [57]

## B. U.S. Ivory Regulations

[50]  Terms of Reference for the Panel of Experts on the African Elephant and Criteria for the Transfer of Certain African Elephant Populations from Appendix I to Appendix II, CITES Res. Conf. 7.9 (1989) (available at http://www.cites.org/eng/res/all/07/E07-09  .pdf [http://perma.cc/0jrNFfap3x1] (accessed Nov. 17, 2013)). Res. Conf. 7.9 was later recalled by Res. Conf. 10.9. Consideration of Proposals for the Transfer of African Elephant Populations from Appendix I to Appendix II, CITES Res. Conf. 10.9 (1997) (available at http://www.cites.org/eng/res/10/10-09.php [http://perma.cc/0qBKEAFJzZY] (accessed Nov. 17, 2013)).

[51]  CITES, Decisions of the Tenth Conference of the Parties 125 (1997) (available at http://www.cites.org/eng/cop/10/E10-Decisions.pdf [http://perma.cc/0cvEDtGTtnW] (accessed Nov. 17, 2013)); Christian Nellemann et al., Elephants in the Dust - The African Elephant Crisis: A Rapid Response Assessment 12 (UNEP et al. 2013) (available at http://www.cites.org/common/resources/pub/Elephants in the dust.pdf [http://perma .cc/HJ3T-39A3] (accessed Nov. 17, 2013)).

[52]  Trade in Elephant Specimens, CITES Res. Conf. 10.10 (Rev. CoP16) (2013) (available at http://www.cites.org/eng/res/10/10-10R16.php [http://perma.cc/0s343tUctMk] (accessed Nov. 17, 2013)).

[53]  Id.

[54]  Williamson, supra n. 20, at 9.

[55]  Decisions of the Conference of the Parties to CITES in Effect after the 12th Meeting, CITES Decisions 12.36-12.39 (2002) (available at http://www.cites.org/eng/dec/valid13/E12-Dec.pdf [http://perma.cc/0fUV1oCpfq1] (accessed Nov. 17, 2013)).

[56]  Joseph Vandegrift, Elephant Poaching: CITES Failure to Combat the Growth in Chinese Demand for Ivory, 31 Va. Envtl. L.J. 102, 110 (2013).

[57]  Consideration of Proposals for Amendment of Appendices I and II, CITES CoP15 Prop. 6 (2010) (available at http://www.cites.org/eng/cop/15/prop/E-15-Prop-06.pdf [http://perma.cc/0gaSLRmYFeD] (accessed Nov. 17, 2013)).

U.S. elephant ivory regulations are deceptively complicated. Imports are banned, but there are three exceptions to this general rule. [58] First, "antique elephant ivory items may be imported or exported for commercial purposes when accompanied by a valid CITES pre-Convention [59] certificate [60] issued by the Management Author-

  [*38] ity [61] of the exporting country." [62] Second, African elephant sport-hunted trophies can be brought into the U.S. with valid documentation, but cannot be sold after import. [63] Third, there is an exception for re-import of "personal effects" [64] that were legally acquired by U.S. residents and later

---

[58]  Vandegrift, supra n. 56, at 123. The authors created a flow chart showing the current legal/regulatory regime for ivory in the U.S., but the size and complexity of the chart prevented its inclusion in this Article. The chart demonstrates the labyrinthine nature of the laws and regulations, taking on the appearance of an extended family tree with proscriptions for sales, possession, and imports and exports based on qualifiers in the various laws and regulations. During consultations with the U.S. Fish and Wildlife Service, staff advised the authors that mapping this system would be a difficult process, and it became clear that laying out the current legal and regulatory regime is far from a simple matter. Email from Craig Hoover, Chief, Wildlife Trade & Conserv. Branch, FWS Div. of Mgt. Auth., Intl. Affairs, to Peter LaFontaine, Author, Ivory Paper and Flow Chart (Nov. 20, 2013, 6:39 p.m. EST) (copy on file with Animal Law).

[59]  A pre-Convention specimen refers to a specimen that was acquired before the Convention applied to the specimen. Res. Conf. 13.6 recommends that

a) the date from which the provisions of the Convention apply to a specimen be the date on which the species concerned was first included in the Appendices; and

b) the date on which a specimen is acquired be considered as the date on which the animal or plant or, in the case of parts or derivatives, the animal or plant from which they were taken, was known to be either:

[sp'b)'+n]i. removed from the wild; or

ii. born in captivity or artificially propagated in a controlled environment; or

iii. if such date is unknown or cannot be proved, the date on which the specimen was acquired shall be the earliest provable date on which it was first possessed by a person.

Implementation of Art. VII, paragraph 2, concerning 'Pre-Convention Specimens,' CITES Res. Conf. 13.6 (Rev. CoP16) (2013) (available at http://www.cites.org/eng/res/13/13-06R16.php [http://perma.cc/0fq3CX5n9dr] (accessed Nov. 17, 2013)).

[60]  A pre-Convention certificate is a certificate that verifies a specimen is a pre-Convention specimen. Permits and Certificates, CITES Res. Conf. 12.3 (Rev. CoP16) (2013) (available at http://www.cites.org/eng/res/12/12-03R16.php [http://perma.cc/0v4fU1rSk S1] (accessed Nov. 17, 2013)).

[61]  The "Management Authority" is responsible for issuing permits and certificates and making any findings required for issuance of a permit or certificate. CITES, supra n. 44, at art. IX.

[62]  Daniel Stiles & Esmond Martin, The USA's Ivory Markets - How Much a Threat to Elephants?, 45 Pachyderm 67, 69 (July 2008-June 2009) (explaining that "an antique is defined as a specimen at least 100 years old that has not been modified or repaired using ivory obtained since 28 December 1973 (the date of enactment of the ESA)").

[63]   Id.; FWS, U.S. Efforts to Control Illegal Elephant Ivory Trade and Internal Markets 2 (Sept. 2012) (available at http://www.fws.gov/international/pdf/factsheet-us-efforts-to-control-illegal-elephant-ivory-trade.pdf [http://perma.cc/0MTFbpuomn3] (accessed Nov. 17, 2013)) [hereinafter FWS, U.S. Efforts].

[64] Personal effects" means specimens that are

a) personally owned or possessed for non-commercial purposes;

b) legally-acquired; and

c) at the time of import, export or re-export either:

[sp'c)'+n]i) worn, carried or included in personal baggage; or

ii) part of a household move[.]

exported. [65] Exports are also tightly regulated, with a total ban on exports of raw ivory and U.S. Fish and Wildlife Service (FWS)/CITES permits required for exports of worked ivory. [66]

This section highlights the three major federal laws pertaining to the ivory trade - the Endangered Species Act, the Lacey Act, and the African Elephant Conservation Act - as well as the Asian Elephant Conservation Act and state laws. In Part IV, the authors discuss the real-world problems of enforcement, detailing how legal loopholes, insufficient domestic regulations, and lack of funding for inspectors and resources have allowed the domestic market in illegal ivory to flourish.

1. The Endangered Species Act

The Endangered Species Act (ESA) was signed into law in 1973 and remains one of the United States' strongest environmental protection statutes. [67] Jointly administered by the FWS and the National Marine Fisheries Service (NMFS), the ESA is intended to mitigate harm to endangered and threatened wildlife by regulating human activities that could otherwise impact listed species, such as construction, [*39] logging, and - as is the case for ivory - interstate and international trade. [68]

Under the ESA, species may be listed as either "endangered" or "threatened"; the former, more restrictive category means that a species "is in danger of extinction throughout all or a significant portion of its range," while the latter means that a species "is likely to become [endangered] within the foreseeable future throughout all or a significant portion of its range." [69] These categories are roughly analogous to Appendices I and II of CITES, which the ESA implements in the U.S. [70] While Asian elephants are categorized as endangered under the ESA, African elephants are only listed as threatened despite their rapidly dwindling populations. [71]

Although the ESA expressly limits trade in threatened and endangered species, section 4(d) of the Act confers upon the Secretary of the Interior the authority to "issue such regulations as he deems

Control of Trade in Personal and Household Effects, CITES Res. Conf. 13.7 (Rev. CoP16) (2013) (available at http://www.cites.org/eng/res/13/13-07R16.php [http://perma .cc/0gehGApF8Gh] (accessed Nov. 17, 2013)).

[65]    FWS, African Elephant Ivory 2 (Nov. 1999) (available at http://library.fws.gov/IA Pubs/african elephant ivory99.pdf [http://perma.cc/02VV2iEgD1s] (accessed Nov. 17, 2013)). For example, if someone owned a legal ivory necklace and moved overseas, the owner would have to obtain a CITES export permit from the FWS, but would be allowed to bring it back in the country by showing the original export permit.

[66]  Id.

[67]  16 U.S.C.§§1531-1540; see Tenn. Valley Auth. (TVA) v. Hill, 437 U.S. 153, 180 (1978) (discussing the comprehensive nature of the ESA).

[68]  16 U.S.C. § 1531 (finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation[,]" and stating the purpose of the Act is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend on may be conserved … ."); TVA, 437 U.S. at 184 ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated polices of the Act, but in literally every section of the statute.").

[69]  16 U.S.C. § 1532(6), (20).

[70]  Id. at§§1532(4), 1538(c).

[71]  FWS, Species Profile for Asian Elephant (Elephas Maximus), http://ecos.fws.gov/speciesProfile/profile/speciesProfile.action?spcode=A059 [http://perma.cc/0q47CrQL9py] (updated Sept. 26, 2013) (accessed Nov. 17, 2013); FWS, Species Profile for African Elephant (Loxodonta Africana), http://ecos.fws.gov/speciesProfile/profile/speciesProfile.ac tion?spcode=A07U [http://perma.cc/0VzbWLVWqrK] (updated Sept. 27, 2013) (accessed Nov. 17, 2013).

necessary and advisable to provide for the conservation of such species." [72] This so-called "special rule" or "4(d) rule" has resulted in the sport hunting trophy exemption for raw African ivory. [73] Under the special rule, antique, worked ivory can be imported, exported, and sold. [74]

The Act also sets requirements for import and export permits and licensing which, combined with Lacey Act guidelines, create a structure for regulating customs traffic of wildlife products like ivory. [75] Criminal violators of the ESA may be fined as much as $ 50,000 for each infraction, while civil violations can result in fines of up to $ 25,000 per infraction. [76]

[*40]

## 2. The Lacey Act

The Lacey Act, [77] passed in 1900 and amended several times since, is one of the United States' oldest and broadest laws regulating the wildlife trade. [78] The Act built on existing state animal protection laws by prohibiting interstate or foreign commerce in "any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law … or in violation of any foreign law." [79]

Under the Lacey Act, commercial shipments (whether international or domestic) must be properly labeled according to FWS regulations. Federal officials rely upon the Act to prosecute customs violations involving wildlife, which carry significant penalties - individual violators face misdemeanor penalties up to $ 100,000 and one year in prison, while felony penalties can be up to $ 250,000 and five years incarceration. [80] Other provisions of the U.S. Criminal Code, such as conspiracy, often apply in such cases. [81]

## 3. The African Elephant Conservation Act

Congress passed the African Elephant Conservation Act (AfECA) on October 7, 1988 due to mounting concern for the survival of the species, and acknowledged that CITES restrictions had not been

---

[72] 16 U.S.C. § 1533(d).

[73] 50 C.F.R. § 17.40(e)(3)(i) (2011).

[74] Id. at § 17.40(e)(3)(ii); Williamson, supra n. 20, at 11.

[75] 16 U.S.C.§§1538-1539.

[76] Id. at § 1540.

[77] 16 U.S.C.§§3371-3378 (2006).

[78] See Robert S. Anderson, The Lacey Act: America's Premier Weapon in the Fight against Unlawful Wildlife Trafficking, 16 Pub. Land L. Rev. 27 (1995) (discussing the history and scope of the Lacey Act).

[79] 16 U.S.C. § 3372(a)(1), (3)(A).

[80] Anderson, supra n. 78, at 70-71.

[81] Williamson, supra n. 20, at 10-11.

effective in protecting African elephants from illegal poaching. [82] Technically an amendment to the Endangered Species Act, the AfECA establishes even more stringent regulations on the trade of ivory and other elephant parts, while also providing financial assistance for elephant conservation projects. [83]

Under one of the AfECA's strongest provisions, raw ivory cannot be re-exported from the U.S., [84] which limits the potential for investment purchases (in China, ivory speculation has been part of the cause [*41] of price surges). [85] The Act also prohibits imports from "middleman" nations - all products must come directly from ivory producing countries, and must be accompanied by documentation from those countries' management authorities to prove the legality of the product. [86] Following guidelines set forth in the law, on June 9, 1989 President George H.W. Bush instituted a moratorium on ivory imports, noting the "virtual impossibility of distinguishing legal from illegal ivory," but also made an import exception for sport-hunted trophies. [87]

In its original iteration, the legislation that became the AfECA prohibited the importation into or exportation from the U.S. of any elephant products. [88] Then-Representative Anthony Beilenson (D-CA), the bill's sponsor, explained the need for these protections:

Some people argue that the elephants belong to Africa, and that, ultimately, it will be up to the countries there to determine whether or not the elephant will survive. However, it has become apparent that even the best-intentioned and uncorrupted African governments are limited in their ability to control poachers because, like the drug trade, there is enormous profit to be made from ivory. For that reason, I believe very strongly that the United States, and other ivory consuming nations, can and must play a bigger role in restricting the ivory trade. [89]

President Bush's import prohibition was pending Interior Department review of the conservation plans of Africa's ivory producing nations. [90] This action served, in large part, as the impetus for the decision by the Parties to place African elephants on Appendix I of CITES; the international ban on commercial

---

[82]   16 U.S.C.§§4201-4246 (2006); see H.R. Subcomm. on Fisheries and Wildlife Conserv. and the Env., African Elephant Conservation: Hearings on H.R. 2999, H.R. 4849, 100th Cong. 2, 8, 19 (June 22, 1988) (statements from Rep. Claudine Schneider, Rep. Jack Fields, and elephant biologist Iain Douglas-Hamilton discussing the ineffectiveness of CITES restrictions).

[83]   Michael Glennon, Has International Law Failed the Elephant?, 84 Am. J. Intl L. 1, 14 (1990) (citing 16 U.S.C. § 4212); see 16 U.S.C.§§4221-4222 (requiring the Secretary to "review the African elephant conservation program of each ivory producing country" and to place a "moratorium on the importation of raw and worked ivory from an ivory producing country immediately upon making a determination that the country does not meet all the criteria set forth in section 4221(b)(1)").

[84]   16 U.S.C. § 4223(2).

[85]   Grace Gabriel et al., Making a Killing: A 2011 Survey of Ivory Markets in China 13-14 (Intl. Fund for Animal Welfare 2011) (available at http://www.ifaw.org/sites/ default/files/Making%20a%20Killing.pdf [http://perma.cc/0k1iPhg8gim] (accessed Nov. 17, 2013)).

[86]   16 U.S.C. § 4223(1).

[87]   54 Fed. Reg. 24758, 24761 (June 9, 1989).

[88]   H.R. 2999, 100th Cong. § 4(1) (July 23, 1987).

[89]   134 Cong. Rec. 21012 (1988).

[90]   16 U.S.C. § 4221.

trade took effect in 1990. [91] The 1998 Senate committee report reauthorizing AfECA states that immediately after the Appendix I listing and resulting international ban, "the price of ivory, trade in ivory, and poaching of elephants all decreased." [92] Extensive data from the United Nations Environmental Programme-World Conservation Monitoring Center (UNEP- WCMC) database, tracking CITES-registered import and export of ivory, confirms that ivory imports decreased dramatically immediately [*42] after the passage of the AfECA. [93] But trade has quickly rebounded, although not to a level approaching historic maximums, as the market for ivory adapted to new international and domestic laws on import and export. [94] With new U.S. law distinguishing "raw" and "worked" ivory, the U.S. asserted itself as the second largest importer of African elephant worked ivory. [95]

### 4. The Asian Elephant Conservation Act

The Asian Elephant Conservation Act (AsECA) was passed in 1997 to increase protections for this species. [96] In introducing the bill, Representative H. James Saxton (R-NJ) said that "the United States, as a world leader in conservation, must step forward and assist in Asian elephant conservation" with a focus on reversing the trend of habitat fragmentation (as opposed to AfECA's emphasis on poaching). [97] As enacted, AsECA provides financial assistance for conservation projects; because Asian elephants are listed as ESA-endangered, no commercial trade is allowed and AsECA does not include 4(d) special rules allowing such trade. [98]

### 5. State Laws

In addition to federal laws, various state laws apply to the ivory trade, and almost half of the U.S. states incorporate the ESA into their wildlife protection statutes. [99]

### IV. DIFFICULTY IN ENFORCING U.S. LAWS

### A. Weaknesses in the Laws

---

91  U.S. Ivory Market Collapses after Import Ban, N.Y. Times (June 5, 1990) (available at http://www.nytimes.com/1990/06/05/science/us-ivory-market-collapses-after-import-ban.html [http://perma.cc/0m3jr4vJkb2] (accessed Nov. 17, 2013)) [hereinafter U.S. Ivory Market].

92  Sen. Rpt. 105-222 (June 25, 1998) (available at http://www.gpo.gov/fdsys/pkg/CRPT-105srpt222/html/CRPT-105srpt222.htm [http://perma.cc/0gosba9Pngf] (accessed Nov. 17, 2013)).

93  See CITES, CITES Trade Database, http://www.unep-wcmc-apps.org/citestrade/expert accord.cfm [http://perma.cc/04TNrGowvck] (accessed Nov. 17, 2013) (tracking registered imports and exports of wildlife).

94  The Humane Socy. of the U.S., An Investigation of Ivory Markets in the United States 1-2, 20 (2002) (available at http://www.humanesociety.org/assets/pdfs/Ivory Trade Report.pdf [http://perma.cc/04JeT6Hxgk2] (accessed Nov. 17, 2013)) [hereinafter HSUS].

95  Stiles & Martin, supra n. 62, at 75.

96  16 U.S.C.§§4261-4266 (2006).

97  143 Cong. Rec. E1135 (1997).

98  16 U.S.C. § 4264(a).

99  Williamson, supra n. 20, at 13.

The 1989 U.S. moratorium was intended to restrict trade to CITES nations that have demonstrably effective elephant conservation programs, [100] but despite the good intentions of Congress, the African Elephant Conservation Act has been ineffective in sufficiently restricting the illegal trade in ivory. Although the law has strong provisions limiting exports, as well as some import restrictions, there are loopholes [*43] for antiques and sport-hunted trophies. [101] More importantly, in 2004 the U.S. was found to be out of compliance with CITES Res. Conf. 10.10, [102] which recommended that countries adopt measures to register ivory dealers, conduct public education outreach, and monitor domestic ivory traffic. [103] Without these internal controls and monitoring, there is no "second line of defense" after an illegal ivory shipment has made it past customs inspectors.

The AfECA suffered a blow in 1997 when the Eleventh Circuit of the Court of Appeals decided, in U.S. v. Grigsby, that violations of that Act must be held to a higher standard - "specific intent" - than what normally governs similar cases. [104] Under this ruling, the court shifted the burden of proof onto the government to prove that criminal defendants (1) knew that they were performing the act; and (2) understood the illegality of their actions. [105] The criticism against this ruling is obvious: barring explicit evidence to the contrary, the accused can say they believed they were trading in legal material such as mastodon ivory or bone, and therefore cannot be held liable under the AfECA.

As Part V details, a significant quantity of ivory is illegally imported into the U.S. by businesses and individuals despite the laws restricting trade. [106] The reasons for this are apparent when considering the risk/reward calculation for traffickers. To begin with, ivory is a lucrative business, with demand sustaining prices up to $ 1,000 per pound on the streets of Beijing. [107] Second, there is no real disincentive for illegal ivory importers in the U.S., because although a fine and/or prison sentence is possible in the large smuggling cases, in the vast majority of cases, importers simply forfeit the illegal items to government officials. [108] Additionally, the system fails to maximize inspections of potentially fraudulent shipments; wildlife products are supposed to be routed through a limited number of designated ports of entry in the U.S., and officials rely upon proper labeling to prioritize their inspections. [109] Any ivory smuggler with common sense will avoid following the rules designed to catch them.

Once ivory enters the U.S., either legally or illegally, it is difficult to assess exactly how much ivory is domestically traded or who is involved in such operations. For example, according to U.S. regulations, any legal commercial trade in raw elephant ivory would have to derive from tusks

---

[100] 16 U.S.C. § 4221.

[101] See Williamson, supra n. 20 (presenting a comprehensive account of import and export restrictions).

[102] Id. at 35.

[103] CITES Res. Conf. 10.10 (Rev. CoP16), supra n. 52.

[104] U.S. v. Grigsby, 111 F.3d 806, 807 (11th Cir. 1997).

[105] Id. at 819.

[106] Stiles & Martin, supra n. 62, at 71.

[107] Gettleman, supra n. 34.

[108] HSUS, supra n. 94, at 1.

[109] 50 C.F.R. §§14.11-14.12, 14.81 (2012).

imported into the U.S. before the 1989 trade ban under the  [*44]  AfECA. [110] Sport-hunted ivory imported legally under CITES, the Endangered Species Act, and the AfECA since 1989 cannot be carved and sold commercially, although it can be carved for personal use. [111] Unfortunately, there is no way to determine the full extent of the ivory trade because the amount of legally imported, pre-ban African elephant tusks in domestic circulation is unknown. [112] Adding to the problem is the fact that no state has conducted a survey to try to determine the potential number of remaining ivory carvers, or the extent of the ivory market. [113]

Movement of ivory products within the U.S. is particularly difficult to track because of limited internal controls; there are no interstate border inspections and, as Stiles and Martin observe, "customers buy ivory on the Internet, at auctions or from antique dealers, often from sellers who live in different states or even abroad and who simply send the items by mail or courier." [114] Inspections of retail outlets are a low priority for state officials, and there is little collaboration with federal authorities. [115]

Although CITES has put forth recommendations to control the internal ivory trade, [116] the U.S. has not taken the necessary steps for their implementation. The Humane Society of the U.S. (HSUS) made the following findings during an investigation into the domestic market for elephant ivory:

The United States does not register or license all importers, manufacturers, wholesalers, and retailers dealing in raw, semi-worked, or worked ivory products; does not have recording or inspection procedures to enable appropriate government agencies to monitor the flow of ivory within the United States; does not have compulsory trade controls over raw ivory; and does not have a comprehensive and demonstrably effective reporting and enforcement system for sale of worked ivory. [117]

The rampant online trade in the U.S. (including the auction sites described in Part V(B), as well as other online platforms such as Craigslist.org) illustrates a significant and growing problem for federal enforcement officials: how to regulate a market where buyers and sellers often remain anonymous, both in name and geographic location. Because the government must prove specific intent to prove violation of the AfECA, officials can find themselves without a leg to stand on if they do not seize ivory shipments as soon as the ivory enters the country.

 [*45]  In general, businesses associated with ivory items often claim that their ivory is pre-Convention and therefore legal. [118] Since it can be challenging to determine the age of the ivory, it often goes

---

[110] HSUS, supra n. 94, at 3.

[111] Id.

[112] Williamson, supra n. 20, at 30.

[113] Id.

[114] Stiles & Martin, supra n. 62, at 73.

[115] Id.

[116] CITES Res. Conf. 10.10 (Rev. CoP16), supra n. 52.

[117] HSUS, supra n. 94, at 1.

[118] Id. at 20.

unchecked. [119] The defense of "pre-ban" ivory is easily invoked because there is no inventory of global ivory stocks from before the ban took effect - ivory lasts forever, more or less, so the availability of this loophole is timeless. [120]

## B. Lack of Resources

The U.S. Fish and Wildlife Service's Office of Law Enforcement (FWS-OLE) wildlife inspections are the nation's front-line defense against illegal international trade in wildlife and wildlife products. FWS-OLE wildlife inspectors are responsible for monitoring wildlife imports and exports to ensure that wildlife shipments meet the requirements of U.S. laws, as well as the laws of foreign countries that have established special protections for their native animals. [121] Inspectors are stationed at selected airports (including passenger terminals), seaports, and border crossings, where they maintain import/export controls and interdict smuggled wildlife and wildlife products. [122] Inspections are also conducted at centralized mail facilities that handle international traffic. [123]

In fiscal year (FY) 2013, the FWS-OLE employed 140 wildlife inspectors, at 38 ports of entry (out of nearly 300 points of entry into the U.S.), including 18 designated ports of entry and 20 nondesignated ports of entry. [124] The total workload in FY 2012 was 186,000 declared shipments of wildlife and wildlife products worth more than $ 4.4 billion. [125] In comparison, in FY 2003 FWS-OLE inspectors processed 138,754 wildlife shipments, with a declared value around $ 1.5 billion (thus showing an increase of nearly 300% in value in the last ten [*46] years). [126] Contrast that workload to a marginal increase in total funding for the FWS-OLE, which went from $ 51.6 million in FY 2003 to $ 62.1 million in FY 2012. [127]

According to a 2008 Congressional Research Service report, the

---

[119] Id.

[120] Christy, supra n. 15.

[121] FWS-OLE, Law Enforcement at a Glance 2 (Feb. 8, 2013) (on file with Animal Law) [hereinafter Law Enforcement at a Glance].

[122] Id.

[123] FWS Div. of L. Enforcement, Annual Report FY 1999 5 (1999) (available at http://www.fws.gov/le/pdf/final-annual-report-fy-1999.pdf [http://perma.cc/0VZ2tqG7UUk] (accessed Nov. 17, 2013)) [hereinafter Annual Report FY 1999].

[124] Law Enforcement at a Glance, supra n. 121, at 1; see also Annual Report FY 1999, supra n. 123. Generally, all wildlife (including parts and products) must be imported or exported through a designated port. The FWS has a system of ports to allow for the import and export of wildlife, including parts and products. These ports are used for all movement of wildlife, including for commercial, non-commercial, scientific, or personal purposes. Certain port locations are designated to allow the international movement of any lawful wildlife, while other locations are restricted to allow only certain types of wildlife for certain purposes. FWS-OLE, Ports Importation and Exportation Wildlife, http://www.fws.gov/le/ports-contact-information.html [http://perma.cc/0JWXxr6tKAg] (updated Mar. 29, 2013) (accessed Nov. 17, 2013).

[125] Law Enforcement at a Glance, supra n. 121, at 2.

[126] FWS-OLE, Annual Report FY 2003 33 (2004) (available at http://www.fws.gov/le/pdf/final-annual-report-fy-2003.pdf [http://perma.cc/03BJb4G4gf9] (accessed Nov. 17, 2013)).

[127] Id.; FWS-OLE, Annual Report FY 2011 23 (2011) (available at http://www.fws .gov/le/pdf/final-annual-report-fy-2011.pdf [http://perma.cc/0hY5PnzA2Jn] (accessed Nov. 17, 2013)).

FWS reportedly inspects approximately 25% of declared wildlife shipments at the U.S. border. FWS does not inspect undeclared shipments except during planned investigations or seasonal periods when certain illegally obtained wildlife have a higher probability of being imported into the United States. [128]

This is an obvious problem with the system; criminals have every incentive to avoid accurately declaring their merchandise or shipping it through designated inspection points.

As noted above, FWS-OLE efforts to police the ivory trade focus on monitoring imports and exports at the border. However, if the FWS does not have an adequate number of trained wildlife inspectors, this crucial aspect of the U.S. response to illegal ivory trade, as well as other wildlife trafficking, is weakened. The 2002 report on ivory markets by the HSUS put it clearly: "There simply are not enough FWS agents to fully inspect all shipments imported to and exported from the United States for contraband." [129]

FWS "wildlife inspectors work closely with Customs and Border Protection (CBP) and other Federal trade inspection agencies to facilitate the detection and disruption of wildlife trafficking." [130] The FWS-OLE also "provides wildlife import/export training to all new Customs and CBP agriculture inspectors and periodic 'cross-training' at ports of entry nationwide to broaden the reach of wildlife trade enforcement." [131] Still, it is apparent that current FWS-OLE resources are inadequate to address the ever-expanding illegal wildlife trade. According to a 2013 report from a D.C. government relations law firm, [132] "of particular concern is the marginal increase in number of special agents. With the increased sophistication seen in today's wildlife trafficking networks, more special agents are needed at a greater [*47] number of ports of entry to effectively combat illegal activity." [133] Ed Grace, a top law enforcement officer at the FWS, said in March 2013, "'Every hour, every day, there's a wildlife product being smuggled into the United States.'" [134] The sheer volume of international traffic and correspondence makes inspectors' tasks a logistical nightmare: "Thousands of people arrive by air hourly and cannot all be checked; millions of packages posted abroad arrive daily and many are not marked according to the ESA and Lacey Act while others do not arrive at airports designated by

---

[128] Liana Sun Wyler & Pervaze A. Sheikh, International Illegal Trade in Wildlife: Threats and U.S. Policy 24 (Cong. Research Serv. Mar. 3, 2008) (available at http://fpc.state.gov/documents/organization/102621.pdf [http://perma.cc/0mtLrMEyHuQ] (accessed Nov. 17, 2013)) (internal citation omitted).

[129] HSUS, supra n. 94, at 6.

[130] FWS, Office of Law Enforcement Strategic Plan 2011-2015: Protecting Our Wildlife and Plant Resources 28 (available at http://www.fws.gov/le/pdf/OLE-Strategic-Plan .pdf [http://perma.cc/0jaH4ermGPu] (accessed Nov. 17, 2013)).

[131] Id.

[132] Pike Associates, About Pike Associates, http://pikeassoc.com/aboutus.html [http://perma.cc/UZL2-2ZMF] (accessed Nov. 17, 2013).

[133] Memo. from Jeffrey Pike, Pres., Pike Assocs. LLC, to Beth Allgood, Campaigns Manager, Intl. Fund for Animal Welfare, Wildlife Trafficking Investments Analysis: United States Government 4 (Jan. 10, 2013) (copy on file with Animal Law).

[134] Darryl Fears, Inspectors Catch Wildlife Smugglers but Fear the Sequester's Bite, Washington Post (Mar. 10, 2013) (available at http://articles.washingtonpost.com/2013-03-10/national/37605551   1   wildlife-crimes-u-s-fish-fish-and-wildlife-office [http://perma.cc/0n354ogT48y] (accessed Nov. 17, 2013)) (quoting Edward Grace, a law enforcement officer for the U.S. Fish and Wildlife Service).

USFWS as wildlife product entry points." [135] Because FWS officials have to maximize their resources, suspicious parcels and luggage are prioritized, leaving many others to pass through unchecked.

Adding yet another stumbling block, most of the federal and state agencies charged with preventing the illegal wildlife trade are dealing with budget cuts. Due to the recent budget-cutting sequester, the FWS-OLE had to cancel plans to train 24 additional agents and will not fill 14 vacancies for wildlife inspectors at major ports of entry; overtime and weekend inspections of shipments will also be eliminated. [136] At 218 agents (the same number it had in 1978), the unit is already stretched. [137] Budget cuts have also prevented the National Fish and Wildlife Forensics Laboratory - the only forensic organization in the world dedicated to investigating wildlife crimes - from filling 3 positions. [138]

## V. U.S. IVORY MARKET

### A. Studies of the U.S. Ivory Market

In discussing the regulations governing the ivory trade, it is important to note that the U.S. has a substantial legal market for ivory and other elephant parts. [139] In theory, this market exists solely for the purpose of buying and selling antique ivory; however, because of the inherent difficulties in determining the age of ivory, the legal market actually facilitates commerce in non-antique ivory. [140] Some unscrupulous dealers and consumers undoubtedly take advantage of the system by mislabeling or purchasing ivory they know to be illegal, but ignorance  [*48]  also plays a role - in the absence of a clear and simple identification method for products, even trustworthy consumers and merchants face difficulties in following the law. [141]

Recent studies have found that the U.S. is a prime market for elephant products. [142] A 2008 study by Stiles & Martin for the British-based conservation group Care for the Wild International (CWI) found that the U.S. is the world's second largest retail market for elephant ivory products (behind only China), and documented 24,004 ivory products in 657 outlets in sixteen American cities. [143] The largest number was found in New York City, followed by San Francisco and Los Angeles. [144] The San Francisco Bay area was found to be a significant market primarily because of its large Chinatown area and its strong links with Hong Kong; it is likely that ivory items in this market were recently made. [145] The largest number of stores selling ivory in the U.S. was found in the greater Los Angeles area;

---

[135] Stiles & Martin, supra n. 62, at 73.

[136] Fears, supra n. 134.

[137] Id.

[138] Id.

[139] HSUS, supra n. 94, at 4.

[140] Id. at 20.

[141] Id. at 18-19.

[142] Id. at 6.

[143] Stiles & Martin, supra n. 62, at 71.

[144] Id.

[145] Id.

again, many of the items appeared to be post-1989 worked ivory. [146] Despite its relatively small size, the city of Honolulu held a large amount of ivory, which the authors also attributed to the large East Asian community. [147] The study reported that large quantities of worked ivory enter the U.S. legally every year, mostly labeled as antiques, and that ivory is sold openly in markets, shops, and periodic antique fairs and auctions, [148] a situation that has not dissipated. It was noted that "individuals probably smuggle a significant quantity as personal effects [in luggage], while other pieces enter by post and courier in mislabeled packages and occasionally by sea." [149] Additionally, the Environmental Investigation Agency has found that "the U.S. is a main destination for illegal ivory, which is imported into the U.S. by individuals and through the Internet, feeding a large market for small ivory objects." [150]

The Humane Society of the U.S. (HSUS) characterized the U.S. domestic ivory market as follows:

First, there is the highly lucrative market for antique ivory objects, such as carvings - some worth millions of dollars each - which are imported legally, mainly from Europe, and traded domestically in the high-end art market. Secondly, there is the market in relatively less expensive, non-antique Asian-style carvings, including the very popular small carvings of animals or people known as netsuke; the supply for this market appears to rely, at least in part, on illegal imports of ivory from Hong Kong that was carved in China. Thirdly, there is a profitable market in raw tusks, supplied by hunters who have imported the tusks as sport-hunted trophies. [*49] Fourthly, these tusks, in turn, supply a domestic ivory carving industry, which turns the tusks into arts and crafts objects, gun and knife handles, and the like, which are sold on the domestic market. [151]

Undercover operations by HSUS have revealed that while some of these U.S. businesses will only buy pre-ban tusks with accompanying paperwork, others are not as concerned about the legal or illegal provenance of their items. [152] Finally, HSUS has noted that at least part of the ivory market in the U.S. includes products imported illegally from African countries, based on the large number of ivory import seizures originating from that continent. [153]

## 1. Internet Trade

A number of extensive studies on wildlife trade on the Internet indicate that most Americans purchase ivory online rather than in-store. The International Fund for Animal Welfare (IFAW), which conducted the most recent and thorough study available of wildlife trade on the Internet, tracked over 180

---

[146] Id.

[147] Id.

[148] Id. at 73.

[149] Stiles & Martin, supra n. 62, at 71.

[150] Id.

[151] HSUS, supra n. 94, at 20.

[152] Id. at 16.

[153] Id. at 20.

websites around the globe to determine the extent of wildlife trade on the Internet. [154] During their six-week study in 2008, investigators tracked 7,122 online auctions, advertisements, and communiques offering wildlife and wildlife products for sale domestically and internationally. [155] Of the countries tracked, the U.S. by far represented the highest volume of trade and the largest monetary value of items both advertised and sold. [156] Most U.S. sellers in this study (69.2%) fell into a category listed as "possible violation" by making a general claim of legality, but failing to list any supporting documentation attesting to the species or age of the item being sold. [157] Directly following the IFAW investigation and report, eBay, the largest source of online wildlife trade (99% of which was ivory in the U.S.), voluntarily announced in October 2008 that the company would ban ivory sales on all its Internet auction sites. [158] A follow-up to this investigation is needed to determine if ivory sales have been reduced or simply shifted to other online auction or sale sites.

The following sections include data analysis of ivory products cleared at the U.S. border as well as the ivory available for sale through U.S.-based auction houses and other venues, showing a significant ivory market in the U.S.

[*50]

2. Legal Trade Analysis: Summary of Legal Ivory Imported to and Exported from the U.S. (2009-2012) [159]

In the period from 2009 to 2012, the U.S. allowed the legal import of 13,221 ivory objects plus 430 kilograms of additional tusks and ivory pieces/scraps. [160] Table 1 provides the total number of specimens of legal imports by ivory type per year. Over three-fourths of the cleared ivory imports listed the country of origin as "unknown." According to the U.S. Fish and Wildlife Service (FWS), "unknown" country of origin for legal imports would have to be pre-Convention ivory, and the vast majority of this would be antique ivory. Otherwise, South Africa and Zimbabwe were listed most frequently as the country of origin for legal ivory imports. Other top countries of origin were Botswana, Tanzania, and Namibia. Most (over 75%) ivory carvings were imported from Great Britain.

---

[154]   IFAW, Killing with Keystrokes: An Investigation of the Illegal Wildlife Trade on the World Wide Web 2 (available at http://www.ifaw.org/sites/default/files/Killing%20 with%20Keystrokes.pdf [http://perma.cc/0wXN9t4th8E] (accessed Nov. 17, 2013)).

[155]   Id.

[156]   Id. at 3.

[157]   Id. at 21.

[158]   Id. at 3, 20; Richard Brewer-Hay, eBay Inc. Blog, eBay to Institute Global Ban on Ivory Sales, http://blog.ebay.com/ebay-to-institute-global-ban-on-ivory-sales [http://perma.cc/0NfHyFGDuGb] (Oct. 20, 2008) (accessed Nov. 17, 2013).

[159]   The analysis presented in Part V(A)(2) is based on data IFAW acquired on ivory trade in the U.S. from the FWS's Law Enforcement Management Information System (LEMIS) in response to IFAW's December 2012 and February 2013 Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests. FWS, Response to IFAW FOIA Requests, LEMIS Data (Mar. 2013) (on file with Animal Law) [hereinafter 2013 LEMIS Data]. The analyses of U.S. ivory imports and exports presented in this Article are based on an internal IFAW report initially analyzing and interpreting the data. FWS staff reviewed the IFAW report and provided feedback on the analyses. Marina S. Ratchford, U.S. Ivory Trade Analysis: A Report Prepared for IFAW (Mar. 19, 2013) (on file with Animal Law) [hereinafter Ratchford, IFAW Report]. For a discussion of the methodology used in this Article, consult infra appendix B.

[160]   Infra tbl. 1 (charting legal imports of ivory objects by type, number, and weight in kilograms according to the LEMIS database).

Other common countries of import included France, Germany, and Portugal. Importers of the largest number of cleared ivory carvings included Sotheby's (456 specimens), MS Rau Antiques LLC (414), Sydney Moss C/O Quality International (317), Alexina Matisse (254), Hartman Rare Art Incorporated (233), Sallea Antiques (164), JELACNC NO 2, LP (105), Lockson Incorporated (90), Oracle Investment Advisors, LLC (70), Rosemary Bandini (68), Blumka Gallery (65), Metropolitan Museum of Art (61), Cheryl Harris (52), Antique Supermarket Inc. (42), Gander & White Shipping Inc. C/O de Wilde (40), and D/B/A Quality International Freight Forwarders & Customs Breakers (36). About half of all imports did not list the names of the U.S. importer (presumably individuals, such as art collectors). The FWS does not release the names of individuals.

There were a small number of ivory jewelry imports (59 specimens), which tended to be imported in small quantities (up to 20 objects) by museums and individuals from African countries of origin, or otherwise of unknown origin. [161] Ivory pieces tended to be imported in quantities of up to 224 specimens, by antiques dealers, museums or individuals; most of these imports had an unknown country of origin, with a few listing Japan and Zimbabwe. The largest importer of ivory piano keys, which tended to be imported in groups of 52 keys, was [*51] Thomas Strange, though most imports did not list an importer. [162] Most keys were imported from Great Britain and Canada. Pianos with ivory keys were imported singly by individuals and colleges; all except one had an unknown country of origin, and Canada was listed as the exporting country for about half of the pianos. There were 1,746 imports of hunting trophies, [163] which consist of two tusks each. Trophies tended to be imported one at a time by individuals and taxidermy companies (only 122 imports listed the name of the importer of record); such trophies originated mainly in Botswana, Namibia, South Africa, Tanzania, and Zimbabwe. Imports of tusks totaled 900 specimens plus 422.4 kilograms of tusks for this period, and tended to be imported one or two at a time. [164] Tusks were mainly imported by individuals or companies, including taxidermists, with exceptions such as Bad Boys Bail Bonds Inc. importing 42 tusks in one shipment (likely the result of a "cull" hunting). [165] Only 85 imports of tusks identified the name of a business as the importer of record. Most items in the "tusk" category originated from Botswana, Namibia, South Africa, Tanzania, and Zimbabwe.

[*52]

---

[161] Infra tbl. 1 (providing totals of legal imports of ivory items from 2009-2012).

[162] FWS-OLE provided business names, but withheld individual names in response to IFAW's FOIA requests. Therefore, shipments that do not list an importer or exporter can be assumed to have been imported or exported by individuals and FWS-OLE did not provide those names.

[163] Infra tbl. 1. "Hunting trophy" means

a whole animal, or a readily recognizable part or derivative of an animal, specified on any accompanying CITES permit or certificate, that:

i) is raw, processed or manufactured;

ii) was legally obtained by the hunter through hunting for the hunter's personal use; and

iii) is being imported, exported or re-exported by or on behalf of the hunter, as part of the transfer from its country of origin, ultimately to the hunter's State of usual residence.

CITES Res. Conf. 12.3 (Rev. CoP16), supra n. 60.

[164] Infra tbl. 1.

[165] Ratchford, IFAW Report, supra n. 159, at 9 cmt. 14.

Table 1: Legal Ivory Imports to the U.S. from 2009-2012,
by Type of Ivory Object [166]

| Year | Carvings | Jewelry | Pieces | Ivory Keys | Pianos with ivory keys | Trophies | Tusks | Total Specimens |
|---|---|---|---|---|---|---|---|---|
| 2009 | 1,488 | 8 | 27 | 104 | 9 | 534 | 191+ 245.4kg | 2,361+ 245.4kg |
| 2010 | 3,270 | 9 | 15 | 88 | 7 | 427 | 208+ 62kg | 4,024+ 62kg |
| 2011 | 1,897 | 1 | 356+ 9.6kg | 642 | 7 | 360 | 187+ 2kg | 3,450+ 2kg |
| 2012 | 942 | 41 | 753+ 7.5kg | 909 | 2 | 425 | 314+ 113kg | 3,386+ 120.5kg |
| Total | 7,597 | 59 | 1,151+ 7.5kg | 1,743 | 25 | 1,746 | 900+ 422.4kg | 13,221+ 429.9kg |

In addition to the legal imports of ivory, there was a significant amount of legal ivory exported from the U.S., totaling 6,753 objects for the period of 2009 to 2012. Table 2 provides the totals by type of ivory product.

Table 2. Legal Ivory Exports from the U.S. from 2009-2012,
by Type of Ivory Object

| Year | Carvings | Jewelry | Pieces | Keys | Pianos | Trophies | Tusks | Specimens |
|---|---|---|---|---|---|---|---|---|
| 2009 | 2,374 | 4 | 19 | 192 | 57 | | 1 | 2,647 |
| 2010 | 1,210 | | 2 | 104 | 111 | 1 | 4 | 1,432 |
| 2011 | 436 | 2 | 7 | 256 | 47 | 3 | 1 | 752 |
| 2012 | 437 | 1 | 90 | 774 | 108 | | 512 | 1,922 |
| Total | 4,457 | 7 | 118 | 1,326 | 323 | 4 | 518 | 6,753 |

## B. Snapshots of Ivory Available for Sale through Auctions

Data analysis of the main U.S.-based auction houses selling ivory products was conducted using the LiveAuctioneers [167] and AuctionZip [168]   [*53]   search engines. In order to estimate the amount of ivory available for sale through auctions, the authors took an inventory of available items in March 2013. It is important to note that this inventory only reflected a snapshot of the ivory available for sale through

[166]  According to the LEMIS import/export key code, and throughout this Article when analyzing FWS data, "pieces" refer to nonmanufactured ivory pieces, including scraps; "trophies" refer to all the parts of one animal, and therefore can be assumed to include two tusks each; and "tusks" refer to substantially whole tusks, worked or not. FWS-OLE, Import/Export Key 1 (Feb. 2013) (on file with Animal Law).

[167]  LiveAuctioneers is a New York City-based company operating since 2002. By hosting thousands of auctions in real time via the Internet, the site allows unprecedented access to remote sales. More than 1,500 premier auction houses rely on LiveAuctioneers' technology, with 7.9 million bids placed. LiveAuctioneers, About Us, http://www.liveauc tioneers.com/about.html [http://perma.cc/0ZLjqQLsdXV] (accessed Nov. 17, 2013). "In 2009, the debut of LiveAuctioneers' iPhone and Android apps … opened up a new mobile pipeline to bid anytime, from anywhere, with complete anonymity." Id.

[168]  AuctionZip is the world's largest online auction marketplace … where more than 25,000 professional auctioneers and 13 million auction buyers come together each year to list and find auctions. AuctionZip Live! is the nation's largest online bidding destination. Every week AuctionZip lists thousands of new items at auction, and live auctions around the world." AuctionZip, About Us, http://www.auctionzip.com/about.html [http://perma.cc/0mSFN1ioGrg] (accessed Nov. 17, 2013).

auctions taking place at that time. [169] Inventory taken did not include any ivory products available at retail stores, from Internet-only marketplaces, or from auction houses located outside of the U.S. (though U.S. residents can bid on their products).

Table 3. A Snapshot of Ivory Sales through Online Auction Houses from 1999-November 2013 [170]

| Year | # Sales |
|------|---------|
| 1999 | 28 |
| 2000 | 99 |
| 2001 | 75 |
| 2002 | 68 |
| 2003 | 1863 |
| 2004 | 2228 |
| 2005 | 4283 |
| 2006 | 4211 |
| 2007 | 4137 |
| 2008 | 5283 |
| 2009 | 3747 |
| 2010 | 6837 |
| 2011 | 14618 |
| 2012 | 17763 |
| 2013 | 17675 |
| (Jan.-Nov.) | |

 The snapshot included a total of fifty U.S.-based auction houses with ivory products listings available for sale in March 2013. These auction houses were located throughout the U.S., mainly in Florida, California, [*54] New York, North Carolina, and Texas. The inventory offered for auction by these fifty houses included 1,666 items with suggested bids totaling $ 1,214,498. [171] The auction houses dealing with the largest number of ivory items at the time of this snapshot were Elite Decorative Arts, Leslie Hindman Auctioneers, Richard D. Hatch & Associates, Heritage Auctions, Kimball M. Sterling, and I.M. Chait. The auction houses with the highest priced inventory were Rome & Associates, A.B. Levy's, Leslie Hindman Auctioneers, Doyle New York, I.M. Chait, and Antique Place. The most common types of worked ivory items for sale were netsukes (miniature sculptures), human figurines, canes with ivory handles, tusks, and jewelry.

In terms of ivory sold at auction, the following is a snapshot of ivory sales through online auction houses in the U.S. in the period from 1999 to November of 2013, using the LiveAuctioneers search engine. There were roughly 82,114 ivory sales sold from 1999 to November of 2013 (each sale may include multiple ivory items).

## C. U.S. Ivory Buyers

169   Analysis is based on the data provided in Ratchford, IFAW Report, supra n. 159, at 29 tbl. 15.

170   LiveAuctioneers, http://www.liveauctioneers.com; search keyword "ivory," select SOLD, select United States, view by Year, select Search titles only, deselect Require image, click GO (accessed Nov. 17, 2013). Subtract any search results that include keywords such as "rug," "carpet," "sofa," "color," "hippo," "mammoth," "walrus," or "whale" to minimize inclusion of non-elephant ivory items. This is a conservative count, because each search result may include multiple items sold.

171   This number represents the sum of suggested bids for all ivory items listed by the fifty auction houses offering ivory inventory at the time of the snapshot.

The company Elephant Ivory Tusks claims to be one of the main buyers of ivory tusks and partials in the U.S., which it uses for resale purposes ("No one buys more or pays more than we do.") [172] The company offers to pay from $ 40 up to $ 135 per pound (of solid sections) for tusks and partials. [173] Similarly, David Warther in Dover, Ohio purchases antique elephant tusks from private, estate, and museum collections within the U.S. [174] While Warther's business purchases "uncarved ivory tusks, [it] does not purchase carved tusks, scrimshaw, jewelry or other worked pieces of ivory." [175] As an active purchaser of antique tusks, the company website claims to "adhere to the laws of the United States and [] not purchase tusks from outside the US." [176] Ivory Crafts is another prominent buyer of ivory tusks. [177] The store also buys "damaged ivories for repair material or to repair and resell." [178] The Boone Trading Company is both a seller and a buyer, [179] as is Coast Ivory, which "also buys most any type of legal ivory, [*55] whether it be in chunks or whole tusks." [180] Ivory Heaven, operated by a collector of antique ivories, regularly purchases ivory pieces from auction houses and according to its website, it currently only purchases "pre-ban ivory jewelries of [the] highest quality." [181]

Regarding U.S.-based auction houses as well as art and antique galleries dealing with luxury ivory products, a literature review indicates that most buyers of ivory from these sellers are Americans who are collectors of ivory antiques. [182] However, gathering more specific information about the profile of ivory buyers from auction houses proves to be extremely difficult. [183]

The U.S. maintains a largely unregulated ivory crafting industry. The number of U.S. artisans most recently reported is "about 200 carvers who use elephant ivory." [184] Ivory artisans purchase raw ivory

---

[172] Elephant Ivory Tusks, The Real Facts, http://www.elephantivorytusks.com/info .html [http://perma.cc/08jYD7Gh1SN] (accessed Nov. 17, 2013).

[173] Id.

[174] Ivorybuyer.com, Elephant Tusks - Buyers of Legal Estate Ivory in USA, http://www.ivorybuyer.com [http://perma.cc/0m6pBTDCjny] (accessed Nov. 17, 2013).

[175] Ivorybuyer.com, About Us, http://www.ivorybuyer.com/?page=legal%20ivory [http://perma.cc/0VCsWLBRzUj] (accessed Nov. 17, 2013).

[176] Id.

[177] Ivory Crafts, Raw Ivory, http://www.ivorycrafts.com/raw-ivory-crafts-supplies [http://perma.cc/0gwmdhHBRE6] (accessed Nov. 17, 2013).

[178] Ivory Crafts, Ivory Repair, http://www.ivorycrafts.com/ivory-repair [http://perma .cc/0hR6HNkuGHD] (accessed Nov. 17, 2013).

[179] The Boone Trading Co., Boone Trading Company - Ivory and Scrimshaw, http://boonetrading.com [http://perma.cc/0kPLDNfd3Zo] (accessed Nov. 17, 2013).

[180] Coast Ivory, Exotic Materials for the Knifemaker and Craftsman, http://www.coast ivory.com [http://perma.cc/0oQmpuLarBh] (updated May 29, 2013) (accessed Nov. 17, 2013).

[181] Ivory Heaven - Antique Ivory Collection, Sell Your Ivory, http://www.ivoryheaven .com/id67.html [http://perma.cc/0etf9mGwWLr] (accessed Nov. 17, 2013).

[182] Stiles & Martin, supra n. 62, at 67, 73.

[183] See Email from Robert Weisblut, Intl. Ivory Socy., to Marina Ratchford, Author, Question about Membership (Mar. 4, 2013, 6:11 p.m. EST) (copy on file with Animal Law) (stating that auction houses do not provide information on their customers).

[184] Fisher, supra n. 10.

as well as broken ivory items. [185] Such ivory is available both at retail stores and from the Internet. Some of the most common products made by ivory artisans are handles for guns or knives. [186] In addition, specialists have pointed out that the use of "ivory for billiard cue parts, inlaying billiard cues" (ferrules, joints and butt caps), "making ornamental scrimshaw items and crafting jewelry" will likely continue to be high. [187] Since "the U.S. holds so many ivory objects," ivory repair work by artisans will also continue to be in demand in the U.S. [188] Ivory is also the preferred material for stores specializing in musical instrument parts; ivory is used for guitar nut blanks, nuts and saddles, bassoon rings, and end caps for bagpipes, among other uses. [189]

[*56]

## VI. ANALYSIS OF ILLEGAL TRADE IN IVORY: LEMIS SEIZURE DATA/SPECIAL INVESTIGATIONS AND OPERATIONS [190]

As discussed in Part V(A), the substantial legal market provides cover for dealers and consumers - whether intentionally or not - to sustain the trade in illegal ivory. The International Fund for Animal Welfare (IFAW) conducted an analysis of recent wildlife product seizures, based on data from the Law Enforcement Management Information System (LEMIS) of the U.S. Fish and Wildlife Service (FWS). In addition, the authors offer a summary of relevant FWS investigations and special operations related to ivory since 2008.

The data analysis described in this Article finds that from 2009 to 2012, there were close to 1000 products seized upon entry into the U.S. [191] However, INTERPOL estimates that interdictions only represent about 10% of the actual traffic in illegal goods, [192] because customs and border patrol officials have limited resources and must process an astonishing amount of merchandise every day. [193] Therefore, the illegal ivory that is smuggled into the U.S. may be closer to 2,500 specimens per year.

---

[185] Stiles & Martin, supra n. 62, at 70.

[186] Id. at 71.

[187] Id. at 75.

[188] Id.

[189] See e.g. Elephant Ivory Tusks, Elephant Ivory Guitar and Instrument Parts, http: //www.elephantivorytusks.com/elivgupa.html [http://perma.cc/03QFmmmMsUZ] (accessed Nov. 17, 2013) (selling a variety of ivory products, including musical instrument parts).

[190] The analysis presented in Part VI is based on data IFAW acquired on ivory trade in the U.S. from the FWS's Law Enforcement Management Information System (LEMIS) in response to IFAW's December 2012 and February 2013 Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests. 2013 LEMIS Data, supra n. 159. The analyses of U.S. ivory imports and exports presented in this Article are based on an internal IFAW report initially analyzing and interpreting the data. FWS staff reviewed the IFAW report and provided feedback on the analyses. Ratchford, IFAW Report, supra n. 159. For a discussion of the methodology used in this Article, consult infra appendix B.

[191] Infra tbl. 3.

[192] Christy, supra n. 15.

[193] Bernard Irigia Kaaria & Ndica Lawrence Muchiri, Enforcement Challenges across Borders: Detecting and Prosecuting Illegal Wildlife Trafficking 204, 204 (Ninth Intl. Conf. on Envtl. Compliance & Enforcement 2011) (available at http://inece.org/ conference/9/proceedings/26 KaariaMuchiri.pdf [http://perma.cc/0CzG51i58tR] (accessed Nov. 17, 2013)).

[194] Additionally, about 250 ivory items were seized upon exportation from the U.S. in the same four-year period. Again, using INTERPOL's 10% estimation, the authors determine that approximately 625 additional ivory items are being smuggled out of the U.S. each year, bringing the estimated number of combined illegal ivory imports and exports in the U.S. to 3,125 per year. [195]

In addition to border seizures, highlights from some FWS investigations and special operations related to ivory from 2008 up to and including 2012 indicate that the ivory market in the U.S. involves sophisticated schemes including operatives and partners in the black [*57] market ivory trade from multiple countries. [196] Ivory investigations in that five-year period involved defendants, in at least ten states, in relation to at least a dozen shipments. [197] In one case in 2011, FWS investigators seized one ton of elephant ivory from an individual. [198] A single investigation in New York confiscated $ 2 million worth of ivory objects. [199]

The lack of comprehensive trafficking data is a serious problem in its own right, as it makes it difficult to accurately assess the size of the domestic market for illegal goods. Despite these obvious limitations, the LEMIS data below, combined with the descriptions of additional FWS special investigations related to ivory, are a tool to understand the scope of illegal imports and exports.

A. Data Analysis of Ivory Imports and Exports Seized in the U.S. (2009-2012)

According to analysis of LEMIS data, elephant products were the fourth most common species grouping of wildlife seized upon importation in the U.S. from 2009 to 2012 (among Endangered

---

[194] Christy, supra n. 15 (applying INTERPOL's 10% rule).

[195] Infra pt. VI tbls. 5, 9; see Christy, supra n. 15 (noting that INTERPOL utilizes a rule of thumb "that says seized contraband equals 10% of actual smuggling").

[196] Discussed infra pt. VI(D); see generally FWS, Law Enforcement Annual Reports (available at http://www.fws.gov/le/annual-reports.html [http://perma.cc/0p84mV7S8 Mk] (accessed Nov. 17, 2013)) (Each annual report contains a list of accomplishments regarding investigative and enforcement efforts against the illegal trade in wildlife and wildlife products.); see e.g. FWS, Annual Report FY 2009 10 (available at http://www .fws.gov/le/pdf/final-annual-report-fy-2009.pdf [http://perma.cc/0BxCeeaNNqk] (accessed Nov. 17, 2013)) ("Six defendants were arrested in New York, New Jersey, Virginia, and Texas for conspiring to smuggle African elephant ivory from Ivory Coast, Cameroon, and Uganda into the United States; the group smuggled at least eight shipments through New York, falsely declared as wooden statutes or handicrafts."); FWS, Annual Report FY 2008 11 (available at http://www.fws.gov/le/pdf/final-annual-report-fy-2008.pdf [http://perma.cc/09oezSpU3DA] (accessed Nov. 17, 2013)) ("A Canadian citizen was sent to prison for five years and fined $ 100,000 for illegally smuggling elephant ivory valued at $ 158,000 from Cameroon to the United States… . [She] ran a sophisticated scheme to smuggle ivory [including] operatives within international commercial shipping companies, contacts in the black market ivory trade, and partners in all three countries.").

[197] See FWS, Annual Report FY 2011, supra n. 127, at 8 (detailing ivory seizures in Pennsylvania, New York, Florida, and Georgia); FWS, Annual Report FY 2009, supra n. 196, at 7-8, 10 (detailing ivory seizures in Illinois, Texas, New York, New Jersey, and Virginia); FWS, Annual Report FY 2008, supra n. 196, at 9-11 (detailing ivory seizures in Georgia, Texas, Tennessee, Kentucky, Florida, and New York).

[198] FWS, Annual Report FY 2011, supra n. 127, at 8.

[199] David M. Halbfinger, 2 Manhattan Jewelers Admit Illegal Ivory Trading, N.Y. Times (July 12, 2012) (available at http://www.nytimes.com/2012/07/13/nyregion/illegal-ivory-leads-2-to-plead-guilty-in-new-york.html [http://perma.cc/0MunQsSFSgx] (accessed Nov. 17, 2013)).

Species Act (ESA)-and Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES)-listed mammals, birds, and reptiles) based on lines of data. [200]

[*58]   Table 4 focuses specifically on imports containing elephant parts and derivatives, which were seized by FWS inspectors in the period from 2009 to 2012. The table provides information on quantity of specimens or weight; wildlife descriptions (i.e., whether it contained ivory, trophies, tusks, medicinals, etcetera); country of origin; exporting country; and port of entry. The main purposes identified for these imports by the exporters were either personal or commercial, with a third category listing hunting trophies. The main sources identified by the exporters were specimens taken from the wild (most shipments); unknown source; or pre-Convention.

In the period from 2009 to 2012, the 472 import data entries containing elephant parts/products that were seized in the U.S. included 1,795 specimens plus 17.7 kilograms of elephant parts and derivatives. A look at the contents of these import entries (wildlife descriptions) reveals that ivory was present in most of them.

Table 4. Detailed Information on Seized Elephant Imports from 2009-2012

| | |
|---|---|
| Number of Specimens or Weight | 1,795 total specimens + 17.7kg |
| Description by Number of Specimens or Weight | Ivory carvings: 566; Leather products: 294; Ivory jewelry: 167; Skin piece: 142 + 0.955kg; Unspecified: 127 + 0.27kg; Ivory piano keys: 100 + 0.2kg; Hair: 54 + 0.058kg; Medicinals: 51; Tusks: 50 + 13.8kg; Meat: 46 + 2.419kg; Other jewelry: 44; Hair product: 32; Ivory pieces/scraps: 29; Shoe/boots: 19; Bones (including jaws, but not skulls): 18; Foot: 12; Skin (essentially whole): 11; Teeth: 9; Trophies: 6; Tails: 5; Trim: 5; Ear: 4; Bone pieces: 3; Bone product: 1 |
| Main Countries of Origin (by import entries) | Unknown: 841 specimens; Other top countries of origin: Zimbabwe; Thailand; South Africa; Nigeria; China; Lao; Botswana; Tanzania; Vietnam |
| Main Exporting Countries (by import entries) | Thailand; Zimbabwe; U.K.; South Africa; Nigeria; Lao; Japan; Vietnam; France; Canada. 50 different additional countries were identified as exporting countries |
| Main Ports of Entry (by import entries) | Houston; San Francisco; Los Angeles; New York; Dallas/Fort Worth; Atlanta; Newark; Honolulu; Anchorage; Dulles; Chicago; Miami |

[200]   In the period from 2009 to 2012, there were 472 import data entries of seizures containing elephant parts and derivatives, from African elephants (Loxodonta Africana), Asian elephants (Elephasmaximus), as well as entries listed as "all elephants" (Elephantidae). The top three species groupings by data entries of seizures upon importation into the U.S. in the same period were crocodiles (906 entries), pythons (594), and sea turtles (544).

In addition to the seized elephant imports, elephants were the most common wildlife species grouping (among ESA-and CITES-listed mammals, birds, and reptiles) contained in seized exports from the U.S. from 2009 to 2012 (by lines of export entries). In that period, there  [*59]  were a total of 387 export data entries, containing ESA-and CITES-listed mammals, birds, and reptiles, and 97 of those entries contained elephant specimens. Further analysis into such entries reveals that nearly all entries of seized elephant exports from the U.S. contained ivory products.

B. Types of Illegal Ivory Imported into the U.S.

Ivory carvings and ivory jewelry are among the items most commonly refused entry upon importation into the U.S. In the period from 2009 to 2012, officials seized nearly 1000 ivory specimens, plus an additional 14 kilograms of ivory, upon importation into the U.S. These ivory specimens included 566 ivory carvings, 167 ivory jewelry items, 50 tusks (plus an additional 13.8 kilograms of tusks), 29 ivory pieces (not manufactured, including scraps), 6 trophies, and 100 ivory piano keys (plus an additional 0.2 kilograms of ivory piano keys). The largest type of ivory by far was carvings, followed by jewelry and piano keys, and finally tusks, ivory pieces, and trophies. Table 5 provides information about each category in terms of the number of seized specimens plus additional weight.

Table 5. Ivory Imports Seized in the U.S. from 2009-2012

| Ivory Type | Number of Specimens | Additional Seized Ivory Measured in Weight Only |
|---|---|---|
| Ivory carvings | 566 | |
| Ivory jewelry | 167 | |
| Ivory piano keys | 100 | 0.2 kg |
| Tusks | 50 [201] | 13.8 kg |
| Ivory pieces | 29 | |
| Trophies | 6 | |
| Total | 918 | 14 kg |

Table 6 provides detail about the main countries of origin and countries of export for each type of ivory product seized upon importation into the U.S. in the period from 2009 to 2012. When looking at all types of ivory products together, the top countries of origin (by import lines) in this period were South Africa and Nigeria, but by far the most commonly listed country of origin was "unknown." [202] The countries listed most commonly as the country of export for seized ivory imports were the United Kingdom (U.K.), Nigeria, South Africa, Zimbabwe, and Japan, noting that a large amount of countries were listed as the country of export for at least one specimen. Only a few imports had the same country listed as the country of origin and the country of export.

 [*60]

Table 6. Main Countries of Origin and Export of Seized Ivory Imports from 2009-2012

| Ivory Type | Main Countries of Origin (by import entries) | Main Countries of Export (by import entries) |
|---|---|---|
| Ivory carvings | Unknown; South Africa; Nigeria; Zimbabwe; Thailand; Cambodia; | U.K.; Japan; South Africa; Nigeria; France; Canada; Zimbabwe; China; Uruguay; |

201 Includes one item seized in transit.

202 Assumed by FWS to be pre-Convention.

20 Animal L. 27, *60

| | | |
|---|---|---|
| | Cameroon; Vietnam; Canada; 203 Central African Republic; U.K.; Ireland; Namibia; Zambia | Vietnam; Unknown; Australia; Cambodia; Germany; Ireland; Philippines; Belgium; Denmark; Greece; Indonesia; Mozambique; Netherlands; Portugal; United Arab Emirates; Burundi; Bolivia; Brazil; Cameroon; Egypt; Georgia; Hong Kong; Haiti; Israel; Italy; Kuwait; Malaysia; New Zealand; Panama; Peru; Saudi Arabia; South Korea; Syria |
| Ivory jewelry | Unknown; South Africa; Zimbabwe; Nigeria; Thailand; Cameroon; Vietnam; Ghana; Namibia; Sudan; Zambia | Vietnam; South Africa; Nigeria; Zimbabwe; Thailand; Cameroon; Unknown; Ghana; Japan; Lebanon; South Korea; Eritrea; Germany; Honduras; Hong Kong; India; Italy; Namibia; Netherlands; New Zealand; Peru; U.K. |
| Tusks | Zimbabwe; Unknown; Nigeria; Namibia; Botswana; Central African Republic; Democratic Republic of the Congo; Kenya; Tanzania | Nigeria; Zimbabwe; Namibia; Belgium; Botswana; France; U.K.; Bahamas; Ghana; Greece; South Africa; Tanzania; Thailand; Venezuela |
| Ivory pieces | Unknown; Congo; Laos; South Africa; Zambia | U.K.; Belgium; France; Japan; Laos; Morocco; New Zealand; South Africa |
| Trophies | Zimbabwe; Botswana; Tanzania | Zimbabwe; Botswana; South Africa; Tanzania |
| Ivory piano keys | Unknown | U.K. |

Table 7 looks at the main ports of entry for seized ivory imports, by type of ivory product. When looking at all types of seized ivory imports, the most common ports of entry where seizures took place were Houston, New York, Dallas/Fort Worth, Atlanta, Anchorage, and Newark (by import entries).

[*61]

Table 7. Most Common Ports of Entry for Seized Ivory Imports from 2009-2012

| Ivory Type | Main Ports of Entry (by import entries) |
|---|---|
| Ivory carvings | Houston; New York; Anchorage; Newark; Atlanta; Chicago; Dallas/Fort Worth; Los Angeles; Louisville; Region 4; Detroit; Dulles; Miami; Honolulu; Memphis; San Francisco; Boston; Port Huron; Region 1; Baltimore; Buffalo; Calais; Derby Line; Norfolk |
| Ivory jewelry | Dallas/Fort Worth; Atlanta; Houston; Dulles; Denver; Chicago; Los Angeles; New York; Honolulu; Memphis; Anchorage; Miami; Newark; Seattle; Tampa |
| Tusks | Houston; Miami; San Francisco; Newark; Dallas/Fort Worth; New York; Region 4; Anchorage; Boston; Dulles; Los Angeles |
| Ivory pieces | Memphis; Dallas/Fort Worth; Houston; Honolulu; New York; |

---

203  This appears to be an error in the LEMIS data, as well as the entries listing U.K. and Ireland as the countries of origin. Ratchford, IFAW Report, supra n. 159, at 14 cmt. 22.

20 Animal L. 27, *61

| | | |
|---|---|---|
| | Los Angeles | |
| Trophies | San Francisco; Dallas/Fort Worth; New York | |
| Ivory piano keys | Region 4; Newark | |

Table 5 indicated that the total number of seized ivory imports in the period from 2009 to 2012 was 918 specimens plus 14 kilograms of additional ivory. Nearly half of all specimens (393) were contained in sixteen individual shipments. Table 8 takes a closer look at those sixteen shipments. All of these shipments contained either African elephant products or those listed under "all elephants."

Table 8. Contents and Other Information regarding the Sixteen Largest Ivory Shipments (Ten or More Specimens) Seized upon Importation into the U.S. from 2009-2012

| Ivory Specimens/ Type | Country of Origin | Country of Export | Purpose | Port of Entry | U.S. Importer | Foreign Exporter |
|---|---|---|---|---|---|---|
| 10 carvings | Unknown | U.K. | Personal | Newark | | Anglo Pac. Intl. PLC |
| 10 pieces, scraps | Congo | Belgium | Personal | Memphis | Added Value | |
| 11 carvings | Unknown | Netherlands | Commercial | Atlanta | Kimball M. Sterling Inc. | |
| 11 carvings | Unknown | U.K. | Personal | Denver | | |
| 16 jewelry items | Zimbabwe | New Zealand | Personal | Los Angeles | | |
| 16 carvings | Unknown | South Africa | Personal | Region 4 | | |
| 16 carvings | Unknown | Portugal | Commercial | Houston | | Cabral Moncada Leiloes |
| 16 carvings | Unknown | U.K. | Personal | Louisville | | Stacey's Auctions |
| 21 carvings | Unknown | U.K. | Personal | Chicago | | Gavin Gardiner Ltd. |
| 23 carvings | Unknown | Australia | Commercial | Los Angeles | Joyce Berman Antiques | |
| 27 carvings | Unknown | U.K. | Commercial | Norfolk | Red Schoolhouse Antiques | Scottish Connection |
| 31 carvings | Unknown | Germany | Personal | Atlanta | | Fuchs Interiors Antiques & Interior Design |
| 42 carvings | Unknown | Peru | Personal | Houston | | |
| 43 | Unknown | Australia | Commercial | San | | |

| | | | | | |
|---|---|---|---|---|---|
| carvings | | | | | Francisco |
| 50 ivory piano keys | Unknown | U.K. | Commercial | Region 4 | David Tims Antiques and Auction |
| 50 ivory piano keys | Unknown | U.K. | Commercial | Region 4 | Atlanta Auction Co. |

## C. Ivory Seized upon Exportation from the U.S.

As noted in Part VI(A), in the period from 2009 to 2012, there were ninety-seven entries of seized exports containing elephant parts and products, making elephants the top species grouping for line entries of seized exports from the U.S. [204] This total included parts and products from African elephants and entries listed as "all elephants." Table 9 provides information about the number of specimens for each category of elephant parts and products seized upon exportation.

[*62]   [*63]

Table 9. Seized Exports from the U.S. Containing Elephant Products/Parts from 2009-2012

| Ivory Type | Number of Specimens [205] |
|---|---|
| Ivory carvings | 221 |
| Ivory pieces, scraps | 21 |
| Ivory jewelry | 5 |
| Other carvings (not ivory) | 3 |
| Other jewelry (not ivory) | 1 |
| Total | 251 |

Table 10 lists the main countries of origin and countries of import for each type of ivory product seized upon exportation from the U.S., as well as the ports of departure. When looking at all types of ivory products together, most products listed "unknown" as the country of origin, except for three entries which listed the U.S. [206] The country listed most commonly by far as the country of import for seized ivory exports was China (by export entries). This represents a significant change from similar analyses of ivory exports covering earlier periods, when most of the U.S. ivory exports were destined for the U.K. and other European countries. [207] Chicago was by far the port of departure most commonly used for seized ivory exports, followed by New York.

Table 10. Main Countries of Origin and Import, and Main Ports of Departure for Seized Ivory Exports from the U.S. from 2009-2012

| Ivory Type | Main Countries of | Main Countries of | Main Ports of |
|---|---|---|---|

---

[204] Because the U.S. has no indigenous elephant population, all ivory exported from the U.S. to other nations can be presumed to have originally entered the country as ivory imports. While FWS records these entries as exports, they can also be termed re-exports. "'Re-export' means export of any specimen that has previously been imported[.]" CITES, supra n. 44, at art. I(d).

[205] Note that nearly all specimens (247 out of 251) were ivory products.

[206] The authors postulate that this is an error in data reporting.

[207] Comparable analyses of ivory trade include, for example, the report Tackling the Ivories: The Status of the US Trade in Elephant and Hippo Ivory (2004) by TRAFFIC North America, which looked at data from 1995-2002. Williamson, supra n. 20, at 1.

| | Origin (by export entries) | Import (by export entries) | Departure (by export entries) |
|---|---|---|---|
| Ivory carvings | Unknown, U.S. [208] | China, Hong Kong, Saudi Arabia, Taiwan, Thailand, Japan, New Zealand, U.K., Russia, Singapore, Italy, Ukraine, Laos | Chicago, New York, Anchorage, Newark, Dulles |
| Ivory pieces | Unknown | China, Japan | New York |
| Ivory jewelry | Unknown | China | Chicago, New York |

[*64]

## D. Investigative Efforts and Special Operations Focused on Illegal Ivory

In addition to the seizures of illegal wildlife shipments carried out by FWS wildlife inspectors, FWS special agents and wildlife inspectors team up to disrupt global wildlife trafficking. [209] Seizures at ports of entry often lead to investigations that document large-scale smuggling operations. [210] Special Operations are long-term, complex investigations into the illegal commercialization or large-scale illegal taking of protected plants and animals. [211] These investigations, which are sometimes conducted undercover, involve the penetration of well-organized, highly secretive groups of individuals engaged in the illegal wildlife trade. [212] FWS investigative efforts and special inspection operations take place at air and ocean cargo facilities, passenger terminals, and international mail facilities to disrupt global wildlife trafficking and dismantle large-scale smuggling operations. [213]

In Fiscal Year (FY) 2012, the FWS conducted a total of 12,996 investigative cases, resulting in $ 9 million in fines, 56.9 prison years, 550.5 probation years, and $ 1.1 million in civil penalties. [214] This was carried out with a work force of 219 special agents who actively pursued leads from confiscations

---

208  Again, the authors postulate that this is an error in data reporting.

209  See FWS, About Service Wildlife Inspectors, http://www.fws.gov/le/wildlife- inspectors.html [http://perma.cc/0w1EPECJ2W8] (updated Feb. 14, 2013) (accessed Nov. 17, 2013) ("Wildlife inspectors work closely with Service special agents … . They staff special enforcement task forces that conduct inspection blitzes at international mail processing facilities and other locations or target specific enforcement problems, such as the import and sale of medicinal products made from endangered species.").

210  FWS-OLE, Strategic Plan 2011-2015, at 10, 28 (available at http://www.FWS.gov/le/pdf/OLE-Strategic-Plan.pdf [http://perma.cc/0jaH4ermGPu] (accessed Nov. 17, 2013)).

211  FWS-OLE, About Service Special Agents, http://www.fws.gov/le/special-agents .html [http://perma.cc/0JsJMf5u5tt] (accessed Nov. 17, 2013).

212  Id.

213  About 200 FWS special agents conduct investigations involving "both native species and global trafficking, and [a] four-person intelligence unit supports both domestic and international enforcement work. Investigative priorities focus on unlawful commercialization of protected wildlife, including species listed under CITES" and the ESA. H.R. Comm. on Nat. Resources, Poaching American Security: Impacts of Illegal Wildlife Trade, 110th Cong. (Mar. 5, 2008) (testimony of Benito A. Perez, Chief, FWS-OLE).

214  Law Enforcement at a Glance, supra n. 121, at 2. This includes, in addition to investigations related to combating global wildlife trafficking, domestically focused investigations related to habitat destruction, illegal take, violations of hunting regulations, contaminants, and illegal guiding. Id.

and tips. [215] According to the Woodrow Wilson Center, "Comparatively, the Federal Bureau of Investigations (FBI) has 2,000 [criminal investigators] and the Drug Enforcement Agency has over 5,000 investigators." [216]

[*65]  Since 2008, investigative efforts focusing on ivory have included the following:

[il1.9] . A Canadian citizen was sentenced to prison for five years and fined $ 100,000 for smuggling elephant ivory from Cameroon to the U.S. The defendant's sophisticated scheme to smuggle ivory involved local artists and craftsmen, operatives within international shipping companies, and partners in the black market ivory trade in all three countries. FWS agents worked with a cooperating Ohio business owner to make large purchases of illegal raw elephant ivory. Forensic testing confirmed that the total amount of ivory intercepted during the investigation came from at least twenty-four elephants and had a resale value of about $ 158,000. (2008) [217]

. FWS's Special Inspectors from Memphis, Louisville, and Miami conducted a post-summer Olympics inspection blitz in search of ivory and other unlawfully imported "souvenirs" from Beijing. (2008) [218]

. A similar operation in New York conducted by the port's Special Operations Team resulted in the interception of elephant ivory jewelry, among other wildlife items. (2008) [219]

. Inspection efforts by New York's Special Operations Team resulted in the seizure of twenty carvings found in African cargo shipments. (2008) [220]

. In New York, a foreign national was arrested aboard a passenger flight for smuggling thirty-six pieces of elephant ivory from Africa; he received a prison sentence of sixteen months and was fined $ 5,000. (2008) [221]

. A Nantucket, Massachusetts scrimshander was arrested on charges including smuggling, conspiracy, and making false statements to federal agents in connection to illegally imported elephant ivory. The scrimshander used email to arrange deliveries of the illegal products via California through a Ukrainian man. The investigation involved FWS officers as well as the Massachusetts Environmental Police. (2008) [222]

. Six defendants in New York, New Jersey, Virginia, and Texas were arrested for conspiring to smuggle African elephant ivory from Ivory Coast, Cameroon, and Uganda into the U.S.; the defendants  [*66]

---

215  Id. at 1.

216  Alan Campana, Animal Investigators: Solving Wildlife Crimes and Saving Endangered Species in Brazil and China, http://www.wilsoncenter.org/article/animal-                      investigators-solving-wildlife-crimes-and-saving-endangered-species-brazil-and-china [http://perma.cc/0ZBLgpYFvXM] (May 20, 2009) (accessed Nov. 17, 2013).

217  Annual Report FY 2008, supra n. 196, at 11.

218  Id.

219  Id. at 10.

220  Id.

221  Id. at 11.

222  Press Release, U.S. Dept. of J., Nantucket Scrimshaw Artist Guilty of Smuggling Sperm Whale and Elephant Ivory, Conspiracy, and Lying to Federal Agents (Jan. 28, 2010) (available at http://www.fws.gov/northeast/PDF/MANGHISverdictPR.pdf [http://perma.cc/0j2a2kSvwhU] (accessed Nov. 17, 2013)) ("Manghis was indicted and arrested at his home on Nantucket in April 2008.").

smuggled at least eight shipments through New York, falsely declared as statues or handicrafts. (2009) [223]

. Seizures in Anchorage, Alaska included five shipments containing six Japanese hanging scrolls with elephant ivory knobs. (2011) [224]

. A Philadelphia businessman was indicted on charges for trafficking in African elephant ivory that was smuggled into the U.S. after being carved to order and made to look "antique." FWS investigators seized one ton of elephant ivory from this individual - "probably the largest seizure ever of this material in the U.S." (2011) [225]

. In New York, a man was sentenced to thirty-three months in prison and a $ 25,000 fine for smuggling elephant ivory into the U.S. The defendant was one of six successfully prosecuted individuals involved in this trafficking scheme and was convicted for importing two shipments from Nigeria and Uganda containing seventy-one elephant ivory carvings hidden inside the hollow cavities of wooden and metal handicrafts. The carvings had an estimated market value of $ 73,300. (2011) [226]

. A Florida pool cue manufacturer and an Atlanta, Georgia piano import company were convicted of ivory trafficking, as a result of FWS investigations. (2011) [227]

. An Indiana FWS special agent and FWS wildlife inspectors from Michigan conducted a joint enforcement blitz with customs officers at an Indianapolis FedEx facility that processes over 6,000 packages per night. FWS officers inspected 117 packages arriving from "high risk" countries over two nights. Elephant ivory was included among the seized unlawful imports. (2011) [228]

. The Atlas Fibre Company, a company that manufacturers billiard products in Skokie, Illinois, was fined $ 150,000 for selling products containing African elephant ivory and products made from other endangered species. A division of the company called Atlas Billiard Supplies sold parts involved in fabricating billiard cue sticks, including African elephant ivory. (2012) [229]

In addition, some states conduct their own operations, which vary greatly in scope and frequency. A noteworthy example took place in July 2012, when the Manhattan District Attorney announced one of [*67] the largest seizures in state history. [230] More than $ 2 million worth of illegal ivory was found

---

[223] FWS, Annual Report FY 2009, supra n. 196, at 10.

[224] FWS, Annual Report FY 2011, supra n. 127, at 11.

[225] Id. at 8.

[226] Id.

[227] Id.

[228] Id. at 10.

[229] Emily Bryson York, Skokie Company Fined for Illegally Exporting Ivory, Chi. Tribune (Jan. 10, 2012) (available at http://articles.chicagotribune.com/2012-01-10/business/chi-skokie-company-fined-for-illegally-exporting-ivory-20120110 1 illegal-ivory-african-elephant-ivory-billiard [http://perma.cc/0LisCmb6oe2] (accessed Nov. 17, 2013)).

[230] Lorenzo Franceschi-Bicchierai, Illegal-Ivory Bust Shows Growing U.S. Appetite for Elephant Tusks, Wired (July 12, 2102) (available at http://www.wired.com/wired science/2012/07/2-million-illegal-ivory-bust [http://perma.cc/0CBZ3RmtQHx] (accessed Nov. 17, 2013)).

mostly in tiny pieces used to make small jewelry, animal statues, and carved tusks. [231] The ivory was being sold at two shops in Manhattan, New York Jewelry Mart and Raja Jewels; two owners pled guilty to environmental crimes. [232] They forfeited all the ivory as well and were made to pay fines of $ 10,000 and $ 45,000, respectively, to the Wildlife Conservation Society. [233] In early 2013, another Manhattan-based jewelry wholesaler, Stonex Corp., pled guilty to one count of illegal commercialization of wildlife, a felony offense. [234] As part of the plea settlement, the store owner will forfeit more than 70 pounds of ivory worth more than $ 30,000. [235]

Although the above is not a complete listing of investigations and special operations during the period from 2008 to 2012, it is clear even from this selection that these efforts have yielded successful results in disrupting and preventing the illegal trade of ivory. The amount of ivory intercepted through these operations, when analyzed in terms of quantity of specimens or estimated value of the confiscated ivory, likely exceeds the ivory contained in the shipments that were seized at the U.S. border, upon importation or exportation during the same period. [236]

Despite existing regulations and active enforcement efforts, however, the U.S. remains a large consumer of elephant ivory products, and this legal trade appears to be facilitated by the two major loopholes in the law (hunting trophies and antique ivory), which have allowed a significant amount of ivory trade to continue in the U.S. Part VII provides recommendations to address these problems.

## VII. POLICY ANALYSIS AND RECOMMENDATIONS FOR IMPROVEMENT

The biggest weaknesses with the current U.S. system to control the illicit ivory trade are (1) undetected illegal imports and exports and (2) interstate and intrastate sale of illegal products that are advertised as legal. The authors have found that a significant amount of illegal ivory is being intercepted by the U.S. Fish and Wildlife Service (FWS) [*68] and U.S. Customs and Border Patrol officials; however, just a small number of inspections are actually made, and if illegal ivory gets in, it is almost impossible to identify as such. [237] Much of the domestic commerce - legal or not - happens without oversight or even thorough documentation, which makes it impossible to accurately assess the U.S. impact on species decline. These problems are compounded by genuine confusion over what, exactly, constitutes "legal" ivory. Thus, the time has come to address the reality facing African elephants and the role of the U.S. - federal legislation from Congress or a similar regulatory change by the executive branch is needed in order to provide the framework that will halt illegal ivory trade, and to encourage other nations to do the same.

## A. Options for U.S. Regulatory and Legislative Reforms

[231] Id.

[232] Id.

[233] Id.

[234] Associated Press, N.Y. Jewelry Company Admits Having Illegal Ivory, Wash. Examiner (Mar. 8, 2013) (available at http://washingtonexaminer.com/ny-jewelry-company -admits-having-illegal-ivory/article/feed/2077968 [http://perma.cc/0PBQUWXsDta] (accessed Nov. 17, 2013)).

[235] Id.

[236] See supra tbls. 5, 9 (providing total seized ivory imports and exports from 2009-2012).

[237] Discussed supra pt. IV.

Many of the options listed below can be implemented by either legislation or executive action. While laws and executive action can have the same effects, legislation is generally considered more permanent, as a future administration can relatively easily overturn rules and regulations promulgated by a predecessor. Laws can be amended or overturned, too, but these measures are subject to a more involved legislative process that requires overcoming potential opposition in Congress.

## 1. Import/Export Regulations

Ivory is not permitted to be imported into or exported from the U.S. unless it meets the criteria described in Part III. [238] The main complications with imports and exports are the exceptions for sport-hunted trophies, antiques, and "personal effects," [239] and these exceptions could be changed individually by legislative or regulatory change. As noted, current regulations promulgated by the Department of the Interior (DOI) under the Endangered Species Act (ESA)'s section 4(d) "special rule" clause allow for imports of sport-hunted African elephant trophies and commercial trade (and limited imports and exports) of antique African elephant ivory. [240]

The authors hypothesize that these exceptions, combined with inadequate oversight of the domestic market, create a veneer of legality for the illegal ivory trade and allow illicit products to enter into commerce - the wildlife equivalent of money laundering. This is because there are no federal permitting or registration requirements for ivory once it is in the country, as long as the owner does not attempt to export it. Some purchasers require an affidavit attesting to the ivory's [*69] pre-ban/antique provenance, but even this small assurance is not required by law. [241] Closing the trophy and antiques loopholes would prevent new shipments of ivory from entering the stream of domestic commerce.

While not a legal reform per se, illegal shipments into or out of the U.S. could also be more tightly controlled by increasing the number of border inspections, conducting more - and more intensive - special investigations, and other law enforcement enhancements.

## 2. Control of Ivory Sales within the U.S.

The authors, in conducting research for this Article, have been struck not just by the problems posed by limited resources for enforcement and oversight, but also by the ambiguity of many of the laws and regulations governing the ivory trade, particularly as they apply to interstate commerce - and conversations with senior staff at the FWS Office of Law Enforcement (OLE) made it clear that this frustration is shared by (at least some) of the officials in charge of the system. [242] And as a practical matter, even if the law were straightforward, a fundamental problem is posed by the fact that antique

[238]   See infra pt. VII(A)(3) (discussing the U.S. regulatory requirements imposing some restrictions on the import and export of ivory).

[239]   See CITES Res. Conf. 13.7 (Rev. CoP16), supra n. 64 (defining "personal effects").

[240]   50 C.F.R. § 17.40(e) (2011). The Asian Elephant is listed as ESA-endangered and is banned from imports or interstate trade in the U.S. 50 C.F.R.§§17.11, 17.21.

[241]   See supra pt. III(B) (discussing U.S. laws related to ivory trade).

[242]   Conversations between Craig Hoover, Chief, Wildlife Trade & Conserv. Branch, FWS Div. of Mgt. Auth., Intl. Affairs, and Peter LaFontaine, Author (Sept. 5, 23, & 25, 2013); Conversations between Dan Rollince, Resident Agent in Charge, Richmond, Va., FWS-OLE, and Peter LaFontaine, Author (July 8, 10, & 17, 2013); see Email from Dan Rollince, Resident Agent in Charge, Richmond,

ivory looks no different from recently-poached ivory, making enforcement even more difficult. With this all in mind, the following options could be considered for regulating the U.S. domestic ivory market.

a. Registration System

The Convention on International Trade of Endangered Species of Wild Fauna and Flora (CITES), with Conference Resolution 10.10 (revised at the 16th Conference of the Parties), sought to improve regulation of domestic ivory markets by making sure that parties had a system to (1) register or license importers, manufacturers, and others along the chain of commerce; (2) inform consumers of import/export restrictions; (3) assert compulsory trade controls over raw ivory; and (4) establish a comprehensive and effective reporting and enforcement system for worked ivory. [243] The U.S. was found to be out of compliance with this resolution, [244] which presents an opportunity for reform: by instituting a comprehensive ivory registration and reporting system for ivory items, the U.S. could more effectively oversee domestic trade.

[*70]   However, a registration system is a complex proposition, particularly for countries with large markets like the U.S., that already have an unknown quantity of pre-ban ivory. It would require a public education blitz with the goal of near-100% awareness and compliance, a documentation method that could foil forgers, and extensive policing by wildlife officials. China is the best and biggest example of the registration system in effect, [245] and the results are telling: According to a 2011 study from the International Fund for Animal Welfare (IFAW), Chinese dealers are guilty of "widespread abuse of the ivory trade control system … [and] illegal ivory, once smuggled to the country can be laundered freely through the legal market." [246] Not only did IFAW investigators uncover numerous unlicensed retailers - about twice as many as licensed retailers - almost 60% of the licensed retailers "were found to violate the system in some way to launder illegal ivory." [247]

b. Prohibition of All Ivory Trade in the U.S.

One of the strongest steps the U.S. could take to protect wild elephant populations would be to institute a prohibition on the domestic sale of ivory. This prohibition could be enacted on interstate sales and, if mirrored by complimentary state laws, intrastate sales. The U.S. could enact either a permanent ban, or a temporary moratorium that has an ending or "sunset clause" so that the law remains in effect until certain conditions are met, or upon reaching a specified date.

c. Uplisting the African Elephant to ESA-Endangered and CITES Appendix I

One potential solution - a de facto ban - would require uplisting African elephants to ESA-endangered status, which would eliminate the exception for trophies and prohibit imports, exports, or interstate

Va., FWS-OLE, to Peter LaFontaine, Author, Elephant Questions (July 15, 2013, 5:20 a.m. PDT) (copy on file with Animal Law) (author commenting on shared confusion).

[243]  CITES Res. Conf. 10.10 (Rev. CoP16), supra n. 52.

[244]  Control of Internal Ivory Trade, CITES, SC50 Doc. 21.1 (Rev. 1) (2004) (available at http://www.cites.org/eng/com/sc/50/E50-21-1.pdf [http://perma.cc/02P6dAMHVaH] (accessed Nov. 17, 2013)).

[245]  Gabriel et al., supra n. 85, at 2.

[246]  Id.

[247]  Id.

trade of antiques and pre-ban ivory. Additionally or alternatively, the U.S. could advocate for uplisting all populations of African elephants to CITES Appendix I which would ban international trade in this species. [248] Currently, the populations in Namibia, South Africa, Botswana, and Zimbabwe are listed in Appendix II. [249]

[*71]

### d. The Endangered Species Act 4(d) Rule and African Elephant Conservation Act Loophole Closure

Even without uplisting the African elephant, changes can be made to what is considered legal commerce in ivory. Of the two loopholes listed above, the antiques exception is the larger problem because once ivory is in the country, there is no oversight or legal requirement to prove the age of the item. Therefore, anything can be passed off as "antique" or pre-ban and accrue the benefits of these designations. Leaving aside the thorny question of the ethics of hunting threatened species, the trophy exception may be the smaller problem because it allows imports without the potential for legal sale. However, someone can import a trophy (legally) and then sell the tusks (illegally), and once this occurs the ivory is essentially "laundered." [250]

Closing the antiques loophole would be a bigger step toward solving the problem. Without this exception, all legal interstate trade in ivory (as well as trophy tusks that were illegally repurposed for sale) would cease, although it is likely that some commerce would be conducted on the black market. [251] Still, merchants and consumers could no longer claim that their transactions were above-board.

### e. A Lower Standard of Intent for Criminal Cases

The only case on record analyzing the intent requirements for criminal prosecution under the African Elephant Conservation Act (AfECA), U.S. v. Grigsby, requires specific intent. [252] This requirement is an extremely difficult burden for the prosecution to meet and thus, the government is hesitant to bring ivory smugglers to court. [253] In effect, interpreting the AfECA to require specific intent provides defendants with the ready-made defense of mistaken identity (e.g., "I thought I was importing mammoth ivory"). While it is likely that different U.S. circuits would interpret the law differently, the question of intent can also be dealt with through legislative amendment, by specifying the standard of general intent.

### f. Higher Penalties for Violations

If ivory traffickers and consumers remain complacent about the risk/reward tradeoffs, they will continue to break the law. Civil and criminal penalties could be raised, with higher fines and the real

---

[248]  Uplistings can only occur during the CITES Conference of the Parties (CoP). The next CoP, CITES CoP17, does not occur until 2016. See e.g. Press Release, CITES, CITES Conference Takes Decisive Action to Halt Decline of Tropical Timber, Sharks, Manta Rays and a Wide Range of Other Plants and Animals (Mar. 14, 2013) (available at http://www.cites.org/eng/news/pr/2013/20130314  cop16.php [http://perma.cc/0ifnR2XoJfQ] (accessed Nov. 17, 2013)) (discussing the adoption of strong enforcement measures to fight wildlife crime, including decisions to transfer four species from Appendix II to Appendix I).

[249]  CITES, supra n. 44, at app. II.

[250]  Gabriel et al., supra n. 85, at 2.

[251]  Id. at 3.

[252]  Grigsby, 111 F.3d at 819.

[253]  Id. at 820.

threat of incarceration, in order to remove convicted dealers from the marketplace and to act as a deterrent to would-be traffickers. Prosecutors could also pursue linked offenses such as money laundering, conspiracy, and tax evasion, in these cases.

[*72]

## B. Recommendations

It has been almost three decades since Congress enacted the AfECA, [254] and there can be no doubt that African elephants need further protection. Until measures were taken internationally and by individual countries to stop the ivory trade, the market indicated strong and continued growth from 1950 to 1988. [255] Since the short period of calm (roughly from 1990 to 2006) immediately following the international ivory trade ban, African elephant populations have continued their precipitous decline. [256]

The U.S. took the lead in addressing the ivory trade problem in the 1980s and other countries followed suit; [257] the U.S. can do so again. The government's first order of business in reforming the system should be to clarify and simplify its laws and regulations. Much of the haziness stems from the ESA's "special rule" that makes allowances for antiques and trophy elephant parts; [258] uplisting the African elephant as "endangered" under the ESA would reduce this problem (although the ESA does not restrict intrastate trade). However, there are other options to consider which may be less time-consuming and contentious. Upon thorough analysis of these options, the authors recommend the following regulatory and legislative actions (with legislative reform being the preferable route):

[il1.9] (1) Prohibition on commercial trade: The authors recommend a prohibition on all domestic commerce of ivory, preferably through Congressional legislation or by uplisting the African elephant to endangered status under the ESA. However, a ban on sales through revision of the 4(d) rule and closure of AfECA loopholes would also be acceptable. As discussed above, the difference between a ban and a moratorium is the "sunset" provision (or end date) implied by the latter, and which one to choose is a bit of a political calculation - a moratorium might be easier to obtain, given that it is time-limited, and therefore, less "extreme." The authors recommend an outright ban for several reasons: (1) it may be easier for the public to understand, rather than introducing an element of time-limitation; (2) it carries a certain moral weight, indicating that the "social license" for ivory has been revoked; and (3) it elevates elephant [*73] conservation as a long-term priority. However, if officials deem it politically advisable to pass a moratorium rather than a ban, the authors urge that certain safeguards be incorporated to best serve the aim of species recovery: a moratorium should end only when a comprehensive method for preventing illegal commerce can be fully implemented and vetted, and data show that poaching no longer significantly threatens elephants. A strong moratorium

---

254 FWS, U.S. Efforts, supra n. 63, at 1.

255   Id.; U.S. Ivory Market, supra n. 91; American University, TED Case Studies: Elephant Ivory Trade Ban, http://www1.american.edu/ted/elephant.htm [http://perma.cc/0N6vgvWpzTE] (accessed Nov. 17, 2013).

256 BBC, African Forest Elephants Decline by 62% in 10 Years, http://www.bbc.co.uk/nature/21655613 [http://perma.cc/0iofZQ3Y8np] (Mar. 5, 2013) (accessed Nov. 17, 2013).

257 FWS, U.S. Efforts, supra n. 63, at 1; Press Release, CITES et al., Experts Report Highest Elephant Poaching and Ivory Smuggling Rates in a Decade (June 21, 2012) (available at http://www.cites.org/eng/news/pr/2012/20120621 elephant poaching ivory smuggling.php [http://perma.cc/0eRBWMjixRf (accessed Nov. 17, 2013)).

258 50 C.F.R. § 17.40(e)(iv)(3).

would not have an automatic "sunset clause"; instead, the burden of proof would be on the ivory industry to show that these conditions have been met.

(2) Import/export loophole closures: The U.S. is currently operating under a modified version of the original 1989 moratorium, but the exceptions for antiques and sport-hunted trophies present major hurdles for enforcement. [259] To date, strong lobbying from big game hunters has kept the trophy exemption sacrosanct, and it may be impossible to overturn. But if our goal is to minimize traffic in illegal ivory to the greatest extent possible, then both the exemption for antiques and the exemption for sport-hunted trophies should be eliminated. Barring an outright ban, closing one or both of these loopholes, either for imports or domestic trade, would be the next best step.

(3) Raise the penalties for breaking the law, particularly targeting recidivists and large-scale violators.

(4) Lower the standard of intent for criminal cases to general intent.

(5) Public awareness: The U.S. government should make a concerted effort to elevate the American public's awareness of wildlife crimes, like illegal ivory trafficking, through a coordinated education campaign. This would ideally be a collaboration of government agencies, nongovernmental organizations, the media, and other stakeholders, to help consumers understand their role in the poaching epidemic and their impacts on elephants and other wildlife. In the event that an ivory ban is implemented, efforts would need to be made to inform the public and make sure that ignorance of the law did not perpetuate a shadow market for illegal ivory.

The U.S. has the tools and resources to make a significant difference for a dwindling species, and at the time of this writing the White House is considering rule changes that may reflect some or all of these suggestions. [260] It is important that any reforms be codified - and strengthened if necessary - by Congress, and given the urgency and rising awareness around the elephant crisis, there is hope that our elected officials will take these steps. Consumers, too, have a role to  [*74]  play, by making sure that they avoid ivory products overseas and at home.

## VIII. CONCLUSION

It can be easy to overthink an issue as complicated as this. There are constituencies to placate, legal hurdles to surmount, and decades' worth of international red tape to cut through. These considerations have created a briar patch of "thou shalt nots" that has brought meaningful conservation to a standstill. But underneath it all is a simple truth: without our help, elephants face extinction.

The measures the authors call for are not free; they will require funding and government attention that are hard to come by in a time of austerity. And realistically, a few small businesses may suffer financially if an ivory trade ban is implemented. Ultimately, though, we have to ask ourselves, are we prepared to leave the next generation a world without elephants? What does it say about our society, if trinkets and trophies are valued more than the animals that are killed to furnish the materials? And does it matter that the animal in question is one of the most intelligent, social, and breathtaking

---

[259]  Discussed supra pt. III(B)(3).

[260]  Exec. Or. 13648, 78 Fed. Reg. 40621 (July 5, 2013).

creatures to ever walk the earth? Once you answer those questions, the path is clear - and it is up to all of us to bring these iconic species back from the brink.

[*75]

APPENDIX A:
ACRONYMS

AfECA - African Elephant Conservation Act of 1989

AsECA - Asian Elephant Conservation Act of 1997

CBP - United States Customs and Border Patrol

CITES - Convention on International Trade in Endangered Species of Wild Fauna and Flora

CoP - Conference of the Parties (CITES member states)

DOI - United States Department of the Interior

ESA - Endangered Species Act

ETIS - Elephant Trade Information System

FOIA - Freedom of Information Act

FWS - United States Fish and Wildlife Service

HSUS - Humane Society of the United States

IFAW - International Fund for Animal Welfare

INTERPOL - International Criminal Police Organization

LEMIS - Law Enforcement Management Information System

LRA - Lord's Resistance Army

OLE - Office of Law Enforcement (at FWS)

Res. Conf. [conf. no.].[res. no.] - CITES conference resolution

UNEP - United Nations Environment Program

UNESCO - United Nations Educational, Scientific and Cultural Organization

WCMC - World Conservation Monitoring Center

[*76] [rs text]

APPENDIX B:
METHODOLOGY OF ANALYSIS

The analysis of data derived from legal and illegal U.S. imports and exports containing elephant ivory products is based mainly on data provided by the Office of Law Enforcement at the U.S. Fish and Wildlife Service (FWS), from the declaration subsystem of its Law Enforcement Management Information System (LEMIS), in response to two Freedom of Information Act (FOIA), 5 U.S.C. § 552, requests by International Fund for Animal Welfare (IFAW). The first FOIA request (December 2012) focused specifically on the illegal trade of mammals, birds, and reptiles that are listed under the Endangered Species Act (ESA) and/or Convention on International Trade of Endangered Species of Wild Fauna and Flora (CITES) during the period from 2009 to 2012. Data provided by the FWS reflected imports and exports that were refused entry at the U.S. border, including seizures from individuals as well as commercial shipments. Importantly, data derived from seizures does not reflect the amount of undetected illegal wildlife entering or leaving the U.S., which may differ considerably from the information provided by the data on seizures.

This information was subsequently supplemented by additional related data from the FWS upon IFAW's second FOIA request in February 2013. The additional information utilized the same parameters as the original FOIA request but focused on legal imports and exports that were cleared at the U.S. border. This additional data included some records shipped in 2012 with disposition dates in 2013.

Note that whenever ivory is mentioned in this Article, it is understood that it refers to elephant ivory only (ivory from other species such as hippopotamus, walrus, whale, mammoth, etcetera, is not included in the data analysis of this Article). When looking at the trade in elephant parts and derivatives relative to other species, elephants are referred to as a "species grouping," which includes African and Asian elephants. It should be noted that the LEMIS species codes do not necessarily equate to taxonomic species (for example, some refused species codes may be species-level codes and other codes may represent genus or higher taxonomic level codes). The volume of trade involving the elephant species grouping is compared to other species groupings that include more than one species, such as crocodiles, pythons, and sea turtles.

Throughout this Article, the volume of ivory trade, both legal and illegal, is measured mainly by the number of specimens, and in some cases by weight (kilograms). Main countries of origin, export or import, as well as the main ports of entry, are identified by counting import or export lines of data. A single import or export shipment may be reported as a single line of data or multiple lines of data depending on reporting requirements and the specific items in a given shipment. In the case of elephants specifically, a shipment may be split into separate lines, usually because of differences in the "commodity" within a [*77] shipment (for example, a sport-hunted trophy may be reported on several lines as two tusks, skin, skull, tail, feet, or it could also be recorded as one trophy).

For the purposes of this Article, the luxury ivory market includes antiques and art dealers, interior designers, art galleries, craft stores, and auctioneers, among other businesses that deal with ivory products and objects. While some, if not most, of these businesses offer services and products via the Internet, this data analysis does not include Internet-only platforms such as Craigslist, Alibaba, or Etsy.

The survey of auction houses currently selling ivory products was done using the LiveAuctioneers and AuctionZip search engines. It is important to note that this inventory only reflects a snapshot of the ivory available for sale through auctions at the time that this Article was written, because details are

available only for auctions taking place one to three months into the future. Such inventory does not list any ivory products available at retail stores or from Internet-only market places. Also note that this snapshot is only a rough estimation of ivory products for sale at these online auction houses for that point in time, due to the imprecise nature of the search engines.

Animal Law
Copyright (c) 2013 Animal Law
Animal Law

**EXHIBIT B**

*Dener Giovanini*

# Taking Animal Trafficking Out of the Shadows

## RENCTAS Uses the Internet to Combat a Multi-Billion Dollar Trade

Animal trafficking, the third largest illegal trade in the world after drugs and arms, is a US$20 billion business. Brazil is estimated to account for up to 15% of this illicit global trade.[1] In Brazil alone approximately 38 million animals are poached every year, posing a deep threat to regional and global biodiversity. The trade is as wasteful as it is massive; nine out of ten animals die while being captured or transported, often in torturous circumstances.

Animal trafficking is threatening Brazil's biodiversity at an alarming rate. Over the past 10 years, the official list of Brazilian animals threatened by extinction has nearly doubled. Today, over 600 species are on this "death row." Animal trafficking has played a significant role in the growth of this list. Many species run the risk of disappearing exclusively as a result of their illegal trade. In addition to contributing to the reduction of biodiversity, wild animal trafficking is responsible for the transmission of diseases and disproportionately harms poverty-stricken communities.

As Environmental Secretary in the municipality of Três Rios, a small city in the southern Brazilian state of Rio de Janeiro, in the mid-1990s, I was alarmed by a growing number of incidents involving captured wild animals in my jurisdiction. Sensing a problem of significant magnitude, in early 1999, I founded an organization to address animal trafficking at the local level. My two colleagues, Raulff Lima and Sergio Peixoto, and I named our organization the National Network to Fight the Trafficking of Wild Animals (the Portuguesa acronym is RENCTAS). In seven years, RENCTAS has become the leading force combating illegal animal trafficking

---

*Dener Giovanini is founder of the National Network for Combating Wild Animal Trafficking (RENCTAS). Prior to founding RENCTAS, Giovanini was Environmental Secretary of Três Rios, a city in the Brazilian state of Rio de Janeiro. In 1999 he was elected an Ashoka Fellow, and subsequently honored as a Schwab Social Entrepreneur. In 2003 he was named co-winner of the United Nations Environment Program (UNEP) Sasakawa Environment Prize, among the world's most prestigious environmental awards.*

© 2006 Tagore LLC

in Brazil, and is among the major organizations of its type globally.

When we began, animal trafficking was a non-issue in Brazil. Today it is a public concern addressed regularly on Brazil's major news outlets. We have worked to effect this change by documenting the particulars of the trade, enhancing public awareness, educating law enforcement officials, influencing legislation, and shaping public policy. Central to these successes is our use of the Internet to convert animal trafficking from an unknown and un-quantified issue to a high-priority item on the national policy agenda.

A BURGEONING TRADE
CAUSING ENVIRONMENTAL, SOCIAL, AND ECONOMIC DAMAGE

While animal trafficking has escalated dramatically in recent years, it is not a 20th-century phenomenon. Five hundred years ago, when Europe began colonizing the world, voyagers returned with unknown animals as evidence of having discovered new continents. These animals drew attention and curiosity in Europe, and were soon exhibited and traded in the streets.[2] The possession of wild animals was a symbol of power, wealth, and nobility. This status and curiosity fueled the creation of a profitable business.

Brazil has long been a prime source of "exotic" animals. With an area covering more than 8.47 million square kilometers, Brazil has one of the richest fauna worldwide. It has the greatest number of species, with approximately 3,000 terrestrial vertebrates and 3,000 fresh water fishes.[3] Brazil is the richest country in mammal diversity, with 524 species[4] and ranks third in birds, with nearly 1,677 species,[5] fourth in reptiles, with 468 species, and first in amphibians, with 517 species.[6]

Traffickers plunder Brazil's living resources for four markets. The first market is made up of collectors and private zoos. Although these collectors and private zoos hold illegally extracted animals, many in fact have government authorization to operate. Private collectors are generally extremely wealthy individuals who maintain collections for reasons of vanity. Although this is a serious problem in Brazil, the problem is far more extensive abroad since these collectors are out of the reach of Brazilian law. Supplying private collections is perhaps the most destructive type of wildlife trafficking because its primary focus is the most endangered species; the rarer the species the higher an animal's value. The lear's macaw, for example, fetches US$60,000 on the international market.

The second trade, biopiracy, extracts chemicals from animals for research and production of medicines. This industry is growing daily, with the incursion of illegal researchers within Brazil in search of new species. Huge revenues are garnered from these activities. The nigriventer spider venom is coveted for research on a new and more effective analgesic substance, with a value of up to US$4,000 a gram and the market value for hypertension drugs uniquely derived from one Brazilian snake species is US$500 million.

Biopiracy is supported through a complex operational system that navigates loopholes in laws and discrepancies in international accords. Many animal and

*Taking Animal Trafficking Out of the Shadows*

plant-based chemical substances leave one country illegally but arrive at their final destination as legal. This occurs, among other reasons, because the information-sharing among nations is still deficient. Many countries allow pirated animal materials to enter their territory, unaware of their illegal origins. The organized gangs who operate in this market deploy diverse types of fraud, from falsification of documents to bribing public officials. In some cases animal or plant products are even patented, which requires years to resolve through international courts.

Pet animals are the third market. Boas, turtles, macaws, marmosets, and many other creatures are captured; the few that survive end up in private homes in the United States, Europe, Asia, or elsewhere. The fourth category, fauna products, consists of parts of animals, such as reptile skins or bird feathers, which are used as ornaments and in crafts that cater to the fashion market.

> Animal trafficking, the third largest illegal trade in the world after drugs and arms, is a US$20 billion business. Brazil is estimated to account for up to 15% of this illicit global trade. In Brazil alone approximately 38 million animals are poached every year, posing a deep threat to regional and global biodiversity.

Within Brazil, most stolen animals are transported by trafficking networks operating across highways in trucks, buses, and cars. Corruption and fraud often facilitate the process. According to the Brazilian Federal Police, smuggling is likely to be supported and facilitated by government officers assigned to strategic positions such as ports, airports, and customs offices; on the international side, researchers acting for international traffickers use government-issued credentials. Also, "animal laundering" is carried out in Brazil through zoos or so-called scientific, conservationist, or commercial breeding grounds which provide false certificates claiming that animals were born in captivity. Even when animals are recovered during busts or sting operations, many cannot be returned to nature. Close to 60% are found in conditions so poor as to make their return impossible. These animals must spend the rest of their lives in captivity.

Brazil's animal trafficking supply chain flows through three groups: suppliers, middlemen, and consumers. Suppliers are usually extremely poor people from the backlands of Brazil for whom the fauna trade is a supplementary source of income. The middlemen range from *regatões* (boatmen of the Northern and Mid-Western regions), to farmers, truck and bus drivers, and street peddlers. Small and medium traffickers connect these rural middlemen with the larger, international networks. Large-scale international traffickers operate globally and deploy the same smug-

*Dener Giovanini*

gling and corruption tools as other international trafficking networks. Some zoos and breeding grounds also participate at this level. On the consumer end, animals and animal products land in homes, zoos, aquaria, circuses, private collections, tanneries for industry, fashion stylists and producers, and pharmaceutical industry.

Like the drug trade, animal trafficking capitalizes on an asymmetric economic relationship between the source, usually developing countries with fragile and under-funded enforcement capacity, many of whose citizens desperately need income, and the demand, wealthy countries with purchasing power. This disparity brings corruption, further eroding the ability of Brazil and other developing-country governments to build strong and accountable institutions. The responsibilities of the various enforcement agencies are fragmented geographically by local, national, and regional jurisdictions and bureaucratically by "silos" of operation. Their lack of coordination undermines the ability of enforcement agencies to take on the complex networks used by traffickers to move animals from their point of capture or breeding to the final purchaser.

An alarming development with far-reaching consequences for Brazil and other nations is the integration of trafficking activities, especially between animal trafficking and the drug trade.[7] For example, officials in Miami recently apprehended a shipment of snakes together with packages of cocaine. As animal traffickers become part of larger and more violent global criminal organizations, their capacity to outgun and outmaneuver enforcement efforts grows.

One area where animal trafficking differed notably from the drug trade was in the degree of public awareness of the scope and scale of the problem. In Brazil in the late 1990s, the animal trade was unknown. Ignorance of the problem spanned all regions and socio-economic strata of Brazilian society. For example, in an article published in a daily newspaper an economist and former elected representative was quoted criticizing Brazilian environmental enforcement because it arrested a German trafficker. According to him, the intention of the "poor fellow" was to help Brazil get rid of such plagues as spiders and other venomous animals. The animal trafficking business operated almost entirely under the radar.

USING THE INTERNET TO GATHER AND ORGANIZE
INFORMATION ABOUT THE TRADE

When Raulff Lima, Sergio Peixoto, and I started RENCTAS in Três Rios in 1999, information technology, including the Internet, was not part of our plan. Our small team began by delivering workshops on the animal trafficking problem, and we began collaborating with law enforcement groups and environmental agencies locally and nationally. We also provided support to research projects concerning conservation of endangered species and carried out national awareness campaigns. Yet in trying to bring attention to the problem, we were confronted with indifference caused by a sustained lack of information.

Many of the advocacy and training activities in which we engaged were fairly

*Taking Animal Trafficking Out of the Shadows*

traditional for non-governmental organizations (NGOs) at the time. However, from the outset, the other critical component of our work was researching and investigating trafficking activity so we could report it to the enforcement authorities for action. Initially, all our research, tracking, and reporting of the illicit animal trade was paper-based. This changed late one Saturday night in our first year of operation. I was home when I received a call at 10:00 p.m. from a police officer at an international airport. She had just apprehended a foreign citizen who had in his suitcase nearly 500 toads and 200 snakes. He was bound on a flight to a European destination. As this individual was claiming that he was unaware that taking these animals out of the country was illegal (a common ploy by traffickers), the officer urgently needed to corroborate whether he had been involved in other criminal trafficking activity in Brazil, as this would escalate the gravity of the charges. Without this evidence, the police would be required to let him go after a brief detention and confiscation of the animals. With the clock ticking, I quickly called several colleagues away from their normal Saturday night festivities and together we began to search frantically through our piles of files containing approximately 30,000 papers. At 5:00 a.m., having given up, I sat in my chair, despondent—and saw the paper I had been looking for, face up on the floor among all the other papers.

Having found the needle in the haystack, we immediately phoned the police officer, who told me that, regretfully, they had just released the suspect due to lack of evidence proving deliberate intent to traffic animals. At that moment we realized the imperative of collecting information electronically. Soon thereafter we purchased database software and computers, and digitized our records.

Nevertheless, the story of the snake-trafficker resolved itself favorably. One year later, I received a phone call from a judge in the Amazonian city of Manaus, who had participated in one of our training workshops. She informed me that the following day she would make a judgment on a case involving a foreign citizen who claimed no knowledge of Brazilian law regarding animal transportation. Three minutes later I had pulled the records on the individual, the same who had gotten away the year before! This time, the government had the information it required to press the case.

This "back end" database allowed us to track larger volumes of criminal activity; however, we quickly discovered that criminals didn't appreciate being tracked. At that point our base of operations was very local (in the state of Rio de Janeiro) and very high-profile through talks we gave, our interactions with law enforcement, and so forth. One day I was in a local hotel giving a speech when through a door I saw a gun pointed at my head. The message was clear; the traffickers were giving me a "last chance" to withdraw our activities. This threat, coupled with an increasing volume of e-mails from citizens and collaborators, made clear the advantages–and necessity–of "going virtual."

Although we were dragged by circumstance and frustration into the information age, once online we were deliberate and aggressive in how we used our new capacity. From this point forward we chose the Internet as the primary venue for

*Dener Giovanini*

our work. The original core model of our virtual operation consisted of a website we developed to allow ordinary citizens to report tips–instances of animal capture, sale, transport, or illegal breeding. RENCTAS investigated the tips and passed the findings to local law enforcement for action.

Our investigators also began using the Internet to scour auction sites, chat rooms, and pet and collector bulletin boards for clues to illegal animal trafficking. RENCTAS also employed old-school investigative tools such as the telephone and even a CB radio to speak with truckers. The Internet, however, proved the most efficient and effective way to gather information. As those who live by the sword die by it, those who trade on the Internet can also get caught in it: One of our techniques for identifying middlemen and sellers has been to pose as buyers on some of the more than 5,000 animal sites that cater to animal traffickers.

The Internet has also provided a higher degree of anonymity to those wishing to report animal trafficking crimes without being detected, as they might be by walking into a local police station in a small town. But even with the Internet, we must be careful. Given the risks inherent with digitally storing personal information, all tips are immediately taken off computers and stored separately in safe locations to protect the individual informers.

By the late 1990s, e-activism was nothing new. What was novel, however, was our approach to it. Many NGOs were active online through chain-letter petitions, letter-writing campaigns, and general list-serv-based forums for discussion. These activities tended to be one-directional, directed at already mobilized constituents, and they rarely linked the common citizen to tangible results.  In contrast, we internally mandated that each tip receive a personalized response and gave priority to updating our tipsters on the results of their contributions. It was clear to us that virtual and anonymous online interactions required heavy personalization to effectively build a community base.

TAPPING THE STRATEGIC LINK
BETWEEN VIRTUAL INTERACTIONS AND MEDIA DISSEMINATION

From this model of heavily personalized online information brokerage, two challenges began to emerge. First, although RENCTAS could investigate many local cases, enforcement spanned many local, sub-national, and national government levels in Brazil, a huge country. A second growing challenge for our investigative staff of two was the sheer volume of tips, which were coming into our system at an average of 30 per day. The problem of improving our coordination with government enforcement agencies was partially addressed by our move, after one year of operation, from the state of Rio de Janeiro to Brasilia, the country's capital, in January 2000. This gave us proximity to the federal government's federal police and environmental agencies such as IBAMA (Brazilian Institute for Natural and Renewable Resources) and the Ministry of Environment.

Our move to Brasilia also coincided with a shift in the balance between virtual and traditional interactions. While we maintained our website for tip-gathering

*Taking Animal Trafficking Out of the Shadows*

and for nationwide reach—continuing to broker information between citizens and law enforcement officials—we began to leverage the value of that capacity in novel and powerful ways. The tips we received related, variously, to each point along the traffickers' supply chain, from source to final buyer. We began to translate the information in those tips into a clear picture of the trade. By aggregating the bits and pieces we gathered through the Internet, we achieved an understanding of the process of animal trafficking unsurpassed by anyone except, perhaps, the traffickers themselves.

> The tips we received related, variously, to each point along the traffickers' supply chain, from source to final buyer. We began to translate the information in those tips into a clear picture of the trade.

We used this aggregated information to tell a compelling, and tragic story. In January 2000, at the same time as our move to Brasilia, Brazil's largest television network, Rede Globo, broadcast a five-part series on animal trafficking called "Life for Sale" based on the work of RENCTAS.[8] In addition to dramatically boosting awareness of the problem, the Globo series generated an explosion of 28,000 new tips, queries, and other information through the RENCTAS site from throughout the country. In the Brazilian print press, coverage of animal trafficking in the country's four leading daily newspapers multiplied fourfold between 1999, the year of RENCTAS' inception and 2006. RENCTAS and the problem it combats have been featured in the leading international press as well, including *The Economist*, the BBC, *National Geographic*, and the *Christian Science Monitor*.

One reason our media work in Brazil has been so effective is that we have appealed to a sense of national pride in one of our most distinctive attributes: our biodiversity, as symbolized by beautiful and unique animals. Appealing to the emotional side of the problem also served another purpose: it gave us political coverage and thus protected us from counterattacks, be they from corrupt officials or the traffickers themselves.

Increasingly we learned to manage the interplay between our Internet work and press coverage of animal trafficking. For example, each time a story appeared in a local newspaper, our staff sent e-mails with a link to the article to our subscribers, encouraging people to write the newspaper to thank them for covering the issue. This positive reinforcement motivated more coverage that, in turn, drove even more traffic to RENCTAS. The dynamic between Internet and media ultimately served our goal of creating awareness of a formerly invisible issue. The next question was how to translate this awareness into changes in policy and practice.

We came to understand that many of the visitors to our website were environmentalists who would respond to pleas for action. Using postings on the home

*Dener Giovanini*

page of the site along with the "push" of e-mail messages to over 60,000 sub-
scribers, we developed the capacity to respond to specific issues
or threats. For example, at 9:00 a.m. one morning we learned that a measure with
harmful implications for wildlife conservation would be discussed and decided
upon that day at 11:00 a.m. in one of the Brazilian government agencies. We post-
ed the news on our site and via our e-mail listserv. By 10:30 a.m. 25 activists
dressed in black RENCTAS "uniforms" and wearing dark glasses were flashing
cameras at the participants arriving at the meeting. Our goal was to apply pressure
on decision makers by evoking an intimidating image, while suggesting that their
picture might appear in the media associated with an unpopular decision. We suc-
ceeded in influencing the outcome of this policy decision with only five minutes of
effort that morning.  We increasingly use this type of "power of persuasion" to
accomplish our goals.

## RENCTAS AND BRAZIL'S GOVERNMENT

In our early efforts to build relationships with local, national, and international
government organizations, we found that government attitudes about the problem
encompassed everything from inertia to outright obstruction by officials who were
probably compromised by the trafficking trade. We developed a two-pronged
approach to meet this challenge. First, we discovered pockets of enthusiasm among
lower-level government technical staff, many of whom were committed to saving
the environment. In contrast to many more combative Brazilian activist NGOs at
the time, we were cooperative with the government. At the same time, RENCTAS
never accepted government grants or program support to ensure its complete
autonomy. This stance has played a key role in building trust and respect with gov-
ernment officials, who realized that RENCTAS was not after their money.

Our strategy of collaborative autonomy allowed us to build support from the
bottom up in ministries and police agencies. We combined this with top-down
political pressure generated by the increasingly visible cycle of media publicity and
the growing volume of tips and other forms of citizen involvement flowing into
RENCTAS through the Internet. RENCTAS and the animal trafficking problem in
Brazil could no longer be ignored. As a result of our efforts, the Brazilian
Parliament created an Inquiry Commission to investigate the problem and the
Federal Police launched and implemented a national campaign against animal
trafficking. Interpol, the Brazilian Federal Police, IBAMA (the Brazilian national
environmental agency), the U.S. Department of Justice, CITES (the Convention on
International Trade in Endangered Species of Wild Fauna and Flora, headquar-
tered in Switzerland), WEG (Wildlife Enforcement Group, New Zealand) have all
grown to depend on RENCTAS for information and collaboration.

As time progressed, RENCTAS has increasingly diversified its operations and
has taken on training programs for police, hosted international conferences, and
published a book detailing the levels and patterns of animal trafficking.[9]

*Taking Animal Trafficking Out of the Shadows*

KEEPING PACE WITH AN INCREASINGLY GLOBAL AND INTEGRATED
TRAFFICKING NETWORK

Just as the Internet has evolved, so have we. While we continue to use the Internet to drive enforcement, media coverage, activism, and public policy domestically and internationally, we are also expanding our use of Web conferences and instant messaging to interact online in realtime with our collaborators. We are also expanding our use of "just-in-time" activism, relying especially on our advocacy e-mail list of 60,000 thousand activists for pointed, rapid mobilization focused on public policy decisions.

Ironically, while it was the traffickers who drove us to the Internet in 1999, now we have driven them into more virtual spaces. The clearest evidence of this is the disappearance of open markets in Brazil where, until a couple of years ago, one could purchase huge varieties of birds, reptiles, and even primates. As with all other forms of global criminal networks, from drug traffickers to terrorists, animal trafficking networks increasingly deploy technology to their advantage to circumvent local enforcement and to capitalize on the lack of both legislation to regulate their online activities and government information-sharing to pursue them. Our challenge is to keep pace with them, which we do by increasing our undercover presence in their online worlds. We are also working to influence government regulation over these activities; most recently we succeeded in providing the Brazilian justice ministry with information on over five thousand violations based on our research of offers of illegal animal sales on the Internet.

> As with all other forms of global criminal networks, from drug traffickers to terrorists, animal trafficking networks increasingly deploy technology to their advantage to circumvent local enforcement and to capitalize on the lack of both legislation to regulate their online activities and government information-sharing to pursue them.

One of our most significant recent actions has been to move directly into the distribution channels by partnering with transportation companies that have served, often but not always unwittingly, as the conduits for animal trafficking. We currently partner with the Itapemirim Group, one of Brazil's largest passenger transportation companies. Itapemirim was even considered an "accomplice" of traffickers by some sectors of the government and society since its buses were often used by traffickers. This bad publicity eventually compelled Itapemirim to rethink its position in the market. By partnering with RENCTAS, the firm and its clients,

*Dener Giovanini*

suppliers, and employees have been educated to realize that they were victims, not villains. We have conducted a massive joint PR campaign to raise awareness among the company's drivers and passengers about animal trafficking. A second effort to reach into the traffickers' transportation networks in Brazil involves our collaboration with the Martins Group, one of Latin America's largest trucking firms which travels over all of Brazil's roads. The company's entire team of truck drivers has been provided with awareness training.

The aim of our partnerships with both Itapemirim and Martins is to make it more difficult for animal traffickers to use transportation networks to transport animals. By educating the drivers, cargo handlers, those in management positions, and even the firms' clients, we increase the level of vigilance and make it more difficult for all of these people to be co-opted into the animal-trafficking process. This, in turn, leads to fewer denunciations (tips) linked to specific buses or trucks (due, we believe, to reduced trafficking) which in turn translates into better business for the transportation companies.

LOOKING AHEAD

Our work has garnered public recognition. In 1999 I was honored to be awarded a fellowship by Ashoka for my work with RENCTAS, and in 2003 I received the United Nations Environment Programme (UNEP) Sasakawa Environment Prize, considered the highest distinction for environmental work in the world.  In 2004, Former Brazilian president José Sarney, then leader of the Brazilian Senate, bestowed upon me the National Congressional Medal. At this ceremony he summarized what we do:

> The great merit of RENCTAS was, without doubt, to show Brazil a country we didn't know. Today the trafficking of animals has come out from the shadows thanks to the light that RENCTAS cast upon it to be seen by all except those who refuse to look.

Indeed, lifting the curtain on this activity in Brazil is an important accomplishment. However, just as trafficking is both global and domestic, our work increasingly involves both spheres. The challenge at home still looms large. Perhaps our biggest barrier is the relative lack of a civic and philanthropic culture to support wildlife preservation in Brazil, among other things. Getting companies and citizens on board in sustainable ways is a huge uphill battle in a country with a limited history in philanthropy or corporate responsibly. Many of our future efforts in Brazil will be directed in this area. On the global front, we must raise awareness among the consumers of animals and their products. Currently we are working with the Brazilian Foreign Ministry to conduct an awareness campaign abroad with posters, brochures, and other educational materials through our embassies worldwide.

Unfortunately, the accomplishments of RENCTAS and our colleagues in other organizations can not ensure the survival of the 600 Brazilian species now on extinction's "death row," nor can they ensure the sustainability of our planet's bio-

*Taking Animal Trafficking Out of the Shadows*

diversity.  As with arms and drugs, traffickers service a demand. Until citizens—particularly individuals and institutions in industrialized countries—hold themselves and their governments fully responsible for curtailing consumer demand for illegally traded animals, the traffic will continue.

## Acknowledgements

I thank Winthrop Carty for his work in translating this paper from the Portuguese, and providing invaluable assistance in framing and organizing the ideas presented. I also thank Ashoka for their support along multiple dimensions, including the development of a previous case study of RENCTAS.[10]

*We invite reader comments. Email <editors@innovationsjournal.net>.*

1. Rocha, F.M. (1995) Tráfico de Animais Silvestres, WWF. Discussion Paper.

2. Hagenbeck, C. (1910) *Animales y Hombres*. Hijos de Carlos Hagenbeck. Editores, Hamburgo-Stellingen, . 483.

3. Mittermeier et al, (1992) "O País da megadiversidade". *Ciencia Hoje* (14): p. 20-27, 81.

4. Fonseca et al, (1996). Lista Anotada dos Mamíferos do Brasil. Ocasional Paper no. 4, April, Conservation Internacional.

5. Sick, H. (1997) *Ornitologia brasileira*. Nova Fronteira, Rio de Janeiro, p. 912.

6. Mittermeier et al, 1992

7. This relationship is documented in the final report of the Brazilian Congress's Parliamentary Inquiry Commission on Animal Trafficking.

8. "Vida a Venda" in Portuguese.

9. "First National Report on Fauna Traffic in Brazil." Available in PDF format from <http://www.renctas.org>.

10. Additionally, this article drew from a report written by Shannon Walbran, then of Ashoka in 2002 and from a case study co-authored by Stanley Yung, then of Ashoka, and Winthrop Carty, then of the Ash Institute at Harvard University. For more about Ashoka see <www.ashoka.org>.

**EXHIBIT C**

# An Economic Assessment of Wildlife Farming and Conservation

ERWIN H. BULTE* AND RICHARD DAMANIA†

*Department of Economics, Tilburg University, P.O. Box 90153, 5000 LE Tilburg, The Netherlands, email e.h.bulte@uvt.nl
†School of Economics, University of Adelaide, Adelaide 5001, Australia

**Abstract:** *The supply-side approach to conservation, as recommended by economists, prescribes the provision of cheap substitutes for wildlife commodities in an effort to lower the price of such commodities and reduce harvesting pressure. We developed a theoretical economic model to examine whether wildlife farming or ranching indeed contributes to conservation. We first present the naïve economic model that lends support to the supply-side approach. This model is incomplete because it fails to capture the fact that most wildlife markets are not perfectly competitive (instead, models are characterized by a small number of suppliers who have a certain degree of market power), which also implies that it fails to incorporate strategic interaction between suppliers. We then present an alternative model of the (illegal) wildlife trade that reflects imperfect competition and strategic interaction, and demonstrate that wildlife farming may stimulate harvesting (or poaching) rather than discourage it. By applying the model to the case of rhinoceros poaching and ranching, we demonstrate the potentially ambiguous outcomes of rhinoceros-ranching initiatives—wild rhinoceros stocks may recover or suffer from additional depletion, depending on key parameters and the type of competition on output markets. We also show that this type of ambiguity may be eliminated when policy makers restrict quantities of farmed output through a quota system; in that case, introducing wildlife farming will unambiguously promote conservation. In the absence of such accompanying regulation, however, policy makers should be careful when stimulating wildlife farming and be aware of potentially adverse consequences.*

**Key Words:** captive breeding, poaching, rhinoceros conservation, rhinoceros dehorning, wildlife ranching, wildlife trade

Una Evaluación Económica de la Crianza y Conservación de Fauna Silvestre

**Resumen:** *La estrategia de abastecimiento para la conservación, recomendada por economistas, propone el suministro de sustitutos baratos de los artículos de consumo provenientes de vida silvestre en un esfuerzo por disminuir el precio de tales artículos y reducir la presión de captura. Desarrollamos un modelo económico teórico para examinar si la crianza de fauna silvestre realmente contribuye a la conservación. Primero presentamos el modelo económico simple que soporta a la estrategia de abastecimiento. Este modelo está incompleto porque no considera el hecho de que la mayoría de los mercados de vida silvestre no son perfectamente competitivos (dichos mercados se caracterizan por un número pequeño de proveedores que tienen cierto grado de fuerza de mercado), lo que también implica que no incorporan interacciones estratégicas entre proveedores. Luego presentamos un modelo alternativo del comercio (illegal) de vida silvestre que refleja la competencia imperfecta y la interacción estratégica y que demuestra que la crianza de fauna silvestre puede estimular la captura (o cacería ilegal) en lugar de disuadirla. Aplicando el modelo al caso de la crianza y caza ilegal de rinocerontes, demostramos los resultados potencialmente ambiguos de las iniciativas de crianza de rinocerontes—las existencias de rinocerontes silvestres se pueden recuperar o sufrir mayor reducción dependiendo de los parámetros clave y del tipo de competencia en los mercados resultantes. También mostramos que este tipo de ambigüedad puede ser eliminado cuando tomadores de decisiones restringen la producción en cautiverio por medio de un sistema de cuotas—en ese caso la introducción de crianza de fauna silvestre promoverá la conservación sin ambigüedades. Sin embargo, en ausencia de tal reglamentación acompañante*

*Paper submitted September 10, 2003; revised manuscript accepted September 8, 2004.*

1222

Conservation Biology 1222–1233
©2005 Society for Conservation Biology
DOI: 10.1111/j.1523-1739.2005.00149.x

*los tomadores de decisiones deberán tener cuidado al estimular la crianza de fauna silvestre y estar alertas de consecuencias potencialmente adversas.*

**Palabras Clave:** cacería furtiva, comercio de vida silvestre, conservación del rinoceronte, crianza de fauna silvestre, descornado de rinocerontes, reproducción en cautiverio

## Introduction

An important threat to the survival of many wildlife species in developing countries is harvesting of wildlife for meat or other commodities such as bones, skins, horns, tusks, and bladders. To protect species from overhunting, various (complementary) conservation measures are used. The key insights to safeguard endangered species from excessive hunting pressure are based on simple economics—conservation efforts should be geared toward reducing the benefits of harvesting or increasing its cost. Information campaigns, for example, are aimed at lowering consumer demand by stigmatizing the consumption of certain wildlife goods (e.g., ivory consumption in Europe and the United States). As a result, demand shrinks and prices fall, eroding the profitability of harvesting effort and lowering hunting pressure. Enforcement by antipoaching units, in contrast, raises the cost of poaching by introducing an expected fine or penalty. In certain countries, such as Zimbabwe, Nepal, and Kenya, penalties can be as severe as being shot to death (Messer 2002).

Both approaches—raising costs and reducing benefits—have been effective with varying degrees of success. Raising consumer awareness and altering human preferences, however, are difficult and time-consuming and often have only limited impact. Monitoring and enforcement are obvious solutions, but they are expensive. And expense is a serious consideration in light of tight budget constraints and fiscal deficits in many developing countries. It is no surprise, then, that there is a constant search for new and more cost-effective ways to enhance conservation.

One rather new, market-based approach to restrict harvesting appears to be gaining momentum; we call it the "supply-side approach" to wildlife conservation. Interestingly, its main supporters are economists, not conservation biologists. Supply-side conservation aims to provide a cheap substitute for the wildlife commodity in question, depressing the commodities' market price, which lowers hunting incentives and forces harvesters to search for alternative employment. Supply-siders recommend "flooding" the market for wildlife goods with farmed varieties (Brown & Layton 2001) or with other substitutes such as stockpiled goods (Kremer & Morcom 2000) or chemical substitutes (Mills et al. 1995). For example, Viagra has affected the trade in velvet from reindeer antlers, harp seals, and hooded seal penises—all commodities prescribed as aphrodisiacs in traditional Asian medicine (von Hippel & von Hippel 2002).

There have been proposals to begin farming wildlife for specific commodities—bears for bile, tigers for bones and other organs, rhinoceros for their horns—as well as to farm animals for more generic output such as bushmeat (Clayton et al. 2001). Supply-side conservation has also been recommended to curb the buoyant illegal trade in live endangered species such as seahorses, birds, and reptiles (Commonwealth of Australia 1998). A key element common to all approaches is that segments of the (international) trade in wildlife commodities is legalized so that the legal trade can crowd out the illegal trade.

Despite its logic and appeal, many conservationists are reluctant to adopt the supply-side approach without further analysis. We argue that they are correct and evaluated the prospects of supply-side policies for conservation. We argue that the basic premises of the supply-side model ignore important elements of conservation, and demonstrate that this model may at times be counterproductive, triggering extra harvesting and further deterioration of wild stocks.

We considered the particular market structure of certain parts of the (endangered) wildlife goods trade and focused on the wildlife trade characterized by imperfect competition and few active traders. The trade for certain wildlife commodities is run by criminal networks that are involved in smuggling and trading wildlife goods and in trafficking of arms, drugs, and people across borders. Support for this assertion comes from three distinct sources: (1) studies conducted for conservation organizations such as World Wildlife Fund and TRAFFIC, (2) law enforcement authorities, and (3) academic work (e.g., Galster et al. 1994; Commonwealth of Australia 1998; Le Duc 1999; Galster & Eliot 2000; Cook et al. 2002). Within a criminal network, introducing competition from farms might trigger various strategic responses from incumbent traders, including one that is detrimental to conservation. The nature of the emerging competition between traders and farmers will determine the exact outcome that is, essentially, unknown a priori in many cases.

We focused exclusively on situations in which farmed commodities compete with poached output from the wilds in an effort to discourage poaching. We did not consider the ethical aspect of raising species, such as captive bears for their bile; the private profitability of wildlife farming; or the potentially important role of wildlife farming to restock empty habitats. We also did not consider the impact of wildlife farming on the conservation of wildlife when the trade in wildlife commodities is characterized by perfect competition, which is arguably the context

*Conservation Biology*
Volume 19, No. 4, August 2005

for many wildlife commodities, including bushmeat and certain reptile skins. Our focus is on farming endangered species that are currently protected and, when harvested, are traded illegally by criminal networks. We therefore use the terms harvesting, hunting, and poaching interchangeably.

## Wildlife Farming and Conservation

Growing and breeding wildlife in captivity takes various forms. Although the terminology associated with captive propagation can at times be confusing and contradictory, the term "captive breeding" usually refers to zoos and efforts to breed wild animals for conservation. "Wildlife farming" typically refers to intensive management and husbandry of wild stock, and "wildlife ranching" usually refers to less-intensive management in semifree ranching contexts and applies to rhinoceros breeding. Sometimes ranching involves raising eggs or juveniles collected from the wilds (such as with crocodile ranching), but this is not always the case. Our focus is on farming and ranching supported by commercial captive propagation, resulting in a flow of output that can be sold on wildlife commodity markets and how these operations interact with supplies from the wilds. We use the words *farming* and *ranching* interchangeably.

There are opposing views on the impact of wildlife farming on conservation. A plethora of perspectives is contained in a recent volume by the IUCN/SSC (2001). There are several arguments why commercial farming may contribute to the conservation of wild stocks. Farmed supplies may simply discourage harvesting from the wilds through its depressing effect on prices. In addition, in certain cases farmed animals can be used to restock depleted populations in the wild (unless such individuals carry contagious diseases). When demand for wildlife commodities is growing rapidly (e.g., certain food items and traditional Chinese medicine), meeting demand with supplies from the wild without destroying the wild stock may be impossible. It has also been argued that captive populations may provide a genetic safety net for wild populations and that a share of the revenues from farming or ranching may be used to fund conservation of wild stocks. Finally, when harvested from the wild, many animals in the pet trade die during transport to consumer markets. Breeding such pets closer to consumers can prevent many unnecessary deaths.

There are downsides to farming as well. When harvesting from the wild is banned, introducing a legal flow of farmed output may facilitate the "laundering" of illegal output from the wild through, for example, false paperwork. Dobson and Poole (1992) use an argument along these lines to encourage the retention of the ivory trade ban. The availability of farmer wildlife may confuse consumers by sending a signal that the wild species is no

longer endangered, or it may reduce the stigma associated with consuming certain wildlife commodities. This inadvertently inflates demand (and prices). When wildlife farms or ranches are restocked from the wild (effectively transforming a common good into a private), farming can result in more intense hunting pressure for animals as an intermediate input into farming systems. On the other hand, when farms and ranches are closed systems and completely separate from wild stocks, they may remove the incentive to protect the wild resources altogether—why invest in the conservation of wild resources when farmed substitutes are readily available? Farming may also undermine the profitability of use programs through its impact on prices, compromising farm viability and decreasing the scope of conservation through sustainable use.

With so many conflicting arguments, it is no surprise that the debate about the desirability of wildlife farming is unsettled and remains a controversial topic. Real-life examples are scarce and cannot guide decision making. For example, Meacham (1997) argues that the laundering effect has caused the (near) extinction of the wild crocodile in Thailand. In contrast, widespread bear farming in China in the 1990s stabilized Chinese prices for bear bile (Mills et al. 1995), whereas such prices have increased substantially elsewhere in Asia (providing an incentive to expand harvests from the wilds there). Crocodilians provide one exception for which adequate data are available. Ross (2001) argues that countries with crocodile-farming systems that have severed all direct and economic interest of commercial operators from the wild population are typically associated with poorly known and depleted crocodilian populations. In light of these conflicting arguments and findings, it is perhaps no surprise that Parry-Jones (2001) concludes that "captive breeding's actual conservation impact on wild populations has yet to be documented."

## The Supply-Side View

One of the main reasons why people believe wildlife farming will contribute to conservation of wildlife is through its depressing effect on prices for wildlife goods. Supply-side conservation typically rests on the (implicit) assumption that the market for wildlife commodities is characterized by perfect competition; that is, there are many hunters or poachers, each taking the price of the wildlife commodity as a given and beyond their control. Moreover, poachers do not have property rights to the resource. Although they may recognize that excessive harvesting today curtails the scope for hunting tomorrow, they also are cognizant of the fact that any wildlife left unharvested today (an investment decision) will not be available to them for future use but instead will be taken by another poacher. This implies that no poacher is willing



*Figure 1. (a) Demand and supply of wildlife commodities. Extra supply from farms lowers the price of the wildlife good from s (price level that balances demand and supply) to S (new, lower market price). (b) Lower prices of the wildlife good will trigger an outflow of labor from poaching to other sectors in the economy and an increase in the equilibrium wildlife stock from $x_0$ (initial wildlife stock) to $x_F$ (new equilibrium of wildlife stock) (s, price of wildlife commodity without wildlife farming; S, price with wildlife farming; F, total demand at price S; $q_F$, supply from wilds at price S; $q^*$ supply from wilds in absence of wildlife farming; dx/dt, change in wildlife stock over time interval dt; dE/dt, change in poaching effort over time interval dt; Z, open-access interior solution.)*

to forego current harvesting to enhance future production and, in economic jargon, poachers discount the future at a very high or infinite rate. In short, they act as static optimizers.

There are various specifications of the basic poaching model outlined in the Appendix, and alternative specifications have been used to analyze the demise of many different species resulting from hunting in the past (e.g., Wilen 1976, seals; Björndal & Conrad 1987, herring; Amundsen et al. 1995, minke whales; Bulte & van Kooten 1999, elephants; and Bulte et al. 2003, Tasmanian tigers). One convenient specification is to define poaching as an economic activity that yields a certain return per unit of labor (or effort) based on the (1) price of wildlife commodities and (2) size of the wild stock. These are two variables beyond the control of the individual poacher. Because there are no property rights, no one can be excluded from harvesting the species. This implies that labor (effort) will spill into this activity as long as the returns to poaching are higher than the returns to labor elsewhere in the economy. Conversely, labor will flow out of the poaching sector when the reverse is true. In an interior equilibrium, therefore, the return to labor in poaching must be equal to the return to labor in some other sector, and hunting

effort does not change over time. In equilibrium (Fig. 1), wildlife replenishment also equals aggregate off-take so that the wildlife population does not change over time.

Effects of aggregate supply and demand on the output market for the wildlife good (Fig. 1a) and equilibrium conditions for hunting effort and the wildlife population in question (Fig. 1b) (see the Appendix for details on derivation) are obviously interconnected. The solid upward sloping line in Fig. 1b depicts all combinations of the wildlife stock ($x$) and aggregate poaching effort ($E$) that, for a certain wildlife commodity price, $s$, yield an unchanging effort level: dE/dt = 0, where dE/dt measures the change in effort (dE) over a small time interval (dt). When dE/dt = 0, or effort is unchanging, the marginal poacher recovers only the opportunity cost of his effort and earns zero profits. The solid downward sloping line depicts all combinations of $x$ and $E$, where harvesting is equal to growth such that the wildlife population is unchanging over time: dx/dt = 0. The intersection of these two lines is the unique and stable equilibrium of the open-access system, and we denote it with $Z$.

In Fig. 1b at equilibrium $Z$, the marginal poacher earns zero rent, given wildlife price $s$. Figure 1a describes how this price comes about according to the supply-sider view.



*Figure 2. Captive breeding equilibria with imperfect competition. Farmed output shifts the residual demand curve inward (from $D_1$ to $D_2$). In response, depending on the type of competition, traders of products from the wilds may supply Cournot ($q^c$) or Bertrand ($q^b$) quantity (i.e., respond by supplying less or more; $q^*$, supply from wilds in absence of wildlife farming).*

Price $s$ is the unique price level that exactly balances demand for the wildlife commodity and supply from the wild (at production/consumption level $q^*$ which, in equilibrium, must be exactly equal to replenishment of the wild stock at population level $x_0$ in Fig.1b). Assuming perfect competition in this market, the supply curve is defined by the marginal cost of harvesting (or the foregone returns to labor elsewhere in the economy). For the functional specification in the Appendix this amounts to a linear upward sloping line as drawn in Fig. 1a (given any wildlife stock $x$).

Introducing wildlife farming essentially adds production capacity to the market. For each price, there is some additional supply. For Fig. 1a this implies that the supply curve shifts out and is represented by the thick dashed line. Assuming that the downward-sloping demand curve is unaffected, a new and lower market price $S$ emerges. Following the drop in prices, some poachers will choose to switch to another occupation, and supply from the wild will fall from $q^*$ to $q_F$. The remainder of the market (or $F-q_F$ in Fig. 1a) will be supplied henceforth by farms.

The consequences for the wildlife population of decreasing the price (Fig. 1b) for the poached commodity from $s$ to $S$ rotates the $dE/dt = 0$ isocline downward (it becomes the thick dashed line). Stated simply, the result is fewer people chasing more animals. The new equilibrium is characterized by a wild stock of $x_F$ animals (i.e., the population makes a comeback and the captive breeding effort is considered a success in terms of its contribution to conservation). In this institutional setting, any policy that lowers the price of the wildlife commodity is good for conservation.

We believe that this model is misleading in at least two ways. First, as mentioned in the section on Wildlife Farm-

ing and Conservation, the assumption that aggregate demand is unaffected by wildlife farming is probably false. The introduction of a farmed (legal) substitute may stimulate demand because it reduces the stigma (if any) associated with consumption of the wild thing; it may act as a stepping stone toward the real thing for new users. We do not deal with this important issue but it could be easily incorporated in our analysis by shifting the demand curve in Fig. 1a upward. (Interested readers should refer to Fischer [2004] for more information.) Second, and perhaps less obvious, the assumption of perfect competition on the wildlife goods market is violated in practice. As we have argued, it is well documented that the marketing channel associated with the wildlife trade, linking consumer demand to poaching effort, can be qualified only as imperfectly competitive. Only a few (often criminal) groups are involved in the smuggling and trafficking of the commodity across borders. We analyzed the implications of this insight in the next section.

## An Alternative View: Imperfect Competition and the Wildlife Trade

In a perfectly competitive market the marginal production cost curve defines the supply curve. The key element is that poachers take prices as given. Supply is determined by a large number of poachers, and individuals cannot influence market prices.

The perfectly competitive market form is the basic workhorse in economic science. This model is used so often not because it is an accurate description of most markets in reality; instead, it is simply a convenient model with which to work. Abandoning the perfect competitive framework can have far-reaching consequences.

The trade in some wildlife commodities is one example of an imperfectly competitive industry that is controlled by a relatively small number of criminal organizations or networks. These groups, then, have the ability to a certain extent to set market prices by manipulating their own supplies. In economic jargon, these groups are said to have market power. These traders are the crucial hinge between poachers and consumers, often illegally trafficking their commodity across borders and typically earning supernormal profits. The market structure of the wildlife commodity trade resembles an hourglass: there are few traders in the middle but many poachers and consumers at opposing ends of the marketing chain.

How does this market structure affect our supply-side analysis? We argue that the assumption of open-access harvesting is essentially correct—there are many poachers who take prices as given and typically do not have formal property rights to the resource they are harvesting. The model in Fig. 1b, therefore, follows. Fig. 1a, however, is too gross a simplification of reality and must be amended

because it completely ignores the role of the traders in the middle. We demonstrate that failure to capture market power may result in bad policy recommendations.

For the sake of argument, first consider the extreme and clearly unrealistic case of a single wildlife trader for a wildlife good. Assume all rhinoceros horns (or other commodity) are trafficked by a single organization that has monopoly power when selling to consumers. How much horn would such a trader sell? It is well established that a profit-maximizing monopolist supplies less than a large number of perfectly competitive suppliers would, raising prices and increasing profits. This is a crucial point for the analysis that follows—when traders have market power the supply curve is no longer the same as the marginal cost curve. This holds both for the extreme case of a monopolist and for the more moderate version in which a small group of traders competes on the output market—the so-called oligopoly setting. If traders have market power there will be a markup of price over marginal costs, the extent of which is determined by the intensity of competition. The markup is largest in the case of a monopolist and gradually approaches zero as the number of traders increases. Although the oligopoly setting is a more apt description of the wildlife trade than the monopoly assumption, the latter is easier to work with, so we present the main insight through this market structure. It is important to realize that the results follow, albeit in a somewhat diluted form, for the oligopoly case (Tirole 1988). An appendix showing this result is available from the authors.

We propose an alternative model. First, the monopolistic trader chooses the quantity of output $q^*$ that maximizes his or her own profits. The trader takes into account that (1) demand for wildlife goods is downward sloping, such that expanding supply implies a lower price for all the units sold and (2) the marginal production cost is upward sloping because supply can be expanded only by attracting more people to the poaching business at increasing cost. After establishing the optimal output level, the trader chooses the transfer price $s^*$ offered to poachers. Transfer price $s^*$ is the price level at which aggregate supply by poachers is equal to the quantity that the trader wants to sell to consumers. Hence, the poachers take $s^*$ as a given and produce the desired quantity $q^*$, which is sold to consumers who pay the (black) market monopoly price $p^*$. Market price $p^*$ obviously exceeds transfer price $s^*$, such that the monopolist earns positive profits.

How robust are our earlier results on the beneficial impact of captive breeding on stock conservation with respect to this new institutional context? The effect of wildlife farming is ambiguous, a priori.

The logic is as follows (the full mathematical model is available from the authors on request). In Fig. 2 curve $D_1$ represents the demand curve the trader faces in the absence of competition from captive-bred animals. The supply curve under imperfect competition will therefore lie above the marginal cost curve (Fig. 2). In equilibrium a supply of $q^*$ animals will be poached from the wild, commanding a market price $p^*$.

The introduction of legal supplies from captive-bred animals lowers the residual demand for the illegal commodities—represented by an inward shift in demand from $D_1$ to $D_2$. This shift reflects the new reality that the "trader" (or the traders in an oligopoly) now has to share the market with farmers. But the story does not stop here. It turns out there are two distinct possibilities.

If the trader(s) responds "passively" to this increased competition and continues to operate on their original supply curve(s), poaching levels fall to $q^c$ and price declines to $p^c$. Supply from the wild declines, with the difference made up by farmed output (Fig. 2; the new market price $p^c$ is lower than the old one). In equilibrium, there must be thicker wild stocks, and captive breeding is a conservation success. But this is but one possible outcome.

If, on the other hand, competition is intense, the trader(s) may compete more aggressively and lower the markup. This can be envisaged by rotating the supply curve in Fig. 2 clockwise. In the extreme case of highly aggressive competition, the price may fall back to marginal cost, such that the marginal cost curve again represents the supply curve (as in the case of perfect competition). In other words, competition has dissipated profits for the trader, and an even lower price $p^b$ materializes, with quantity of poaching $q^b$. Because $q^b > q^*$, this outcome can only be interpreted as a conservation failure. Intermediate outcomes between the monopolist's initial supply curve and the marginal cost curve are of course also feasible, which implies that the conservation effect is ambiguous. In a more general oligopoly model, the position of the postfarming supply curve will also depend on the number of traders in the market.

Formally, whether traders continue to operate on their original supply curves or move to a new supply curve depends on whether competition occurs through quantity adjustment (i.e., a Cournot equilibrium, hence the superscript $c$ in Fig. 2) or through price setting (called a Bertrand equilibrium, hence the superscript $b$). The latter will occur when competition among players is highly aggressive, whereas the former is more likely to occur when competition is less intense (e.g., Tirole 1988)—a matter of the attitudes of the players. It is unclear a priori what mode of competition will emerge, and it is unclear whether captive breeding will enhance or undermine conservation efforts. Farmers and traders would strictly prefer to compete less aggressively (i.e., Cournot manner) if they could commit to such a strategy (benefiting from higher prices and de facto reaping greater market power rewards). It has been demonstrated, however, that lack of commitment devices implies that ambiguities remain, making these greater benefits impossible (Shapiro 1980).

But there is an exception to this rule, and we believe that this exception could be important for "conservation through wildlife farming" efforts in the future. In a duopoly context (i.e., with one farmer and one trader), Kreps and Schienkman (1983) have shown that the type of competition—Cournot or Bertrand—that emerges on the output market can be manipulated by artificially restricting the output level of one of the trading partners. When the government constrains the output level of one of the suppliers, it is in the best interest of the unconstrained supplier to respond by competing in a Cournot fashion—by setting quantities. The mathematical proof of this result is straightforward and available from the authors on request. But this has an important implication. Although restricting the output level of the trader is difficult and expensive, this is not true for controlling the farmer. The farmer's production can presumably be monitored at relatively low cost, and the government can force the farmer to comply at the risk of legal sanctions. This suggests that the ambiguities surrounding unconstrained captive breeding can at times be resolved by managing the farmer's output instead. Thus far, however, we have not seen this issue discussed.

There are various ways for the government to restrict farmers' output. When farmers are heterogeneous (i.e., have different production costs) and when the government cannot differentiate between high- and low-cost farmers, market-based regulatory instruments such as taxes and tradable quota are most efficient because these instruments achieve production levels at lowest cost (most of the production takes place by low-cost farms). Other types of intervention, such as command and control regulation, aggregate quota systems, and subsidies, typically entail efficiency losses. Experiences with fisheries management have taught us that the implementation of a tax system to regulate resource management is often politically infeasible. Quota systems, then, are the most likely candidates to regulate farmers in practice. Although tradable quota are most efficient (independent of whether they are auctioned off or "grandfathered"), a system of nontradable quota may be considered (which is administratively more straightforward) when efficiency concerns are relatively minor or when farmers are relatively homogenous. For more information on managing natural resources, see Hartwick and Olewiler (1986).

It may be hard to sell the idea that restricting the profits of legal firms ensures that illegal ones behave in a certain fashion. But a few observations are in order: (1) if the tradable quotas are auctioned, the money can be used to finance additional enforcement—hurting illegal firms. And (2) by restricting supply in the farming or ranching sector, firms in this sector are capable of generating supernormal profits. They might not object to this type of regulation. Moreover (3) by advocating a cap on the production level of legal firms, we do not specify how stringent the regulation should be. In other words, the aggregate quota can

be quite large—given any initial level, a cap precludes a wasteful and risky race to the bottom. But, of course, the higher the level of the cap, the more that residual demand for the illegal commodity falls.

The key insights of this section can be summarized as follows. When the government allows captive breeding to conserve wild stocks, the outcome could be the exact opposite of what is desired—extra poaching pressure and smaller wild stocks. Evidence suggests that there is imperfect competition in the wildlife commodity market; hence, the mode of competition between suppliers is undetermined a priori. It is unclear whether competition will be intense or not, implying that it is unclear whether supplies from the wild will contract or expand. However, if the government does not only allow captive breeding or wildlife farming but at the same time restricts the farmer's output level below the output level that maximizes the farmer's profits, (1) farmer and trader competition is restricted and resembles the Cournot outcome and (2) farming lowers poaching and raises wild stocks.

## An Application to Rhinoceros Conservation

Here we demonstrate our key results by applying the model to the case of rhinoceros conservation. Recently, proposals have been put forward to conserve wild stocks by supplying the market with horns from farmed rhinoceros, dehorned on a sustainable basis (e.g., Brown & Layton 2001). We focus on the black rhinoceros (*Diceros bicornis*) for which reasonable data are available. The population has plummeted from an estimated 100,000 animals in 1960 to a current stock of approximately 3000 animals. Poaching for rhinoceros horn has been identified as the chief threat to the species (Dublin & Wilson 1998). We explored the effects of competition from captive-bred substitutes on population levels in the wild under the two modes of competition—passive (Cournot) and aggressive (Bertrand) competition.

We calibrated and simulated the model with data provided by Milner-Gulland and Leader-Williams (1992). Because of the lack of data, we have incorporated a few simplifications consistent with the theoretical model. Our quantitative results are therefore at best a tentative approximation at this stage. Specifically, we adopted the following four simplifying assumptions. First, rhinoceros growth is described by a logistic growth function, as opposed to the skewed growth function common in the ecological literature: $g(x) = 0.16x(1 - x/k)$, where $x =$ rhinoceros stocks and $k = 100,000$ animals. Second, the parameter for poaching costs is set such that the no-farming model yields a steady state of 2600 animals (the rhinoceros population in the early and mid 1990s). Third, with respect to farming costs, we assume that the only costs of farming are based on dehorning and approximately

$1000 per rhinoceros. Fourth, the (inverse) demand function for rhinoceros horn is assumed to be linear and has been derived by fitting a regression line through the price-quantity data that are available, yielding $p(q) = a - bq = 6182 - 2.13q$, where $p$ is the price of rhinoceros horn, $q$ is the number of rhinoceros supplied, and every rhinoceros carries 3 kg of horn. In the absence of data on substitutability, we arbitrarily set the elasticity of substitution between farmed and poached horns at $\gamma = 0.75$ (see Sensitivity Analysis for additional analysis). The inverse demand function used in the numerical analysis therefore reads as $p(q) = 6182 - 2.13q_T - \gamma q_F$, where $q_T$ is supplies from traders and $q_F$ is supplies from farmers. The coefficient $\gamma$ measures the impact of farmed supplies on the price of commodities obtained from the wild. When $\gamma = b$, the wild and farmed goods are perfect substitutes. Expanding legal supplies will have the same effect on prices as expanding illegal supplies. For most species, however, $\gamma < b$ holds, reflecting that consumers will perceive the wild and farmed commodity as "somewhat different." This may happen, for example, because consumers believe product from the wild is more potent. For $\gamma$ close to $b$, there will be strong interaction and rivalry between the two sectors. Conversely when $\gamma = 0$, farmed products have no effect on the price of wild supplies, so there is little strategic interaction between the sectors. Full details of the simulation model are available from the authors.

Figure 3 illustrates the qualitative features of the equilibria with and without rhinoceros farming. The growth of the wild rhinoceros population is given by the concave function $g(x)$. The equilibrium harvest function $q$, implied by the previously described model, increases in stocks $x$ and is convex-concave in $x$. Equilibria are defined by the intersection of the $g(x)$ and $q$ curves, where the harvest equals the growth rate (e.g., May 1974). The number of equilibria that results depends on the position and slopes of these curves. When the harvest function intersects the growth curve from below, the equilibria are stable. When the reverse holds, the equilibria are unstable.



*Figure 3. An example of supply from the wild with three population equilibria (a, b, c): a and c are stable and b is unstable (q, harvesting; x, wildlife stock; g(x), growth of the wildlife population).*

The simulations reveal that without competition from a farmed substitute, there are three equilibria (outcomes a, b, and c [Fig. 3], of which a and c are stable and b is unstable). We now examine how these equilibria are affected by the introduction of captive-breeding efforts.

The ecological effects of Cournot competition (passive) are summarized in Figs. 4a and b. The curve in Fig. 4a portrays the wildlife population as the number of wildlife farmers increases from 1 to 30; the curve is upward sloping. That is, holding the number of traders







*Figure 4. Effects of competition from captive breeders of rhinoceros on the population of wild rhinoceros: (a) low steady state and Cournot competition (see equilibrium a in Fig. 3), (b) high steady state (see equilibrium c in Fig. 3), and (c) Bertrand competition.*

constant, increased competition from farmers increases wildlife stocks. (Another result, not shown, is that the number of rhinoceros falls as the number of traders increases and competition is more intense, given the number of farmers.) More importantly, perhaps, is that as the intensity of competition from farms increases, the low, stable equilibrium disappears when the number of farmers is greater than 20. Thus, with Cournot competition, increasing the number of farmers pushes the $q$ curve in Fig. 3 down. This implies that equilibria $a$ and $b$ approach each other, merge, and eventually disappear. As a result, the rhinoceros population "jumps" (in a mathematical sense, not a biological one) to the high-abundance equilibrium (as depicted in Fig. 1b). Hence, encouraging a sufficiently large number of farmers to enter the rhinoceros farming business could result in an enormous conservation success if there is Cournot competition in the rhinoceros horn market.

In the case of the (aggressive) Bertrand competition, there is only one stable equilibrium. The curve in Fig. 4c represents the wildlife population as the number of wildlife farmers increases from 1 to 30, for any given number of traders. Increased competition from farmers induces wildlife traders to lower their price (cut their profit margins) to maintain market share. The curve therefore slopes downward. Holding the number of traders constant, increased competition from farmers lowers wildlife stocks, eventually leading to extinction as competition becomes increasingly aggressive. This is an important result: encouraging a sufficiently large number of farmers to enter the rhinoceros farming business could result in extinction of wild stocks if there is aggressive competition. Moreover as before, and again not shown, increasing the number of traders shifts each curve downward—because competition is more intense, stocks decline more rapidly.

The form of competition thus significantly affects equilibrium stocks, shifting steady states but possibly triggering discontinuous jumps from one steady state to another. These numerical results demonstrate that the behavioral underpinnings of wildlife markets should be of the utmost importance to policy makers. But without sufficient understanding of the market and the biological dimensions of the problem, it is hard to predict what outcome might emerge.

## Sensitivity Analysis

The paucity of data, in particular on the economic dimension of the problem (demand and substitution), renders our numerical results imprecise. It is therefore important to examine the robustness of our results to variations in key parameters. In the absence of data on an identifying instrument, it is possible that the estimated parameters of the rhinoceros horn demand function are flawed. It is known that, when demand is sufficiently elastic—the

demand curve is sufficiently flat—the oligopolistic outcome approximates the perfect competition outcome, where firms take prices as given (from the perspective of individual suppliers, the demand curve is completely flat). Because there is insufficient information to estimate a demand function, we performed a sensitivity analysis by varying the demand parameters.

A reduction in the slope parameter of the inverse demand function implies that price declines less as the quantity supplied on the market increases (Fig. 5a). Thus, an increase in the supply of rhinoceros horns has less impact on the overall price of wild rhinoceros horns and the profitability of hunting wild rhinoceros. Because prices are less affected by increases in the supply of horns, there is an incentive to increase harvests. All else being equal, as the slope parameter of the inverse demand function declines (Fig. 3), the hunting curve $q$ pivots upward. It follows that for any given level of competition from farmers, the low, stable steady-state equilibrium now occurs at a higher stock of wild rhinoceros (Fig. 5a), and the high, stable steady-state equilibrium occurs at a lower stock of wild rhinoceros (not shown). The qualitative results are therefore unaffected for considerable changes in the slope parameter, but it is clear that the impact on the quantitative results (i.e., the number of rhinoceros in equilibrium) may be large. We believe that this highlights the importance of gathering more price and quantity data on black markets for wildlife commodities. Access to such data will be critical when evaluating the prospects of new approaches to conservation.

Rhinoceros stocks decline more rapidly with more intense farm competition as the slope parameter falls (Fig. 5b). As the slope of the inverse demand function declines, a given increase in the supply of horn has less impact on market price. Hence, there is a stronger incentive for traders to compete more aggressively. Accordingly, wild rhinoceros stocks decline more rapidly as the slope parameter declines, and extinction becomes more likely. Again, the qualitative results are unaffected, but the demand parameter shifts the critical threshold beyond which extinction occurs.

Varying the parameter representing the substitutability of demand between wild and farmed products ($\gamma$) has consequences with Cournot competition. As the degree of substitutability between farmed and wild products diminishes, increased competition from farmed products has less impact on the demand for wild rhinoceros horn. Because the degree of competition between the rival sectors is reduced, farming has less impact on hunting levels. All else being equal, the hunting curve $q$ pivots upward as $\gamma$ declines (Fig. 3). Qualitatively, therefore, the impact of lowering $\gamma$ is akin to decreasing the slope of the demand curve. Rhinoceros stocks decline in the high equilibrium as the substitutability parameter declines, and they increase in the low equilibrium (these results are not shown).





*Figure 6. Effect of varying the degree of substitution between farmed output and output from the wild (Bertrand competition). If farmed and wild outputs are better substitutes, increasing the number of farmers has a larger impact on the wild rhinoceros population.*



*Figure 5. Effects of varying the slope parameter of the demand function, assuming five wildlife traders. (a) Cournot competition: increasing the slope parameter implies that the effect of competition by farmers becomes smaller. (b) Bertrand competition: increasing the slope parameter implies that the effect of competition by farmers becomes smaller.*

Varying $\gamma$ affects the price competition equilibrium (Fig. 6). Because a decline in the degree of substitutability implies that supplies from the farmed sector have less impact on the demand for wild rhinoceros products, there is less incentive for traders to compete aggressively (Fig. 6). Hence, for any given number of farmers ($n$ in Fig. 6), a reduction in the substitutability parameter results in a higher equilibrium stock of rhinoceros. Thus, despite increased farm competition, rhinoceros numbers remain close to carrying capacity levels (Fig. 6). This represents a large qualitative change. When the degree of substitutability of farmed and poached output is sufficiently low, the potentially disastrous effects of Bertrand competition will not occur. This, of course, is intuitive. When the market perceives these commodities as separate entities, the degree of strategic interaction between different types of producers will be mitigated. On the downside, of course, there are few beneficial effects to be expected

from Cournot competition when the degree of substitutability is very low.

Again, this finding suggests that there should be more applied research into the functioning of (black) markets and consumption of (illegal) wildlife commodities. Currently, there are conflicting signals that hamper accurate predictions in this field. Some evidence suggests farmed commodities are perceived as superior and other evidence suggests farmed output may lack the potency of the "real thing" (e.g., Mills et al. 1995; IUCN/SSC 2001). The issue is further complicated by the fact that legalization of trade may also lead to shifts in the demand curve. For instance, it is possible that legalization may lower the penalties associated with consuming banned products or reduce the stigma attached to consuming these commodities, both of which would reduce the expected costs of consumption and stimulate demand for wild commodities. The consequences of this are obvious. Higher demand will lead to higher prices and thus greater harvesting from the wild—irrespective of the form of competition.

## Conclusions

Evidence suggests that the illegal trade in wild animal products is controlled by groups of criminal networks specialized in trafficking illegal commodities across borders. These traders have a substantial grip on the market for wildlife commodities and earn high profits by exercising control over supplies and prices. Thus, the illegal trade in endangered species is characterized by imperfect competition. Failure to acknowledge this fact could have detrimental consequences for wildlife.

Drawing on conventional models of imperfect competition, we show that if competition in the wildlife market is aggressive, a captive-breeding program may result in greater poaching pressure and perhaps accelerate the likelihood of extinction. Conversely, if competition is

sufficiently passive, supplies from captive-bred animals could curb poaching and thus be used as a useful adjunct with other conservation policies. A priori, it is extremely difficult to predict the likely response of traders without detailed knowledge of the structural parameters of the market. We also argue, however, that policy makers can affect the nature of the competition by setting quotas for wildlife farmers (which is arguably less expensive than controlling poaching). Our main objective is not to negate the potential for captive breeding as a conservation tool, but rather to sound a note of caution on its use. The picture becomes more complex when we allow for the possibility that consumer preferences are likely unstable and that transaction costs of the illegal trade are affected when a parallel legal trade develops. Our analysis therefore suggests that simple rules of thumb might not exist in the complex world of the international trade in wildlife commodities.

## Acknowledgments

We thank our assigning editor and two anonymous referees for helpful comments and suggestions.

## Literature Cited

Amundsen, E., T. Björndal, and J. Conrad. 1995. Optimal harvesting of the northeast Atlantic minke whale. Environmental and Resource Economics **7:**167–185.

Björndal, T., and J. Conrad. 1987. The dynamics of an open access fishery. Canadian Journal of Economics **20:**74–85.

Brown, G., and D. Layton. 2001. A market solution for preserving biodiversity: the black rhino. Pages 32–50 in J. Shogren and T. Tschirhart, editors. Protecting endangered species in the United States: biological needs, political realities, economic choices. Cambridge University Press, Cambridge, United Kingdom.

Bulte, E. H., and G. C. van Kooten. 1999. The ivory trade ban and elephant numbers: theory and application to Zambia. American Journal of Agricultural Economics **81:**453–466.

Bulte, E. H., R. Horan, and J. Shogren. 2003. Is the Tasmanian tiger extinct? A biological economic re-evaluation. Ecological Economics **45:**271–279.

Clark, C.W. 1990. Mathematical bioeconomics. 2nd edition. Wiley, New York.

Commonwealth of Australia. 1998. Commercial utilisation of Australian native wildlife. Senate Committee Report, Canberra, Australia

Cook, D., M. Roberts, and J. Lowther. 2002. The international wildlife trade and organised crime: a review of the evidence and the role of the UK. University of Wolverhampton, Regional Research Institute, Wolverhampton, United Kingdom.

Clayton, L., E. J. Millner-Gulland, D.W. Sinaga, and A. H. Mustari. 2001. Effects of a proposed ex situ conservation program on in situ conservation of the babirusa, an endangered suid. Conservation Biology **14:**219–221.

Dobson, A., and J. Poole. 1992. Ivory: why the ban must stay! Conservation Biology **6:**149–151.

Dublin, H., and A. Wilson. 1998. The fight for survival: four decades of conserving Africa's rhinos. World Wide Fund for Nature, Gland, Switzerland.

Fischer, C. 2004. The complex interactions of markets for endangered species products. Journal of Environmental Economics and Management **42:**926–953.

Galster, S., S. LaBudde, and J. Kelly. 1994. Crime against nature: organized crime and illegal wildlife trade. Earthscan, San Francisco.

Galster, S., and V. Eliot. 2000. Roaring back: anti poaching strategies for the Russian far east. In J. Seidensticker, S. Christie, and P. Jackson, editors. Riding the tiger. Cambridge University Press, Cambridge, United Kingdom.

Hartwick, J. M., and N. D. Olewiler. 1986. The economics of natural resource use. Harper Collins, New York.

IUCN/SSC (World Conservation Union/Species Survival Commission). 2001. Commercial captive propagation and wild species conservation (selected background papers). White Oak Foundation, Jacksonville, Florida.

Kremer, M., and C. Morcom. 2000. Elephants. American Economic Review **90:**212–234.

Kreps, D., and J. Schienkman. 1983. Quantity precommitment and Betrand competition yield Cournot outcomes. Bell Journal of Economics **14:**326–337.

Le Duc, J. P. 1999. Traficking in animals and plants. International Criminal Police Review **458:**19–32.

Meacham, C. J. 1997. How the tiger lost its stripes. Harcourt Brace, Orlando, Florida.

Messer, K. D. 2002. Should poachers be shot on sight? Efficiency and ethics. Discussion paper. Department of Economics, Cornell University, Ithaca, New York.

Mills, J., S. Chan, and A. Ishihara. 1995. The bear facts: the east Asian market for bear gall bladder. Traffic East Asia, Cambridge, United Kingdom.

Milner-Gulland, E. J., and N. Leader-Williams. 1992. A model of incentives for the illegal exploitation of black rhinos and elephants: poaching pays in Luangwa Valley, Zambia. Journal of Applied Ecology **29:**388–401.

Parry-Jones, R. 2001. Captive breeding and traditional medicine. World Conservation Union Species Survival Commission, Jacksonville, Florida.

Ross, J. P. 2001. Commercial captive breeding of crocodilians. World Conservation Union Species Survival Commission, Jacksonville, Florida.

Shapiro, C. 1980. Theories of oligopoly. In R. Schmalansee and R. Willig, editors. The handbook of industrial organization. North Holland, Amsterdam.

Tirole, J. 1988. The theory of industrial organization. MIT Press, Cambridge, Massachusetts.

von Hippel, F., and W. von Hippel. 2002. Sex drugs and animal parts: will Viagra save threatened species? Environmental Conservation **29:**277–281.

Wilen, J. E. 1976. Common property resources and dynamics of overexploitation: the case of the north–Pacific fur seal. Resource paper 3. University of British Columbia, Vancouver.

## Appendix: The Supply-Side Perspective on Wildlife Farming

Assume that there are multiple sectors in the economy with varying returns to labor. Presumably this reflects different skill requirements for different sectors, otherwise such income differentials cannot be sustained and will be eroded though entry and exit decisions. Conceptually, line these sectors up from low- to high-income sectors—reflecting increasing opportunity cost of labor, or increasing marginal cost of poaching effort in the aggregate effort level. The person with the lowest skills earns the lowest wage; as the skill level increases, earning power rises. Assuming that there are no special skill requirements for hunting (i.e., labor effort in hunting is homogenous), poachers are first attracted from low-income occupations. If, because of some exogenous shock (e.g., a price or technology shock), the returns to hunting effort suddenly

increase, new poachers are attracted from other increasingly profitable alternative occupations until a new equilibrium materializes.

Denote $U$ as the net payoff from poaching for the "marginal poacher." The marginal poacher is defined as the person currently poaching who could earn most if he would switch to some other sector—the most-skilled individual that is hunting. In equilibrium, this marginal poacher must earn zero rents. That is, the return to his labor is as high in poaching as elsewhere in the economy. So-called inframarginal poachers (people with fewer skills and fewer opportunities in the rest of the economy) earn positive rents, and all others in the economy (with higher skill levels) lose money if they were to switch to the hunting sector and hence choose to stay employed elsewhere. The following differential equation captures the essence of this labor allocation process over time:

$$dE/dt = \eta U = \eta[sq/E - \partial(WE^{\phi})/\partial E], \qquad (1)$$

where $E$ denotes aggregate poaching effort, $\eta$ is an adjustment parameter reflecting the speed with which labor moves around in the economy in response to any profit differentials, $s$ is the net price received by poachers per unit harvested, and $q$ is the total quantity harvested. This implies that the return per unit of poaching effort is simply $sq/E$. The second term describes the returns to labor in other sectors in a stylized manner ($W > 0$ and $\phi > 1$ are cost parameters—increasing $E$ implies that the income foregone elsewhere also goes up). We assume that these returns can be represented by a continuous function, and without loss of generality we assume that $\phi = 2$ in what follows.

Turning to production in the poaching sector, harvesting is typically described by a so-called Schaefer production function, $q = \sigma x E$, where $\sigma$ is the "catchability coefficient" and $x$ is the wildlife stock (e.g., Clark 1990). We can complement the basic poaching model by introducing population growth of the species that is harvested. Assuming a conventional logistic growth function, the dynamic system of the resource is described by the following differential equation:

$$dx/dt = g(x) - q = rx(1 - x/k) - \sigma x E, \qquad (2)$$

where $g(x)$ describes the biological growth of the resource, $r$ is the intrinsic growth rate, and $k$ is the carrying capacity. We can take Eq. 1 and Eq. 2 together in a phase plane (Fig. 1b) to analyze this simple dynamic bioeconomic model. In Fig. 1b we present this phase plane, and plot the two isoclines associated with the state variables "hunting effort $E$" and "population size $x$." These isoclines are obtained by setting the right-hand side of Eq. 1 and Eq. 2 equal to zero and solving for $E$ as a function of $x$. The steady state of the dynamic system is at the intersection of the $dE/dt = 0$ isocline (or $E = [\sigma s/2W]x$) and the $dx/dt = 0$ isocline (or $E = r/\sigma[1-x/k]$) in Fig. 1. This is at point $Z$. This steady state is unique (as the isoclines are linear), and upon inspecting the direction of trajectories when the system is off equilibrium, it is readily verified that the steady state is stable (not shown in Fig. 1, but see Clark 1990). For point above the $dx/dt = 0$ isocline, $dx/dt < 0$ holds and for points below $dx/dt = 0$ the reverse is true. For points to the right of the $dE/dt = 0$ isocline, $dE/dt < 0$ holds. Similarly, for points to the left of $dE/dt = 0$, we know that $dE/dt > 0$.



**EXHIBIT D**

Biological Conservation xxx (2011) xxx–xxx

Contents lists available at SciVerse ScienceDirect

Biological Conservation

journal homepage: www.elsevier.com/locate/biocon





# Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (*Morelia viridis*) from Indonesia

Jessica A. Lyons *, Daniel J.D. Natusch

*School of Biological, Earth and Environmental Science, University of New South Wales, NSW 2052, Australia*

ARTICLE INFO

*Article history:*
Received 24 August 2011
Received in revised form 26 September 2011
Accepted 1 October 2011
Available online xxxx

*Keywords:*
Pet trade
Indonesia
Illegal
Green python
*Morelia viridis*
Wildlife farming
Laundering
Population decline
Eggshell method

ABSTRACT

Wildlife breeding farms have been promoted to aid biodiversity conservation by alleviating the pressure of harvest on wild populations. There is, however, growing concern that many breeding farms are being used to launder illegally caught wildlife. Surveys of wildlife traders in the Indonesian provinces of Maluku, West Papua and Papua were conducted between August 2009 and April 2011 to assess the trade of the green python (*Morelia viridis*), the species currently exported in the largest numbers from Indonesia declared as captive-bred. In total, 4227 illegally collected wild green pythons were recorded during surveys and high levels of harvest were found to have depleted and skewed the demographics of some island populations. Snakes were traced from their point of capture to breeding farms in Jakarta where they are to be exported for the pet trade, confirming the reports of wildlife laundering. Extrapolation of monthly collection estimates provided by traders revealed that at least 5337 green pythons are collected each year, suggesting that at least 80% of the green pythons exported from Indonesia annually are illegally wild-caught. The results of examination of 139 eggshells from five python species suggest that reptilian eggshells may be used as proof of provenance for each individual reptile exported. This method, in addition to the evidence that breeding farms play a significant role in the illegal exploitation of wildlife, allows conservation managers to begin to adequately monitor, regulate and determine the role of breeding farms in the conservation of wild populations.

© 2011 Elsevier Ltd. All rights reserved.

## 1. Introduction

The trade in wildlife is a major contributor to biodiversity loss and has been recognised as a major conservation concern (Grieser-Johns and Thomson, 2005; Sutherland et al., 2009). Driven mainly by economics, wildlife is traded for medicines, luxury goods, food and pets and operates on local, national and international levels (Nijman, 2010). When wildlife is traded illegally, conservation efforts and sustainable harvests are seriously undermined (Schoppe, 2009; Zhou and Jiang, 2005). Few studies have attempted, or been able, to determine the scale of illegal trade (Gavin et al., 2009), the effects of illegal harvest (Schoppe, 2009; Smith et al., 2011) or the mechanisms by which it operates (but see Wutty and Simms, 2005). As the demand for wildlife increases, additional strain is placed on wild populations, and unsustainable harvesting practices can result in extensive biodiversity loss and ecosystem degradation (Broad et al., 2003; Roe, 2008). In response, the establishment of commercial breeding farms has been promoted as a means of alleviating pressure on wild populations (Jori et al., 1995; Nogueira and Nogueira-Filho, 2011; Siswomartono, 1998).

The trade of wildlife for pets, both legal and illegal, is a multi-million dollar industry, yet it has received little attention from conservation scientists (but see Auliya, 2003; Natusch and Lyons, in press; Nijman and Shepherd, 2007; Shepherd, 2006; Yuwono, 1998). South East Asian economies, particularly Indonesia, export large numbers of species as pets that are sourced from the wild each year (Nijman and Shepherd, 2009; Pernetta, 2009; Shepherd, 2006). Reptiles in particular, are heavily exploited and Indonesia exports more than 160 live reptile species destined for the pet trade (Anon., 2010a,b). Indonesia's wildlife trade is internationally regulated by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Indonesia became a Party to CITES in 1979 and trade is monitored by the CITES Management Authority, the Directorate General of Forest Protection and Nature Conservation (PHKA). For CITES Appendix II listed species, quotas are set annually with the guidance of the CITES Scientific Authority, the Indonesian Institute of Sciences (LIPI) (Siswomartono, 1998). A small number of reptile species are protected under Indonesian legislation and these may be traded legally only if bred in captivity. In the early 1990s, in response to recommendations from the CITES Secretariat and high demands from consumer nations, the Indonesian government encouraged captive breeding of selected species for export (Siswomartono, 1998). This was intended to aid conservation: (1) by breeding foundation stocks for re-release into the

* Corresponding author. Tel.: +61 2 93853446; fax: +61 2 93856127.
*E-mail address:* jess.lyons87@gmail.com (J.A. Lyons).

0006-3207/$ - see front matter © 2011 Elsevier Ltd. All rights reserved.
doi:10.1016/j.biocon.2011.10.002

wild, and (2) to protect species seriously threatened by commercialisation (Siswomartono, 1998).

While farming has resulted in reduced pressure on some wildlife populations (Revol, 1995), it is feared that commercial breeding may result in increased demand for wild founder stock and be used to launder illegally wild-caught animals (Bulte and Damania, 2005; Mockrin et al., 2005). For example, in Indonesia, nationally protected wildlife can be traded under permit if captive-bred, promoting the mis-declaration of animals that are in fact wild-caught (Engler and Parry-Jones, 2007). Globally, there are an increasing number of reports suggesting that for many species, this may very well be the case (Auliya, 2003; Brooks et al., 2010; Engler and Parry-Jones, 2007; Nijman and Shepherd, 2009; Vinke and Vinke, 2010).

Nijman and Shepherd (2009) found large discrepancies between the number of reptiles exported annually from Indonesia and the number of reptiles capable of being produced by Indonesian breeding farms. Their study provided strong evidence for spurious captive breeding in Indonesia (Nijman and Shepherd, 2009). The CITES-listed species exported in largest numbers from Indonesia as captive-bred is the green python (Morelia viridis) (CITES Trade Database, 2011). Green pythons are listed in Appendix II of CITES, which regulates international trade, and in 1999 became a fully protected species under national legislation in Indonesia (Dilindungi PP 7/1999). Green pythons are keenly sought after by reptile keepers, mainly due to their distinctive and unique colouration. Juveniles are born either yellow or red and change to green at approximately 65 cm in length. Restricted to tropical rainforests in Australia, Papua New Guinea (PNG) and the Indonesian provinces of Maluku, West Papua, and Papua (Natusch and Natusch, in press; O'Shea, 1996). Indonesia is the only range state that allows export of captive-bred green pythons for commercial purposes, but restricts such exports to the progeny of captive breeding. Reptile enthusiasts have recognised subtle differences in adult and juvenile colouration of green pythons and as such, have designated each colour morph as a specific locality type (Kivit and Wiseman, 2005; Maxwell, 2005). This has resulted in the search for new morphs and localities. There are numerous reports suggesting that illegal harvesting of green pythons is occurring and that some populations are in decline (Auliya et al., 2009). There is however, no direct evidence of the existence of an illegal trade in wild-caught specimens. A recent report submitted by LIPI for the CITES Asian Snake Trade Workshop (2011) stated that the illegal trade of snakes in Indonesia was non-existent. Most importantly, there is currently no easy method for differentiating between wild-caught or captive-bred reptiles destined for export (Auliya, 2003).

It is the aim of the present paper to quantify the scale of illegal trade in green pythons and evaluate the effects of current harvest levels on wild populations. The evidence for laundering of green pythons through breeding farms is examined and the role that commercial breeding plays in the conservation of wild animals is discussed. The mechanisms by which the illegal trade operates are identified and ways in which it can be reduced are suggested. Finally, a novel method for regulating the export of reptiles is proposed and it is suggested that it be trialled using green pythons.

## 2. Material and methods

### 2.1. Study region

Six sites were visited in the Indonesian provinces of Maluku, West Papua and Papua between August 2009 and April 2011 (Fig. 1). These sites were selected on the basis of known consumer demand for 'locality specific' green pythons, and therefore areas where trade of green pythons was likely to occur. Study sites were grouped into five localities based on geography (Fig. 1). In addition, markets and breeding farms that claimed to keep, breed and export green pythons were visited in the Indonesian capital, Jakarta.

### 2.2. Trader identification and interviews

Green python traders were identified mainly through anonymous informants, and additional traders were located using snowball (non-probability) sampling (which uses recommendations from traders to establish contact with others; Bryman, 2004). Trade data were gathered by conducting semi-structured interviews with traders at each site and included the number of snakes collected, collection trends, and trade history. The information given in interviews was ground-truthed using direct counts of individual green pythons and by crosschecking with others within the trade chain. The average numbers given by traders at each locality were combined to determine the total number of green pythons collected each month. These data were then extrapolated to estimate the total number collected annually from each locality (Table 1). Companies registered to export reptiles internationally were identified using lists provided by the Indonesian Reptile and Amphibian Trade Association.

### 2.3. Examination and morphometrics

#### 2.3.1. Green pythons

A large number ($N = 701$) of green pythons in the possession of traders was measured to determine the harvest demographic for each locality. The measurements recorded were: (1) snout-to-vent length (SVL) measured with a steel measuring tape to the nearest 0.5 cm; (2) weight, to the nearest 1 g using Pesola spring scales, and (3) sex, which was determined by insertion of a blunt probe into the cloaca and recording probe depth. In addition, the colour of snakes was recorded as red, yellow or green and their condition of health was noted. Finally, each snake was given a unique scale clip so that it could be identified if relocated (Brown and Parker, 1976).

#### 2.3.2. Pythonid eggshells

The eggshells of five python species were measured to determine whether the eggshell size could be used to identify the species. Eggshells from a number of different clutches were measured to avoid intra-clutch homogeneity and to encompass the variation in eggshell size and weight for each species. Eggshells were obtained from a breeding farm in Indonesia, and had been kept in a dry and sheltered room between 0 and 2 years. The length and width of each eggshell was determined to the nearest 0.1 mm using a dial caliper. Weight of the eggshell was measured to the nearest 0.1 g using 30 g Pesola spring scales. The eggs of pythons approximate closely to a prolate spheroid. As such, we used the following formula to calculate the volume of each egg in cm$^3$:

$$V = 4/3\pi a^2 b$$

where $a$ is the width of the egg divided by 2 and $b$ is the length of the egg divided by 2.

#### 2.3.3. Analysis

Contingency table analysis was used to determine deviances from a null hypothesis of equal proportions between sexes, sizes and colours of green pythons harvested from each locality. Analysis of covariance was used to determine whether snakes lose condition as they progressed along the trade chain (with time since capture as factor, SVL as the covariate, and ln weight as dependent variable). All tests were conducted using Minitab 16 software.

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (Morelia viridis) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

J.A. Lyons, D.J.D. Natusch / Biological Conservation xxx (2011) xxx–xxx

3



**Fig. 1.** Six study sites visited in Indonesia (●), and the five corresponding localities from which green pythons are sourced (enclosed in boxes).

**Table 1**
Trade data for green pythons collected from five localities in Indonesia.

| Locality | Traders | Times visited | Snakes recorded | Collected per month | Collected per year |
|---|---|---|---|---|---|
| Aru Islands | 1 | 2 | 123 | 67 | 804 |
| Biak | 1 | 25 | 3831 | 250 | 2841 |
| Jayapura | 3 | 15 | 70 | 40 | 480 |
| Merauke | 2 | 21 | 29 | 9 | 108 |
| Vogelkop and Raja Ampat | 6 | 31 | 176 | 92 | 1104 |
| Total | 13 | 94 | 4229 | 458 | 5337 |

## 3. Results

### 3.1. Trade dynamics

In total, 13 traders were located in the Indonesian provinces of Maluku, Papua and West Papua, and visited 94 times between August 2009 and April 2011 (Table 1). Several different individuals are involved in the trade of green pythons, and collectively they form the trade chain. Villagers working in, or in close proximity to, rainforest during the day opportunistically collect green pythons. Snakes are captured by hand and kept in a plastic bottle or bag for a variable period of time. Depending on the ease of access, snakes are sold either directly to a trader situated in a major centre, or via a local collector.

Seventy-six per cent (10/13) of traders stated that collecting wildlife was not their only source of income. On average, traders had been dealing in wildlife for about 14 years (range 4–27; 9/13). Only one trader (1/13) harvested green pythons only; the others stated that they also traded in other species. None of the traders (0/13) had attempted to breed green pythons, although 15% (2/13) expressed interest in doing so in the future. Sixty per cent (6/10) stated that they had been approached by foreigners, who had purchased green pythons from them directly. Ninety-two per cent (12/13) of traders reported that they could easily circumvented laws

and regulations by paying off officials. Finally, all traders (13/13) were clearly aware that trading wild-caught green pythons was illegal.

### 3.2. Harvest levels

In total 4229 illegally harvested green pythons were recorded between August 2009 and April 2011. Most were collected from Biak (including both Biak and nearby Supiori Islands but together referred to hereafter as Biak), with a smaller number being collected from the four other localities (Table 1). Seventy-six per cent (10/13) of traders provided information on the average number of green pythons collected each month. These figures were corroborated by our surveys and through interviews with others along the trade chain. It should be noted that two collectors from Vogelkop and Raja Ampat and one from Jayapura did not provide information on the number of green pythons collected. Consequently, the total numbers collected from these localities are likely to be higher.

The number of green pythons that were claimed to be collected each month differed significantly between localities ($\chi^2 = 384$, $df = 4$, $P = <0.001$). Ground-truthing showed that the numbers provided by traders were consistent, although they did depend on the number and timing of visits. For instance, despite only two visits to the trader from the Aru Islands, large numbers of snakes were recorded on both occasions due to a backlog of unsent shipments. One trader from Biak provided us with written records of the number of green pythons collected between January and September 2010 and surveys conducted in this locality indicated that the numbers claimed were consistent with the numbers recorded (Fig. 2).

The trader from Biak indicated that during the 10 years green pythons had been collected, they had become less abundant. Similarly, collectors on the island of Kofiau (located in the Raja Ampat Archipelago) reported that green pythons had become particularly difficult to find. According to traders and local people this was due to intensive harvests driven by a high demand for green pythons from this island, which apparently retain their yellow juvenile col-

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (*Morelia viridis*) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

4                                                   *J.A. Lyons, D.J.D. Natusch / Biological Conservation xxx (2011) xxx–xxx*



**Fig. 2.** Numbers of green pythons collected from Biak between August 2009 and April 2011. Black columns represent the numbers counted in this survey and white columns represent the number recorded by a single trader. Missing columns indicate months when no data were gathered.

ouration into adulthood. The single trader on Kofiau estimated that only one snake was collected per month. During our two visits we recorded five snakes on each occasion, which were apparently collected over 4-month periods. Further, one long-time trader based in Sorong on the Vogelkop Peninsula and another based in Jayapura reported declines in mainland populations.

### 3.3. Variation in harvest demographic among localities

There was a significant difference between the demographic composition of green pythons collected at each locality ($\chi^2 = 22.86$, df = 4, $P = 0.001$; Fig. 3). Adults significantly outnumbered juveniles at all localities except Biak (Fig. 3). In Biak, juveniles were collected more often than adults in both years surveyed (2009, $\chi^2 = 10.99$, df = 1, $P = 0.001$; 2011, $\chi^2 = 87.67$, df = 1, $P = <0.001$; Fig. 3b). The single trader on Biak indicated that when harvesting first began more than 10 years ago, a substantial number of adults were collected. More recently however, juveniles are most commonly encountered. The larger number of juveniles from Vogelkop and Raja Ampat was due primarily to the inclusion of two clutches of recently hatched snakes (Fig. 3a).

There was no significant difference between the number of red and yellow juveniles collected from all localities ($\chi^2 = 3.405$, df = 3, $P = 0.333$), or from Biak in either year surveyed (2009, $\chi^2 = 2.32$, df = 1, $P = 0.128$; 2011, $\chi^2 = 0.47$, df = 1, $P = 0.49$; Fig. 3b). No red juveniles were recorded from the Aru Islands or Merauke where this juvenile colour phase does not occur (Natusch and Lyons, unpubl. data). There was a significant change in the proportion of juvenile to adult green pythons collected from Biak between 2009 and 2011 with the proportion of adults dropping from 37% to 21%, respectively ($\chi^2 = 26.77$, df = 1, $P = <0.001$; Fig. 3b). The numbers of each sex collected at all localities were equal ($\chi^2 = 1.561$, df = 4, $P = 0.816$).

The general health of green pythons being traded was poor. We observed hundreds of snakes that were malnourished, showing symptoms of disease and/or infection, or were dead. A small number of green pythons were measured within a day of collection at villages in the Aru Islands and their weights were compared with those of snakes from the Aru Islands encountered further along the trade chain. A significant difference was observed between the weights of each ($F_{(1,24)} = 72.4$, $P = 0.001$), indicating that the stress of trade conducted in this manner adversely affects the health of green pythons (Fig. 4).

### 3.4. Final destination

Unique scale clips enabled green pythons to be traced as they moved through the trade chain. After leaving Papua, 60 snakes





**Fig. 3.** Percentage of green pythons that were red (●), yellow (○) and green (●), collected from (a) the Aru Islands, Merauke, Vogelkop and Raja Ampat, and Jayapura and (b) the percentage of green pythons that were yellow, red and green, collected from Biak in 2009 (black columns) and 2011 (white columns).

clipped by us were found again in Jakarta for sale in the Barito Market, in the possession of two middlemen and at a single breeding farm. According to the middlemen, all green pythons in their possession were destined for breeding farms. This confirmed the information given by the traders surveyed, of which 76% (10/13) reported sending green pythons, and other wildlife, to many different breeding farms in Java and/or Bali.

### 3.5. Pythonid eggshells

A total of 139 eggshells from five species of python were measured (Table 2). Each species has a distinctively shaped eggshell (Fig. 5). The largest eggshells were those of the Papuan olive python (*Apodora papuana*) and Sumatran blood python (*Python curtus*). Although both eggshells are large, they differ significantly in

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (*Morelia viridis*) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

J.A. Lyons, D.J.D. Natusch / Biological Conservation xxx (2011) xxx–xxx                                                                5



**Fig. 4.** Weight vs. SVL of green pythons from the Aru Islands measured the day of collection (○), compared to individuals recorded further along the trade chain (●).



**Fig. 5.** Length vs. width of pythonid eggshells, showing the distinctive shape of *Morelia viridis* (■), *Morelia spilota* (●), *Apodora papuana* (◆), *Morelia tracyae* (▲), and *Python curtus* (×). Error bars indicate the extremes of length and width for each species.

their shape, weight and volume (Fig. 5; Table 2). The eggshells of the green python were the smallest and lightest of those measured (Fig. 5; Table 2).

## 4. Discussion

This is one of few studies to provide quantitative data relating to the illegal trade and laundering of wildlife through breeding farms. It provides evidence that there is a thriving illegal trade of wild-caught green pythons in Indonesia and documents this trade from its source to destination.

### 4.1. Effects of illegal harvest on wild populations of green pythons

Evaluating the extent to which harvesting threatens wild populations is important for designing adequate enforcement and management strategies. Other studies have found that harvesting techniques or selection for specific attributes have altered population demographics (Fenberg and Roy, 2008; Fitzgerald and Painter, 2000). However, the results presented herein indicate that the opportunistic nature of green python collection at most sites does not result in collection biases based on sex, size or colour. On Biak the large number of green pythons collected allowed determination of the harvested demographic at this site. The high proportion of juveniles collected from Biak suggests that over-harvesting may have skewed the age composition as has been observed in populations of other harvested snakes (Means, 2009; Sasaki et al., 2008; Webb et al., 2002), and to a lesser degree in other green python populations (Natusch and Natusch, in press). Furthermore, the proportion of adult green pythons collected from Biak decreased significantly between 2009 and 2011 (Fig. 3b) suggesting a continued decline in the reproductive potential and therefore sustainability of that population. Adding to these concerns, the green python population in Biak appears to be distinct, possibly specifically, from mainland populations (Natusch and Lyons, unpubl. data). Intensive, prolonged depredation on this population caused by exploitation may lead to earlier maturation of individuals as well as genetic changes that could increase the risk of extinction and reduce the ability of the population to recover even if this depredation is brought under control (Allendorf et al., 2008; Congdon et al., 1993).

Trade was also found to occur at other sites, with small numbers of snakes being taken from the islands of Numfor and Yapen and the central highlands. In addition, traders reported that they occasionally obtained snakes from neighbouring Papua New Guinea, as had been found with the cross-border trade of other wildlife and its products (Georges et al., 2006; Hitchcock, 2006). The scale of trade from these areas was not assessed in the present study, but due to the relatively small numbers of snakes encountered in the trade cycle, it is suspected that the distance of these areas from major trading hubs, combined with the small numbers actually collected, has resulted in minimal impact on those populations.

It is widely known that a large number of animals suffer and die in the pet trade every year (Bulte and Damania, 2005; Herbig, 2010). The results presented herein confirm that the husbandry skills of traders are very poor and snakes lose condition as they

**Table 2**
Means and standard deviations (in parenthesis) of eggshell measurements of the fives species of python in our study. n = sample size.

| Common name | Scientific name | n | Length (mm) | | Width (mm) | | Weight (g) | | Volume (cm³) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Mean (SD) | Extremes | Mean (SD) | Extremes | Mean (SD) | Extremes | Mean (SD) | Extremes |
| Green python | *Morelia viridis* | 81 | 38.0 (3.1) | 28–44 | 28.1 (2.2) | 22–33 | 0.5 (0.1) | 0.35–0.8 | 15.8 (2.8) | 8.6–22.8 |
| Carpet python | *Morelia spilota* | 22 | 49.3 (3.5) | 43–57 | 37.8 (2.6) | 34–44 | 1.1 (0.1) | 1–1.25 | 37.0 (5.1) | 27.6–46.9 |
| Halmahera scrub python | *Morelia tracyae* | 13 | 62.2 (3.5) | 57–70 | 53.9 (2.6) | 50–57 | 2.5 (0.1) | 2.25–2.6 | 95.0 (11.7) | 77.2–108.9 |
| Papuan olive python | *Apodora papuana* | 14 | 88.3 (5.3) | 78–96.9 | 53.5 (3.3) | 47–59.5 | 4.5 (0.1) | 4.2–4.75 | 132.5 (15.6) | 109.3–157.6 |
| Sumatran blood python | *Python curtus* | 9 | 80.8 (3.6) | 77–89 | 68.4 (2.8) | 66–73 | 7.5 (0.2) | 7.25–7.7 | 198.1 (18.3) | 175.6–231.6 |

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (Morelia viridis) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

are transported from their collection location (Fig. 4). Based on the present work it is estimated that up to 50% of the green pythons collected at some of the localities will die before they are transported to Jakarta. Captive-bred specimens are often more attractive for the hobbyist market as they are more resistant to health complications and hence easier to keep than wild-caught animals (Auliya, 2003). As such, the finding that many of the green pythons traded were in poor health suggests that trade based on wild-caught individuals is economically counter-productive because traders must carry the cost of being unable to sell sick or dead individuals.

### 4.2. The threat of breeding farms

The finding that most of the green pythons harvested are destined for breeding farms confirms previously held suspicions that most of the green pythons exported annually as captive-bred are in fact wild-caught. The number of companies in Indonesia registered to breed reptiles for export to supply the pet trade increased from 11 in 2006 to 19 in 2008 (Nijman and Shepherd, 2009). Similarly, the number of green pythons exported annually as captive-bred has increased dramatically since the year 2000 (Fig. 6).

Because visits were irregular the number of green pythons collected per unit time could not be determined. However, the large number of snakes recorded during surveys and the extrapolation of numbers reported by traders each month (Table 1) is similar to the annual number of green pythons exported (Fig. 6). This indicates that wild-caught green pythons could make up at least 80% of the annual export of this species from Indonesia. It is also possible that traders have underestimated the numbers claimed to be collected each month because they are aware that such collection is illegal. This, in addition to the lack of monthly harvest data from three traders means that the number collected annually may far exceed the 5337 estimated (Table 1).

Nijman and Shepherd (2009) found that many Indonesian breeding operators do not have the knowledge to successfully breed many reptile species. Surveys by TRAFFIC discovered that some facilities do not have parent stock and others do not even have premises from which to run a successful breeding operation (C.R. Shepherd, pers. comm.).

For breeding farms to be successful they should provide a cheaper, more acceptable product to the consumer than wild-caught individuals (Bulte and Damania, 2005). Not-surprisingly, however, breeding, raising and feeding large numbers of many species over successive years reduces profit margins and is more time consuming than directly selling wild-caught animals. This was confirmed by one farm owner who stated that all other farms launder wild-caught

green pythons, so that to remain competitive he had to do the same thing. As well as citing economic motivation, this farm owner stated that the high year-round demand for pets meant that snakes could not be bred fast enough to meet demand, a common Achilles heel of species that have relatively long reproductive cycles (Mockrin et al., 2005; Vinke and Vinke, 2010). For this reason, it may be that breeding and selling many Indonesian reptile species is not economically viable given that many are slow to mature and have long reproductive cycles.

We were told that foreigners who wanted to select green pythons personally had approached the majority of traders surveyed. Traders reported that the snakes chosen were then sent to breeding farms where they are claimed to be captive-bred, given CITES export permits, and shipped to the individual concerned in the importing country. Interestingly, traders we interviewed said they had not collected green pythons prior to the time foreign dealers had approached them offering to pay for snakes.

Finally, a small number of traders claimed that they currently had orders from foreign clients. Because reptile enthusiasts seem to prefer captive-bred over wild-caught animals (Auliya, 2003; Lyons and Natusch, unpubl. data) we assume that many who purchase green pythons are not aware of the provenance of that individual. Indeed, there are a number of dealers who knowingly import wild-caught green pythons and other species and sell them as captive-bred, relying on the difficulty of differentiating between the two in order to mislead unsuspecting buyers and enforcement authorities in both Indonesia and the importing countries. It is also likely that other dealers are unaware they are receiving wild-caught green pythons, relying on the word of the Indonesian exporter that they are captive-bred.

### 4.3. Management implications

It is well known that Indonesia is faced with several challenges that limit effective conservation of biodiversity. These include, but are not limited too poor natural resource governance, lack of conservation funding, indifference to environmental sustainability, as well as corruption (Laurance, 2004; Posa et al., 2008; Sodhi et al., 2004). The present study has enabled identification of the key factors that facilitate illegal trade of green pythons. As a result, we recommend the following initiatives to reduce the laundering of wildlife through breeding farms.

(1) *Adequate monitoring*: Currently, breeding farms are inadequately monitored. Regular inspections by individuals trained in the identification of species of interest should be undertaken. Disincentives are needed for farm owners who



**Fig. 6.** Four reptile species exported from Indonesia in the highest numbers as captive-bred between the year 2000 and 2009 (UNEP-CITES Trade Database). *Morelia viridis* (■), *Varanus timorensis* (▲), *Varanus prasinus* (×), *Varanus indicus* (○).

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (*Morelia viridis*) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

J.A. Lyons, D.J.D. Natusch / Biological Conservation xxx (2011) xxx–xxx

illegally trade in wildlife, that are appropriate to the scale of illegal trade involved. Registrations should be revoked if farm owners are found to not be complying with national laws (Keane et al., 2008; Wellsmith, 2011).

(2) *Allowing legal harvest*: Legalising the harvest of green pythons under a quota system may help to improve trade monitoring and provide economic benefit to a wider range of people and communities. However, it is currently unknown what level of harvest different populations of green pythons can sustain and would require strict enforcement by Indonesian authorities to ensure harvest quotas are not over-stepped.

(3) *Husbandry training*: The present study found that at least two traders wanted to breed green pythons, but did not have the knowledge or capacity to do so. Assistance and training in the methods required to adequately breed this, and other species, may offer economic incentive to those at the bottom of the trade chain to not trade in wild-caught animals.

(4) *Determination of economic viability*: To provide incentives for farm owners not to trade in illegal wildlife, the economic viability of farming should be determined based primarily on the biology of the species involved in the trade (Mockrin et al., 2005). Specifically, account should be taken of the receptiveness of a species to farming, rather than based primarily on consumer demand.

(5) *Educating the consumer market*: One would assume that with so many green pythons in foreign collections, there would be a large population of healthy, captive-bred animals. It may be, however, that the difficulty of keeping wild-caught green pythons, many of which were in poor health when purchased, has resulted in the mortality of many individuals within a short period after reaching their destination. Educating consumers and showcasing the issue of illegal wildlife trade may help to reinforce the need to know the provenance of any animal purchased. This may in turn reduce the number of dealers and consumers knowingly or unknowingly buying animals that may be wild-caught.

(6) The finding that green pythons were present in Jakarta's Barito Market raises the need for further research into Indonesia's growing domestic pet trade. Regardless of whether the laundering of green pythons for the international trade is stopped, demand from the Indonesian domestic market may continue to place stress on wild populations and prove to be much harder to regulate (Pires and Moreto, 2011).

### 4.4. Proving provenance

Despite the best efforts of Indonesian authorities, determining whether an individual is wild-caught or captive-bred is difficult. We suggest breeding farms should be required to keep eggshells from the reptiles that are bred and to export them with each individual reptile as evidence of their provenance. Like all pythons, green pythons are oviparous, with adult females producing up to one clutch of eggs each year (Maxwell, 2005). The eggs are characteristically small, white and leathery. After hatchlings leave the egg, the leathery texture of the shell begins to harden and compress, but retains its overall shape.

Our results show that green python eggshells are considerably smaller and lighter, in terms of length, width, weight and volume, by comparison with the four other python species examined in this study (Table 2). A single extreme measurement of length overlapped slightly with that of a single egg of the closely related carpet python (*Morelia spilota*). However, in all other respects the measurements of this eggshell matched those for other green pythons. This species has the smallest egg of all commercially bred python species in Indonesia. We conclude that, with a little knowledge

and the aid of reference guide, identifying the eggs of green pythons would be a relatively simple task.

There are a number of other python species exported in small numbers by Indonesian breeding farms. These include the black python (*Morelia boeleni*), water python (*Liasis fuscus*), New Guinea scrub python (*Morelia amethistina*) and the white-lipped python (*Leiopython albertisii*). Although we have a small number of average egg measurements for these species (Barker and Barker, 1994; Charles et al., 1985; Flagle and Stoops, 2009), we lack data sets that encompass the variation between individual hatched egg cases. Without this information, differentiating between the egg cases would be difficult. As a result, although further studies could turn this limitation around, at present the eggshell method can only confidently be used to monitor trade in the green python.

#### 4.4.1. Potential loopholes

There are several ways in which breeding farms might try to circumvent the proposed eggshell identification method. However, in each case there are ways to minimise the risks of corrupt behaviour.

*4.4.1.1. Using the egg shells of other species.* On a few occasions measurement ranges for the different python species examined overlapped. However, never more did a single measurement do so (Table 2 and Fig. 5) and, when used in conjunction with eggshell weights and volume each species has unique eggshell metrics. Python eggs are roughly spherical or oval in shape and closely approximate a prolate spheroid. The eggs of other snake families such as Elapidae and Colubridae are generally smaller and more elongate. Consequently, confusion between families is unlikely. Further, Indonesia does not harvest or breed large enough numbers of suitably sized elapids or colubrids to substitute these shells for those of green pythons. Also, given the complexity and cost of production, it is unlikely that surrogate eggshells could be produced by artificial means.

*4.4.1.2. The transfer of eggshells.* Individual breeding farms may produce only small numbers of green pythons each year. The snakes that are bred may produce eggs but not a juvenile animal of export quality. This potentially could enable its shell to be dishonestly attributed to what is in fact a wild-caught individual. Data compiled from captive breeding records of 109 breeding pairs of green pythons in Indonesia in the years 2009 and 2010 showed that females produced an average of 17 eggs. On average, four snakes in each clutch died, leaving about 450 empty eggshells over the 2-year period. It is possible that these eggshells could be kept and dishonestly attributed to wild-caught individuals intended for export. However, this represents only a small percentage of the green pythons currently exported from Indonesia each year; hence this dishonest behaviour would have a relatively small impact.

## 5. Conclusions

Despite being illegal, collection of wild green pythons is occurring. This study indicates that harvesting is threatening some populations, and, in particular, those on isolated islands. Of most concern is that green pythons from Biak, which may prove to be a distinct species, are experiencing the highest levels of population depletion. Further, the results indicate that most of the green pythons exported from Indonesia each year are actually wild-caught and laundered through breeding farms under the guise of being captive-bred. The suitability and in fact feasibility of breeding farms for producing wildlife to alleviate harvest of wild animals needs to be re-evaluated. It appears that breeding green pythons is currently not a cheaper alternative to laundering wild-caught

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (*Morelia viridis*) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

8                                   J.A. Lyons, D.J.D. Natusch / Biological Conservation xxx (2011) xxx–xxx

animals and is therefore not fulfilling the conservation objectives that led to the establishment of farms in the first place. Adequate monitoring and serious disincentives for illegal activity by farm owners should be introduced and enforced. Despite the growth of wildlife farms and their promotion by governments in South East Asia, a thorough assessment of the economic and, more importantly, biological viability of reptile farming throughout Indonesia is needed.

Our results suggest that the eggshell method could be very effective in reducing the laundering and export of wild-caught green pythons through Indonesian breeding farms. We suggest that this method be trialed in relation to green pythons, with the onus falling upon both the exporting and the importing countries to monitor eggshells.

Although green pythons are still relatively common in most of the areas in which they occur, noticeable declines have occurred in islands and, to a lesser degree, some mainland populations. It is hoped that by quantifying the level and impacts of illegal trade, identifying the mechanisms by which it operates and publishing this information, international and Indonesian national regulation agencies will focus on enforcing laws already in place that were intended to control this debilitating activity.

## Acknowledgements

We would like to thank the many people who assisted us in the field. Despite the sensitive nature of this study, never were traders unfriendly or unwilling to help. Thanks to B. Osborne and L. McIntyre for their assistance in Indonesia. Thanks to Vladimir Odinchenko and Yury Lukin for allowing us access to python eggshells and generously providing their unpublished data on green python reproduction. M. Archer, D. Natusch, C. Shepherd and V. Nijman provided valuable comments on an earlier draft of this manuscript. This work was carried out in accordance with the University of New South Wales Animal Ethics protocol (Permit Number 10/90A).

## References

Allendorf, F., England, P.R., Luikart, G., Richie, P.A., Ryman, N., 2008. Genetic effects of harvest on wild animal populations. Trends in Ecology & Evolution 23, 327–337.
Anon., 2010a. Kuota ekspor tumbuhan alam dan satwa liar yang termasuk Appendix CITES untuk periode tahun 2010. Keputusan Direktur Jenderal Perlindungan Hutan Dan Konservasi Alam.
Anon., 2010b. Kuota ekspor tumbuhan alam dan satwa liar yang termasuk Non-Appendix CITES untuk periode tahun 2010. Keputusan Direktur Jenderal Perlindungan Hutan Dan Konservasi Alam.
Auliya, M., 2003. Hot Trade in Cool Creatures: A Review of the Live Reptile Trade for the European Union in the 1990s with a Focus on Germany. TRAFFIC Europe, Brussels, Belgium.
Auliya, M., Shine R.A., Allison, A., 2009. Morelia viridis. In: IUCN 2011. IUCN Red List of Threatened Species. Version 2011.1. <www.iucnredlist.org> (accessed March 2011).
Barker, D.G., Barker, T.M., 1994. Pythons of the World: Australia, vol. 1. Advanced Vivarium Systems, Escondido, California.
Broad, S., Mulliken, T., Roe, D., 2003. The nature and extent of legal and illegal trade in wildlife. In: Oldfield, S. (Ed.), The Trade in Wildlife: Regulation for Conservation. Earthscan Publications, UK, pp. 3–22.
Brooks, E., Roberton, S., Bell, D., 2010. The conservation impact of commercial wildlife farming of porcupines in Vietnam. Biological Conservation 143, 2808–2814.
Brown, W., Parker, W., 1976. A ventral scale clipping system for permanently marking snakes (Reptilia, Serpentes). Journal of Herpetology 10, 247–249.
Bryman, A., 2004. Social Research Methods, second ed. Oxford University Press, New York.
Bulte, E.H., Damania, R., 2005. An economic assessment of wildlife farming and conservation. Conservation Biology 19, 1222–1233.
Charles, N., Field, R., Shine, R., 1985. Notes on the reproductive biology of Australian pythons, genera Aspidites, Liasis and Morelia. Herpetological Review 16, 45–48.
CITES Asian Snake Trade Workshop, 2011. Guangzhou, China, 11–14 April.
CITES Trade Database, 2011. CITES Trade Database, UNEP World Conservation Monitoring Centre, Cambridge, UK. <http://www.unep-wcmc-apps.org/citestrade/trade.cfm> (accessed June 2011).

Congdon, J.D., Durnham, A.D., Van Loben Sels, R.C., 1993. Delayed sexual maturity and demographics of Blandings turtles (Emydoidea blandingii): Implications for conservation and management of long-lived organisms. Conservation Biology 7, 826–833.
Engler, M., Parry-Jones, R., 2007. Opportunity or Threat: The Role of the European Union in Global Wildlife Trade. TRAFFIC Europe, Brussels, Belgium.
Fenberg, P.B., Roy, K., 2008. Ecological and evolutionary consequences of size-selective harvesting: how much do we know? Molecular Ecology 17, 209–220.
Fitzgerald, L.A., Painter, C.W., 2000. Rattlesnake commercialization: Long-term trends, issues, and implications for conservation. Wildlife Society Bulletin 28, 235–253.
Flagle, A., Stoops, E., 2009. Black Python: Morelia boeleni. Chimaira Buchhandelsgesellschaft, Germany.
Gavin, M.C., Solomon, J.N., Blank, S.G., 2009. Measuring and monitoring illegal use of natural resources. Conservation Biology 24, 89–100.
Georges, A., Guarino, F., Bito, B., 2006. Freshwater turtles of the TransFly region of Papua New Guinea: Notes on diversity, distribution, reproduction, harvest and trade. Wildlife Research 33, 373–384.
Grieser-Johns, A., Thomson, J., 2005. Going, Going, Gone: The Illegal Trade in Wildlife in East and Southeast Asia. World Bank, Washington, DC.
Herbig, J., 2010. The illegal reptile trade as a form of conservation crime: a South African criminological investigation. In: White, S. (Ed.), Global Environmental Harm: Criminological Perspectives. Willan Publishing, UK, pp. 110–131.
Hitchcock, G., 2006. Cross-border trade in Saratoga fingerlings from the Bensbach River, south-west Papua New Guinea. Pacific Conservation Biology 12, 218–228.
Jori, F., Mensah, G.A., Adjanohoun, E., 1995. Grasscutter (Trynonomys swinderianus) production: An example of rational exploitation of wildlife. Biodiversity and Conservation 4, 257–265.
Keane, A., Jones, J.P.G., Edwards-Jones, G., Milner-Gulland, E.J., 2008. The sleeping policeman: Understanding issues of enforcement and compliance in conservation. Animal Conservation 11, 75–82.
Kivit, R., Wiseman, S., 2005. The Green Tree Python and Emerald Tree Boa: Care, Breeding and Natural History. Kirschner and Seufer Verlag, Germany.
Laurance, W.F., 2004. The perils of payoff: Corruption as a threat to global biodiversity. Trends in Ecology & Evolution 19, 399–401.
Maxwell, G., 2005. The More Complete Chondro. ECO Publishing, China.
Means, D., 2009. Effects of rattlesnake roundups on the eastern diamondback rattlesnake (Crotalus adamanteus). Herpetological Conservation and Biology 4 (2), 132–141.
Ministry of Forestry, Directorate General of Forest Protection and Nature Conservation, Directorate of Biodiversity Conservation (PHKA), 2011. Country Report of Indonesia: Snake Trade and Conservation. Jakarta. <www.cites.org/eng/com/ac/25/Snake/Indonesia.pdf> (accessed March 2011).
Mockrin, M., Bennett, E.L., LaBruna, D.T., 2005. Wildlife Farming: A Viable Alternative to Hunting in Tropical Forests? WCS Working Paper No. 23. Wildlife Conservation Society, New York.
Natusch, D.J.D., Lyons, J.A., in press. The harvest of Antaresia maculosa from West Papua, Indonesia. Herpetological Review.
Natusch, D.J.D., Natusch, D.F.S., in press. Distribution, abundance and demography of green pythons (Morelia viridis) in Cape York Peninsula, Australia. Australian Journal of Zoology.
Nijman, V., 2010. An overview of international wildlife trade from Southeast Asia. Biodiversity and Conservation 19, 1101–1114.
Nijman, V., Shepherd, C.R., 2007. Trade in non-native, CITES-listed, wildlife in Asia, as exemplified by the trade in freshwater turtles and tortoises (Chelonidae) in Thailand. Contributions to Zoology 76, 207–212.
Nijman, V., Shepherd, C.R., 2009. Wildlife Trade from ASEAN to the EU: Issues with the Trade in Captive-bred Reptiles from INDONESIA. TRAFFIC Europe Report for the European Commission, Brussels, Belgium.
Nogueira, S.S.C., Nogueira-Filho, S.L.G., 2011. Wildlife farming: an alternative to unsustainable hunting and deforestation in Neotropical forests? Biodiversity Conservation 20, 1385–1397.
O'Shea, M., 1996. A Guide to the Snakes of Papua New Guinea. Independent Publishing, Port Moresby.
Pernetta, A.P., 2009. Monitoring the trade: Using the CITES database to examine the global trade in live monitor lizards (Varanus spp.). Biawak 3 (2), 37–45.
Pires, S.F., Moreto, W.D., 2011. Preventing wildlife crimes: Solutions that can overcome the 'Tragedy of the Commons'. European Journal on Criminal Policy and Research 17, 101–123.
Posa, M., Diesmos, A., Sodhi, N., Brooks, T., 2008. Hope for threatened tropical biodiversity: lessons from the Philippines. BioScience 58, 231–240.
Revol, B., 1995. Crocodile farming and conservation, the example of Zimbabwe. Biodiversity and Conservation 4, 299–305.
Roe, D., 2008. Trading Nature: A Report, with Case Studies, on the Contribution of Wildlife Trade Management to Sustainable Livelihoods and the Millennium Development Goals. TRAFFIC International and WWF International.
Sasaki, K., Fox, S., Duvall, D., 2008. Rapid evolution in the wild: Changes in body size, life-history traits, and behavior in hunted populations of the Japanese Mamushi snake. Conservation Biology 23, 93–102.
Schoppe, S., 2009. Status, Trade Dynamics and Management of the Southeast Asian Box Turtle in Indonesia. TRAFFIC Southeast Asia, Petaling Jaya, Selangor, Malaysia.
Shepherd, C.R., 2006. The bird trade in Medan, north sumatra: An overview. Birding ASIA 5, 16–24.
Siswomartono, D., 1998. Review of the policy and activities of wildlife utilization in Indonesia. Mertensiella 9, 27–31.

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (Morelia viridis) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

Smith, M.J., Benitez-Diaz, H., Clemente-Munoz, M.A., Donaldson, J., Hutton, J.M., Mcgough, H.N., Medellin, R.A., Morgan, D.H.W., O'Criodain, C., Oldfield, T.E.E., Schippmann, U., Williams, R.J., 2011. Assessing the impacts of international trade on CITES-listed species: Current practices and opportunities for scientific research. Biological Conservation 144, 82–91.

Sodhi, N., Koh, L., Brook, B., Ng, P., 2004. Southeast Asian biodiversity: An impending disaster. Trends in Ecology & Evolution 19, 654–660.

Sutherland, W.J. et al., 2009. One hundred questions of importance to the conservation of global biological diversity. Conservation Biology 23, 557–567.

Vinke, T., Vinke, S., 2010. Do breeding facilities for chelonians threaten their stability in the wild? Schildkröten im Fokus online. Bergheim 1, 1–18.

Webb, J., Brook, B., Shine, R., 2002. Collectors endanger Australia's most threatened snake the broad-headed snake *Hoplicephalus bungaroides*. Oryx 36, 170–181.

Wellsmith, M., 2011. Wildlife crime: The problems of enforcement. European Journal on Criminal Policy and Research 17, 125–148.

Wutty, C., Simms, A., 2005. Intelligence-led Investigation into Illegal Wildlife Hunting and Trade in Southwest Cambodia. Conservation International, Natural Resource Protection Group and Fauna and Flora International.

Yuwono, F.B., 1998. The trade of live reptiles in Indonesia. Mertensiella 9, 9–15.

Zhou, Z., Jiang, Z., 2005. Identifying snake species threatened by economic exploitation and international trade in China. Biodiversity and Conservation 14, 3525–3536.

Please cite this article in press as: Lyons, J.A., Natusch, D.J.D. Wildlife laundering through breeding farms: Illegal harvest, population declines and a means of regulating the trade of green pythons (*Morelia viridis*) from Indonesia. Biol. Conserv. (2011), doi:10.1016/j.biocon.2011.10.002

**EXHIBIT E**

RECIEL 22 (3) 2013. ISSN 2050-0386

# Uncertainty and Markets for Endangered Species under CITES

## Annecoos Wiersema

At the next Conference of the Parties in 2016, the parties to the Convention on International Trade in Endangered Species (CITES) will likely be presented with proposals for legal trade in some of the most iconic endangered species covered by the treaty – elephants, rhinoceroses and tigers. This article evaluates the proposals for legal trade and discusses how the parties to CITES should approach the questions raised by these proposals. The projections about trade in elephants, rhinoceroses and tigers reveal deep and multilayered uncertainty. The article concludes by suggesting that conservation principles, sound science and the legal mandate of CITES itself should lead the parties to adopt a cautious approach. Trade bans should be maintained to protect species from extinction due to trade.

## INTRODUCTION

At the next Conference of the Parties (CoP) in 2016, if not sooner, the parties to the Convention on International Trade in Endangered Species (CITES)[1] will likely be asked by some parties and commentators to consider authorizing legal trade in some of the most iconic endangered species covered by the treaty – elephants, rhinoceroses and tigers. Many of the sub-populations of these species have been listed on Appendix I of CITES for several years, meaning that commercial international trade in them and their parts is banned. Yet as CITES enters its fifth decade, some commentators are questioning whether trade bans are the most effective means of protecting these species and are proposing some form of legal trade. The question of whether legal trade or trade bans is the most effective means of protecting these species is particularly urgent because the last few years have seen a severe escalation of poaching in many areas.[2] These iconic species hover on the brink

of extinction and even traditionally well-managed populations are feeling the threat of escalating demand. What, then, should the relationship be between trade and endangered species in CITES?

This article evaluates the proposals for legal trade and discusses how the parties to CITES should approach the questions raised by these proposals. Specifically, it explores some of the often unquestioned assumptions made in these proposals and demonstrates that there is great uncertainty surrounding many of the assumptions in these arguments. Because arguments for legal trade are based on assumptions surrounded by uncertainty and backed up with little or no empirical data, the article demonstrates that the benefits of legal trade to endangered species are therefore both unproven and likely cannot be proven. Given this uncertainty, the article suggests that consistency with conservation principles and sound science should lead parties to adopt a cautious approach that will be consistent with the CITES mandate to protect species from extinction due to trade. In a world of perfect information, it would be easier to identify whether legal trade or a ban in trade is the most effective way of achieving that mandate. However, we do not and cannot have perfect information. The projections about trade in elephants, rhinoceroses and tigers reveal deep and multilayered uncertainty. In the face of this uncertainty, this article urges caution and proposes a way to apply that caution.

## CITES AND TRADE IN ENDANGERED SPECIES

The two primary appendices for the listing of species in CITES create an important dynamic within the treaty. Appendix I listing is reserved for 'all species threatened with extinction which are or may be affected by trade'.[3] For these endangered species, the Convention prescribes a ban on trade 'for primarily commercial purposes'.[4] Appendix II listing is intended for 'all species

---

[1] Convention on International Trade in Endangered Species of Wild Fauna and Flora (Washington, DC, 3 March 1973; in force 1 July 1975) ('CITES').

[2] Elephant Conservation, Illegal Killing and Ivory Trade (SC62 Doc. 46.1 (Rev.1), 2012), Report to the 62nd Meeting of the Standing Committee, Geneva, Switzerland, 23–27 July 2012, found at: <http://www.cites.org/eng/com/sc/62/E62-46-01.pdf>, at 7; S. Stoner and N. Pervushina, Reduced to Skin and Bones Revisited: An Updated Analysis of Tiger Seizures from 12 Tiger Range Countries (2000–2012) (TRAFFIC, 2012), at 15; T. Milliken and J. Shaw, The South

*Africa–Viet Nam Rhino Horn Trade Nexus: A Deadly Combination of Institutional Lapses, Corrupt Wildlife Industry Professionals and Asian Crime Syndicates* (TRAFFIC, 2013), at 68–73.

[3] CITES, n. 1 above, Article 3.1.

[4] Ibid., Article 3.3(c).

© 2013 John Wiley & Sons Ltd, 9600 Garsington Road, Oxford OX4 2DQ, UK and 350 Main Street, Malden, MA 02148, USA.

RECIEL 22 (3) 2013

which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival'.[5] Appendix II-listed species can be commercially traded with permits, provided the trade will not be detrimental to the survival of the species.[6]

The existence of an interim listing option on Appendix II for species not yet considered endangered means that regulators can manage species with some flexibility before the moment of imminent extinction with more options than just relying on a trade ban. However, once a species is identified as endangered and threatened by trade, Appendix I comes into play and the treaty takes a different approach to the role of trade in conservation.

For some in the CITES and conservation communities, this different view of the role of trade for species at different levels of threat has been problematic. As CITES entered its second and third decades, commentators began to push against what they saw as a constricting and ecologically unsound approach of assuming that all trade in endangered species was a threat.[7] The parties also acted at CoPs, agreeing to adjustments for certain species, such as the Nile crocodile (*Crocodilus niloticus*) and the vicuña (*Vicugna vicugna*).[8] Both the crocodile and the vicuña have in turn been seen as examples of successfully using legal trade and farming or captive-breeding operations to save the species and, for some, have fed support for CITES to adapt and accommodate some trade in endangered species.[9]

During the Convention's first forty years, parties have also sought to ensure that listing on CITES appendices and decision making by the parties are based on science and facts.[10] Proponents of opening up trade often suggest that allowing for some legal trade would be an objective and scientifically based approach.[11] In particular, commentators often suggest that counterarguments are motivated by ethical considerations in the form of animal welfare or a dislike of killing that do not belong in the conservation world.[12] The implicit message is, then, that counter-arguments to allowing some legal international trade in elephant, rhino and tiger parts are ungrounded in science.

This article tests the proposals for trade, examining in detail the assumptions they make and the evidence they rely upon. Only in this way can we assess what will be the most scientific and fact-driven strategy for the parties to CITES to adopt for these three species. The article presents counter-arguments to the proposals' assumptions in order to highlight areas where models may be unreliable or data insufficient but does not try to prove definitively that the proposals are either correct or incorrect in their assumptions. It is the position of this article that such proof would be impossible. The next section thus raises more questions than it answers about the potential effect of legal trade on the survival of endangered species.

# PROPOSALS TO LEGALIZE TRADE IN ENDANGERED SPECIES UNDER CITES

## *THE SPECIES*

Proposals to legalize some trade in endangered species frequently focus on one or more of three animal species: elephants, rhinoceroses and tigers. This article refers to these as three species, although there are a number of sub-species with different circumstances, threats and legal protection.[13] All three are under severe threat from

---

[5] Ibid., Article 2.2. Article 2 also provides for listing of so-called 'lookalike species' on Appendix II. Ibid., Article 2.2(b). Appendix III is intended for species that are identified by a party as being subject to regulation within its domestic jurisdiction to prevent or restrict exploitation and for which international cooperation is needed. Ibid., Article 2.3.

[6] Ibid., Article 4.

[7] See, e.g., C. Huxley, 'CITES: The Vision', in: J. Hutton and B. Dickson (eds.), *Endangered Species, Threatened Convention: The Past, Present and Future of CITES* (Earthscan, 2000), 3, at 10–11; R.B. Martin, 'When CITES Works and When It Does Not', in: J. Hutton and B. Dickson, ibid., 29, at 36.

[8] H. Kievit, 'Conservation of the Nile Crocodile: Has CITES Helped or Hindered?', in: J. Hutton and B. Dickson, n. 7 above, 88, at 93; R.R.J. McAllister, D. McNeill and I.J. Gordon, 'Legalizing Markets and the Consequences for Poaching of Wildlife Species: The Vicuña as a Case Study', 90:1 *Journal of Environmental Management* (2009), 120, at 121.

[9] See J.P. Ross (ed.), *Crocodiles: Status Survey and Conservation Action Plan*, 2nd edn. (IUCN/SSC Crocodile Specialist Group, 1998), at 48–50; H. Kievit, n. 8 above; M. Kreger, 'Sustainable Use for Vicuña Conservation', 30:2 *Endangered Species Bulletin* (2005), 12; Department of Environmental Affairs, Republic of South Africa, *Rhino Issue Management Report 2013* (2013), at 17; J. Hutton and G. Webb, 'Crocodiles: Legal Trade Snaps Back', in: S. Oldfield (ed.), *Trade in Wildlife: Regulation for Conservation* (Earthscan, 2003), 108, at 111–118; D. Biggs, F. Courchamp, R. Martin and H.P. Possingham, 'Legal Trade of Africa's Rhino Horns', 339:6123 *Science* (2013), 1038; E. Lapointe, 'Myth of Trade or No Trade', in:

IWMC World Conservation Trust (ed.), *Tiger Conservation: It's Time to Think Outside the Box*, in: IWMC World Conservation Trust, 2007), 4, at 5–6. For a less wholehearted endorsement of the lessons to be drawn from crocodiles for sustainable use proposals generally, see: J. Thorbjarnarson, 'Crocodile Tears and Skins: International Trade, Economic Constraints and Limits to the Sustainable Use of Crocodilians', 13:3 *Conservation Biology* (1999), 465.

[10] See CITES Resolution Conf. 9.24 (Rev. CoP16), Criteria for Amendment of Appendices I and II (1994/2013).

[11] See K. Conrad, 'Trade Bans: A Perfect Storm for Poaching?', 5:3 *Tropical Conservation Science* (2012), 245, at 252.

[12] See H. Jenkins, 'Conservation of the Tiger: The Need for New and Radical Approaches', in: IWMC World Conservation Trust, n. 9 above, 11, at 12; D. Biggs *et al.*, n. 9 above, at 1039.

[13] See Department of Environmental Affairs, Republic of South Africa, n. 9 above, at 9; H.S. Riddle, B.A. Schulte, A.A. Desai and L. van der Meer, 'Elephants: A Conservation Overview', 2:1 *Journal of Threat-*

© 2013 John Wiley & Sons Ltd

poaching, although they are also subject to threats from factors such as habitat loss.[14] Most of the sub-populations of these species are listed on Appendix I of CITES and are considered endangered, resulting in a ban in commercial trade.[15] For elephants and tigers, the main demand is for parts that are only available if the animal is killed – namely ivory, tiger skins and tiger bones. For rhinos, demand is primarily for rhino horn, which can – with the right expertise and equipment – be harvested from rhinos without killing them.[16] However, poachers kill rhinoceroses to obtain the horn.

Despite listing on Appendix I, some legal international or domestic trade has continued for certain elephant, rhino and tiger parts, albeit in different forms depending on the species. In the case of the African elephant (*Loxodonta africana*), after listing on Appendix I in 1989,[17] some populations of the species were downlisted from Appendix I to Appendix II in 1997 and two international sales of State-controlled stockpiles of ivory have since been authorized by CITES to two States – Japan and China.[18] Domestic trade in ivory has also continued in some countries.[19] Rhinoceros species were listed on Appendix I in 1977.[20] In 1994 and 2004, respectively, South Africa and Swaziland's populations of white rhinoceros (*Ceratotherium simum*) were transferred to Appendix II, with an annotation limiting permissible international trade of rhino parts to hunting trophies.[21] International trade in tiger parts has been banned through Appendix I listing on CITES since 1975,[22] with the exception of the Siberian Tiger

(*Panthera tigris altaica*), which was listed on Appendix I in 1987.[23] Yet some domestic trade in certain parts of captivity-bred tigers that have died in captivity appears to be authorized within China.[24]

At the next CITES CoP in 2016 or sooner, some or all of these three species are likely to be the subject of proposals to legalize some international trade in their parts. These proposals are not all the same, just as the species are not all the same. For ivory, parties to CITES are being asked to develop a decision-making mechanism to govern periodic sales of ivory.[25] This intended trade is not proposed to result in farming of elephants. The ivory to be sold comes from some form of sanctioned killing of wild elephants from culling programmes or hunting, from natural deaths in protected reserves, or from seizures of illegal ivory. For tigers, proposals for legal trade primarily involve allowing captive-breeding operations to trade in tiger parts.[26] For rhinos, proposals could involve both wild and ranched animals.[27] Sources of rhino horn could include stockpiles of rhino horn gained from wild rhinos in much the same way as stockpiles of ivory, as well as sales of rhino horn from State dehorning programmes. Sources could also include rhino horn from dehorning and hunting trophies of rhinos held on private land in operations more akin to farming or ranching.

Because the proposals are all slightly different, some of the arguments by both proponents and opponents to legal trade are inapplicable to some species. This article notes these differences where relevant. Nevertheless, the article addresses arguments favouring legal trade for all three species at the more general level, focusing on the assumptions behind these arguments.

## EVALUATING THE PROPOSALS

Aspects of the arguments by commentators proposing consideration of legal trade in endangered species can be grouped into four categories. First, many arguments centre on economic models of supply and demand drawing on supply-side economics. Second, arguments often discuss the demand for wildlife products and argue that this demand is inelastic. Third, many of the proposals make assumptions about the level of legal and regulatory infrastructure required for legal trade and how

ened Taxa (2010), 653; R. Tilson and P.J. Nyhus (eds.), *Tigers of the World: The Science, Politics and Conservation of Panthera Tigris*, 2nd edn. (Elsevier, 2010), at 37–41 and 45–48.

[14] United Nations Environment Programme (UNEP), CITES, International Union for Conservation of Nature (IUCN) and TRAFFIC, *Elephants in the Dust: The African Elephant Crisis* (UNEP, 2013), at 6; Department of Environmental Affairs, Republic of South Africa, n. 9 above, at 16; S. Stoner and N. Pervushina, n. 2 above, at 1–2.
[15] CITES, n. 1 above, Article 3.3(c).
[16] See D. Biggs *et al*., n. 9 above, at 1038; P.A. Lindsey and A. Taylor, *A Study on the Dehorning of African Rhinoceroses as a Tool to Reduce the Risk of Poaching* (Department of Environmental Affairs, Republic of South Africa, 2011), at 24.
[17] Amendments to Appendices I and II of CITES (Lausanne, 20 October 1989; in force 18 January 1990), at 73.
[18] Amendments to Appendices I and II of CITES (Harare, 20 June 1997; in force 18 September 1997), at 151; H. Kiyono, *Japan's Trade in Ivory after the Tenth Conference of the Parties to CITES* (TRAFFIC, 2002), at 1; CITES Notification to the Parties No. 2004/073, Amendments to Appendices I and II of the Convention (19 November 2004), at 4–5.
[19] A.M. Lemieux and R.V. Clarke, 'The International Ban on Ivory Sales and Its Effects on Elephant Poaching in Africa', 49:4 *British Journal of Criminology* (2009), 451; D. Carrington, 'Thailand's Prime Minister Pledges to Outlaw Domestic Ivory Trade', *The Guardian* (3 March 2013).
[20] See T. Milliken and J. Shaw, n. 2 above, at 44.
[21] CITES Resolution Conf. 9.14 (Rev. CoP15), Conservation of and Trade in African and Asian Rhinoceroses (1994), at 1.
[22] CITES Resolution Conf. 12.5 (Rev. CoP15), Conservation of and Trade in Tigers and Other Appendix-I Asian Big Cat Species (2002/2010), at 1.

[23] Amendments to Appendices I and II of CITES (Ottawa, 24 July 1987; in force 22 October 1987), at 98.
[24] Environmental Investigation Agency (EIA), *Hidden in Plain Sight: China's Clandestine Tiger Trade* (EIA, 2013), at 5.
[25] Decision-making Mechanism for a Process of Trade in Ivory (CoP 16 Com. II.18, 2013).
[26] See K. Nowell and X. Ling, *Taming the Tiger Trade: China's Markets for Wild and Captive Tiger Products since the 1993 Domestic Trade Ban* (TRAFFIC, 2007), at 6; E. Dinerstein *et al*., 'The Fate of Wild Tigers', 57:6 *BioScience* (2007), 508, at 512.
[27] See Department of Environmental Affairs, Republic of South Africa, n. 9 above, at 22–24; D. Biggs *et al*., n. 9 above, at 1038.

© 2013 John Wiley & Sons Ltd

that compares to the infrastructure needed to enforce bans on products. Finally, proposals often make arguments that implicate principles of ecology and conservation biology. These four categories of arguments are discussed in turn in the following sections.

## Economic Models of Supply and Demand

Some of the proposals advocating trade rely heavily on supply-side economics for the proposition that increasing supply will reduce the price of the commodity – in this case, wildlife products – and thereby result in the legal market crowding out the illegal supply.[28] With legal products reducing the price, incentives to poach should, under this approach, be diminished.[29]

Models that rely on supply-side economics and predict that legal products will compete with and end the illegal market in certain wildlife products are built on three core assumptions. (An additional assumption – namely that demand for wildlife products will not increase with increased availability of that product – is addressed in the next section). First, this basic supply-side model assumes that the wildlife product market is perfectly competitive.[30] However, there is strong evidence to contradict this assumption. In the case of illegal international wildlife trade, the evidence suggests that there are relatively few powerful traders and that these traders act as an oligopoly.[31] This is key, because when the market is not perfectly competitive, it is no longer as predictable what will happen when a legal source is introduced to the market.[32] For example, Bulte and Damania use mathematical models to show that where the market is dominated by an oligopoly, two alternate outcomes might result from introducing a legal market.[33] If illegal traders act passively and continue to operate on their existing supply curve, they would no longer make as much money from illegal trade and would, it is

assumed, seek out other opportunities for financial gain.[34] The result could indeed be a reduction in poaching as the traders driving the poaching move into other, more lucrative fields.[35] If, however, illegal traders act aggressively and decide to make up for lost profit per unit by increasing their supply, the introduction of a legal supply will lead to a possible increase in poaching.[36] Thus, because the market is not perfectly competitive, it is impossible to predict with certainty whether introducing a legal market will reduce poaching as assumed by supply-side wildlife economists.[37]

Bulte and Damania go on to use mathematical modelling to predict that limiting legal supply could lead to greater likelihood that illegal traders will act passively and poaching would go down.[38] However, their proof lies in modelling rather than empirical research.[39] Evidence from the introduction of farmed stocks of bear bile suggests that traders will sometimes increase illegal supply rather than face losing profit.[40] Importantly, there is not enough information to allow us to make an informed inference one way or the other about whether traders are likely to act passively or aggressively. Thus, within the supply-side models, there is a great deal of uncertainty about which models are the most likely to predict the effects of a legal trade on traders.

Many variables will play a role in determining how traders are likely to behave.[41] These include the behaviour and incentives of poachers, the ease of increasing supply of illegally obtained wildlife parts, the demand for wildlife parts and the motivations of illegal traders. These variables may also play out differently for different species. Many of these variables are addressed in the remainder of this article. For now, using the supply-side model that assumes that illegal traders will withdraw from the market if legal products become available does not account for the potential for an increase in poaching for some or all of these endangered species. The assumption, then, that the wildlife product market is perfectly competitive and that introduction of a legal source of wildlife parts will therefore reduce illegal trade is unproven.

The second assumption behind the supply-side arguments is that legal products can be produced cheaply enough and in enough quantity that they can undercut the illegal market.[42] Having legal products compete in

---

[28] M. 't Sas-Rolfes, *Who Will Save the Wild Tiger?* (PS-12 PERC Policy Series, 1998), at 10; G. Brown and D.F. Layton, 'A Market Solution for Preserving Biodiversity: The Black Rhino', in: J.F. Shogren and J. Tschirhart (eds.), *Protecting Endangered Species in the United States* (Cambridge University Press, 2001), 32; R.C. Kirkpatrick and L. Emerton, 'Killing Tigers to Save Them: Fallacies of the Farming Argument', 24:3 *Conservation Biology* (2010), 655, at 657; E.H. Bulte and R. Damania, 'An Economic Assessment of Wildlife Farming and Conservation', 19:4 *Conservation Biology* (2005), 1222, at 1223.

[29] See B. Abbot and G.C. van Kooten, *Can Domestication of Wildlife Lead to Conservation? The Economics of Tiger Farming in China* (Resource Economics and Policy Analysis Research Group, Department of Economics, University of Victoria, 2009), at 12, stating the proposition with regard to tigers.

[30] See E.H. Bulte and R. Damania, n. 28 above, at 1224; and R.C. Kirkpatrick and L. Emerton, n. 28 above, at 658.

[31] See E.H. Bulte and R. Damania, n. 28 above., at 1226; T. Milliken and J. Shaw, n. 2 above, at 81–82; and R.C. Kirkpatrick and L. Emerton, n. 28 above, at 657 and 658.

[32] See E.H. Bulte and R. Damania, n. 28 above, at 1227; and M. 't Sas-Rolfes, n. 28 above, at 10.

[33] See E.H. Bulte and R. Damania, n. 28 above, at 1227.

---

[34] Ibid.

[35] Ibid.

[36] Ibid.

[37] Ibid.; and R.C. Kirkpatrick and L. Emerton, n. 28 above, at 657.

[38] See E.H. Bulte and R. Damania, n. 28 above, at 1227.

[39] Ibid., at 1228.

[40] See R.C. Kirkpatrick and L. Emerton, n. 28 above, at 657 and 658.

[41] Ibid., at 657.

[42] See D. Biggs *et al.*, n. 9 above, at 1038; and Z. Jiang, C. Li, H. Fang, Z. Meng and Y. Zeng, 'Captive-bred Tigers and the Fate of Wild Tigers', 57:9 *BioScience* (2007), 725.

© 2013 John Wiley & Sons Ltd

price with illegal products is key to the success of the pro-trade models because the models themselves rely on the possibility of an increase in supply deflating price, thereby diminishing incentives for poachers and illegal wildlife traders.[43] With regard to cost, the cost of producing legal wildlife parts will vary depending on the species, particularly since – as discussed earlier – the source of the legal wildlife parts varies across the species. Selling pre-existing stockpiles of wildlife parts, for example, does not require any additional investment of resources to obtain the product, whereas beginning a breeding programme would. The quantity of a legal product that will be available is also variable, depending on breeding rates.

In support of a legal trade in rhino horn, Biggs *et al.* argue that cost-effectiveness is achievable with rhino horn because of the possibility of dehorning rhinos relatively cheaply.[44] However, even if these cost projections hold true in the case of rhinos, or for sales of stockpiles, it is not clear that this will be true of all markets. In many instances, even possibly with rhinos, illegal hunting will be more cost-effective than farming.[45] Costs may also vary over time. Hunting or poaching could be more cost-effective initially until the wild source runs out due to extinction.[46] Alternatively, relying on stockpiles could make the legal source more cost-effective initially until that legal source runs out or can no longer meet demand. Abbot and van Kooten have observed that captive-breeding operations of tigers might be able to benefit from economies of scale where they can produce multiple products from tigers that they cannot produce where activities have to be done in secret.[47] Yet they also observe that if this hypothesis is wrong and the output from tiger farms does not affect the price of wild-caught tigers – because it is not cheap enough to flood the market – then tiger farming will have no effect on poaching of wild tigers.[48] Conrad proposes that cost analysis could reveal the relative cost of bringing captive-bred and wild products to market.[49] Yet it is unlikely that such cost analysis could eliminate all uncertainty about costs and supply. In addition, farmers and ranchers engaged in a legal operation would not necessarily have an incentive to keep prices down. Indeed, farmers and ranchers have an incentive to allow particular species to go extinct in the wild since that would give these farmers and ranchers a monopoly in the market and allow their products

to gain in value.[50] There is some evidence of players in wildlife markets engaging in this kind of speculation, stockpiling products until the species is extinct or severely endangered, so that they can realize greater profits in the future.[51]

The third assumption in the supply-side models is that the legal products that would be introduced into the market can substitute for the illegal ones.[52] If consumers do not perceive wild-caught and domestically raised products as perfectly substitutable, it will be harder to undercut one with another. Thus, it is critical for us to know the level of substitutability between legally and illegally traded wildlife parts. For some wildlife, the legal source of parts will come from wild populations that have died naturally or been culled as part of population control measures. This is true, for example, of sales of stockpiles of ivory by States. In those instances, substitutability between the legally traded part and the illegally traded part is likely to be high, since both originally come from a wild animal. However, for some species – tigers and rhinos, for example – legally traded parts could come from captive-breeding operations or ranching and farming operations. For these species, substitutability may be different because the legally traded product will not come from wild populations.

What is the evidence about substitutability? Inevitably, it is limited because of the absence of regulated legal markets in tiger and rhino products, although some evidence can perhaps be gleaned from some clandestine markets in captive-bred products. Gratwicke *et al.* point to evidence that there can be higher demand for wild-caught products, with those products commanding a significantly higher price because they are believed to be more potent.[53] At the very least, we can say that it is not certain that buyers of wildlife products will treat legally sourced products as substitutable for illegally sourced products.

Thus, substitutability may vary depending on the species at issue, but in most proposals for trade, substitutability is assumed. In a more nuanced approach, Bulte and Damania assume a figure to represent the elasticity of substitution between farmed and poached rhino horns.[54] Although this assumption of a figure is necessary for modeling, the authors themselves acknowledge that they set this elasticity of substitution

---

[43] D. Biggs *et al.*, n. 9 above, at 1038.

[44] Ibid., at 1039.

[45] M.H. Mockrin, E.L. Bennett and D.T. LaBruna, *Wildlife Farming: A Viable Alternative to Hunting in Tropical Forests?* (Wildlife Conservation Society, 2005), at 15; E. Dinerstein *et al.*, n. 26 above, at 512.

[46] See E. Dinerstein *et al.*, n. 26 above, at 512.

[47] See B. Abbot and G.C. van Kooten, n. 29 above, at 3.

[48] Ibid., at 7–8.

[49] K. Conrad, 'Could Farming Save the Wild Tiger?', in: IWMC World Conservation Trust, 2007, n. 9 above, 7, at 8.

[50] C. Mason, E.H. Bulte and R.D. Horan, 'Banking on Extinction: Endangered Species and Speculation', 28:1 *Oxford Review of Economic Policy* (2012), 180; B. Gratwicke *et al.*, 'The World Can't Have Wild Tigers and Eat Them, Too', 22:1 *Conservation Biology* (2008), 222, at 223.

[51] See C. Mason, E.H. Bulte and R.D. Horan, n. 50 above.

[52] See D. Biggs *et al.*, n. 9 above, at 1038.

[53] See B. Gratwicke *et al.*, n. 50 above, at 222.

[54] See E.H. Bulte and R. Damania, n. 28 above, 1229.

© 2013 John Wiley & Sons Ltd

'arbitrarily' and that varying the parameter representing substitutability has consequences for the outputs of their model.[55]

These three assumptions are therefore highly uncertain. This uncertainty is significant, because it fundamentally alters the supply and demand curves of these models and the effect of supply on price. For example, two practical consequences could flow from a scenario where farms are not cheaper producers of the product. First, poachers and smugglers would have substantial incentive to undercut farmers and increase poaching.[56] If poached products are cheaper to bring to the market and also substitutable, this problem is exacerbated. Evidence regarding tiger skins suggests that this combination is a real possibility since captive-bred tiger skins can sell for 1.5–3 times higher than the price of wild tiger skins.[57] Second, farmers are unlikely to want to sell their products at a deflated price; indeed, they would have every incentive to increase their prices above cost, again opening the door to increased poaching.

Markets for wildlife products are complex and affected by many variables.[58] While economic models can help us see some of the factors in how they react, these models are only as good as the assumptions and data that go into them. In the case of markets for wildlife products and the effects of legal sales, particularly regarding elephants, rhinos and tigers, there are more questions than answers about these assumptions and the data. Further, as discussed below, what may be true for one species may not be true for another.

## Demand Elasticity

An important argument put forward by advocates of a legal trade in one or more endangered species is that demand for products from these species is inelastic, both in its strictly economic sense as unresponsive to price and in the sense that demand cannot be reduced.[59] Conrad posits five conditions for her perfect storm scenario of a trade ban being ineffective.[60] The first of these factors is that demand is inelastic.[61] The second is that use of these products has a long history of cultural significance.[62] For Conrad, the inability to shift demand for these wildlife products is at the core of her view that trade bans for elephants, rhinos and tigers will be

ineffective.[63] Some proponents of trade concede that even if demand is not completely inelastic, campaigns to reduce demand will work too slowly and are expensive and difficult.[64] Feeding into this, in turn, is an argument that consumption of wildlife products is based on traditions going back thousands of years and is embedded in strong cultural values.[65] These cultural roots affect not only the elasticity of demand, but also lead to arguments that demand reduction efforts are inappropriate because they imply that cultural beliefs and different approaches to medicine are not as important as values of conservation or animal rights.[66] In support of the view that demand for wildlife products is inelastic, some commentators note that the most severe criminal penalties, including the death penalty, have not prevented poaching.[67]

Demand is certainly difficult to address. Looking at empirical evidence from TRAFFIC, Biggs *et al.* argue that 'education, enforcement, protection, and awareness efforts aimed at reducing the use of [rhino] horn have all demonstrably failed to turn the tide of this rising demand'.[68] However, there is also counterevidence that suggests that demand can change. Some examples suggest that demand can go down. Campaigns aimed at reducing consumption of shark fin soup in China appear to have had the effect of reducing demand, even though shark fin soup is a traditional dish for important celebrations.[69] In Yemen, a traditionally large market for rhino horn, demand has gone down in response to economic conditions, changing norms and price.[70] Demand has also gone down for some products in response to a change in legal status of a product; when a product is no longer legally available, a negative stigma can attach to that product, reducing demand.[71] Nowell and Ling document a decline in the use of tiger bones after China's 1993 ban on the use of tiger bone in traditional Chinese medicine (TCM).[72] It may be true that demand cannot go below a certain threshold, but this is uncertain and does not alone justify an assumption that demand is fixed.

---

[55] Ibid., at 1230.
[56] Ibid.
[57] See EIA, n. 24 above, at 7.
[58] TRAFFIC, *What's Driving the Wildlife Trade? A Review of Expert Opinion on Economic and Social Drivers of the Wildlife Trade and Trade Control Efforts in Cambodia, Indonesia, Lao PDR and Vietnam* (TRAFFIC, 2008).
[59] See, e.g., K. Conrad, n. 11 above, at 249–250; M. 't Sas-Rolfes, *The Rhino Poaching Crisis: A Market Analysis* (unpublished, 2012), at 12; D. Biggs *et al.*, n. 9 above, at 1038.
[60] See K. Conrad, n. 11 above.
[61] Ibid., at 249.
[62] Ibid., at 250.

[63] Ibid.
[64] Ibid., at 249. Conrad notes that 'successful [demand reduction] campaigns must be carefully crafted and culturally relevant'. Ibid.
[65] Ibid., at 250; M. 't Sas-Rolfes, n. 59 above, at 4–6.
[66] See M. 't Sas-Rolfes, n. 59 above, at 14.
[67] See K. Conrad, n. 11 above, at 249.
[68] See D. Biggs *et al.*, n. 9 above, at 1039.
[69] WildAid, 'WildAid's Campaign Helps Reduce Shark Fin Demand' (6 February 2013), found at: <http://www.wildaid.org/news/wildaids-campaign-helps-reduce-shark-fin-demand>. On demand reduction efforts generally, see S. Zain, *Behavior Change We Can Believe In: Towards a Global Demand Reduction Strategy for Tigers* (TRAFFIC, 2012).
[70] L. Vigne and E. Martin, 'Demand for Rhino Horn Declines in Yemen', 47:3 *Oryx* (2013), 323.
[71] See B. Gratwicke *et al.*, n. 50 above, at 223.
[72] See K. Nowell and X. Ling, n. 26 above, at 20.

© 2013 John Wiley & Sons Ltd

Furthermore, demand can certainly increase. Changes in the legality of products can affect the stigma attached to their use.[73] It also changes in response to economic conditions and cultural norms. For example, Milliken and Shaw document that the rise in use of rhino horn in Vietnam, which appears to be driving so much of the increased poaching in rhinos, is primarily due to new uses.[74] Some of those new uses appear to be a response to traders stimulating demand by marketing to cancer patients.[75] While one of the current main uses of rhino horn does appear to be connected with TCM,[76] this new, but more traditionally oriented, use is not the horn's primary use in Vietnam.[77] Rather, new uses that are related to status and conspicuous consumption are the primary drivers of increased demand.[78] Indeed, Vietnam's markets for rhino horn are now believed to be the main consumer markets and markets elsewhere have gone down.[79]

At the very least, the evidence is uncertain. It is difficult to trace causal connections between certain events and increases or decreases in demand. This is particularly true where some legal trade has either been occurring or has been a possibility for the future, as is the case for all three species addressed here. For example, commentators disagree about the effect of the CITES-authorized ivory sales to Japan and China on demand for ivory, but demand has certainly increased since the sale of ivory stockpiles to China.[80] While interest in tiger bones appears to have gone down after the Chinese domestic ban on the use of such products in TCM in 1993, some evidence also links a revival of interest to Chinese official action changing the illegal status of tiger bone products and appearing to sanction a current or future trade in such products.[81] Abbot and van Kooten note the possibility that an anticipated shift to permitting legal trade may already be shifting behaviour with carcasses of tigers that have died in captivity frozen and stored 'as owners speculate that the domestic trade ban will be relaxed'.[82]

The evidence suggests, then, that demand is not completely fixed in either direction. Further, uses for certain wildlife products change over time and not all uses are traditional. This is significant because if demand does increase in response to legalizing wildlife products, economic models predict that higher demand will lead to higher prices and greater harvesting from the wild due to the higher incentives for traders and poachers, unless the legal source can supply sufficient quantities to meet this increased demand.[83] Some commentators simply do not address this possibility or argue that demand is not related to factors other than price.[84] However, some commentators concede that demand may increase in response to legalization of certain wildlife products.[85] 't Sas-Rolfes concedes that aggressive product marketing is likely easier in a legal market, allowing producers and traders to push up demand, but he also argues that a legal market will in turn allow easier regulation of that advertising.[86]

In the case of rhinos, Biggs *et al*. acknowledge that for a legal trade in rhino horn to be successful at stemming poaching, 'demand [must not] escalate to dangerous levels as the stigma associated with the illegality of the product is removed'.[87] Yet they believe that demand can be met with a growing population of rhinos and posit that an increase in demand would signify success.[88] Implicitly, this assumes that the higher demand can also be met quickly enough by farmed animals to respond to any increase in demand. Yet, with the size of the TCM market and with new uses being developed for rhino horn and other wildlife products, it is far from certain that demand can be met and met quickly if it increases in response to legal trade.[89] Increased demand that cannot be entirely satisfied by legal supply would reignite traders' interest in bringing illegally obtained – poached – wildlife products to the market.

Where there is substitutability, legalizing a product can have an impact on demand even before the product becomes available. Indeed, some traders may be trying to cash in before others enter the market, so it is possible that there would be an upsurge in poaching in the immediate aftermath of a decision to legalize trade in certain wildlife products before the legal supply is on the market.[90] In the case of the babirusa (*Babirusa babyroussa*) – a type of wild pig – a planned international captive breeding programme had a dramatic effect on trade in wild babirusas over a period of just a few months.[91] This increase in trade occurred before the

[73] C. Fischer, 'The Complex Interactions of Markets for Endangered Species Products', 48:2 *Journal of Environmental Economics and Management* (2004), 926, at 927–929 and 932–934.
[74] See T. Milliken and J. Shaw, n. 2 above, at 118–123.
[75] Ibid., at 118–123 and 134.
[76] This is use by young mothers to reduce fevers in their infant children. Ibid., at 136–137.
[77] Ibid., at 136.
[78] Ibid., at 134–136.
[79] Ibid., at 104 and 111.
[80] EIA, *Stop Stimulating Demand!: Let Wildlife Trade Bans Work* (EIA, 2013); D. Biggs *et al*., n. 9 above, at 1039.
[81] See EIA, n. 24 above, at 9–11.
[82] See B. Abbot and G.C. van Kooten, n. 29 above, at 2. See also C. Mason, E.H. Bulte and R.D. Horan, n. 50 above.

[83] See E.H. Bulte and R. Damania, n. 28 above, at 1231; and R.C. Kirkpatrick and L. Emerton, n. 28 above, at 657.
[84] See M. 't Sas-Rolfes, n. 59 above, at 6.
[85] See, e.g., D. Biggs *et al*., n. 9 above, at 1039.
[86] See M. 't Sas-Rolfes, n. 59 above, at 6.
[87] See D. Biggs *et al*., n. 9 above, at 1038.
[88] Ibid., at 1039.
[89] See B. Gratwicke *et al*., n. 50 above, at 223.
[90] For an argument that this is happening with rhinos, see EIA, *Poaching Increases as SA Pushes Legal Rhino Horn Trade* (EIA, 2013).
[91] L.M. Clayton, E.J. Milner-Gulland, D.W. Sinaga and A.H. Mustari, 'Effects of a Proposed *Ex Situ* Conservation Program on *In Situ* Conservation of the Babirusa, an Endangered Squid', 14:2 *Conservation Biology* (2000), 382, at 383.

© 2013 John Wiley & Sons Ltd

captive breeding programme had begun and before permits for legal trade had been issued.[92] It appears to have been fuelled by the belief that there would be a lucrative trade that was now officially sanctioned.[93]

Although we do not know enough about how demand will respond, one thing is clear: careful examination of the models pertaining to lifting trade bans establishes that they do not account for the myriad factors that affect the demand for elephant, rhinoceros and tiger parts. Thus, if proponents of legal bans base models on 'a linear derived demand function' – for example, for wild tigers – or inelastic demand, the output of the model is not necessarily a reflection of what will happen in practice.[94] These models do not demonstrate empirically that demand for wildlife products cannot be reduced, even though this is a cornerstone of many justifications for developing a legal trade. Nor can they demonstrate that demand will not rise in response to the introduction of a legal source of a given wildlife product.

## Legal and Regulatory Requirements of Dual Stream Markets

Among the arguments that many proponents of opening up trade advance is that alternatives such as enforcement of bans and demand reduction campaigns are expensive and have proven ineffective. Conrad's fifth element for the perfect storm is inadequate enforcement of the ban.[95] On this view, the market models discussed above predict that legalizing trade in wildlife products will allow market forces to drive down the price, removing the incentive to poach and trade illegal wildlife products. Some commentators simply fail to discuss what will be needed to ensure that a legal market in wildlife products operates as hoped, preferring instead to highlight the costs of trying to enforce a ban in wildlife products.[96]

Opponents of allowing legal trade often express concern that allowing legal trade will make it harder to crack down on illegal trade.[97] A legal market can allow traders to launder illegal products through the legal market and evidence from the Environmental Investigation Agency (EIA) suggests that this has been happening with the legal domestic trade in tiger pelts in China.[98] Other concerns include the potential for

impacts on wildlife populations because farms and captive-breeding facilities can look to wild populations to repopulate their stock.[99]

To address these concerns, a strong enforcement infrastructure is required. For this reason, dual streams involving both legal and illegal products can increase the burden on enforcement.[100] In addition to the increased burden for enforcement, dual streams create difficulties for consumers, making it harder for consumers to exercise a preference for legal products because they may not know which are legally sourced and which are illegally sourced. In the case of tropical timber, the European Union and the United States have both sought to limit the burden on consumers by placing the burden on importers to demonstrate that imported timber was not harvested contrary to the domestic laws of the source country.[101] Although such a system shifts the burden away from consumers, it does not lessen the monitoring and enforcement burden. Indeed, it may increase the enforcement and monitoring burden as regulators have to determine whether the source of the item was legal or illegal under a foreign country's domestic laws.

Some commentators acknowledge that legal infrastructure is needed if a legal market is going to be introduced.[102] However, many of these commentators assume that the costs for this will not outweigh the benefits of a legal market. If the market operates as predicted in the supply-side models, the costs of developing the necessary infrastructure to regulate the legal market and end the illegal market are presumed to be lower because the market's invisible hand will lead to the intended result of less poaching. Thus, Biggs et al. identify the need for regulators to prevent laundering of illegal products through legal markets as one of the factors necessary for a legal trade to be effective in helping to protect species.[103] However, they also argue that this is possible with rhino horn because enforcement efforts will be most cost-effective with a legal market.[104] They rely on the existence of technologies to use DNA testing and assume that these technologies will be available and cost-effective.[105]

Let us assume that market forces would indeed drive down pressure for poaching and thereby make enforcement easier and more cost-effective. Decisions will still need to be made about allocating permits, licensing

---

[92] Ibid., at 384.
[93] Ibid.
[94] See B. Abbot and G.C. van Kooten, n. 29 above, at 8 and 12.
[95] See K. Conrad, n. 11 above, at 251.
[96] See, e.g., ibid., at 17; and B. Mitra, 'How the Market Can Save the Tiger', 168:6 Far Eastern Economic Review (2005), 44, at 47.
[97] See T. Milliken and J. Shaw, n. 2 above, at 105; EIA, n. 80 above.
[98] See EIA, n. 24 above, at 7–8.

[99] See M.H. Mockrin, E.L. Bennett and D.T. LaBruna, n. 45 above, at 11.
[100] See R.C. Kirkpatrick and L. Emerton, n. 28 above, at 657.
[101] Regulation 995/2010/EU of 20 October 2010 Laying Down the Obligations of Operators who Place Timber Products on the Market, [2010] OJ L 295/23; The Lacey Act, 16 USC §§ 3371–3378 (2013).
[102] See, e.g., J. Hutton and G. Webb, n. 9 above, at 115.
[103] See D. Biggs et al., n. 9 above, at 1038.
[104] Ibid.
[105] Ibid., at 1039.

© 2013 John Wiley & Sons Ltd

captive-breeding and ranching facilities, monitoring of trade, policing illegal trade, and allocations of funding to various stakeholders and conservation efforts. All of those activities will require administrative resources. In addition, regulation of captive-breeding and ranching facilities will need to ensure that these facilities do not result in negative ecological effects for the species of concern or more generally.[106] Decisions will also need to be made about the structure of the legal market. Options include whether to privatize the commodity, allowing ranchers or captive-tiger breeding operations to operate within a regulated market, or whether to develop central selling organizations.[107] CITES parties could opt to allow only country-to-country sales, or sales between countries and private individuals, or sales between private individuals and private individuals.[108]

These are not trivial questions, because they affect the flows of funds that are supposed to be generated by sales. In other words, who will profit from legal sales of wildlife products? Some arguments in favour of trade posit that legal trade in wildlife will provide local populations with a revenue stream, thereby giving them a financial stake in the survival of the species.[109] However, this will only happen if local populations benefit directly from the legal sale. Yet in a private market system where ranchers and captive-breeding facility operators can sell products on the market, profits will likely go to them rather than to local populations. Indeed, in the case of tigers, captive-breeding operators are often located closer to consumption markets than to the range of the tigers. If, instead, the choice is made to develop a closed market with government control, this could be used to channel money from the sales back to local communities or conservation efforts. Alternatively, local populations can be given control over the resources. Yet even these choices will require a strong regulatory infrastructure. McAllister, McNeill and Gordon argue with regard to the vicuña that in order to channel resources to local communities, community-based conservation must be managed carefully, with strong oversight of trade. Otherwise, poaching could increase, depriving local populations of their income.[110]

If the decision is made to rely on private markets, some of the regulatory costs could be borne by ranchers and farmers. This could allow for a legal trade to offset the costs of enforcing a ban. Nevertheless, any decision about who should bear the costs of this regulatory structure can have consequences for the market models above, since increasing the costs to farmers and breeders could undermine the requirement that these operations provide wildlife parts at a cheaper price than illegally acquired parts. It is far from certain, then, that the legal and regulatory infrastructure required for a functioning dual stream market would be less than that required for effective enforcement of a trade ban. It may in fact be larger and more expensive. Further, the development of that infrastructure may have unanticipated consequences for the market models relied on by some of the proponents of legal trade.

## Ecological and Conservation Principles

Some proponents of legal trade in species suggest that trade bans are an outdated or overly simplistic approach to conserving species.[111] Embedded within these arguments is an assumption that allowing for legal trade, captured by the phrase 'sustainable utilization', is more consistent with modern ecological principles and the tenets of conservation biology. This assumption is, however, debatable.

Ecologists and conservation biologists argue that conservation is complex and filled with uncertainty and unpredictability.[112] Conservation is context-dependent.[113] Further, humans are part of the ecosystem and human behaviour is an important component of conservation strategies.[114] Because of this complexity, conservation biologists point out the need for experimentation and adaptive approaches to management.[115]

All of these principles support the view that conservation decisions are not simple and it is certainly true that the survival of species does not depend on simply agreeing to a ban on trade. Nevertheless, some arguments by proponents of legal trade do not always seem to take full account of the true complexity of conservation. This plays out in three ways. The first way the complexity of conservation plays out is in whether it is possible to rely on analogies with other species for decisions on how best to conserve species. As we have seen, proponents

---

[106] See M.H. Mockrin, E.L. Bennett and D.T. LaBruna, n. 45 above, at 8–13; and J.A. Cousins, J.P. Sadler, and J. Evans, 'The Challenge of Regulating Private Wildlife Ranches for Conservation in South Africa', 15:2 *Ecology and Society* (2010), 28.

[107] Biggs *et al.*, n. 9 above, at 1039, advocate a central selling organization.

[108] Milliken and Shaw, n. 2 above, at 104, set out a number of considerations and options that would need to be considered for any legal trade in rhino horn.

[109] See B. Mitra, n. 96 above, at 47.

[110] See R.R.J. McAllister, D. McNeill and I.J. Gordon, n. 8 above, at 126.

[111] See, e.g., B. Moyle, 'Regulation, Conservation and Incentives', in: S. Oldfield, n. 9 above, 41; and M.A. du Plessis, 'CITES and the Causes of Extinction', in: J. Hutton and B. Dickson, n. 7 above, 12, at 22–24.

[112] D. Lindenmayer and M. Hunter, 'Some Guiding Concepts for Conservation Biology', 24:6 *Conservation Biology* (2010), 1459, at 1460; and C.S. Holling, 'What Barriers? What Bridges?', in: L.H. Gunderson, C.S. Holling and S.S. Light (eds.), *Barriers and Bridges to the Renewal of Ecosystems and Institutions* (Columbia University Press, 1995), 3, at 19.

[113] See D. Lindenmayer and M. Hunter, n. 112 above, at 1463.

[114] R.E. Grumbine, 'What is Ecosystem Management?', 8:1 *Conservation Biology* (1994), 27, at 31; D. Lindenmayer and M. Hunter, n. 112 above, at 1465.

[115] See R.E. Grumbine, n. 114 above, at 31.

© 2013 John Wiley & Sons Ltd

of legal trade sometimes rely on stories of the successful use of legal trade for conserving some species, particularly crocodiles and vicuña, to demonstrate that legal trade is appropriate for other species.[116] Yet given the lessons from ecology, decision makers should be careful when assuming that species are analogous. Proposals for legal trade in rhino horn and proposals for legal trade in tigers are not directly analogous. Similarly, examples of success or failure with legal trade in some species are not, alone, adequate predictors of success or failure with legal trade in other species. Species vary, for example, in reproductive rates, in the product for which they are killed, in whether they can be bred in captivity, and in whether their products can be obtained without killing or harming individual animals. What may work for the crocodile may not work in the same way for other species. In addition, the economic, social and cultural context affecting conservation efforts varies over species, over geographical space and over time.[117] For example, civil wars and the availability of arms can trigger increased poaching, and the development of highways can create trade routes that make it easier to smuggle illegal wildlife products across borders. Indeed, even the initial success of introducing legal trade can change – for example, if market demand for the product changes.[118] Economic models and policy approaches that do not take these various contexts into account will be limited in their predictive capacity.[119]

The second way the complexity plays out is in addressing the role of humans in conservation. Proponents of legal trade often stress the conflict between the relevant species and the humans that live with or near those species[120] – for example, tigers kill people and elephants trample crops.[121] Two related consequences flow from this conflict. First, some killing will likely happen whether or not there is demand for products from the animal. Second, proponents of legal trade suggest that killing is less likely to happen if locals have a financial incentive to protect the species.[122] Of course, as we have seen in the previous section, it is not clear that profits from legal trade in wildlife will flow to local populations. However, even assuming that it did, commentators' emphasis on conflict between humans and animals oversimplifies a complex set of forces at play in the market for wildlife products. In some regions, hunting for food may be the primary driver of threats to certain species. In others, poachers are driven by demand from middlemen for ivory, rather than by their own desire for food or revenge.[123] In the case of tigers, villagers may kill tigers that threaten them even without any demand.[124] In those situations, it is unclear that financial incentives would supersede the desire to kill an animal that poses a threat to villagers. Human–wildlife conflicts can also be exacerbated by decreased habitat for the wildlife.[125] Ultimately, the root causes of conflicts between wildlife and people are complex and need to be addressed. While some economic incentive for local people not to kill animals could benefit the species, it is not clear that this would address many of the root causes of conflict. Proponents of legal trade that connect trade to human–wildlife conflict are oversimplifying the complex interactions between humans and species and the role of humans in the ecosystem.

The third way in which complexity plays out is in the role of experimentation, monitoring and adaptive approaches to conservation. Some proponents of trade have suggested that a legal trade should be tried, in keeping with the need for experimentation. The effects of legal trade could then be monitored and the legal trade ended if monitoring indicates that the species is suffering increased decline.[126] Yet, as a safeguard, this is highly problematic and unreliable. The monitoring system established to track the illegal killing of elephants after the decision to allow limited international sales of ivory, known as 'Monitoring the Illegal Killing of Elephants' (MIKE), is still significantly hampered by lack of data and lack of resources to gather data.[127] The difficulty of determining cause and effect and the complexity of international drivers of trade also means that any monitoring is inherently value-laden. Decisions will have to made about initial baselines, how to address gaps in data and the factors that are to be taken into account. Those decisions will in turn form a set of assumptions that could shape the outcome of the monitoring. More critically, commentators disagree about how to read the data, suggesting that it might be

---

[116] See n. 9 above and accompanying text.

[117] See R.R.J. McAllister, D. McNeill and I.J. Gordon, n. 8 above.

[118] See J. Thorbjarnarson, n. 9 above. See also R.R.J. McAllister, D. McNeill, and I.J. Gordon, n. 8 above.

[119] As E. Bulte and E.H. Damania, n. 28 above, at 1230, indicate, 'without sufficient understanding of the market and the biological dimensions of the problem, it is hard to predict what outcome might emerge'. See also D. Lindenmayer and M. Hunter, n. 112 above, at 1461–1462, stressing the need for a holistic approach to conservation that takes account of the full context. R.C. Kirkpatrick and L. Emerton, n. 28 above, at 657.

[120] This is Conrad's fourth condition for a perfect storm. K. Conrad, n. 11 above, at 250.

[121] C. Sillero-Zubiri and M.K. Laurenson, 'Interactions Between Carnivores and Local Communities: Conflict or Co-existence?', in: J.L. Gittleman, S.M. Funk, D. Macdonald and R.K. Wayne (eds.), Carnivore Conservation (Cambridge University Press, 2001), 282, at 285; P. Bal et al., 'Elephants Also Like Coffee: Trends and Drivers of Human-Elephant Conflicts in Coffee Agroforestry Landscapes of Kodagu, Western Ghats, India', 47:5 Environmental Management (2011), 789, at 789 and 796.

[122] See B. Mitra, n. 96 above, at 46.

[123] D. Stiles, 'Elephant Meat and Ivory Trade in Central Africa', 50 Pachyderm (2011), 26.

[124] See R. Tilson and P.J. Nyhus, n. 13 above, at 127.

[125] Ibid., at 131.

[126] See D. Biggs et al., n. 9 above, at 1039.

[127] Interpretation and Implementation of the Convention Species Trade and Conservation Elephants: Elephant Conservation, Illegal Killing and Ivory Trade, 62nd Meeting of the Standing Committee (SC 62 Doc. 46.1 (Rev. 1), 2012).

© 2013 John Wiley & Sons Ltd

harder than commentators allow to shut down a legal trade even if there are indications of an increase in poaching. Although there is no dispute about the fact that poaching of elephants has increased since the last legal sale of ivory to China, commentators disagree about whether the sale to China triggered the increase in poaching.[128] These disagreements suggest that a spike in poaching would not necessarily lead proponents of legal trade to conclude that the legal market was driving that poaching. Further, even if the parties to CITES did agree to reverse course in response to the effects of legal trade, it is unclear that they could do so quickly enough to stem any harmful consequences of the legal trade. Indeed, the threat of renewal of a complete ban could fuel poaching and stockpiling.

## CONCLUSION: IMPLICATIONS FOR DECISION MAKERS

Significant and multilayered uncertainty exists regarding the likely impact of legalizing trade in elephants, rhinoceroses and tigers. Because often essential data is unavailable, many of the arguments made by proponents of legalizing trade assume rather than prove key aspects. Proposals in favour of allowing legal trade in some or all endangered species are, therefore, often premised on many empirically unproven assumptions. One response to this is to call, as Conrad has, for further exploration and study.[129] However, it is far from clear that further study can lead to conclusive answers. Demand for wildlife products, for example, may be affected by factors that are unconnected to conservation policies. Models can be useful in predicting what is likely to happen in certain circumstances, but they are limited. This raises the key question for the parties to CITES: What should they do in the face of this kind of uncertainty?

In some cases, uncertainty calls for experimentation. In the case of elephants, rhinoceroses and tigers, however, the stakes are simply too high. Not only are the effects of legal trade uncertain, but the response of the international community to those effects is also uncertain. Given these layers of uncertainty, legal trade is at best a highly risky proposition, untested for these three species, and with as much potential for harm as it seems to offer for benefit. At this point, the parties' best recourse is to turn to the legal mandates of the Convention itself, which calls for the protection of species that are threatened with extinction and are traded internationally. The listing criteria agreed by the parties urge that:

> When considering proposals to amend Appendix I or II, the Parties shall, by virtue of the precautionary approach and in case of uncertainty either as regards the status of a species or the impact of trade on the conservation of a species, act in the best interest of the conservation of the species concerned and adopt measures that are proportionate to the anticipated risks to the species.[130]

In the face of these layers of uncertainty, parties can best fulfil these mandates of protection, precaution and proportionality by pursuing strategies that are directly connected to limiting demand, enforcing bans and ensuring that domestic efforts track international efforts to eliminate trade in endangered species. Important efforts to increase penalties, cooperation and enforcement are underway.[131] It is not just a question of enforcement, however. Efforts are also constantly underway to address demand and better understand the drivers of markets.[132] Channelling more energy into these efforts and signalling that trade in these wildlife parts is not legal or likely to be legal would in itself be a form of experimentation, in keeping with the mandates of conservation biology, but a far less risky form of experimentation than allowing legal trade. By contrast, parties should be cautious about embarking on an approach of using legal markets that is untried, extremely risky and potentially highly resource intensive. The risks are simply too high.[133]

Caution in the face of uncertainty is consistent with the mandates of CITES and with the mandates of ecology and conservation biology. It recognizes that data and predictive models are important but inconclusive, thereby acknowledging the uncertainty and unpredictability inherent in conservation. Such caution also recognizes that conservation strategies need to be highly context-dependent. No single approach can provide the panacea for all species. Acknowledging the layers of uncertainty here requires the application of caution and renewed emphasis on methods that do not carry the level of risk that come with legal trade. This response is the most rational and ecologically sound way to respond in the face of such uncertainty.

---

[128] See D. Biggs *et al.*, n. 9 above, at 1039; and EIA, n. 80 above. See also EIA, n. 90 above. For a discussion of this issue after the sale to Japan, but before the sale to China, see: E.H. Bulte, R. Damania and G.C. van Kooten, 'The Effects of One-off Ivory Sales on Elephant Mortality', 71:2 *Human Dimensions of Wildlife Management* (2007), 613.

[129] See K. Conrad, n. 11 above, at 252.

[130] CITES Resolution Conf. 9.24 (Rev. CoP16), n. 10 above, at 5.

[131] See, e.g., International Consortium on Combating Wildlife Crime (CoP 16 Doc. 15 (Rev. 1), 2013).

[132] See, e.g., S. Zain, n. 69 above; and T. Milliken and J. Shaw, n. 2 above.

[133] See R.C. Kirkpatrick and L. Emerton, n. 28 above, at 658; and E. Dinerstein *et al.*, n. 26 above, at 512.

© 2013 John Wiley & Sons Ltd

Annecoos Wiersema is Ved P. Nanda Chair and Associate Professor of Law and Director, International Legal Studies Program, University of Denver Sturm College of Law; SJD, Harvard Law School, 2004; LLB (Hons), London School of Economics and Political Science, 1998; and BA (Hons), University of Southampton. I am grateful to Justin Pidot, Joyce Sterling, Eli Wald and an anonymous reviewer for their helpful comments, as well as to Nathan Downing for his outstanding research assistance and Diane Burkhardt for her library support.

© 2013 John Wiley & Sons Ltd

**EXHIBIT F**



Available online at www.sciencedirect.com



**JOURNAL OF
ENVIRONMENTAL
ECONOMICS AND
MANAGEMENT**

**ELSEVIER**     Journal of Environmental Economics and Management 48 (2004) 926–953

http://www.elsevier.com/locate/jeem

# The complex interactions of markets for endangered species products

Carolyn Fischer

*Resources for the Future, 1616 P Street NW, Washington, DC 20036, USA*

Received 30 December 2002; revised 4 August 2003; accepted in revised form 1 December 2003

## Abstract

Economic models of trade in endangered species products often do not incorporate four focal arguments in the policy debate over trade bans: (1) law-abiding consumers may operate in another market, separate from illegal consumers, that trade would bring online; (2) legal trade reduces stigma, which affects demand of law-abiding consumers; (3) laundering may bring illegal goods to legal markets when trade is allowed; (4) legal sales may affect illegal supply costs. This paper analyzes systematically which aspects of these complicated markets, separately or in combination, are important for determining whether limited legalized trade in otherwise illegal goods can be helpful for achieving policy goals like reducing poaching.
© 2003 Elsevier Inc. All rights reserved.

*JEL classification:* K42; Q21; D11

*Keywords:* Endangered species; Black markets; CITES; Poaching; Stigma

## 1. Introduction

The question of whether to sell confiscated endangered species products regularly generates debate at meetings of the 160-member Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Sales of ivory in particular have been hotly contested. International trade in ivory has been banned since 1989, marking the end of a decade when poachers in Africa killed as many as 100,000 elephants annually and the continent's population was halved. Since then, conservation activities in certain southern African nations have allowed elephant populations to recover. Seeking funds to aid these activities, these countries have asked for special authorization to sell stockpiled ivory. The first exception permitted Botswana, Namibia and Zimbabwe to sell Japan about 110,000 pounds from their existing legal stocks of raw

---

*E-mail address:* fischer@rff.org.

0095-0696/$ - see front matter © 2003 Elsevier Inc. All rights reserved.
doi:10.1016/j.jeem.2003.12.003

Case 1:15-cv-01026-RCL   Document 16-3   Filed 08/16/15   Page 103 of 145

ivory in 1999, raising $5 million for elephant conservation activities. In November 2002, at the 12th Conference of the Parties (CoP12), CITES again conditionally accepted proposals from Botswana, Namibia and South Africa, allowing one-off sales of ivory [6]. The proposals involve the tusks of elephants that have died from natural causes or as a result of government animal control programs, and funds must be used for conservation and local community development. However, the agreement comes with considerable controversy. Support was not unanimous, and similar proposals by Zambia and Zimbabwe failed because of concerns that those governments could not effectively protect their pachyderm herds or monitor the ivory sales. Furthermore, accounts of the effects on poaching of even limited legalized trade have reported mixed evidence. According to the Environmental Investigation Agency (EIA), a nongovernmental group based in the United Kingdom, elephant poaching increased with the 1999 sales [17]. According to the United Nations Environment Programme and the TRAFFIC network, the legal sales did not elicit an apparent poaching response [9,15]. According to simple economic theory, however, poaching should have decreased.

Traditional economic theory says that selling confiscated goods should unambiguously lower prices by satisfying consumer demand. These lower prices mean the gains from poaching must be smaller, leading to reductions in that activity. Prohibiting confiscated goods from being sold, on the other hand, increases scarcity and drives up prices. In some cases, enforcement can then actually increase poaching, as poachers raise their total catch to ensure enough of the unconfiscated share gets through to the market and the higher prices [3]. A key assumption is that illegally produced goods and legally sold confiscated goods are interchangeable, perfect substitutes in a single market. In reality, though, separate legal and illegal markets can exist, and arbitrage between them may not be perfect. In other words, while consumers in the illegal market may care only about price, as in the traditional model, law-abiding consumers also care about the source of the product.

Anecdotal evidence of the experience with these products suggests that the legal and illegal markets are intertwined in complex manners. For example, many consumers of ivory may prefer their purchase to have been obtained legally and without harm to the species. Thus, not only will law-abiding consumers refuse to purchase from the black market, but their preferences may further depend on aggregate consumption of legal and illegal stocks, not just their own consumption of the good. Consequently, a higher proportion of legal trade can raise their willingness to pay, while more poaching or more illegal trade can lower it. Legalizing trade may then raise overall demand. Meanwhile, more legal trade can lower the odds of being caught in an illegal exchange, affecting prices and incentives in the illegal market. Finally, the legal supply may be intrinsically tied to the illegal supply, as in the case of selling confiscated products obtained from poaching. These kinds of interactions seem to be at the root of concerns voiced by animal preservationist groups that legal trade will remove the stigma of owning ivory, stimulate demand, facilitate smuggling, and increase poaching.[1] Indeed, accounting for these complex interactions, one finds that loosening restrictions on legal supply or tightening enforcement for illegal transactions could have ambiguous or unexpected effects. Thus, it is important to understand the nature of the markets for the illegal product to determine the best policy response.

---

[1] Hastie et al. [10].

We conceptualize the demand externalities as "stigma" and "outrage". Stigma derives from the perception that the product was obtained through illegal or inhumane means; the impact of stigma on utility then depends on how much the consumer cares about that perception in order to enjoy the product. This kind of stigma is likely to be more important for display goods, like ivory or diamonds, than consumed goods, like medicinal uses of rhino horn.[2] Stigma depends on the relative sizes of the illegal and legal markets; outrage, on the other hand, depends on the absolute size of the illegal activity. Outrage has some roots in altruism or existence value, since personal enjoyment of the good is reduced by the scope of the harmful behavior, regardless of whether one's own purchase was obtained in a lawful or cruelty-free manner.

We also allow for supply-side interactions in the form of cost externalities. For example, the relative size and scope of the legal market could affect smuggling costs. Both demand and supply sides can then interact through arbitrage. Arbitrage occurs when law-ignoring consumers cross into the legal market to buy goods, or when launderers make illegally supplied goods available in the legal market.

Most previous studies assume that a single market exists, in effect imposing perfect arbitrage. Some exceptions deal with individual aspects of these complexities but ignore the interactions that may occur when they are considered together. Heltberg [11] recognizes that international consumer demand may shift in a switch from free trade to a trade ban regime, but he does not model separate types of markets with limited legal trade. Barbier and Swanson [2] examine the major sources of demand for ivory and consider the effect of limited legal sales, but they do not formalize the market interactions. They focus primarily on raising ivory values for elephant conservation efforts and funds for enforcement, rather than on depressing the return to poaching. Bulte and van Kooten [5] consider separate domestic and international markets for ivory, the former not being subject to the trade ban and the latter displaying perfectly elastic demand. However, their model does not capture the complexities of stigma externalities or nonconsumptive use values. Another long economics literature exists on competition among imperfect substitutes. Again, consumers are assumed to participate in both markets and to care only about product prices, while production of each product proceeds independently (except in imperfect competition).

Although there is a dearth of data on black market sales, studies of the Japanese ivory market, the designated consumer of legal African ivory sales, offer indications that market separation and stigma may be at play. According to Menon and Kumar [14], in the two decades prior to the international ivory ban, domestic prices remained relatively constant at 18,000–20,000 yen per kg for large tusks. Shortly after the ban, prices rose quickly, peaking at 180,000 yen and then gradually falling to a fixed price of 60,000 yen ($450) per kg. This pattern would be consistent with an initial restriction of legal supply and then growing stigma as legal stocks dwindled relative to illegal supplies. Meanwhile, the surveyed price for smuggled ivory is considerably lower at 20,000–25,000 yen per kg, which is consistent with separated markets. They indicate that original supplier costs might be 6000–8000 yen, with the difference attributed to markups by exporters and transporters (smugglers). Separate price data for Japanese ivory imports from Botswana, Namibia

---

[2] While stigma has not been empirically documented in this area, consumer attitudes toward ivory and the trade ban are frequently mentioned as important factors in policy debates. Stigma effects have been formally documented in other areas of economics, including out-of-wedlock child bearing [16].

and Zimbabwe[3] document that the prices rose from 14,941 yen/kg in 1983 to 37,216 in 1989, as populations dwindled and the ban loomed. They also reveal that prices for the 1999 transactions averaged 10,904 yen per kg, considerably lower than the pre-ban prices, which could reflect stigma effects.[4]

Although reliable data on the linkages between legal and illegal markets are difficult to obtain, perceptions of their importance are widespread among CITES stakeholders. Many conservation groups and Asian countries with elephant populations remain adamantly opposed to any form of legalized trade in ivory, due in large part to concerns about market interactions. For example, observing increased seizures after the first one-off sales, the umbrella organization Species Survival Network worries, "Further legalised ivory trade is likely to confuse consumers even more and to encourage them to believe that all international ivory trade is now legal."[5] Although such a reduction in stigma seems extreme, the trade ban and public education campaigns are indeed widely credited with reducing demand for ivory, not just supply, indicating that some reversal in consumer preferences is also possible.[6] The Indian delegation to CoP12 expressed particular concerns over supply linkages, that "legally acquired ivory is being used for providing a cover to the illegal stocks of ivory."[7]

The purpose of this paper is to think through systematically which aspects of these complicated markets are important for determining whether limited trade in illegal goods is helpful for achieving policy goals like reducing poaching. Four main characteristics peculiar to these markets are considered, both separately and together:

1. Law-abiding consumers may operate in another market, separate from illegal consumers, that certified trade would introduce.
2. Stigma may affect demand of law-abiding consumers, and legal trade reduces stigma.
3. Laundering may bring illegal goods to legal markets when trade is allowed.
4. Legal sales may affect illegal supply costs.

We develop a theoretical economic model taking dual markets, demand externalities, and endogenous production costs into consideration. We explore how different opportunities for arbitrage and different market interactions affect the scope of illegal behavior and the effectiveness of confiscation and resale policies. Section 2 presents the analytical model of dual markets with stigma goods. Section 3 analyzes the case in which only illegal consumers can arbitrage. Section 4 subsequently adds laundering and supply-side externalities. Also included is an appendix that uses simple functional forms to solve the model numerically; it explores the effects of the different market assumptions on how confiscation rates affect poaching, consumption and welfare. Although the model used in this paper is static, it serves as a useful

---

[3] Monthly Trade Statistics, Japan Ministry of Finance, cited in [12].

[4] Of course, drawing strong inferences from price data is tricky, since prices are affected by origin (Africa or Asia) and by tusk size, and averages have varied over time. Furthermore, the legal market for ivory is dominated by five major dealers that dominate both of the industry associations that determine the amount offered at annual auction, so prices may be distorted by market power.

[5] "African Elephant," SSN Fact Sheet. Washington, DC: Species Survival Network, 2002, p. 3.

[6] See, e.g., [1].

[7] "Statement of the Delegation of India Regarding Proposals for the Reopening of International Trade in Ivory from the African Elephant (Loxodonta Africana)," CoP12 Inf. 41, p. 3.

930        *C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*

foundation for analyzing renewable resource problems as well. A dynamic component of a resource stock response could be added to consider long-run effects.[8]

The results indicate that serving the separate demand of law-abiding consumers is not in itself a problem for poaching, but stigma has important implications for policy prescriptions. When limited trade is allowed, unconfiscated poached materials remain illegal to sell; thus, in the dual markets model, black markets continue to operate. Since illegal consumers will change their behavior only if prices in the legal market fall below black market prices, legal trade either depresses prices (and thereby poaching incentives) on the black market or has no impact at all. The key effect of stigma is not to change this result, but to imply that selling all available certified products may not minimize the international price when stigma impacts are strong. Stigma can also render the effects of increasing confiscation rates ambiguous, even with the full resale policy that had ensured lower returns to poaching in the traditional model. The other main result is that for any legal trade to be problematic to poaching, legal demand must be tied to illegal supply, either through arbitrage opportunities like laundering or through externalties with respect to poaching costs. Laundering opportunities bring illegal goods fraudulently to legal markets and can bid up illegal prices if legal demand is higher. The presence of stigma in this case also creates countervailing effects for changes in legal sales and smuggling enforcement policies; however, confiscation and resale of laundered goods is more clearly indicated. Thus, understanding the nature of both demand by law-abiding consumers and also the feedback effects on supply costs for endangered species products is essential for gauging the impacts of limited legal trade and of anti-poaching efforts.

## 2. Dual markets model

We assume that two types of markets exist for endangered species products, which for the sake of brevity and example we will refer to as ivory. Consumers are separated into two types: law-abiding consumers (denoted by subscript L), who will only purchase certified products (denoted by superscript c), and noncompliant consumers (denoted by subscript N), who do not care about the products' origin and are willing to buy uncertified products (denoted by superscript u). Suppliers are represented by poachers in the illegal market and a government or enforcement agency in the certified goods market. We will first assume that certified products can be distinguished from uncertified and then later introduce laundering as a means to bring uncertified goods to supply the legal market.

Let us define the following variables:

$Q_L^c$  consumption of certified products by law-abiding consumers
$Q_N^c$  consumption of certified products by noncompliant consumers
$Q^u$  consumption of uncertified products by noncompliant consumers
$Q_N$  total consumption by noncompliant consumers
$S^c$  total availability of certified products
$S^u$  Total availability of uncertified products

---

[8]For example, interacting markets with stigma could change the optimal strategy found by Kremer and Morcom [13] regarding enforcement and sales for open-access resources producing storable goods.

$K$  total amount of goods produced through poaching (killing)
$H$  total amount of goods produced through harvesting
$\phi$  share of poached goods that remain unconfiscated
$\sigma$  stigma rate

The intent of the static model is to develop intuition about the demand interactions. For simplicity, the presumed policy variable of concern will be the amount of the illegal activity (poaching), as in Bergstrom. A fuller welfare analysis would have to incorporate the utility of different consumer types, enforcement costs, rents from legal sales, and—especially for the case of ivory—it would have to recognize that the variables of interest are actually dynamic. Effectively, this model takes the elephant stock as exogenous. In a dynamic model, equilibrium poaching from the static model would feed back into the elephant stock, determining both harvesting and poaching supply costs in the next period. Equilibrium enforcement might also be endogenous, in that revenues from certified sales of ivory are generally earmarked toward conservation and enforcement efforts. However, the price effects of focus here are useful indicators for a subsequent dynamic model. If we consider the current stock of elephants to be the result of a long-run dynamic equilibrium under a trade ban, the predicted changes in the illegal price will indicate whether more or less pressure will be put on the resource stock. The main differences are that the stock feedbacks on poaching, harvesting and policies in a dynamic equilibrium will also affect stigma; consequently, it would be interesting in subsequent work to investigate how demand interactions affect the path dynamics and the stability of the resource equilibrium.

## 2.1. Supply

### 2.1.1. Illegal supply

Illegal supply, $S^{\mathrm{u}}$, equals the quantity of animals poached and not consfiscated: $S^{\mathrm{u}} = \phi K$. The cost of poaching, $C(K)$, is assumed to be increasing and convex in the catch. Poachers maximize profits with respect to the quantity of animals caught, given the price on illegal markets, the cost of poaching, and the rate of expropriation:

$$P^{\mathrm{u}}\phi K - C(K),$$

leading to

$$K > 0, C'(K) = \phi P^{\mathrm{u}},$$

$$K = 0, C'(0) > \phi P^{\mathrm{u}} \tag{1}$$

Thus, if half of poached goods are confiscated, the poacher requires twice the price to catch a given amount (as opposed to producing a given amount).

### 2.1.2. Legal supply

Legal supply, $S^{\mathrm{c}}$, is composed of legal harvesting and of materials confiscated from poachers. Legal harvesting, $H$, can be from animals that died of natural causes or from active farming.[9]

---

[9] An interesting extension would link this resource management problem in a dynamic model of supply to the existing demand model.

Confiscated goods are a linear function of total poaching and of enforcement effort $(1 - \phi)$, where $\phi$ is the fraction of poached goods that escape enforcement. The confiscation rate is exogenous to the market actors, set by the government. The government collects confiscated and harvested products and can choose how much of this stock to sell. The constraint on legal supply is then

$$S^c \leqslant H + (1 - \phi)K.$$

The chosen amount is auctioned (or otherwise efficiently allocated), and in equilibrium, total consumption of certified products must equal the supply:

$$Q_N^c + Q_L^c = S^c. \tag{2}$$

Thus, legal supply is assumed to be perfectly inelastic, and production costs are irrelevant at this point; effectively, the government is assumed to conduct enforcement and choose auction quantities for reasons other than profit maximization. Later we may endogenize legal supply by considering the planner's decision, such as to minimize poaching or to maximize welfare.

## 2.2. Demand

### 2.2.1. Law-abiding consumers

Law-abiding consumers will only buy from legal suppliers. Their utility from consumption is affected not only by quantity, but also by the stigma that may be attached to their consumption. Stigma derives from the perception that the product was obtained through illegal or inhumane means. We assume that the consumer knows her type and knows that the product was obtained in a legal transaction; however, others are uncertain about her type and the source of the ivory, knowing only the odds of the product being purchased legally. Thus, we assume that this negative perception is an increasing funtion of $\sigma$, the fraction of the total market that is illegal.[10] The impact of stigma on utility then depends on how much the consumer cares about that perception in order to enjoy the product. We also allow the level of poaching activity to affect demand, as "outrage" at the associated horrors may decrease utility; alternatively, consumers may enjoy their product more if the population stock, net of poaching, is higher.[11] The distinction is that stigma depends on the relative sizes of the illegal and legal markets, while outrage depends on the absolute size of the illegal activity. Outrage has some roots in altruism or existence value, since

---

[10] We assume this ratio is known to consumers, at least in a rational expectations sense. However, in reality, this information may be uncertain, and some posit that greater uncertainty may be a source of the reduction in stigma. In a Species Survival Network press release dated July 2, 2002, Dr. Teresa Telecky, director of The Humane Society of the United States' Wildlife Trade Program, argued "Reopening trade in ivory will also confuse consumers as to the legality of ivory and lead to increased demand for ivory." For our purposes, though, the effects of stigma are subsumed in the demand function, which could incorporate uncertainty. Formally, we need only that demand responds in some decreasing fashion to the actual ratio of illegal sales. This treatment of stigma can also allow for interpretations other than perception by others, since disutility may be related to the probability the ivory was obtained by cruel methods, when the consumer is uncertain about the reliability of certification in the presence of laundering.

[11] While stigma is likely to be a function of the flow of poached products compared to legal ones, outrage is arguably more likely to be a function of the stock of elephants and the precariousness of its health. In this static model, poaching is a proxy for stock impacts; in a dynamic model, we recognize the relationship between poaching and herd size is more complicated (as equilibrium poaching will tend to decline with the stock size).

personal enjoyment of the good is reduced by the scope of the harmful behavior, regardless of whether one's own purchase was obtained in a lawful or cruelty-free manner.

Formally, let us represent the utility of the legal consumer as the function $V(Q_L^c, \sigma, K)$. Marginal utility from own consumption is positive and diminishing: $V_1 \geqslant 0$; $V_{11} < 0$. Due to stigma effects, utility is decreasing in $\sigma$: $V_2 < 0$; $V_{12} < 0$.[12] The strength of stigma effects can depend on whether the good is used publicly or consumed privately, but we assume in all cases that if no legal market exists, law-abiding consumers will not buy anything at any price: $V_1(0, 1, K) \leqslant 0$. Finally, the third term reflects the effects of "outrage," which causes utility to decrease with total poaching: $V_3 < 0$; $V_{13} < 0$.

Law-abiding consumers maximize their utility less the costs of consumption:

$$V(Q_L^c, \sigma, K) - P^c Q_L^c,$$

leading to the result that if their consumption of certified goods is positive, their marginal utility equals the price:

$$Q_L^c > 0, \quad V_1(Q_L^c, \sigma, K) = P^c. \tag{3}$$

Stigma is an increasing function of illegal supply and a decreasing function of legal supply; we will assume it is a direct ratio of the former to the total market:

$$\sigma = \frac{S^u}{S^c + S^u}.$$

With no illegal market, $\sigma = 0$. Under a trade ban, $\sigma = 1$. Let $\gamma = H/K$. In an equilibrium with no sales of confiscated goods, with only harvested goods being certified, $\sigma = \phi/(\phi + \gamma)$. If all confiscated goods are sold as well, $\sigma = \phi/(1 + \gamma)$. Without harvesting and with only confiscated goods to sell, $\sigma = \phi$.

The effect of stigma is to shift legal demand. Given any level of stigma, one can consider demand by law-abiding consumers to be downward sloping in a typical form. However, a fall in stigma shifts that demand upward ($-V_{12} > 0$). Thus, given any level of poaching and illegal supply, the effect of a change in certified sales causes both an upward shift in demand and a downward movement along the demand curve as consumption increases. The net effect on willingness to pay depends on the relative strength of the stigma effect.

Fig. 1 depicts demand as a function of total certified sales, given a certain level of poaching and illegal supply; thus, outrage is also held constant. At a given level of certified sales, $S_1^c$, stigma is fixed and marginal utility is declining in consumption. At a greater level of certified sales, $S_2^c$, stigma is lower so larger quantities are demanded at any price. On the effective demand curve, certified sales also equal the quantity consumed. Note that changes in the level of poaching would shift the entire effective legal demand curve. An increase in poaching would increase outrage and reduce demand at every price level and every level of stigma. If increased poaching also increases illegal supply, each level of certified sales is associated with greater stigma, and thus lower willingness to pay as well.

The impact of stigma on utility depends on how much the consumer cares about that perception in order to enjoy the product, which may vary according to the type and use of the good. For

---

[12] On the other hand, for goods like guns, marginal utility may be increasing in the fraction of the sales going to illegal consumers.

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*



Fig. 1. Legal demand and stigma.

example, stigma effects are likely to be more important for display goods, like ivory or diamonds in jewellery, than for consumed goods, like medicinal uses of rhino horn or industrial uses of diamonds.[13] Thus, in different cases, the effective legal demand curve facing the policymaker may be downward sloping, upward sloping, or nonmonotonic. Since we consider the case of ivory sales as our main example, we will assume that the effective demand curve is concave, as depicted. The initially upward slope of demand is implied by the concern of wildlife preservation groups that legal sales will increase demand, indicating a perception that stigma effects will dominate at the outset. However, as certified sales increase and achieve a large market share, satiation is likely to become relatively more important, implying that demand will ultimately slope downward.

### 2.2.2. Noncompliant consumers

Noncompliant or "illegal" consumers are assumed to be impervious to stigma or outrage. Their utility arises solely from their total ivory consumption $U(Q_N)$. They may purchase $Q_N^c$ from legal markets and $Q^u$ through illegal channels (the subscript can be ignored because they are the only consumers active in the market). They maximize their consumption utility less purchasing costs from each market:

$$U(Q_N^c + Q^u) - P^c Q_N^c - P^u Q^u.$$

The resulting first-order conditions lead to three possible outcomes:

$$Q_N^c > 0, \quad Q^u = 0, \quad U'(Q_N^c) = P^c < P^u, \tag{4}$$

$$Q_N^c = 0, \quad Q^u > 0, \quad U'(Q^u) = P^u < P^c, \tag{5}$$

$$Q_N^c > 0, \quad Q^u > 0, \quad U'(Q_N^c + Q^u) = P^c = P^u. \tag{6}$$

---

[13] Andrew [1] notes that public education was more effective for reducing demand for ivory, speculating that consumer preferences for luxury goods may be more malleable than those for products whose uses are rooted in cultural traditions.

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*                935

Since noncompliant consumers are indifferent to the source of the product—whether it was obtained legally or illegally—and therefore will buy whichever product is cheaper. If the price on illegal markets is higher, they will purchase in legal markets. If the price in legal markets is higher, they will resort to illegal markets. If demand is not satisfied fully by one market or another, then arbitrage implies equal prices for certified ivory and for contraband. Under what circumstances can each of these market equilibria occur and what do they imply for the effectiveness of trade bans for protecting endangered species?

## 3. Legal sales without laundering

Some supporters of the trade ban for ivory and other endangered species products argue, in part, that by reducing the stigma of ivory consumption, legal sales of seizures spur more demand. Whether this translates into more illegal behavior, however, depends critically on the type and availability of arbitrage opportunities between the legal and illegal markets. We will show that if the following conditions hold:

- demand-side arbitrage opportunities are unidirectional (illegal consumers will shop in both markets but law-abiding consumers will not);
- illegal suppliers cannot arbitrage between markets (they can sell only to noncompliant consumers); and
- illegal supply costs are unaffected by legal sales;

then

1. a trade ban maximizes poaching;
2. selling all harvested and confiscated goods may not minimize poaching; and
3. increasing enforcement may have ambiguous effects on poaching in all cases, even with full resale of confiscated goods.

To demonstrate these three results, we present the trade ban scenario as a benchmark and then evaluate the three types of market equilibria that can arise under trade. While the first result is reminiscent of the Bergstrom model, the second and third results are different, revealing the influence of stigma effects; thus, the scenario of focus is when illegal consumers arbitrage. Furthermore, we see with separate markets a situation in which legal sales do not affect the illegal market at all, a result absent in single-market models.

An important assumption in this initial analysis is that certified products can be distinguished from uncertified ones at the point of sale. In the next section, we will introduce laundering as a means to bring uncertified goods to supply the legal market. In this case, the first result will no longer necessarily hold.

### 3.1. Trade ban

In this case, no legal market exists. Consumption and supply of certified products are zero, and noncompliant demand is satisfied by illegal supply. In the notation, $Q_L^c + Q_N^c = S^c = 0$ and

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*

$Q^u = S^u = \phi K$. In this equilibrium,

$$U'(\phi K) = C'(K)/\phi. \tag{7}$$

Let $K_{ban}$ be the level of poaching activity that solves this equation. Fig. 2 depicts the market equilibrium when only the illegal market is active. $K_{ban}$ is determined where the marginal cost of poaching, including the tax of confiscation, equals the price per successfully sold unit. Actual illegal supply, $\phi K_{ban}$, is the portion of the goods poached at that price that remain after confiscation. This illustration uses a confiscation rate of about 1/2.

As in the Bergstrom model, without resale of confiscated goods, greater enforcement may actually increase total poaching if the price increase outpaces the additional confiscation. Totally differentiating (7) and solving, we get the change in equilibrium poaching due to a small increase in the confiscation rate (a decrease in the escape rate):

$$-\frac{dK_{ban}}{d\phi} = \frac{-U' - \phi K_{ban}U''}{C'' - \phi^2 U''}.$$

The denominator is clearly positive, but the numerator is of ambiguous sign. Rewriting, we see that the result depends on whether the elasticity of demand in the illegal market ($\eta^u = -(U'/U'')/Q^u$) is greater than or less than one:

$$-\frac{dK_{ban}}{d\phi} = \frac{(1 - \eta^u)P^u Q^u}{\phi(\eta^u Q^u C'' + \phi P^u)}. \tag{8}$$

Thus, if demand is inelastic, greater enforcement increases poaching, since the price increase more than compensates for the additional confiscation. If demand is elastic, greater enforcement reduces poaching.

Fig. 3 portrays a change from a confiscation rate of 1/2 to 2/3, which shifts the supply curve from the inelastic portion of the demand curve. As a result, while illegal consumption falls to $\phi'K'_{ban}$, total poaching increases to $K'_{ban}$.



Fig. 2. Trade ban.

C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953          937



Fig. 3. Change in enforcement.

Note that if this market were the only one (as in the Bergstrom model), a policy of reselling confiscated goods would drive the price down to where poaching supply intersects demand: $P_{\text{resell}}^{\text{u}} = C'(K)/\phi = U'(K)$. In this case, an increase in enforcement would unambiguously decrease poaching:

$$-\frac{dK_{\text{resell}}}{d\phi} = \frac{-U'}{C'' - \phi U''} < 0.$$

This result will no longer hold with certainty when we introduce separate markets and stigma effects.

### 3.2. Single legal market

In an equilibrium where only the legal market is active, we have $Q_{\text{L}}^{\text{c}} + Q_{\text{N}}^{\text{c}} = S^{\text{c}}$ and $Q^{\text{u}} = 0$. If no one buys poached materials, then $K = 0$; no poaching then implies no confiscation and $S^{\text{c}} \leqslant H$. In other words, legal harvesting must fully satisfy both markets. A trade ban in this situation, then, necessarily increases poaching.

From the first-order conditions for consumers (3) and (4), in this equilibrium we have

$$V_1(Q_{\text{L}}^{\text{c}}, 0, 0) = U'(S^{\text{c}} - Q_{\text{L}}^{\text{c}}) = P^{\text{c}} \tag{9}$$

and from (1),

$$P^{\text{c}} < C'(0)/\phi. \tag{10}$$

This situation can occur if expropriation is very high or complete ($\phi = 0$), or if legal harvests are large enough such that residual demand is very low—that is, below the threshold for poaching: $C'(0)/\phi$. The value of $H$ relative to demand is obviously important here, as it determines whether

Case 1:15-cv-01026-RCL   Document 16-3   Filed 08/16/15   Page 114 of 145

sufficient returns to poaching exist. For the remainder of the paper, we assume that $H$ is not large enough to drive out illegal trade: $U'(H - Q_{\mathrm{L}}^{\mathrm{c}}) > C'(0)/\phi$.[14]

### 3.3. Separate legal and illegal markets

In an equilibrium where both markets are active but separate, we have $Q_{\mathrm{L}}^{\mathrm{c}} = S^{\mathrm{c}} \leqslant H + (1 - \phi)K$, $Q_{\mathrm{N}}^{\mathrm{c}} = 0$, and $Q^{\mathrm{u}} = S^{\mathrm{u}} = \phi K$. From the first-order conditions for consumers and producers (Eqs. (3), (5), and (1)), we see that prices must be higher in the legal market:

$$V_1(S^{\mathrm{c}}, \phi/(\phi + S^{\mathrm{c}}/K), K) > U'(\phi K), \tag{11}$$

and the illegal market price after confiscation must equal marginal poaching costs:

$$U'(\phi K) = C'(K)/\phi. \tag{12}$$

Since this latter condition is identical to that under a trade ban, the equilibrium amount of poaching is also equal to trade ban level $K_{\mathrm{ban}}$. Any policy that raises prices in the legal market would have no effect on poaching, as the illegal market is satisfied by current poaching levels and higher prices in the legal market would not affect demand by noncompliant consumers. Poaching will be affected only by changes in the amounts legally auctioned if the result is to lower prices in the certified market below those in the illegal markets. At that point, illegal consumers will arbitrage and the markets will be pushed into the next category of perfect arbitrage. The net effect will be to reduce poaching by lowering the return.

The direction of impact on prices in the legal market of a change in certified sales depends on the relative strength of the stigma effect. Given any quantity of legal sales, which determine stigma, marginal utility is always declining. However, each level of sales corresponds to a different level of stigma, which shifts the marginal utility curve. The legal demand curves pictured are the result of the equilibrium combinations of price and quantities, given the corresponding stigma. The question is whether the direct effects of more legal consumption on the marginal utility of the law-abiding consumer are dominated by indirect utility (shifting) effects of stigma: $V_{11} > ? < -V_{12}d\sigma/dS^{\mathrm{c}}$. That determines whether the effective legal demand curve is downward or upward sloping.

In either case, starting from a point where the markets are separate, a trade ban does nothing to illegal markets and thereby does not affect poaching. A change in legal sales will affect welfare through consumption, but it will not affect poaching unless a regime switch occurs. And in that case, it can only reduce poaching.

Although trade policy in this model can affect illegal behavior only indirectly through equilibrium effects with the legal market, enforcement policy affects the illegal market directly. The equilibrium supply effects of enforcement then also affect legal demand. Holding $S^{\mathrm{c}}$ fixed,

---

[14]We also note that in a dynamic model the stock of elephants would affect both $H$ and poaching costs. Brown and Layton [4] note that sales from an initial stockpile can drive out poaching in the short term. However, in the long run, sustainable harvesting must both be sufficient to satisfy demand and also not correspond to a herd size so plentiful that poaching is easy enough to be worthwhile. Although the government may want to harvest optimally, poachers follow the laws of the commons and do not consider their effect on herd dynamics. Thus, in thinking ahead toward a model of optimal harvesting, we need to recognize Eqs. (9) and (10) as constraints, in addition to the biological response functions. These interesting additional complications will be saved for later exploration.

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*     939

increasing enforcement effort tends to raise prices in both markets: the marginal costs of illegal supply rise, as does the willingness to pay by law-abiding consumers, because of a fall in stigma. Unless the contraction in the illegal market causes prices to rise even higher than in the legal market, the effect of increased enforcement will be identical to that in the trade ban case.

If we sell all harvested and confiscated goods ($S^c = (1-\phi)K + H$), an increase in enforcement may depress the legal price, due to increased consumption, but the effects on poaching remain the same as with a trade ban. As long as the markets remain separate, the impact on poaching supply depends strictly on the elasticity of demand in the illegal market. Meanwhile, a fall in poaching raises consumer surplus and marginal utility in the legal market. However, should the illegal market prices rise to the level of the legal market, the regime will switch to one of arbitrage.

### 3.4. Perfect arbitrage

Thus far, a trade ban either increases poaching or has no effect. Therefore, the only situation in which trade restrictions might help protect species is if noncompliant consumers arbitrage between certified and uncertified product markets. Under perfect arbitrage, $Q_L^c + Q_N^c = S^c$, and $Q^u = S^u = \phi K$. Combining the first-order conditions for consumers and producers (Eqs. (3), (6), and (1)), we know that the marginal utilities of legal consumption are equalized:

$$V_1(Q_L^c, \phi K/(\phi K + S^c), K) = U'(S^c - Q_L^c + \phi K); \tag{13}$$

and the marginal utility of illegal consumption equals the marginal cost, after confiscation:

$$U'(S^c - Q_L^c + \phi K) = C'(K)/\phi. \tag{14}$$

Let us call the resulting equilibrium level of poaching (given $S^c$ and $\phi$) $K_{arb}$.

We know that $K_{arb} < K_{ban}$, since $U'(\phi K_{ban})$ represents an upper bound on the price in the illegal market. If law-abiding consumers demand more than is legally available at that price, the price of certified goods would be driven up and the two markets would remain separate. However, if law-abiding consumers do not soak up the entire legal supply at that price, prices would have to fall, as would the return to poaching. In other words, since the arbitrage can occur only in one direction,



Fig. 4. Separate markets.

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*

it can only drive down the prices in the illegal market compared with no trade, not raise them. Therefore, under no conditions can a full ban on trade reduce the level of poaching in this model.

### 3.4.1. Sales policy

Still, with stigma effects, the relationship between poaching and legal sales may not be monotonic. The level of legal sales that would minimize poaching is that which minimizes prices and maximizes $Q_N^c$. The policy prescription then depends on the shape of effective legal demand.

Consider two equilibrium prices. First, let "all" denote the price when all harvested and confiscated goods are sold:

$$P_{all}^c = V_1\left(Q_{L,all}^c, \frac{\phi}{1 + H/K_{all}}, K_{all}\right) = U'(K_{all} + H - Q_{L,all}^c) = C'(K_{all})/\phi. \qquad (15)$$

If effective demand were strictly downward sloping, then this would be the lowest achievable price.

Next, let "none" denote the lowest equilibrium price when no certified products are sold *to law-abiding consumers*:

$$P_{none}^c = V_1\left(0, \frac{\phi}{\phi + S_{none}^c/K_{none}}, K_{none}\right) = U'(\phi K_{none} + S_{none}^c) = C'(K_{none})/\phi. \qquad (16)$$

In other words, some certified sales occur, but they satisfy illegal consumers that cross over, serving to drive down the price in the legal market until stigma is just low enough that legal consumers consider buying. If effective legal demand increased monotonically, $P_{none}^c$ would represent the lowest achievable price, since any additional sales shift legal demand and raise prices.

Thus, for our example of concave effective legal demand, the price is minimized at $\min\{P_{all}^c, P_{none}^c\}$. Fig. 4 reveals the two ways to drive down the legal price below the trade ban. First, one could sell a lot of certified products and saturate the market, but this would require a large source of harvested goods. Second, one could dramatically cut back certified sales to an amount that raises stigma, driving down legal consumers' willingness to pay, while satisfying more illegal consumer demand and lowering prices.

The intuition for the latter case is that, when stigma effects are initially strong, for very small $S^c$ the illegal consumers have a higher marginal willingness to pay. Rather than dropping to the legal demand level, the price for certified goods follows along the illegal demand curve, as those consumers arbitrage. The difficulties of portraying a dual-market equilibrium become evident here. The effective legal demand curve incorporates stigma effects from additional certified sales. However, as equilibrium prices fall, $K$ contracts, which shifts the legal demand curve upward through changing stigma and outrage effects.[15]

In Fig. 5, the gray lines portray the trade ban equilibrium. If certified sales are above the level $S_{switch}^c$, the markets remain separate. Below this level, because of the greater stigma, law-abiding

---

[15] Poaching changes in this case have an attenuating effect on the impact of additional sales—stigma and outrage effects will raise willingness to pay if poaching decreases, and lower it if poaching increases. However, in equilibrium, the shift cannot completely crowd out the initial price change, else there would be no change in poaching to generate the shift in the first place. Therefore, to understand the direction of the effect on poaching, it is sufficient to consider the partial effects of a small change in sales, holding all else constant.



Fig. 5. Perfect arbitrage with declining stigma effects.

consumers' willingness to pay lies below the trade ban price. If the certified price falls, illegal consumers will buy some of the certified products, driving down the illegal price. The corresponding reduction in poaching shifts up legal demand; at any level of legal consumption, both outrage and stigma will be lower. The black legal demand curve depicts the equilibrium at which the arbitrage price is lowest. If any more than $S^c_{none}$ of certified ivory is made available, law-abiding consumers will bid up the price. If any less is sold, illegal consumers will bid up the price.

Following the other end of the demand curve, we see that the same price could be achieved with a large amount of certified sales. However, for the harvesting supply shown in the picture, this level of sales would not be feasible.

An important point is that these cases—in which something less than full resale can minimize poaching—exist only because of stigma effects and only when they are strong enough to make effective demand increasing over some range.[16] Without them, full resale always minimizes prices. In all cases, then, some level of certified sales occurs and is preferred to a trade ban.

### 3.4.2. Confiscation policy

Note that while greater enforcement raises the poaching and supply curves, it also shifts up legal demand, which causes the kink in the effective demand curve to shift upward as well. If certified sales are held constant, tighter enforcement may or may not dampen poaching, as seen with the trade ban case. An increase in enforcement not only reduces illegal supply but also shifts up legal demand through lower stigma; both effects unambiguously reduce illegal consumption and raise prices. As in the single illegal market case, depending on the elasticity of the (effective) demand (including stigma effects), this price increase can more than offset the cost increases.

Outrage also has an attenuating effect on the impact of additional enforcement—it will raise willingness to pay only if enforcement actually decreases poaching. As before, additional enforcement contracts illegal supply, which raises prices in the illegal market and, by arbitrage, in

---

[16]Interior minima are possible with nonmonotonic demand curves that are convex over some range. This would mean the relative effects of stigma become stronger as it falls, at least over some range. At the minimum price, some certified goods would be consumed by law-abiders, but not all available certified products would be sold.

the legal market. In this case, holding $S^c$ fixed, the reduction in illegal supply reduces stigma, which raises willingness to pay by lawful consumers. As before, it also lowers the return to poaching. Then the question is whether the higher prices in the illegal market outweigh the additional costs of bringing uncertified products to market. Whether selling these additionally confiscated goods mitigates the price effects of reducing illegal supply depends on the previously analyzed demand parameters.

Without a stigma effect, the perfect arbitrage case would mimic that of the conventional single market (as in the Bergstrom model): increasing enforcement unambiguously reduces poaching, since reselling the additional confiscations keeps demand low while costs rise. With stigma, however, the effects of greater enforcement may now also be ambiguous even when all confiscated goods are resold. In a policy of full resale, as in (15), stigma is proportional to the share of poached products that escape confiscation: $\sigma_{all} = \phi/(1 + H/K)$. Now, raising enforcement reduces stigma and shifts up demand, making the net impact on price (and poaching) dependent on the strength of the stigma effect, as well as the regular demand elasticities of legal and illegal consumers.

Appendix A presents a simple simulation model to explore how changes in the confiscation rate affect consumption and poaching, as well as consumer surplus, with a policy of full resale. It compares a trade ban with resale policies for separate and combined markets with and without stigma. Confiscation can have a nonmonotonic effect on poaching with either a trade ban or a perfect arbitrage scenario with stigma effects.

## 4. Legal sales and supply linkages

In the preceding cases, with only stigma effects, we saw that a trade ban could never reduce poaching compared with a regime with sales of confiscated and harvested products, although selling all available certified products might not be optimal. However, these results may change if we relax the assumptions that arbitrage is unidirectional or that illegal costs are unaffected by legal market behavior. By allowing legal consumption to affect the supply of endangered species products, or vice versa, trade policy can have ambiguous effects.

This reverse link between the markets can arise in different ways. First, the very existence of a certification process makes counterfeiting possible. Thus, laundering can bring poached goods to the certified market. Second, thicker legal markets may affect the costs of illegal supply, possibly by making enforcement more difficult or smuggling easier. We see that the former mechanism implies that legal sales can increase poaching if prices are higher in legal markets. The latter mechanism, however, can have ambiguous effects, depending on the precise form of the linkage of supply to legal demand.

It is useful to make a distinction between smuggling and laundering. Smuggling is part of the process of supplying illegal consumers with poached goods. Laundering takes some of those illegal supplies and passes them off as certified products. Ongoing seizures of shipments of poached ivory reveal that smuggling remains a real problem. However, the important question for certified sales policy is the scope for laundering, since that is the mechanism for legal sales to raise illegal prices. Both of the major CITES monitoring systems for ivory, Monitoring of Illegal Killing of Elephants (MIKE) and Elephant Trade Information System (ETIS), focus on illegal

supply. ETIS has begun recording international seizures of ivory, but subsidiary information on the legal trade in elephant products is still under development. This analysis indicates that improved monitoring of legal markets should be a priority; according to EIA, Japan has one of the most strictly regulated ivory markets, yet illegal stocks regularly enter.[17]

### 4.1. Laundering

Suppose we have intermediaries who are willing to buy black-market goods and launder them for fraudulent sale in legal markets. We then must allow for another type of enforcement, $(1 - \phi^f)$, the rate of confiscation of laundered products. We assume that the more laundering is performed, $Q^f$, the greater the costs of doing so, $F(Q^f)$, where $F'(Q^f) > 0$, $F''(Q^f) \geqslant 0$ for $Q^f > 0$. (Thus we assume for now that laundering costs are unaffected by the size of the legal market.) Launderers maximize their net profits, defined as

$$(P^c - P^u)Q^f \phi^f - F(Q^f).$$

The first-order condition for laundering to occur is

$$P^c - P^u = \frac{F'(Q^f)}{\phi^f}. \tag{17}$$

Thus, if no price differential exists and the illegal consumers are doing the arbitrage, no laundering will occur, because excess supply in the legal market is satisfying demand in the illegal market. On the other hand, when the market equilibrium involves separation, laundering offers a vehicle to use illegal supplies to satisfy excess demand among legal consumers. Laundering cannot occur under a trade ban, nor is it worthwhile when both types of consumers operate within a single legal market. Therefore, we will focus on circumstances where this form of arbitrage is active.

Since the relevant case requires $P^c > P^u$, we know that $Q_N^c = 0$. Therefore, the market-clearing conditions are

$$Q_L^c = S^c + \phi^f Q^f \leqslant H + (1 - \phi)K + Q^f,$$

$$Q^u = \phi K - Q^f \geqslant 0,$$

where $0 < S^c \leqslant H + (1 - \phi)K + (1 - \phi^f)Q^f$. We maintain the assumption that stigma is represented by the odds of the product being supplied illegally, the ratio of total illegal supply to total consumption: $\sigma = \phi K/(S^c + \phi K - (1 - \phi^f)Q^f)$. Note that in an equilibrium with full resale, stigma is unaffected by laundering, since laundering (and its enforcement) merely diverts illegal supplies from one market to the other: $\sigma_{resell} = \phi K/(H + K)$.

From the first-order conditions for consumers and producers, we have

$$Q^f > 0, \ V_1(S^c + \phi^f Q^f, \sigma, K) = \frac{C'(K)}{\phi} + \frac{F'(K)}{\phi^f} \tag{18}$$

───────────
[17] Hastie et al. [10].

and

$$Q^{\mathrm{u}} > 0, U'(\phi K - Q^{\mathrm{f}}) = P^{\mathrm{u}} = C'(K)/\phi, \tag{19}$$

$$Q^{\mathrm{u}} = 0, U'(0) < C'(K)/\phi. \tag{20}$$

Two types of solutions result when this arbitrage is present. One is a separating equilibrium where illegal consumers buy at lower black-market prices, and part of the legal market is fed by fraudulently certified products. We call this "imperfect arbitrage" since a cost is incurred bringing illegally obtained goods to legal markets. Both markets are active, and the price in one affects that in the other, although they remain separate. In this equilibrium, we get the same condition as in Eq. (21), as well as (19).

The other solution occurs when demand in the market for certified products is so strong that illegal consumers are crowded out completely, leaving a single "legal" market. In the previous case of a fully legal market, illegal consumers could find cheaper access to goods in legal markets. In this case, a single market occurs because values are so much higher in the market for certified goods that launderers resell everything. If the illegal market is crowded out, then $Q^{\mathrm{f}} = \phi K$. In equilibrium,

$$V_1(S^{\mathrm{c}} + \phi^{\mathrm{f}}\phi K, \phi K/(S^{\mathrm{c}} + \phi^{\mathrm{f}}\phi K), K) = \frac{C'(K)}{\phi} + \frac{F'(\phi K)}{\phi^{\mathrm{f}}}. \tag{21}$$

Furthermore, it must be that $V_1 - F'(\phi K)/\phi^{\mathrm{f}} > U'(0)$.

### 4.1.1. Sales policy

The primary result is that if the market parameters are such that laundering occurs, a trade ban will reduce poaching. These conditions imply that, in the absense of laundering, marginal utility in legal markets must be greater than in illegal ones ($V_1(S^{\mathrm{c}}, \phi/(\phi + S^{\mathrm{c}}/K_{\mathrm{ban}}), K_{\mathrm{ban}}) > U'(K_{\mathrm{ban}})$). If the price difference would be enough to justify laundering, then the subsequent diversion of the illegal supply drives up prices in the illegal market and thereby the incentive to poach. The second result is that selling more certified products does not necessarily further increase poaching, as it depends on the relative effects of consumption versus stigma. If stigma dominates, prices rise, as do poaching and laundering. If satiation dominates, prices fall, as do illegal activities.

### 4.1.2. Confiscation policy

The combination of laundering and stigma has interesting effects on the effectiveness of confiscation policy. Consider the case of the single "legal" market, which removes any incidence on illegal consumers since they have been driven out of the market. In this case, we are in a version of the Bergstrom world, but with stigma effects. Since enforcement against poaching both raises poaching costs and lowers stigma, the direction of impact on poaching could be ambiguous, whether or not confiscated goods are automatically resold, as it was in the perfect arbitrage equilibrium (without laundering). On the other hand, enforcement against laundering with full resale does not directly affect stigma; it changes the share of sales that are laundered but not the share of sales that are originally certified. Thus, increased confiscation of laundered goods has the

effects predicted by the traditional model: returns to poaching are driven down when confiscated goods are resold, while the effect is ambiguous if they are not.

To see these results mathematically, consider an equilibrium in which all confiscated products are sold (and no harvesting is available):

$$V_1(K, \phi, K) = \frac{C'(K)}{\phi} + \frac{F'(\phi K)}{\phi^{\mathrm{f}}}. \tag{22}$$

Totally differentiating, we get the change in poaching as the confiscation rate increases:

$$-\frac{dK}{d\phi} = \frac{-C'/\phi^2 + KF''/\phi^{\mathrm{f}} - V_{12}}{C'/\phi + KF''\phi/\phi^{\mathrm{f}} - V_{11} - V_{13}}.$$

Although the denominator is positive, the numerator is of ambiguous sign, since enforcement raises poaching costs but lowers laundering and its costs and lowers stigma. A similar (but more complicated) result can be obtained holding certified sales fixed. One would expect this case to be more likely to yield a counterproductive effect, since certified prices are likely to rise more in the absence of reselling additional confiscations.

Greater enforcement of laundering, on the other hand, would raise costs and unambiguously decrease poaching if everything confiscated is resold:

$$-\frac{dK}{d\phi^{\mathrm{f}}} = \frac{-F'/(\phi^{\mathrm{f}})^2}{C''/\phi + \phi F''/\phi^{\mathrm{f}} - V_{11} - V_{13}} < 0.$$

This result is similar to that of the Bergstrom model with resale. Given $K$, a change in enforcement of laundering merely reduces the share of sales that are laundered, leaving stigma and consumption unaffected. In equilibrium, then, less laundering means less poaching. The price incidence depends on the consumption and stigma effects.

However, if the fraudulent goods that are confiscated are not resold, the impact of greater enforcement against laundering could have an ambiguous impact on poaching. Totally differentiating (21), we get

$$-\frac{dK}{d\phi^{\mathrm{f}}} = \frac{-F'/(\phi^{\mathrm{f}})^2 - \phi K V_{11}}{C''/\phi + \phi F''/\phi^{\mathrm{f}} - \phi \phi^{\mathrm{f}} V_{11} - \sigma(1-\sigma)V_{12}/K - V_{13}},$$

for which the numerator is of ambiguous sign. The intuition is similar to that in the trade ban case without resale, where the price elasticity of demand is a key factor in determining whether the price effects outweigh the cost effects.

Appendix A presents simulation scenarios for the effect of confiscation policy on poaching when laundering is present.

## 4.2. Supply externalities

A concern with allowing legal trade is that it may cause illegal costs to fall, possibly by making enforcement less effective, given any level of effort. However, if such connections exist, they do not necessarily lend support to the trade ban argument. In fact, it is important exactly what form the externality takes. Do thicker legal markets make enforcement less effective? Do they make

poaching cheaper? Do they lower marginal costs of laundering? Or do they lower the confiscation rate for laundering? The discussion will reveal that

- an externality of legal trade that reduces enforcement effectiveness can have ambiguous effects on poaching; and
- an externality that lowers direct poaching costs may affect the optimal scope of legal trade, but it does not necessarily follow that a trade ban minimizes poaching.

If expanding the legal market makes enforcement more difficult, the effect will be similar to lowering the confiscation rate, which has already been shown to have ambiguous effects on overall poaching in several cases. The intuition is that lowering the confiscation rate lowers the illegal supply curve disproportionately compared with the poaching supply curve, since not only do average returns per kill rise, but also fewer kills need to be made to supply the same amount of goods to the market. Since the illegal supply curve falls more with the lower confiscation rate, the equilibrium price will be lower, given an equivalent shift in the poaching supply curve. Thus, the price may fall enough to mitigate the impact of the cost reduction on poaching. This result for the trade ban case was given in Eq. (8).

If, on the other hand, the externality affects pre-confiscation poaching costs, then legal trade is more likely to increase the profit to poaching. The reason is that lowering poaching costs lowers both the illegal supply and the poaching supply curves proportionately. The number of kills to supply a given amount to market remains the same, so if the price falls and consumption increases, it must be that poaching increases as well.[18]

With laundering, similar differences exists between lower laundering costs or less confiscation. If all confiscations are resold, decreased enforcement or lower costs will increase poaching. If certified sales are fixed, a decrease in laundering confiscations could have ambiguous effects. Lower laundering costs would still increase poaching.

However, the presence of cost externalities does not necessarily imply that a trade ban minimizes poaching. The action that creates the cost-lowering effect (more legal sales) also tends to lower prices. If stigma effects from the legal sales are strong, then part of the incidence of increased laundering will be to push up stigma and mitigate any price increase.

Thus, the question of whether to sell additional certified goods is whether the price-lowering effect outweighs the externality effect. With stigma, it was whether satiation outweighed the shift in demand. Here, the question is whether any negative net impact on the price is outweighed by the shift in supply.

## 5. Conclusion

Traditional, single market models for endangered species products suggest that sales of confiscated and legally harvested goods help reduce incentives for poaching. The analytical model in this paper shows that incorporating more complex interactions between markets for endangered species products can lead to results that contradict those earlier models. However,

---

[18] Consider the trade ban case where $U'(\phi K) = aC'(K)/\phi$, with $a$ being a cost-shift parameter. A negative cost shock necessarily increases poaching: $-\frac{dK_{\text{ban}}}{da} = \frac{C'}{aC'' - \phi^2 U''} > 0$.

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*                947

Table 1

| Regime | Equilibrium | Effect of sales on poaching | Effect of more enforcement |
|---|---|---|---|
| Trade ban | Single illegal market | N.A. | Ambiguous |
| All harvesting | Single legal market | No poaching | N.A. |
| Legal price higher | | | |
|   No laundering | Separate markets | Same as trade ban | Same as trade ban |
|   Laundering | Imperfect arbitrage or single "legal" market | More poaching than with ban, but effect of additional sales ambiguous | Ambiguous, though confiscation and resale will lower return to poaching |
| Legal price lower | Perfect arbitrage | Less poaching than with ban, but effect of additional sales ambiguous | Ambiguous |

not all the interactions that concern trade ban proponents imply that limited sales of certified products will encourage poaching. Table 1 summarizes the results.

In the absense of laundering, poaching is still greatest under a trade ban. However, unlike the traditional model, selling all confiscated and harvested goods may not minimize poaching; given some level of certified sales, additional legal sales may have an ambiguous effect on poaching if stigma effects are important. In the traditional model, a full resale policy for confiscated goods ensures that tighter enforcement reduces poaching. However, with separate legal and illegal markets, resale does not always help satisfy illegal demand. If all resale goes to law-abiding consumers, changes in enforcement have the same potentially ambiguous effects as under the full trade ban. If illegal consumers arbitrage between markets under a resale policy, increased enforcement may still have ambiguous effects, now if the stigma effects are strong enough to raise prices in the legal market.

On the other hand, if laundering will always be present, the least poaching occurs under a trade ban. This result requires not only that fraud be possible, but also that the lowest attainable price in the legal market (given legal supplies) remain above the trade ban price in the illegal market.

When the policy goal is simply to minimize poaching, the intuition behind the "To ban, or not to ban?" question depends on the characteristics of the markets. If demand from law-abiding consumers is relatively big and laundering can and would occur, an enforceable ban on trade would minimize poaching. However, if laundering can be eliminated, allowing certified sales would do no worse than a ban with respect to poaching, while welfare would be higher. If the bulk of demand comes from noncompliant consumers and laundering would generally not occur, then allowing sales of certified goods would tend to lower prices and lower the return to poaching.

Stigma can play an important role, but it does not imply that some certified sales are necessarily counterproductive for poaching policy. Stigma figures into the ban question because it affects the relative size of legal demand. A trade ban is more likely to be needed when stigma effects (as modeled here) are weak and lawful demand is strong. If stigma is initially strong and little affected by small amounts of certified sales, a limited resale policy can help drive down prices in

the illegal market. However, full resale may not minimize poaching; changes in stigma can be important for determining the optimal amount of trade.

Similarly, supply externalities may affect the extent of legalized trade that is desirable, but their presence does not necessarily make a trade ban preferable. If legalized sales make enforcement more difficult, the effect on poaching can be ambiguous, just like the effect of changes in the confiscation rate. If certified sales make poaching itself easier, that effect must be weighed against the price-decreasing effect, perhaps leading to fewer sales rather than no sales at the optimum. If laundering would occur and certified sales would make it cheaper, that would indeed reinforce the case for a trade ban. Alternatively, limited auctions could be combined with a tax on certified sales to eliminate the producer price discrepancy and laundering incentive between legal and illegal supplies.[19]

Appropriate trade and enforcement policy for endangered species products (or dual market products more generally) thus requires a reasonable sense of the different demand and supply parameters. For example, if lawful demand for rhino horn is low and most consumers are indifferent to certification, the trade ban is likely to be ineffectual in reducing demand, and selling confiscated products would bring down prices, primarily by increasing supply to illegal consumers. If ivory, on the other hand, is in large demand by law-abiding consumers with a strong sense of stigma, sales of some but perhaps not all the available stock may help reduce the return to poaching.

An essential research need is to understand these demand variables better according to the products in questions. Unfortunately, such an endeavor can be tricky, given the inherent lack of good data for black-market sales. Improved monitoring of legal markets should also be a priority to determine the extent to which laundering might allow poached goods to masquerade as certified ones, as that is a central mechanism for legal sales to have detrimental effects.

In addition to empirical investigations, a dynamic model could add more richness to the analysis of the supply side as well. For these kinds of species applications, harvest and poaching variables should be endogenous to the resource stock. Although adding a biological response function will influence equilibrium levels of poaching and prices, the underlying market fundamentals studied here will remain. Recognizing that products like ivory are durable and storable is also likely to be important for price dynamics.

Of course, the policy goal may not simply focus on poaching. Restricting trade has several consequences, including forgone enjoyment of the products (consumer surplus), enforcement costs, revenues available for wildlife management, and changing producer costs, not to mention community impacts of changes in the species population. If the goal is to maximize welfare, determining optimal policy involves more complex issues, not the least of which is defining welfare. For example, should one care about the utility of illegal consumers? Or illegal producers? How does stigma affect the evaluation of the utility of law-abiding consumers? An additional question raised by stigma is whether and how sensitivity to stigma should be manipulated. For products with malleable demand, publicity campaigns—such as ''Just say no''[20] or ''I'd rather go

---

[19] A literature in environmental economics exists on interactions between legal and illegal options for waste disposal and tax structures to cope with it [7,8].

[20] Nancy Reagan's campaign against drug use.

naked than wear fur"[21]—could be important policy tools. By reducing law-abiding consumer demand, one could make sales policy more effective at driving down the return to poaching.

Finally, the complications created by separate markets for stigma-related or regulated goods are not restricted to ivory and other endangered species products (like rhino horn, tiger bones, and turtle shells). For example, the current model could be applied directly to the case of "blood" diamonds from war-torn areas, which involves both stigma and laundering. Final demand is from lawful consumers and is large enough to make a ban an unlikely policy, although differentiating that demand through certification is possible. However, to the extent that some will pay a premium for certified non-blood diamonds, openings for fraud will translate some of this differential into higher prices for all diamonds, including those from war-torn areas. If consumers realize that laundering occurs, stigma may influence market prices.

The model could also be adapted to analyze many other products with grey, black, or otherwise segregated markets: GMO-free, cruelty-free or organic products; certified, sustainably harvested timber; drugs; and guns. Several of the other examples share the complex interactions of dual markets, but the demand externalities or the supply interdependence may be quite different.[22] Judging from the results in this model, understanding these kinds of real interactions will be critical to evaluating the effects of banning or restricting sales of many kinds of products that are societally problematic.

## Acknowledgments

The author thanks Erwin Bulte, BIOECON conference participants, and anonymous reviewers for helpful comments.

## Appendix A. Simulating the stigma model

Since poaching activity is typically the variable of most interest to policymakers, we would like to understand how equilibrium poaching reacts to policy changes. To solve for equilibrium poaching activity, we must specify functional forms for demand and supply. To explore further the effects of dual markets and stigma on the impact of enforcement, consider the following simple example using linear supply and demand curves.

Let illegal (inverse) demand be linear of the following form: $P_N = y - Q_N$. Law-abiding consumers have linear demand in the absence of a ban, but $Q_L = 0$ under a ban. Their demand is assumed to be either identical to that of noncompliant consumers or adjusted by a stigma factor. Let marginal poaching costs also be linear: $C'(K) = cK$, leading to the (inverse) poaching supply curve $P_S = cK/\phi$.

---

[21] People for the Ethical Treatment of Animals' campaign against fur.

[22] For example, for endangered species products, the legal supply is tied in part to the illegal supply, as in the case of selling products confiscated from poachers. However, in the case of guns, the illegal supply might instead be a function of the legal supply, if some guns that are initially sold legally subsequently get stolen, resold or otherwise diverted into the unregulated market. The stigma of gun ownership may also be reversed; legal consumers may get more utility from gun ownership the larger the illegal market is, as a response to more criminals' owning guns.

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*

Now we solve for equilibrium poaching in four cases. No trade ban in a scenario means that the remaining illegal supply ($\phi K$) is not restricted to illegal consumption.

*Trade* 1: An equilibrium with just illegal consumers and all confiscations resold.

*Trade* 2: An equilibrium with both markets and all confiscations resold, but where legal consumers are identical to illegal ones. In other words, there is no trade ban and no stigma effect, but antipoaching policy remains. Note that this case represents a single market (as in traditional models); allowing for separated legal and illegal markets would lead to equilibrium poaching of $\min\{K_{ban}, K_2\}$.

*Ban*: A trade ban equilibrium.

*Trade* $\sigma$: A no-ban, perfect arbitrage equilibrium with stigma and all confiscations resold. This case again represents a single market. Allowing for separated legal and illegal markets, the resulting equilibrium would be $\max\{\min\{K_\sigma, K_{ban}\}, K_1\}$.

The following table summarizes the functional form assumptions and equilibrium values for the different scenarios.

| Scenario | Ban | Legal demand | Price Eq. ($P_S$) | Supply Eq. | Poaching |
|---|---|---|---|---|---|
| *Trade* 1 | No | NA | $P_N$ | $Q_N = K$ | $K_1 = \frac{y\phi}{c+\phi}$ |
| *Trade* 2 | No | $P_N = y - Q_L$ | $P_N = P_L$ | $Q_N + Q_L = K$ | $K_2 = \frac{2y\phi}{2c+\phi}$ |
| *Ban* | Yes | NA | $P_N$ | $Q_N = \phi K$ | $K_{ban} = \frac{y\phi}{c+\phi^2}$ |
| *Trade* $\sigma$[23] | No | $P_L = b(1-\phi)y - Q_L$ | $P_N$ and/or $P_L$ | $Q_N + Q_L = K$ | $K_\sigma = \frac{(1+b(1-\phi))y\phi}{2c+\phi}$ |

### A.1. Enforcement policy and poaching

Fig. 6 depicts an example where $y = 10$, $b = 2$ and $c = 0.5$ (or half the slope of the demand curves). With the trade ban, we see that for smaller confiscation rates, increasing enforcement actually increases equilibrium poaching. Not until confiscation becomes more complete is poaching actually reduced.[24] Without stigma effects, a resale policy implies that increases in enforcement always lead to less poaching, as is evident in both trade cases 1 and 2.

The horizontal line shows that a ban alone (without enforcement) is more effective than a full-trade policy, up to fairly high levels of confiscation, since it immediately eliminates the law-abiding half of the market. A combination of ban and legal resale would follow the minimum of the ban and full trade poaching. The smaller is the law-abiding portion of the market (of which Trade 1 is the limit), the sooner can an enforcement policy with resale reduce poaching.

Stigma produces interesting effects. As modeled here, stigma is so high for low levels of confiscation, lawful consumers are outbid by illegal consumers for the resold goods. Thus, initially, the arbitrage path follows Trade 1 until a positive equilibrium quantity generated in the legal market (around $(1-\phi) = 0.2$ in this example). But only for higher confiscation rates is more enforcement effective at reducing poaching, and at that point, the effect of falling stigma makes it harder to reduce poaching.

---

[23] This scenario has corner solutions. $P_S = P_N = P_L$, for $Q_L > 0$ and $Q_N > 0$; and $P_S = P_N$ for $Q_L = 0$, and $P_S = P_L$ for $Q_N = 0$. The equation for $K_\sigma$ represents the interior solution.

[24] In this case, until $\phi = c$, or $c/m$ for other linear demand functions with slope $m$.



Fig. 6. Poaching and enforcement.



Fig. 7. Consumer welfare and enforcement.

## A.2. Welfare

Poaching, however, may not be the only variable policymakers are concerned with. Restricting trade also has other implications, including forgone enjoyment of the products (consumer surplus), enforcement costs, and changing producer costs (although we may tend to sympathize less with the last). As an illustration, Fig. 7 displays the combined consumer surplus of the previous example.

A trade ban is always worst for consumers, and more so at higher confiscation rates, when it performs worse at reducing poaching compared with trade scenarios. Welfare is always higher and poaching lower when confiscated goods are resold on illegal markets (the traditional single market example). When stigma is irrelevant, welfare steadily declines with enforcement, reflecting the consumption decline. However, when stigma is a factor, welfare can rise with enforcement (although so may equilibrium poaching). The kinks in that curve reflect switching from and to corner solutions. First, stigma is so high that all goods are bought by illegal consumers; then, perfect arbitrage occurs; finally, stigma falls so low that legal consumers drive the illegal ones out

*C. Fischer / Journal of Environmental Economics and Management 48 (2004) 926–953*



Fig. 8. Enforcement and laundering without stigma.



Fig. 9. Enforcement and laundering with Stigma.

of the market. The consumer welfare-maximizing confiscation rate is positive but less than 1 when stigma is important (here roughly 65%).

### A.3. Laundering

Adding laundering results in equilibria much like the no-ban scenarios Trade 2 and Trade $\sigma$. Both consumer types have almost full access to the overall market, although the costs to legal consumers are slightly higher because of laundering costs. Figs. 8 and 9 illustrate the effects of laundering and enforcement on consumption and poaching, for the cases without and with stigma, respectively. The presence of laundering, in the absence of stigma, ensures that poaching returns are strictly declining with the confiscation rate. With or without laundering, however, a trade ban alone may be more effective than confiscation until the rate is relatively high.

With our form of declining stigma, laundering becomes less significant for enforcement policy, as the price differential appears only when stigma is relatively low, which occurs only when enforcement rates are relatively high.

# References

[1] D. Andrew, Experience with the Use of Trade Measures in the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), OECD/GD(97)106, OECD, Paris, 1997.

[2] E.B. Barbier, T.M. Swanson, Ivory: the case against the ban, New Scientist (November 17, 1990) 52–54.

[3] T. Bergstrom, On the economics of crime and confiscation, J. Econ. Perspect. 4 (3) (1990) 8–171.

[4] G. Brown, D.F. Layton, A market solution for preserving biodiversity: the black rhino, in: J. Shogren, J. Tschirhart (Eds.), Protecting Endangered Species in the United States: Biological Needs, Political Realities, Economic Choices, Cambridge University Press, Cambridge, UK, 2001.

[5] E.H. Bulte, G.C. van Kooten, Economics of antipoaching enforcement and the ivory trade ban?, Amer. J. Agr. Econ. 81 (2) (1999) 66–453.

[6] CITES, Amendments to Appendices I and II of the Convention (Provisional List), UNEP-CITES, Santiago, Chile, November 15, 2002.

[7] I.M. Dobbs, Litter and waste management : disposal taxes vs. user charges, Can. J. Econ. 24 (1) (1991) 27–221.

[8] D. Fullerton, T.C. Kinnaman, Garbage, recycling and illicit burning or dumping, J. Environ. Econ. Manage. 29 (1) (1995) 78–91.

[9] Greenwire, Ivory Sales did not Increase Poaching – CITES, March 30, 2000, Washington, DC: E&E Publishing, LLC.

[10] J. Hastie, J. Newmann, M. Rice, Back in business: elephant poaching and the ivory black markets of Asia, EIA Report, Environmental Investigation Agency, London, 2002.

[11] R. Heltberg, Impact of the ivory trade ban on poaching incentives: a numerical example, Ecolog. Econ. 36 (2) (2001) 189–196.

[12] Japan Wildlife Conservation Society, Effect of Resumption of International Trade on Japanese Ivory Market, Tokyo, Japan, 1999.

[13] M. Kremer, C. Morcom, Elephants, Amer. Econ. Rev. 90 (1) (2000) 212–239.

[14] V. Menon, A. Kumar, Signed and sealed: the fate of the Asian elephant, Technical Report No. 5, Asian Elephant Research and Conservation Centre, 1998.

[15] T. Milliken, African Elephants and the Eleventh Meeting of the Conference of the Parties to CITES, TRAFFIC Network Briefing Document, TRAFFIC International, Cambridge, 2000.

[16] T.J. Nechyba, Social approval, values, and AFDC: a reexamination of the illegitimacy debate, J. Polit. Econ. 109 (3) (2001) 72–637.

[17] A. Thornton, C. Perry, J. Ruhfus, M. Powell, D. Bell, Lethal experiment: how the CITES-approved ivory sale led to increased elephant poaching, EIA Report, London, UK: Environmental Investigation Agency, 2000.

**Exhibit G**

BIOLOGICAL CONSERVATION 134 (2007) 455–469



available at www.sciencedirect.com

ScienceDirect

journal homepage: www.elsevier.com/locate/biocon



Review

# Economic and conservation significance of the trophy hunting industry in sub-Saharan Africa

## P.A. Lindsey[a,c,*], P.A. Roulet[b], S.S. Romañach[a,c]

[a]Tropical Resource Ecology Programme, University of Zimbabwe, Box 167, Mt. Pleasant, Harare, Zimbabwe
[b]Université d'Orléans, Laboratoire Ermes, Bur. 313, F-45 072 Orléans Cedex 02, France
[c]Savé Valley Conservancy, P.O. Box 47, Birchenough Bridge, Zimbabwe

ARTICLE INFO

Article history:
Received 24 April 2006
Received in revised form
2 September 2006
Accepted 5 September 2006
Available online 27 October 2006

Keywords:
Community conservation
Ecotourism
Game ranching
Safari hunting
Sport hunting

ABSTRACT

There is a lack of consensus among some conservation NGOs and African governments concerning the acceptability and effectiveness of trophy hunting as a conservation tool. This lack of consensus is due partly to a lack of reliable information on the economic significance and ecological impact of the industry. We provide a review of the scale of the trophy hunting industry, and assess both positive and negative issues relating to hunting and conservation in Africa. Trophy hunting occurs in 23 countries in Africa, with the largest industries occurring in southern Africa and Tanzania, where the industry is expanding. The trophy hunting industry has remained static or is shrinking in Central and West Africa. A minimum of 1,394,000 km² is used for trophy hunting in sub-Saharan Africa, which exceeds the area encompassed by national parks. Trophy hunting is thus of major importance to conservation in Africa by creating economic incentives for conservation over vast areas, including areas which may be unsuitable for alternative wildlife-based land uses such as photographic ecotourism. However, there are a number of problems associated with the industry which limit conservation benefits. Several of these problems are common to multiple countries, suggesting that if solutions were developed, conservation benefits would accrue over large areas.

© 2006 Elsevier Ltd. All rights reserved.

## Contents

1.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456
2.  Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457
3.  Results and discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457
    3.1.  Trophy hunting in Africa. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457
    3.2.  Southern Africa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458
    3.3.  East Africa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 458
    3.4.  Central and West Africa . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 460
4.  Trophy hunting as a conservation tool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461
    4.1.  Trophy hunting can be sustainable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461
    4.2.  Financial incentives for conservation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462

* Corresponding author:
  E-mail address: palindsey@gmail.com (P.A. Lindsey).

0006-3207/$ - see front matter © 2006 Elsevier Ltd. All rights reserved.
doi:10.1016/j.biocon.2006.09.005

|     | 4.3. | Privately owned land | 463 |
|     | 4.4. | State-owned land | 463 |
|     | 4.5. | Communally owned land | 463 |
|     | 4.6. | Trophy hunting generates revenues in areas where alternatives such as photographic ecotourism may not be viable | 463 |
|     | 4.7. | Trophy hunting does not preclude other forms of resource use | 464 |
|     | 4.8. | Trophy hunting generates high revenues from low volumes of hunters | 464 |
|     | 4.9. | Trophy hunting as a tool for problem animal control | 464 |
|     | 4.10. | The presence of trophy hunting operators can reduce illegal hunting | 464 |
|     | 4.11. | Relatively low leakage of revenues | 464 |
| 5. | Factors limiting the conservation role of trophy hunting | | 465 |
|     | 5.1. | Private land | 465 |
|     | 5.2. | State and communally owned land | 465 |
|     | 5.3. | Quota setting, over shooting, undershooting | 465 |
|     | 5.4. | Allocating hunting areas | 466 |
|     | 5.5. | Corruption | 466 |
|     | 5.6. | Competition with citizen hunting | 466 |
|     | 5.7. | CITES limitations | 466 |
|     | 5.8. | Failure to maximize revenues | 466 |
|     | 5.9. | Hunting bans reducing consumer confidence | 466 |
|     | 5.10. | Inadequate regulation of the hunting industry | 466 |
| 6. | Potential solutions to problems affecting the trophy hunting industry | | 466 |
| 7. | Conclusion | | 467 |
|     | Acknowledgements | | 467 |
|     | References | | 467 |

## 1.    Introduction

Trophy hunting by early settlers to Africa was largely uncontrolled with negative consequences for wildlife populations, and particularly those of large bodied species (Roulet, 2004a). Quaggas (*Equus quagga*) and blue buck (*Hippotragus leucophaeus*), for example were made extinct due to over hunting (Adams, 2004). Following the devastating impact of hunting by early settlers and explorers, by the late 19th century there was recognition among some hunters of the need to protect remaining 'game' populations (Adams, 2004). During the early 20th century, hunters played a key role in the establishment of protected areas in various African countries (Fitter and Scott, 1978; Adams, 2004).

Later, during the early 20th century, the tourist trophy hunting industry arose in Kenya, with visits to the region by wealthy Europeans and Americans guided on hunting safaris by pioneer farmers and explorers (Adams, 2004; Booth, 2005). Later still, professional trophy hunting industries developed elsewhere in Africa. For the rest of the paper, the term 'trophy hunting' (also known as 'safari' or 'sport' hunting) is used to describe hunting by paying tourists, typically with the objective of selecting individuals with exceptional physical attributes (e.g., large horns, tusks, body size or skull length) and usually in the company of a professional hunting guide. The trophy hunting industry is run by hunting operators who market and sell hunts to clients (often at international hunting conventions), lease or own hunting areas and safari camps, and employ the requisite staff (professional hunters, trackers, drivers, skinners and camp staff).

During the 1980s and 1990s, the potential for trophy hunting revenues to promote conservation was increasingly acknowledged (Adams, 2004). In several African countries, there was a gradual alignment of trophy hunting industries

with conservation and development policies, supported by a number of international donor agencies. This happened first in southern Africa (e.g., as part of the Communal Areas Management Programme for Indigenous Resources [CAMPFIRE] program in Zimbabwe and Administrative Management Design program [ADMADE] in Zambia), then in Central Africa (e.g., through the Programme de Développement des Zones de Chasse Villageoise [PDZCV] in CAR and Zones d'Intérêt Cynégétique à Gestion Communautaire [ZICGC] in Cameroon), and more recently in West Africa (e.g., through Gestion Participative des Ressources Naturelles et de la Faune [GEPRE-NAF], and Ecosystèmes Protégés d'Afrique Soudano-Sahélienne [ECOPAS]).

Today, hunters and hunting advocates insist that trophy hunting is of a major importance for conservation in Africa (see online journal *African Indaba* [Editor: Gerhard Damm] www.africanindaba.co.za, or the Conservation Force website [www.conservationforce.org] for examples [last accessed 25 July, 2006]). Certainly, where well managed (as in some southern African states), trophy hunting involves low off-takes and is sustainable (Bond et al., 2004). Low off-takes and high prices mean that trophy hunting can play a role in creating incentives for the conservation of threatened and endangered species (Leader-Williams et al., 2005). Trophy hunters pay higher fees per client than conventional tourists (Chardonnet, 1995; Baker, 1997; Lewis and Alpert, 1997) and so revenues can be generated from lower volumes of people, resulting in potentially lower environmental impacts (Gössling, 2000; Mayaka et al., 2004). Significantly, trophy hunting generates revenues for conservation in areas which may not be suitable for tourism, including some countries experiencing political instability (Leader-Williams and Hutton, 2005; Lindsey et al., 2006).

There are, however, a number of well publicized problems associated with trophy hunting which limit the extent to

which the industry contributes to conservation objectives. These include ethical, biological and social problems (Lindsey et al., 2006). Partly as a result of these problems, there is a lack of consensus among conservation NGOs and some African governments (notably Kenya) over the acceptability and effectiveness of hunting as a conservation tool (Wilkie and Carpenter, 1999; Mayaka et al., 2004). Meanwhile, animal rights and welfare groups oppose hunting due to a fundamental rejection of the concept of killing animals for sport (Finch, 2004).

Discussion concerning trophy hunting is polarized, with animal rights groups and protectionists on one side, and hunters and pragmatic conservationists on the other (Hutton and Leader-Williams, 2003; Loveridge et al., 2006). This polarisation is exacerbated by a lack of reliable data on the impact of trophy hunting on wildlife conservation. Most information on African trophy hunting occurs in unpublished grey literature, and discussion of hunting in the popular media is sometimes emotive. Examples of titles of negative articles about hunting include: "Lions face new threat: They're rich, Americans and they've got guns" (The Guardian [UK], November 2001), "Slaughter on safari" (Mail on Sunday [UK], 2 April 2006) and "Clamp down on eco-thugs" (Mail and Guardian [South Africa] May 2006). Likewise, some pro-hunting activists or the "lip service brigade" make sweeping statements concerning the positive role of hunting in conservation such as the suggestion that "without hunting wildlife would disappear" without providing genuine contributions to conservation (Baldus and Cauldwell, 2004a).

In this paper, we review available information on trophy hunting in Africa, with the objective of documenting the economic scale of the industry, and assessing both positive and negative impacts of hunting on conservation.

## 2.  Methods

We obtained information in this paper by reviewing both published and unpublished literature. Where possible, we obtained updated statistics from national hunting associations and regulatory authorities. Estimates of total revenues from hunting and of the total number of visiting hunters were made by combining the latest available estimates for the following countries: Benin (Roulet, 2004a, no estimate of revenues available), Botswana (Botswana Wildlife Management Association, 2001, personal communication), Burkina Faso (Chardonnet, 1999; Roulet, 2004a), Cameroon (Mayaka et al., 2004; Roulet, 2004a), Central African Republic (Roulet, 2004a), Ethiopia (J. Roussos, personal communication), Mozambique (Lindsey, 2005, no estimate for number of hunters available), Namibia (Damm, 2005a), South Africa (Professional Hunting Association of South Africa Personal Communication), Tanzania (Baldus and Cauldwell, 2004b), Zimbabwe (Booth, 2002), and Zambia (ZAWA, 1999; Roulet, 2004a). Data were generally only available for nations with significant hunting industries. Our estimates of total revenues and numbers of visiting hunters thus exclude data from several West African nations. However, the countries for which data were missing have minor hunting industries, and we are confident that the lack of information for these nations does not significantly affect the scale of our estimates.

We conducted a survey of hunting operators' internet websites to determine which species are used most commonly to advertise trophy hunting, and to quantify the proportion of hunting operators working in Africa that are based in Africa. We found websites (n = 179) using Google (www.google.com), and from hunting advertisements in publications such as the Safari Club International Magazine, and the African Sporting Gazette.

## 3.  Results and discussion

### 3.1.   Trophy hunting in Africa

Trophy hunting is permitted in 23 sub-Saharan African countries (Roulet, 2004a). Using the most recent estimates for the countries with significant hunting industries, where estimates are available, we estimate that trophy hunting generates gross revenues of at least US$201 million per year in sub-Saharan Africa: from a minimum of 18,500 clients. These revenues compare favourably with the US$33–39 million dollars generated from 45,000 to 60,000 foreign hunters in Eurasia (Hofer, 2002). Over 1,394,000 km$^2$ is used for hunting in sub-Saharan Africa, exceeding the area encompassed by national parks by 22% in the countries where hunting is permitted. In this paper, we use the term 'national parks' to describe protected areas where consumptive utilization is not permitted.

South Africa has the largest hunting industry in terms of numbers of operators, visiting hunters, animals shot and revenues generated (Figs. 1 and 2, Table 1), although hunting is conducted across a larger geographical area in Tanzania (Table 2). As a proportion of GDP (Central Intelligence Agency,



**Fig. 1 – Recent trends in gross annual revenues from trophy hunting in southern and East Africa. Data are derived from: Lewis and Alpert (1997), ZAWA (1999), Leader-Williams (2000), Botswana Wildlife Management Association (2001), Booth (2002), Chardonnet (2002), Van der Merwe (2002), Baldus and Cauldwell (2004), Bond et al. (2004), Professional Hunting Association of South Africa (2006), and Damm (2005a,b).**



**Fig. 2 – Recent trends in the number of foreign hunters visiting southern and East Africa. Data are derived from: Lewis and Alpert (1995), Elliott and Mwangi (1998), Hurt and Ravn (2000), Booth (2002), Chardonnet (2002), Van der Merwe (2002), Roulet (2004a), Baldus and Cauldwell (2004), Damm (2005a); Botswana Wildlife Management Association, Personal Communication; Professional Hunting Association of South Africa, Personal Communication.**

2006), our review suggests that trophy hunting is most significant in Botswana (0.13% of GDP), Tanzania (0.11%), and Namibia (0.08%). By contrast, in Hungary (which has the joint largest tourist trophy hunting industry in Europe), hunting contributes only 0.0005% of GDP (Hofer, 2002).

### 3.2. Southern Africa

Our review indicates that the hunting industry is larger in southern Africa than in other regions on the continent, with well developed industries in South Africa, Zimbabwe, Botswana and Namibia, and smaller industries in Zambia, Mozambique (re-opened for trophy hunting in 2000, Roulet, 2004a) and Swaziland (Lindsey, 2005). Eighty-eight percent of clients hunting in Africa do so in southern Africa (Fig. 3). In southern Africa, unlike elsewhere on the continent, large areas of private land are used for trophy hunting in addition to state-owned wildlife areas (Tables 2 and 3).

The southern African trophy hunting industry has expanded considerably during recent years (Figs. 1 and 2), partly due to the closure of hunting in other countries (e.g., Kenya), the loss of wildlife elsewhere (e.g., West Africa) and political instability in other countries (e.g., Sudan, Democratic Republic of Congo, DRC) (Bond et al., 2004). However, successful wildlife conservation outside protected areas, both on privately and communally owned land has also doubtless played a role (Bond et al., 2004; Child, 2005).

High-value dangerous species such as elephants (Loxodonta africana), buffalo (Syncerus caffer), lion (Panthera leo) and leopard (Panthera pardus) can be hunted in all southern African countries (except Swaziland) (Table 4). South Africa, and Namibia are the only countries where both black (Diceros bicornis) and white rhinoceroses (Ceratotherium simum) are hunted as trophies by tourists. The most commonly hunted species in southern Africa are impala (Aepyceros melampus), warthog (Phacochoerus aethiopicus) and kudu (Tragelaphus strepsiceros)

(Table 1). In Zimbabwe and Botswana, trophy hunting generates most income from elephants (27% and 56% respectively, Booth, 2002; Botswana Wildlife Management Association, 2001), whereas in South Africa where fewer elephants are hunted, most hunting income is generated from kudu (13.2%), gemsbok (Oryx gazella) (8.7%) and lion (8.2%) (Patterson and Khosa, 2005).

### 3.3. East Africa

As the birth place of African trophy hunting, Kenya is viewed with nostalgia by hunters (Lindsey et al., 2006). However, trophy hunting was banned in Kenya in 1977 due to overshooting and corruption (Booth, 2005; Leader-Williams and Hutton, 2005), costing the country an estimated US$20–40 million/year in lost revenues (Elliott and Mwangi, 1998; Hurt and Ravn, 2000). Trophy hunting in East Africa is now limited primarily to Tanzania, which has a sizeable and growing hunting industry (Figs. 1–3; Baldus and Cauldwell, 2004b). More buffalo, leopard and lion are hunted in Tanzania than anywhere else (Table 3), and these species are typically used by operators to attract clients to the country (Table 5). Buffalo, leopard and lion generate 42% of income from hunting for the Tanzanian Wildlife Division, with buffalo alone generating 22.1% (Baldus and Cauldwell, 2004b).

During the 1970s, trophy hunting was also conducted on a large scale in Ethiopia, in 14 large concession areas (Duckworth, 2004b). However, increasing human populations, increasing human encroachment into wildlife habitat and political instability have resulted in a 95% decrease in the area used for trophy hunting (Duckworth, 2004b; Flack, 2005). Revenues from trophy hunting in Ethiopia have declined, from US$1.68 million in 1989 (Chardonnet et al., 1995) to US$1.4 million presently (J. Roussos, personal communication). The endemic mountain nyala (Tragelaphus buxtoni) is the species most used by operators to attract hunters to Ethiopia

| [a]Country | Operators (professional hunters) | # of clients /year | Client nationalities (%) | Hunting days sold/year | Revenues/ year (US$ million) | Animals shot/ year | Most hunted species | Jobs from hunting | Source |
|---|---|---|---|---|---|---|---|---|---|
| South Africa | 1000[a] (2000) | 8530[b] | USA 57[a] Spain 8 Germany 5 | 73,938[a] | 100[c] | 53,885[a] | Impala[a]Warthog Kudu | 5–6000[a] | [a]Patterson and Khosa (2005);[b]PHASA Personal Communication.[b,c][c]Professional Hunting Association of South Africa (2006) |
| Namibia | ? (505)[a] | 5363[a] | Germany 35[a] USA 21 Austria 8 | 15,540[a] | 28.5[a] | 22,462[a] | Gemsbok Kudu[a] Warthog | 2125[b] | [a]Damm (2005a).[b]Chardonnet (2002) |
| Tanzania | 42[a] (221)[b] | 1,654[a] | USA 45[b] Spain 15 France 9 | 20,500[a] | 27.6[a] | 7034[c] | Buffalo[c]Impala Zebra | 4328[d] | [a]Baldus and Cauldwell, 2004;[b]Savannas Forever Personal communication.[c],[c]Leader-Williams (2000);[d]Tanzanian Embassy (2006) |
| Botswana[d] | 13[a] (?) | 350[b] | USA 80[b] EU 12 | 5570[c] | 20[d] | 2500[d] | Impala[d]Lechwe Steenbok | 1000[e] | [a]Peake (2004a);[b]BWMA Personal Communication.[e,c]Humavindu and Barnes (2003);[d]Botswana Wildlife Management Association (2001);[e](Chardonnet et al., 2002) |
| Zimbabwe | 149[a] (545)[b] | 1874[a] | USA 57[a] Germany 9 Spain 6 | 19,646[a] | 16[a] | 11,318[a] | Impala[a]Kudu Warthog | ? | [a]Booth (2002);[b]Damm (2005c) |
| Zambia[d] | 22[a](?) | 250[b] | ? | ? | 5[c] | 5436[b] | ? | ? | Baldry (2004); Chardonnet et al. (1995);[c]Lewis and Alpert (1997) |
| Cameroon | 23[a] (47) | 150–200[b] | France (most)[a] | ? | 2[a] | 960[b] | ? | 1200[b] | [a]Mayaka et al. (2004);[b]Roulet (2004a) |
| CAR | 19 (41) | 100–200 | France (most) | ? | 1.4 | 738 | ? | 1700 | Roulet (2004a) |
| Ethiopia | 4[a] (15)[b] | 50–55[c] | USA[d] Denmark Germany | ? | 1.3[d] | ? | Dik dik spp. Lesser kudu Bushbuck[d] | ? | [a]Duckworth (2004a);[b]Flack (2005);[c]Roulet (2004a);[d]ERVS Personal Communication.[f] |
| Burkina Faso | ? (?) | 250–350[a] | EU (most)[c] | ? | 0.6[b] | 994[a] | ? | ? | [a]Roulet (2004a);[b]Chardonnet (1999)[c]Rouget (2004) |
| Benin | ? (?) | 80–100[a] | EU (most)[b] | ? | ? | ? | ? | ? | [a]Roulet (2004a);[b]Rouget (2004) |
| Chad | 8 (?) | 50–100 | EU (most)[b] | ? | ? | ? | ? | ? | Roulet (2004a);[b]Rouget (2004) |
| DRC | 3 (?) | ? | ? | ? | ? | ? | ? | ? | Roulet (2004a) |
| Congo Brazzaville | 1 (2) | ? | ? | ? | ? | ? | ? | ? | www.huntingreport.com (2006) |

**Table 1 – African trophy hunting statistics**

a No estimates are available for Mozambique, or nations in Central and West Africa other than those listed.
b Professional Hunting Association of South Africa.
c Savannas Forever (a non-governmental organisation working on certification of hunting in Tanzania, contact person – Susan James).
d An unknown, but small number of additional operators also hunt on private land in Botswana and Zambia.
e Botswana Wildlife Management Association.
f Ethiopian Rift Valley Safaris.

BIOLOGICAL CONSERVATION 134 (2007) 455–469

**Table 2 – Land types and land areas utilised for hunting in East and southern Africa**

| Region/country | Type of land used for hunting | Size (km[2]) | % of country | Parks | % of country | Source |
|---|---|---|---|---|---|---|
| *East Africa* | | | | | | |
| Ethiopia | State concessions | 9600 | 0.8 | 32,403 | 2.7 | ERVS[a] Personal Communication |
| Tanzania | Game reserves, game controlled, forestry, open, and wildlife management areas | 250,000 | 26.4 | 134,881 | 14.1 | Baldus and Cauldwell, 2004 |
| Total/mean ± SE | | 259,600 | 13.6 ± 12.8 | 167,284 | 8.4 ± 5.7 | |
| *Southern Africa* | | | | | | |
| Botswana | Wildlife Management Areas (97.2%) communal land (some), private land (least) | 133,451 | 23.0 | 104,120 | 18.0 | BWMA[b] Personal Communication |
| Mozambique | Coutada hunting areas (69%); buffer areas adjacent to Niassa GR (24%); communal land (7%) | 82,250 | 10.5 | 43,455 | 5.6 | Hatton et al. (2001) and C. Begg, Personal Communication. |
| Namibia | Community conservancies (75%); [b]private land (25%); state concessions (some) | 94,052 | 11.4 | 107,125 | 13.0 | Cumming (1999), Krug (2001)[c] and Weaver and Skyer (2003) |
| South Africa | Private land (mostly), provincial reserves (some) | 160,000 | 13.1 | 56,500 | 4.6 | Roulet (2004b) |
| Swaziland | Private land | 46 | 0.3 | 50 | 0.3 | Roulet (2004b) |
| Zambia | [d]Game Management Areas (mostly); private land (some) | 160,488 | 21.3 | 59,451 | 7.9 | Lewis and Alpert (1997); Cumming (1999) |
| Zimbabwe | [e]Private land (46%); state concessions (26%); communal land 22%; state-owned forestry (6%) | 64,945 | 16.6 | 49,418 | 12.7 | Booth (2002) and Cumming (1999) |
| Total/mean ± SE | | 695,232 | 14 ± 2.9 | 420,119 | 9 ± 2.3 | |

a Ethiopian Rift Valley Safaris informed us that there are 16 concessions in Ethiopia ranging from 200 to 1000 km[2]: an estimate of the land area used for hunting was made arbitrarily by using a mid point concession size of 600 km[2].
b Botswana Wildlife Management Association.
c Krug (2001) states that there are 400 hunting ranches of 30–100 km[2] in Namibia, and from this information, an estimate of the land area was made arbitrarily using a mid point ranch size of 60 km[2].
d The wildlife populations of some Zambian game management areas are too depleted to support trophy hunting Lewis and Alpert (1997).
e Land re-distribution in Zimbabwe has reduced the area available to trophy hunting on private land, though hunting continues in parts of the large conservancies (Savé Valley, Bubiana, Bubye Valley, Midlands and Gwayi River, Booth (2005)).



- South Africa (45.6%)
- Namibia (29.0%)
- Zimbabwe (10.0%)
- Tanzania (7.3%)
- Botswana (1.9%)
- Burkina Faso (1.6%)
- Zambia (1.3%)
- Cameroon (1.1%)
- CAR (1.0%)
- Benin (0.5%)
- Chad (0.4%)
- Ethiopia (0.2%)

**Fig. 3 – Proportion of hunters visiting each country (based on latest estimates for hunters visiting each nation). Data are derived from: Lewis and Alpert (1997), Elliott and Mwangi (1998), Hurt and Ravn (2000), Booth (2002), Chardonnet (2002), Van der Merwe (2002), Roulet (2004a), Baldus and Cauldwell (2004), Damm (2005a); Botswana Wildlife Management Association, Personal Communication; Professional Hunting Association of South Africa, Personal Communication.**

(Table 5). Trophy hunting was banned in Uganda in 1979, though the Uganda Wildlife Authority has recently approved two pilot schemes for trophy hunting in an attempt to create incentives for wildlife conservation (Lindsey, 2005).

### 3.4. Central and West Africa

In Central Africa, most trophy hunting is conducted in Cameroon and Central African Republic (CAR) (Roulet, 2004a). Hunting operators in those countries rely less on dangerous species and more on geographically restricted and spectacular species such as Lord Derby Eland *Taurotragus derbianus* and bongo *Tragelaphus euryceros* to attract clients (Table 5). Trophy hunting in Chad is presently severely disrupted by political instability there (Causey, 2006a). Trophy hunting reopened on a small scale in Democratic Republic of Congo (DRC) in 2004 (Roulet, 2004a). Trophy hunting ceased in Congo Brazzaville in 1999 (Roulet, 2004a).

West Africa is best known among hunters for bird shooting, rather than for hunting mammals (Rouget, 2004). However, some trophy hunting occurs in West Africa, primarily in Benin and Burkina Faso (Duckworth, 2004a; Rouget, 2004). Hunting also occurs on a minor scale in Senegal (Duckworth, 2004a;

BIOLOGICAL CONSERVATION 134 (2007) 455–469

| Table 3 – Land types and land areas utilised for hunting in Central and West Africa | | | | | | |
|---|---|---|---|---|---|---|
| Country | Type of land used for hunting | Size (km$^2$) | % of country | Parks | % of country | Source |
| *Central Africa* | | | | | | |
| Cameroon | State concessions, communal land | 43,860 | 9.2 | 30,500 | 6.4 | MINEF (2002) |
| Central African Republic | State concessions, communal land | 196,035 | 31.5 | 68,918 | 11.1 | Roulet (2004b) |
| Democratic Republic of Congo | State concessions | 90,362 | 3.9 | 124,700 | 5.3 | Roulet (2004b) |
| Total/mean ± SE | | 330,257 | 15 ± 8.5 | 224,118 | 3.1 ± 1.77 | |
| *West Africa* | | | | | | |
| Benin | State concessions | 4000 | 3.6 | 8435 | 7.5 | Roulet (2004b) |
| Burkina Faso | State concessions, communal land | 21,500 | 7.8 | 31,937 | 11.6 | Rouamba (2002) |
| Chad | State concessions | 34,320 | 2.7 | 116,890 | 9.1 | Roulet (2004b) |
| Gambia | State concessions | 600 | 5.3 | 230 | 2.0 | Roulet (2004b) |
| Ghana | State concessions | 1137 | 0.5 | 13,489 | 5.7 | Roulet (2004b) |
| Guinea Bissau | State concessions | 8000 | 22.1 | 3,780 | 10.5 | Roulet (2004b) |
| Mauritania | ? | 6000 | 0.6 | 17,500 | 1.7 | Roulet (2004b) |
| Niger | State concessions, communal land | 9169 | 0.7 | 84,130 | 6.6 | Roulet (2004b) |
| Senegal | State concessions | 24,344 | 11.1 | 21,800 | 12.4 | Roulet (2004b) |
| Total/mean ± S.E. | | 109,070 | 7.0 ± 2.33 | 298,191 | 7.5 ± 1.29 | |

Rouget, 2004), Gambia (warthogs only, Rouget, 2004), Ghana (Roulet, 2004a), Guinea (Causey, 2006b), Guinea Bissau, Mauritania (warthogs only, Roulet, 2004b), Mali, and Niger (Roulet, 2004a). The planned re-opening of trophy hunting in Ivory Coast was stalled by the recent political instability (Roulet, 2004a). Little hunting of dangerous species occurs in West Africa; elephant hunting is permitted only in Guinea and leopard hunting is not permitted in the region at all (Table 4).

Central and West Africa attract fewer hunters than East and southern Africa, and generate comparatively modest revenues from hunting. Furthermore, for the Central/West African countries for which data are available, revenues and client numbers appear to be static or declining slightly. For example, in Central African Republic, hunting revenues declined from US$4.4 million in 1989 to US$1.4 million in 1995 (Roulet, 2004a) and the number of visiting hunters declined from 268 in 1990 to 100–200 in 2003 (Roulet, 2004a). In Burkina Faso, revenues from hunting fell from US$2.7 million in 1989 to 0.57 million in 1999, though the numbers of visiting hunters remained fairly stable, from 276 in 1990 to 250–350 in 2003 (Roulet, 2004a). In Cameroon, hunting revenues increased slightly over more than a decade, from US$0.75 million in 1989, to US$1.5 million in 2001 and US$2 million in 2003, and the number of visiting hunters has stayed constant at around 200/year during 1990 and 2003 (Mayaka et al., 2004; Roulet, 2004a).

The relatively limited scale and poor performance of the trophy hunting industry in Central and West Africa is likely the result of multiple causes, including higher human population pressures, the depletion of wildlife populations due to the bush-meat trade, lack of privately owned land, difficult habitat for hunting (rain forest), dependency on logging roads for access to forest areas, political instability, poor infrastructure, and in the case of West Africa, smaller areas of remaining wilderness (Wilkie and Carpenter, 1999). In addition, Central and West Africa appear not to have capitalized on the largest market of international hunters, the US. The majority of hunters visiting Central and West Africa are European (Lubin and Lubin, 2004; Mayaka et al., 2004), and the region is generally only visited by experienced US hunters (Lindsey et al., 2006). Finally, several West and Central African countries do not offer high value dangerous-species hunts,

meaning that revenues rely on lower value 'plains' species (e.g., antelopes, warthogs).

## 4. Trophy hunting as a conservation tool

Trophy hunting has a number of characteristics which enable the industry to play a potentially key role in conservation outside of national parks and where alternative wildlife-based land uses such as photographic ecotourism (tourism based on visitors paying for wildlife viewing opportunities) may not be viable.

### 4.1. Trophy hunting can be sustainable

Well monitored trophy hunting is inherently self-regulating, because modest off-take is required to ensure high trophy quality and thus marketability of the area in future seasons. Accordingly, off-takes for many species are well below available quotas (Table 4). On a local level, financial incentives for sustainable hunting are likely to be most effective where the same hunting operators are given tenure over hunting areas for multiple seasons.

Low off-take rates mean that trophy hunting can play a key role in endangered species conservation (even when excessive hunting was the original cause of the conservation problem). Initially, when species are critically endangered, a complete cessation of all human-caused mortality is necessary. Subsequently, however, revenues from tightly regulated trophy hunting can provide important incentives for careful management, protection and reintroductions. On private land in South Africa, for example, trophy hunting has facilitated the recovery of bontebok (*Damaliscus dorcas*), black wildebeest (*Connochaetes gnu*) and cape mountain zebra (*Equus zebra*) by providing financial incentives for reintroductions (Flack, 2003). Similarly, the recovery of southern white rhinoceros populations was accelerated by incentives from trophy hunting, which encouraged reintroductions onto game ranches (Leader-Williams et al., 2005).

Trophy hunting can also play an important role in the rehabilitation of wildlife areas by permitting income generation from wildlife without jeopardizing population growth of

**Table 4 – Number of each of various species on quota or that are killed each year (number killed without parentheses, quotas in parentheses, where no information on numbers was available, YES or NO is given to denote whether each species is hunted or not)**

| | Elephant *Loxodonta africana* | Buffalo *Syncerus caffer* | Lion *Panthera leo* | Leopard *Panthera pardus* | Black rhino *Diceros bicornis* | White rhino *Ceratotherium simum* | Cheetah *Acinonyx jubatus* | Crocodile *Crocodylus Niloticus* |
|---|---|---|---|---|---|---|---|---|
| *East Africa* | | | | | | | | |
| Ethiopia | YES | YES | 3[a] (20[b]) | (500[b]) | NO | NO | NO | (5[c]) |
| Tanzania | 35 (100[b]) | 2000[d] | 250[d] (500[b]) | 300[d] (500[b]) | NO | NO | NO | 170[m] (1600[c]) |
| Uganda | NO | NO | NO | NO | NO | NO | NO | NO |
| *Southern Africa* | | | | | | | | |
| Botswana | (270[e]) (210[b]) | (160[b]) | (31[e]) (130[b]) | (32[e]) | NO | NO | (5[b]) | (50[b]) |
| Mozambique | (40[b]) | YES | 8[a] | (60[b]) | NO | NO | NO | (900[b]) |
| Namibia | 36[f] (90[b]) | 20[f] | 7[g] | 121[g] (250[b]) | 0[h] (5[b]) | 2[f] | 142[g] (150[b]) | 5[b] (25[b]) |
| South Africa | 31[i] (100[b]) | 179[i] | 190[i] | 45[j] (150[b]) | 0[j] (5[b]) | 60[i] | NO | 24[i] |
| Swaziland | NO | NO | NO | NO | NO | (0.5[g]) | NO | NO |
| Zambia | (20[b]) | YES | 39[a] | (300[c]) | NO | NO | NO | NO |
| Zimbabwe | 243[k] (500[b]) | 853[k] | 89[k] (139[b]) | 303[k] (500[b]) | NO | NO | 6[k] (50[b]) | 69[k] (200[b]) |
| *Central Africa* | | | | | | | | |
| Cameroon | 10[l] (80[b]) | YES | 10[a] | NO | NO | NO | NO | NO |
| CAR[m] | NO | YES | 9[n] | (40[b]) | NO | NO | NO | NO |
| Congo Brazzaville | NO | YES[n] | NO | YES[n] | NO | NO | NO | NO |
| DRC | NO | YES | YES | (5[b]) | NO | NO | NO | NO |
| *West Africa* | | | | | | | | |
| Benin | NO | YES | 1.5[a] | NO | NO | NO | NO | NO |
| Burkina Faso | NO | (94[a]) | (28[a]) | NO | NO | NO | NO | NO |
| Chad | NO | YES | 1[a] | NO | NO | NO | NO | NO |
| Gambia[o] | NO | NO | NO | NO | NO | NO | NO | NO |
| Ghana | NO | NO | NO | NO | NO | NO | NO | NO |
| Guinea | YES[h] | YES[h] | NO | NO | NO | NO | NO | NO |
| Guinea Bissau | NO | NO | NO | NO | NO | NO | NO | NO |
| Mali | NO | NO | NO | NO | NO | NO | NO | NO |
| Niger | NO | NO | NO | NO | NO | NO | NO | NO |
| Senegal | NO | YES[n] | 1[a] | NO | NO | NO | NO | NO |

a Duckworth (2004a) (average number of lions exported during 1994–2004).
b CITES export quotas http://www.cites.org, 2006.
c Damm (2005d).
d Numbers killed in 2005 Kayera (2005).
e Botswana Government imposed quotas (Botswana Wildlife Management Association, Personal Communication).
f Numbers hunted in 2004, Namibian Ministry of Environment and Tourism, Personal Communication.
g Anon (2005).
h www.huntingreport.com (last accessed March 2006).
i Trophy hunting of 1% of the population (currently 61 animals) permitted annually Reilly et al. (2004).
j Patterson and Khosa (2005) Number hunted during 2003/2004 season.
k Booth (2002).
l Wilkie and Carpenter (1999).
m Central African Republic.
n Roulet (2004a).
o Warthogs the are the only species legally hunted in Gambia Rouget (2004).

trophy species (Bond et al., 2004). For example, trophy hunting operators are playing an important role in facilitating the recovery of wildlife populations in the *Coutada* hunting areas in Mozambique following the civil war (Lindsey et al., 2006).

### 4.2.    Financial incentives for conservation

Our review highlights the fact that financial incentives from trophy hunting effectively more than double the land area that is used for wildlife conservation, relative to what would be conserved relying on national parks alone. Trophy hunting

creates incentives for wildlife and habitat protection under a diversity of scenarios, from state-owned concessions where people are excluded and wildlife is actively protected such as the safari areas in Zimbabwe, areas where local communities live but where wildlife is the primary land use (e.g., Wildlife Management Areas in Tanzania and Botswana), and areas where wildlife is not necessarily the primary land use but where incentives from hunting provide incentives for conservation and the sustainable use of natural resources (e.g., Game Management Areas in Zambia). From a conservation perspective, we believe that the provision of incentives which

BIOLOGICAL CONSERVATION 134 (2007) 455–469   **463**

| Table 5 – Percent occurrence of various species on hunting operators' website advertisements | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Botswana | Cameroon | CAR | Ethiopia | Mozambique | Namibia | South Africa | Tanzania | Zambia | Zimbabwe |
| Buffalo | 45 | 23 | 40 | 0 | 63 | 11 | 22 | 63 | 50 | 20 |
| Lion | 36 | 23 | 10 | 33 | 25 | 11 | 24 | 63 | 50 | 27 |
| Elephant | 64 | 38 | 20 | 33 | 13 | 22 | 14 | 25 | 10 | 40 |
| Leopard | 55 | 0 | 30 | 0 | 13 | 22 | 16 | 56 | 40 | 13 |
| Bushbuck | 0 | 15 | 10 | 33 | 0 | 6 | 9 | 6 | 20 | 7 |
| Gemsbok/oryx | 18 | 0 | 0 | 33 | 0 | 53 | 12 | 19 | 10 | 7 |
| Lord derby Eland | 0 | 69 | 80 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bongo | 0 | 69 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Zebra | 27 | 0 | 0 | 0 | 0 | 33 | 21 | 19 | 20 | 7 |
| Sable | 18 | 0 | 0 | 0 | 13 | 6 | 9 | 19 | 37 | 7 |
| Giraffe | 0 | 0 | 0 | 0 | 13 | 50 | 16 | 13 | 0 | 13 |
| Roan | 0 | 23 | 40 | 0 | 0 | 6 | 2 | 13 | 20 | 0 |
| Wildebeest | 27 | 0 | 0 | 0 | 0 | 28 | 9 | 19 | 10 | 7 |
| Red Hartebeest | 27 | 0 | 0 | 0 | 0 | 28 | 7 | 6 | 0 | 7 |
| Springbok | 18 | 0 | 0 | 0 | 0 | 33 | 10 | 6 | 0 | 7 |
| Crocodile | 9 | 0 | 0 | 0 | 13 | 0 | 3 | 19 | 20 | 7 |
| Mountain nyala | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kob | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sitatunga | 0 | 23 | 0 | 0 | 0 | 0 | 2 | 6 | 28 | 0 |
| Steenbok | 0 | 0 | 0 | 0 | 0 | 21 | 3 | 0 | 0 | 7 |

promote wildlife as a land use is the single most important contribution of the trophy hunting industry.

### 4.3.    Privately owned land

In southern Africa during the 1960s and 1970s, legislative changes granted landowners ownership of wildlife and/or the right to derive income from consumptive utilisation (i.e., utilization involving killing animals), resulting in large scale conversion of livestock ranches to game ranches (Krug, 2001). Trophy hunting has been a key stimulant behind the shift to game ranching and typically forms the entry point into wildlife ranching for former cattle ranchers (Bond et al., 2004). In Zimbabwe, trophy hunting was largely responsible for the conversion of 27,000 $km^2$ of livestock ranches to game ranching (prior to the land redistribution programme) and a subsequent quadrupling of wildlife populations (Bond et al., 2004). In South Africa there are approximately 5000 game ranches and 4000 mixed livestock/game ranches with a population of >1.7 million wild animals (Bond et al., 2004). The conversion of livestock ranches to game ranching in South Africa continues at a rate of ~5000 $km^2$ per year (Flack, 2002). In Namibia, the shift to game ranching resulted in an 80% increase in wildlife populations during 1972–1992 (Barnes and De jager, 1996; Bigalke, 2000) and presently 15–25% of ranches are used for wildlife production (Krug, 2001).

### 4.4.    State-owned land

Several African countries have allocated large blocks of land for wildlife utilization in addition to national parks, as game reserves or wildlife/game management areas (Tables 2 and 3). Trophy hunting is vital in generating revenues for many of these areas, and justifying their existence in the context of increasing human populations and demand for land. Significantly, many of these state-owned concessions occur in countries which otherwise have a relatively small proportion of their land surface devoted to wildlife conservation such as Cameroon, Ethiopia and Mozambique (Tables 2 and 3).

### 4.5.    Communally owned land

Trophy hunting is a key component of community conservation schemes in several countries. In parts of Zambia, Zimbabwe, Botswana, Namibia and Tanzania, revenues from trophy hunting have resulted in improved attitudes towards wildlife among local communities, increased involvement of communities in CBNRM programs, requests to have land included in wildlife management projects, and in some cases increasing wildlife populations (Lewis and Alpert, 1997; Child, 2000; Weaver and Skyer, 2003; Baldus and Cauldwell, 2004b; Child, 2005). In Namibia, revenues from trophy hunting have been the primary stimulus for the development of wildlife conservancies on >70,000 $km^2$ of communally owned land (Weaver and Skyer, 2003). In Tanzania, incentives from trophy hunting have been partially responsible for the decision of 50 of 80 villages neighbouring Selous Game Reserve to create Wildlife Management Areas where sustainable wildlife utilization is the primary land use (Baldus and Cauldwell, 2004b). In CAR, partnerships between hunting operators and communities (established through the PDZCV programme) have provided the only income from wildlife (US$175,000 during 2003/2004) for local people during times of economic crisis, with the effect that poaching in hunting areas has declined and wildlife now occurs at higher densities in hunting concessions than in the neighbouring national parks (Roulet, 2004a; Renaud, 2005).

### 4.6.    Trophy hunting generates revenues in areas where alternatives such as photographic ecotourism may not be viable

Trophy hunting is viable in several countries that receive few conventional tourists (e.g., CAR, Chad, and Ethiopia), and in remote parts of countries that are popular among tourists

(e.g., northwest South Africa, and southern Tanzania). In Botswana, 74% of the wildlife estate relies on revenues from consumptive wildlife utilization (Barnes, 2001). Hunting has several advantages over photographic ecotourism which enable the industry to generate revenues under a wider range of scenarios. For example, trophy hunting is potentially viable in remote areas lacking infrastructure, attractive scenery, or high densities of viewable wildlife (Wilkie and Carpenter, 1999; Lindsey et al., 2006). In addition, the hunting industry is also generally more resilient to political instability than tourism; with the onset of land redistribution in Zimbabwe, for example, tourist occupancy fell by 75%, whereas trophy hunting revenues dropped by only 12.2% (Booth, 2002; Bond et al., 2004).

Trophy hunting revenues are vital in part because there are not enough tourists to generate income for all protected areas. Even in the most visited countries such as South Africa and Tanzania, tourism revenues are typically sufficient to cover the costs of only some of the parks (Baldus, 2005) and certainly not to justify wildlife as a land use outside of protected areas. In countries with large parks networks and relatively little tourism such as Burkina Faso, Central African Republic and Zambia, wildlife may be conserved more effectively if some fully protected areas were designated as multiple use reserves where some trophy hunting is permitted (Baldus, 2005).

Photographic ecotourism undoubtedly generates greater gross revenues than trophy hunting in Africa, and where large numbers of tourists visit, employment opportunities for local people can be higher than from hunting. For example, Tanzanian National Parks receive ~US$11 million/year from photographic tourism just from the Serengeti and Ngorongoro Conservation Area, whereas the Tanzanian Wildlife Division receives only US$10.5 million/year from hunting throughout Tanzania (Thirgood et al., 2006). However, hunting revenues are significant because they enable wildlife production to be a viable land use across a wider range of land uses than would be possible relying on revenues from photographic ecotourism alone.

### 4.7. Trophy hunting does not preclude other forms of resource use

In contrast to most national parks, many hunting areas in Africa permit regulated natural resource extraction by local communities in the form of grazing, firewood collection, and in some cases controlled subsistence hunting. The provision of revenues from trophy hunting combined with the retention of sustainable traditional user rights over natural resources has the potential to promote broad acceptance of conservation objectives.

### 4.8. Trophy hunting generates high revenues from low volumes of hunters

Trophy hunting generates considerably more income per client than ecotourism (Baker, 1997; Lewis and Alpert, 1997) though not necessarily higher gross revenues. In Zimbabwe and Tanzania, for example, revenues generated by hunting clients are respectively 30 and 14 times greater than those

generated per photographic client (Chardonnet, 1995). Consequently, hunting revenues can potentially be generated with lower environmental impacts from littering, fossil fuel use and habitat conversion for infrastructure development (Gössling, 2000; Mayaka et al., 2004).

### 4.9. Trophy hunting as a tool for problem animal control

There is interest among clients in hunting problem animals (crop raiders or livestock killers) with the effect that trophy hunting has the potential to generate revenues from animals that would have died anyway and potentially to reduce indiscriminate revenge-killings of wildlife by angry local people. Over 50% of clients are willing to pay more or the same as typical trophy fees to hunt problem animals, even if they are poor trophies (Lindsey et al., 2006). Marketing hunts of problem animals may be difficult, however, because hunts are booked in advance and problem animals occur unpredictably in time and space. One option would be state wildlife agencies to auction the sale of problem animal hunts to operators as they occur. Hunting operators with interested clients could then extend their stay or take time out of their schedule to hunt the animal. Caution would clearly be required to ensure that animals are not falsely declared "problems" as an excuse for trophy hunting. Encouragingly, however, problem animal hunts by hunting clients in Zimbabwe have led to a reduction in the number of problem elephants killed (from several hundred to ~125/year), due to increasing awareness among communities of their value of wildlife as potential trophies (Child, 2005).

### 4.10. The presence of trophy hunting operators can reduce illegal hunting

Lease agreements in some countries (e.g., Zambia, ZAWA, 1999; and Baldus and Cauldwell, 2004b) require assistance with anti-poaching from hunting operators in hunting concessions. Even where anti-poaching is not a legal pre-requisite, operators often conduct anti-poaching to protect the wildlife resource on which they depend (Hurt and Ravn, 2000). In Savé Valley Conservancy in south eastern Zimbabwe, for example, revenue from trophy hunting enables hunting operators to employ approximately 150 anti-poaching game scouts. In Zambia, one of the achievements of ADMADE has been the use of hunting revenues to employ 500 village scouts for anti-poaching in Game Management Areas (Lewis and Alpert, 1997).

### 4.11. Relatively low leakage of revenues

Ecotourism packages are often booked through overseas agents, with the effect that a significant proportion of revenues are lost from host countries. By contrast, our website review indicates that most hunting operators working in Africa are based in Africa (92.6%) and many are based in the countries in which most hunting is conducted (88%). The fact that most hunting operators are based in-country does not necessarily mean that all revenues remain within that country, but available estimates indicate that leakage of revenues from hunting is lower than for photographic ecotourism. In Tanza-

nia, for example, 33% of trophy hunting revenues accrue to the state, compared to 8% of tourism revenues (Baldus and Cauldwell, 2004b). Likewise, 75% of trophy hunting revenues remain within Botswana, compared to 27% of tourism revenues (Botswana Wildlife Management Association, 2001). However, in Central and West Africa, most operators are based in Europe and so significant proportions of revenues are leaked overseas (Roulet, 2004a).

## 5. Factors limiting the conservation role of trophy hunting

### 5.1. Private land

In Namibia, Botswana and South Africa, game ranches are required by law to have perimeter game fencing (Bothma, 2002; Nuding, 2002), with the effect that natural wildlife migrations have been interrupted in some areas (Booth, 2005). In South Africa particularly, fenced ranches are small (8.2–49.2 km$^2$) and often over stocked, resulting in ecological degradation (Bond et al., 2004; Patterson and Khosa, 2005). Ranchers with fenced properties often persecute 'non-huntable' predators such as wild dogs *Lycaon pictus* or cheetahs *Acinonyx jubatus* that they perceive to compete for potential trophies (Lindsey et al., 2005). Exotic species are frequently introduced onto game ranches to increase the diversity of saleable trophies (e.g., fallow deer *Dama dama* and lechwe *Kobus leche* in South Africa, black wildebeest and blesbok *Damaliscus dorcas philippsi* in Namibia) (Hamman et al., 2003; Lindsey, 2005). In some cases, ranchers purposefully hybridize closely related species (e.g., black and blue wildebeest *Connochaetes taurinus*) to offer unique trophy 'species' such as 'red wildebeest', or manipulate genetics to offer prized aberrant varieties such as white or black springbok (*Antidorcas marsupialis*) (Hamman et al., 2003).

There are also ethical issues associated with trophy hunting on some game ranches. These issues generally have relatively little relevance to conservation per se, but negatively impact public perception of trophy hunting as a conservation tool. These activities include shooting from vehicles; shooting female animals or young animals; luring animals from parks; using baits and spotlights; hunting leopards with dogs; put-and-take hunting (the practice of releasing trophies immediately prior to the onset of a hunt); and 'canned hunting' (the practice of shooting animals in small enclosures in which they have no chance of escaping the hunter). An estimated 80–90% of the lions hunted in South Africa for example, are believed to be canned (Damm, 2005a; Patterson and Khosa, 2005). Canned lion hunting is contentious and we believe that for trophy hunting to achieve wider acceptance as a valid conservation tool, such practices should be eradicated. Encouragingly, a panel of experts reporting to the South African Minister of Environmental Affairs and Tourism recently recommended that canned hunting and put and take hunting be prohibited in South Africa (SADET, 2005).

### 5.2. State and communally owned land

Despite some successes, local communities living in or near wildlife rarely benefit adequately from trophy hunting activities. We believe that the inequitable distribution of hunting revenues represents the most serious threat to the long term sustainability of the industry. Reasons for this inequity include; inadequate legislation enforcing community involvement, failure of national governments to devolve wildlife ownership to communities, and the lack of skills among communities required for them to run hunting operations or negotiate improved terms with operators (Lewis and Alpert, 1997; Murombedzi, 1999; Mayaka et al., 2004; Mbwaia, 2004; Child, 2005). In Botswana, for example, benefits accruing to communities are limited by a lack of marketing and management skills among communities, by inappropriate distribution of hunting revenues and through over-reliance on foreign hunting operators and donor agencies (Mbwaia, 2004). In Cameroon, <3% of trophy hunting revenues accrue to local communities, most of which are received by a small proportion of the population, with the effect that local people have negative attitudes towards conservation and trophy hunting (Mayaka, 2002; Mayaka et al., 2004). In Zambia, communities do not own wildlife occurring in Game Management Areas in which they live, and thus receive only 12% of hunting revenues (Lewis and Alpert, 1997). In Tanzania, most of the 25% of hunting revenues required by law to accrue to communities living in or adjacent to hunting areas reach only as far down as local council level, resulting in distrust of the government and resentment that hunting rights are reserved for foreigners (Nshala, 1999).

### 5.3. Quota setting, over shooting, undershooting

Most state wildlife departments lack the resources to census wildlife populations regularly and quotas are often based on guesswork (Caro et al., 1998a). In some areas, aerial censuses are done, but do not provide accurate estimates for small species or carnivores, are unsuitable for establishing quotas for blocks smaller than the home ranges of large species, and often do not involve consultation with local people (Taylor, 2001). Unsurprisingly therefore, quotas for some species are clearly inappropriate in parts of Africa. In Tanzania, species with patchy or limited distributions (e.g., sitatunga *Tragelaphus spekei*, puku *Kobus vardoni*, kudu *Tragelaphus* spp.) should be hunted more conservatively (Caro et al., 1998a), and in southeastern Cameroon, the current off-takes of bongo may be unsustainable (Elkan, 1994; Roulet, 2004a). In Zimbabwe, Grobbelaar and Masulani (2003) suggest that quotas for buffalo and elephant should be reduced to address declining trophy quality, and Loveridge and Macdonald (2002) have suggested that lion quotas should be reduced.

The value of wildlife as trophies creates pressure for the issuance of large and increasing quotas; in Tanzania during the 1990s, for example, hunting areas were split and the original hunting quotas retained for each portion (Baldus and Cauldwell, 2004b). Furthermore, state wildlife departments typically lack resources to enforce existing quotas. In Tanzania, for example, the Director of Wildlife recently issued a plea to hunting operators to respect quotas in light of widespread overshooting (Tanzanian Development Partners Group, 2006). In contrast, in parts of Zambia quotas are under utilised, reducing revenues from hunting and reducing incentives for conservation (ZAWA, 1999).

### 5.4.   Allocating hunting areas

There are problems associated with the process of leasing hunting concessions in some countries with implications for conservation in those areas. In Tanzania, for example, concession areas are not leased on simple market principles; decisions rely on the discretion of a few individuals, resulting in reduced income for the state, nepotism, abuse of authority and corruption (Nshala, 1999). Tanzanian hunting areas are also often under-sold, with the effect that hunting blocks are sub-leased at up to 20 times their original price, resulting in a loss of income for the state (Baldus and Cauldwell, 2004b).

The required contributions of concession area leaseholders to anti-poaching and community development are often vague and poorly enforced (e.g., Zambia, ZAWA, 1999; Baldus and Cauldwell, 2004b). In addition, the anti-poaching efforts of some operators cease at the end of the hunting season leaving a significant period with little or no protection for wildlife (Caro et al., 1998b). Finally, in some instances, leases for concession areas are too short with no guarantee of renewal, reducing the willingness of operators to invest in anti-poaching, wildlife management or community relations (e.g., Mayaka et al., 2004).

### 5.5.   Corruption

Corruption affects the trophy hunting industry in Africa at multiple levels, from government scouts who overlook the overshooting of quotas, to government ministers favouring certain operators when granting concessions (Lewis and Jackson, 2005).

Duckworth (2004b) for example, suggests that corruption is one of the key problems facing trophy hunting in Ethiopia, and alleges that the Ethiopian Professional Hunting Association is used for the sole benefit of the president, to the detriment of other operators.

### 5.6.   Competition with citizen hunting

In some countries, urban citizens are provided with sizeable hunting quotas at greatly subsidised prices, reducing the number of high value trophies that can be sold to foreign trophy hunters, thus reducing incentives for communities to protect wildlife (e.g., Botswana, Botswana Wildlife Management Association, 2001; Baldus and Cauldwell, 2004b; Zambia, ZAWA, 1999). Furthermore, citizen hunting is often poorly supervised and abused (Baldus and Cauldwell, 2004b).

### 5.7.   CITES limitations

In some countries, CITES restrictions on trophy exports impose limitations on revenues from trophy hunting and thus incentives for conservation. In West Africa, for example, several species of key importance for marketing hunting are not on quota (Table 4), which severely limits hunting revenues. Elephant numbers are increasing in Burkina Faso, and legalized hunting of the species would make the country a more attractive hunting destination and permit the derivation of increased revenues from both from trophy fees and from the marketing of longer 15–21 day hunts (Damm, 2004). Elephants hunted in Cameroon are not importable into the US, with the effect that hunting operators routinely fail to utilize elephant quotas, limiting revenues from trophy hunting (Wilkie and Carpenter, 1999).

### 5.8.   Failure to maximize revenues

In Central Africa, trophy fees and daily rates are under priced relative to other parts of Africa limiting incentives for conservation among local people (Wilkie and Carpenter, 1999; Roulet, 2004a). Similarly, daily rates and trophy fees have remained largely static in Zimbabwe during the last decade, and growth in the hunting industry has relied on increasing numbers of hunts and thus increased off-take rates (Booth, 2002; Booth, 2005).

### 5.9.   Hunting bans reducing consumer confidence

In Botswana, the recent ban on lion hunting cost the trophy hunting industry 10% of total revenues (US$1.26 million), and adversely affected community conservation efforts (Peake, 2004b). Likewise, the 2001–2003 ban on trophy hunting in Zambia resulted in an upsurge in poaching due to the removal of incentives for conservation (Lewis and Jackson, 2005). Hunting bans also reduce consumer confidence in affected countries as hunting destinations (Peake, 2004b; Lewis and Jackson, 2005).

### 5.10.   Inadequate regulation of the hunting industry

In some countries in West and Central Africa, and particularly in Cameroon, there is a lack of professionalism among trophy hunting operators due to a lack of formal training, and because concession areas are allocated through a non-transparent procedure which permits hunting by amateur operators (Mayaka et al., 2004). In most countries, operators are not obliged to belong to professional hunting associations or to comply with their standards, making disciplining errant operators difficult (e.g., Zambia, ZAWA, 1999; Booth, 2005). Regulating hunting operators in vast, remote hunting concessions is difficult, particularly given the lack of resources of most African state wildlife departments.

## 6.   Potential solutions to problems affecting the trophy hunting industry

Research into the economic and ecological impacts of trophy hunting in Africa is urgently required. Detailed in-country studies are needed for each nation in which hunting occurs to permit improved assessment of the conservation role of hunting, diagnosis of problems, and the prescription of appropriate, site-specific solutions. For West and Central Africa, investigation into how hunting revenues might be increased is required. For countries where trophy hunting presently does not occur, such as Kenya, in-country assessments of the potential financial gains and conservation positives and negatives would provide a useful basis from which to decide whether to legalise trophy hunting, without relying on input from hunters or northern based animal welfare groups.

Improved monitoring of wildlife populations is necessary to ensure that quotas are sustainable. Where trophy hunting occurs on communal land, simple, repeatable techniques should be used for censuses, and communities should be involved to develop a sense of responsibility for resource management (Taylor, 2001). Greater use should be made of indices such as trophy quality and catch effort to provide a simple and cheap means of determining whether quota sizes are sustainable.

Some of the problems associated with the trophy hunting industry could be addressed by improved enforcement of existing legislation. Improved enforcement could be conducted by state wildlife agencies or by an independent body. We suggest that hunting operators should be forced to belong to state-approved national hunting associations (with representation from mainstream conservation organisations) with the power to remove or suspend hunting licenses in the event of non compliance to hunting legislation. Annual membership levies would be used by the hunting association to monitor compliance to hunting quotas, minimum trophy sizes, use of qualified staff, and contributions to local communities and anti-poaching efforts.

New legislation is also required to tackle some problems associated with trophy hunting. For example, ownership of wildlife should be devolved to communities to permit direct receipt of benefits from hunting and thus create clear incentives for sustainable wildlife management. The provision of ownership of wildlife to private landowners had a rapid and major positive impact on wildlife conservation (Bond et al., 2004). The retention of state-ownership over wildlife in communally owned areas presently constitutes a major barrier to effective wildlife conservation over huge areas. The process of allocating hunting concessions should be made transparent, and based solely on market principles. Concession agreements should include unambiguous and significant minimum contributions to anti-poaching and community development which are subsequently enforced.

Incentives for improved conservation performance by hunting operators should be introduced. One suggestion is the development of a certification system, whereby hunting operators are rated in terms of their commitment to conservation, community development and hunting ethics (Lewis and Jackson, 2005; Packer, 2005; Lindsey et al., 2006). Most hunting clients are concerned that their hunt is conducted in a 'conservation-friendly' manner and would likely select for certified hunting operators (Lindsey et al., 2006). Certification should thus provide an incentive for operators to conduct hunts in a manner more conducive to conservation.

## 7.  Conclusion

Trophy hunting is a major industry in parts of Africa, creating incentives for wildlife conservation over vast areas which otherwise might be used for alternative and less conservation friendly land uses. The trophy hunting industry is increasing in size in southern Africa and Tanzania, and the scope for the industry play a role in conservation should increase accordingly. Presently, however, the conservation role of hunting is limited by a series of problems. Several of these problems are common to multiple countries, and some (such as failure to allocate sufficient benefits to communities, leakage of in-

come and corruption) also affect the photographic ecotourism industry (Christie and Crompton, 2001; Walpole and Thouless, 2005). Developing solutions should thus be a key priority for conservationists, and success would confer large-scale benefits for conservation.

## Acknowledgements

We would like to thank Andrea Turkalo, Debbie Peake, Fiona Maisels, James Culverwell, Jason Roussos (Ethiopian Rift Valley Safaris), Marion Garai, Marianna Louwrens, Michael Carpenter, Jon Barnes and Peter Erb, Sezaneh Seymour, Sonja Meintjes, and Susan James for assistance with information and useful contacts for this study.

## REFERENCES

Adams, W., 2004. Good hunting. In: Adams, W.M. (Ed.), Against Extinction. Earthscan, London, pp. 19–23.
Anon, 2005. Hunting information: Namibia. Presentation at the IV AWCF meeting, Mauritius, 7–9 November, 2005.
Baker, J.E., 1997. Trophy hunting as a sustainable use of wildlife resources in southern and eastern Africa. Journal of Sustainable Tourism 5, 306–321.
Baldry, A., 2004. Zambia. In: Wieland, T. (Ed.), African Hunting Guide 2005/6. Future Publishing, South Africa.
Baldus, R.D., 2005. African wildlife—must it be subsidized. African Indaba 2, 2–8.
Baldus, R., Cauldwell, A., 2004a. Introducing a debate on reform in the safari hunting industry. African Indaba 3, 2–3.
Baldus, R., Cauldwell, A., 2004b. Tourist hunting and its role in development of wildlife management areas in Tanzania. In: Proceedings of the 6th International Game Ranching Symposium, Paris, July 6–9, 2004. International Foundation for the Conservation of Wildlife, Paris.
Barnes, J.I., 2001. Economic returns and allocation of resources in the wildlife sector of Botswana. South African Journal of Wildlife Research 31, 141–153.
Barnes, J.I., De jager, J.L., 1996. Economic and financial incentives for wildlife use on private land in Namibia and the implications for policy. South African Journal of Wildlife Research 26, 37–46.
Bigalke, R.C., 2000. Functional relationships between protected and agricultural areas in South Africa and Namibia. In: Prins, H.H., Grootenhuis, J.G., Dolan, T.T. (Eds.), Wildlife conservation by sustainable use. Conservation Biology Series. Kluwer, London, pp. 169–202.
Bond, I., Child, B., de la Harpe, D., Jones, B., Barnes, J., Anderson, H., 2004. Private land contribution to conservation in South Africa. In: Child, B. (Ed.), Parks in transition. Earthscan, UK, pp. 29–61.
Booth, V., 2002. Analysis of Wildlife Markets (sport hunting and tourism). WWF-SARPO Report, Harare.
Booth, V., 2005. International and Regional Best Practice and Lessons Applicable to Sport and Recreational Hunting in Southern Africa. Department of Environmental Affairs and Tourism, Pretoria, South Africa.
Bothma, J.P., 2002. Some economics of game ranching, In: Penzhorn, B (Ed.), Proceedings of a Symposium on Game Ranch Planning and Management. Onderstepoort, South Africa, 1–2 November, 2002, pp. 23–40.
Botswana Wildlife Management Association, 2001. Economic Analysis of Commercial Consumptive Use of Wildlife in Botswana. Maun, Botswana.

**468**

Caro, T.M., Pelkey, N., Borner, M., Severre, E.L., Campbell, K.L., Huish, S.A., Ole Kuwai, J., Farm, J.P., Woodworth, J.L., 1998a. The impact of tourist hunting on large mammals in Tanzania: an initial assessment. African Journal of Ecology 36, 321–346.

Caro, T.M., Pelkey, N., Borner, M., Campbell, K.L., Woodworth, J.L., Farm, J.P., OleKuwai, J., Huish, S.A., 1998b. Consequences of different forms of conservation for large mammals in Tanzania: preliminary analyses. African Journal of Ecology 36, 303–320.

Causey, D., 2006a. Update on Chad. The Hunting Report, 6 February, 2006. <www.huntingreport.com> (accessed August, 2006).

Causey, D., 2006b. Update on Guinea. The Hunting Report 6 June, 2006. <www.huntingreport.com> (accessed August, 2006).

Central Intelligence Agency, 2006a. Botswana. <https://www.cia.gov/cia/publications/factbook/geos/bc.html> (accessed April, 2006).

Central Intelligence Agency, 2006a. Namibia. <https://www.cia.gov/cia/publications/factbook/geos/bc.html> (accessed April, 2006).

Central Intelligence Agency, 2006a. Tanzania. <https://www.cia.gov/cia/publications/factbook/geos/bc.html> (accessed April, 2006).

Chardonnet, P., 1995. Faune sauvage Africaine, la ressource oubliée, Tomes 1 et 2. CEE/IGF, 699p.

Chardonnet, B., 1999. Perspectives économiques de la chasse dans l'est du Burkina Faso: Résultats et analyse de la saison de chasse 1998–1999. SCAC, Ambassade de France au Burkina Faso, Ouagadougou, 51p.

Chardonnet, P.H., 2002. Conservation of the African Lion: contribution to a Status Survey. IGF/Conservation Force, France/USA.

Chardonnet, P.H., Fritz, H., Zorzi, N., Feron, E. 1995. Current importance of traditional hunting and major contrasts in wild meat consumption in sub-Saharan Africa. In: Bissonete, J., Krausman, P.R. (Eds.), Integrating People and Wildlife for a Sustainable Future. Proceedings of the First International Wildlife Management Conference, Wildlife Society, Bethseda, 715pp.

Child, B., 2000. Application of the southern African wildlife experience to wildlife utilization in Kenya and Tanzania. In: Prins, H.H., Grootenhuis, J.G., Dolan, T.T. (Eds.), Wildlife Conservation by Sustainable Use. Conservation Biology Series. Kluwer, London, pp. 459–468.

Child, B., 2005. Principles, Practice and Results of CBNRM in Southern Africa. <http://sandcounty.net/assets/chapters/assets.pdf> (last accessed February, 2006).

Christie, I.T., Crompton, D.E., 2001. Tourism in Africa. World Bank Africa Region Working Paper Series Number 12. <http://www.worldbank.org/afr/wps/wp12.pdf> (last accessed February, 2006).

Cumming, D.H., 1999. Study on the Development of Transboundary Natural Resource Management Areas in Southern Africa. Biodiversity Support Program, Washington, DC.

Damm, G., 2004. Sustainable use in Burkina Faso. African Indaba 2, 3.

Damm, G., 2005a. Hunting in Namibia in 2004: a summary. African Indaba 3, 4–5.

Damm, G., 2005b. Hunting in South Africa: facts, risks and opportunities. African Indaba 3, 1–14.

Damm, G., 2005c. Zimbabwe. African Indaba 3, 13.

Damm, G., 2005d. Crocodile hunting: Ethiopia. African Indaba 3, 4.

Duckworth, F., 2004a. The mane event. In: Wieland, T. (Ed.), African Hunting Guide 2005/2006. Future Publishing, South Africa.

Duckworth, F., 2004b. Ethiopia. In: Wieland, T. (Ed.), African Hunting Guide 2005/2006. Future Publishing, South Africa.

Elkan, P., 1994. A preliminary survey of Bongo antelope and assessment of safari hunting in the Lobeke region of southeastern Cameroon. WCS, Bronx, New York.

Elliott, J., Mwangi, M., 1998. The opportunity cost of the hunting ban to landowners in Laikipia, Kenya. African Wildlife Foundation, Washington, DC.

Finch, N.A., 2004. The hunting and conservation debate. In: Dryden, G. Craig-Smith, S. (Eds.), Safari Hunting of Australian Exotic Wild Game. Rural Industries Research and Development Corporation Report, Australia, pp. 19–38.

Fitter, R.S., Scott, P.M., 1978. The Penitent Butchers: the Fauna Preservation Society 1903–1978. Collins, London.

Flack, P.H., 2002. Exotic game – catching up with Texas. Magnum, 76–80.

Flack, P.H., 2003. Consumptive tourism – a useful conservation tool. In: Butchart, D. (Ed.), Vision Business Ecotourism and the Environment. Endangered Wildlife Trust, South Africa, pp. 155–157.

Flack, P.H., 2005. Ethiopia: a hunter's perspective. African Indaba 3, 15–18.

Gössling, S., 2000. Tourism a sustainable development option. Environmental Conservation 27, 223–224.

Grobbelaar, C., Masulani, R., 2003. Review of Off-take Quotas, Trophy Quality and Catch Effort Across the Four Main Wildlife Species; Elephant, Buffalo, Lion and Leopard. WWF-SARPO Report, Harare.

Hamman, K., Vrahimis, S., Blom, H., 2003. Can current trends in the game industry be reconciled with nature conservation? In: Damm, G. (Ed.), African Indaba Yearbook 2003. <http://www.africanindaba.co.za> (last accessed January, 2006), pp. 19–38.

Hatton, J., Couto, M., Oglethorpe, J., 2001. Biodiversity and war: a case study of Mozambique. WWF Biodiversity Support Program, Washington, DC.

Hofer, D., 2002. The lions share of the hunt. Trophy Hunting and Conservation: A Review of the Legal Eurasian Tourist Hunting Marketand Trophy Trade Under CITES. TRAFFIC Europe Report, 72pp.

Humavindu, M.N., Barnes, J.I., 2003. Trophy hunting in the Namibian economy: an assessment. South African Journal of Wildlife Research 33, 65–70.

Hurt, R., Ravn, P., 2000. Hunting and its benefits: an overview of hunting in Africa with special reference to Tanzania. In: Prins, H.H., Grootenhuis, J.G., Dolan, T.T. (Eds.), Wildlife Conservation by Sustainable Use. Conservation Biology Series. Kluwer, London, pp. 295–314.

Hutton, J.M., Leader-Williams, N., 2003. Sustainable use and incentive-driven conservation: realigning human and conservation interests. Oryx 37, 215–226.

Kayera, J.A., 2005. Conservation and trophy hunting activities. In: Presentation at the IV AWCF Meeting, Mauritius, 7–9 November, 2005.

Krug, W., 2001. Private Supply of Protected Land in Southern Africa: A Review of Markets, Approaches, Barriers and Issues. Workshop Paper World Bank/OECD International Workshop on Market Creation for Biodiversity Products and Services Paris, 25–26 January, 2001.

Leader-Williams, N., 2000. The effects of a century of policy and legal change on wildlife conservation and utilization in Tanzania. In: Prins, H.H., Grootenhuis, J.G., Dolan, T.T. (Eds.), Wildlife Conservation by Sustainable Use. Conservation Biology Series. Kluwer, London, pp. 219–246.

Leader-Williams, N., Hutton, J.M., 2005. Does extractive use provide opportunities to reduce conflicts between people and wildlife. In: Woodroffe, R., Thirgood, S.J., Rabinowitz, A. (Eds.), People and Wildlife: Conflict or Coexistence. Cambridge University Press, Cambridge, pp. 140–161.

Leader-Williams, N., Milledge, S., Adcock, K., Brooks, M., Conway, A., Knight, M., Mainka, S., Martin, E., Teferi, T., 2005. Trophy hunting of black rhino *Diceros bicornis*: proposals to ensure its future sustainability. Journal of Sustainable Tourism 8, 1–11.

Lewis, D., Alpert, P., 1997. Trophy hunting and wildlife conservation in Zambia. Conservation Biology 11, 59–68.

Lewis, D., Jackson, J., 2005. Safari hunting and conservation on communal land in southern Africa. In: Woodroffe, R., Thirgood, S.J., Rabinowitz, A. (Eds.), People and Wildlife: Conflict or Coexistence. Cambridge University Press, Cambridge, pp. 239–252.

Lindsey, P.A., 2005. A Review of the Economic Contribution of the Trophy Hunting Industry in Africa. Safari Club International Report, Safari Club International, Washington, DC.

Lindsey, P.A., du Toit, J.T., Mills, M.G., 2005. Attitudes of ranchers towards African wild dogs *Lycaon pictus*: conservation implications for wild dogs on private land. Biological Conservation 125, 113–121.

Lindsey, P.A., Alexander, R., Frank, L.G., Mathieson, A., Romañach, S.S., 2006. Potential of trophy hunting to create incentives for wildlife conservation in Africa where alternative wildlife-based land uses may not be viable. Animal Conservation 9, 283–298.

Loveridge, A., Macdonald, D.W., 2002. Impact of trophy hunting – Hwange Zimbabwe. In: Loveridge, A.J., Lynam, T., Macdonald, D.W. (Eds.), Lion Conservation Research, Workshop 2: Modelling Conflict. Wildlife Conservation Research Unit, Oxford.

Loveridge, A., Reynolds, J., Milner-Gulland, E., 2006. Does sport hunting benefit conservation. In: Macdonald, D., Service, K. (Eds.), Key topics in Conservation Biology. Blackwell Publishing, Oxford, UK.

Lubin, R., Lubin, B.C., 2004. Central African Republic. In: Wieland, T. (Ed.), African Hunting Guide 2005/6. Future Publishing, South Africa.

Mayaka, T.B., 2002. Value Wildlife! An Ecological and Economic Assessment of Wildlife Use in Northern Cameroon. Ph.D. Thesis, Leiden University.

Mayaka, T.B., Hendriks, T., Wesseler, J., Prins, H.T., 2004. Improving the benefits of wildlife harvesting in northern Cameroon: a co-management perspective. Ecological Economics 54, 67–80.

Mbwaia, J., 2004. The socio-economic benefits and challenges of a community-based safari hunting Tourism in the Okavango Delta, Botswana. Journal of Tourism Studies 15, 37–50.

MINEF, 2002. Rapports de activities, exercises 1994–1995, 2001–2002, MINEF. Delegation provinciale de l'Est, Delegation departementale du Boumba et Ngoko, Section de la Faune et des aires protogees. Yokadouma, Cameroon.

Murombedzi, J., 1999. Devolution and stewardship in Zimbabwe's CAMPFIRE programme. Journal of International Development 11, 287–293.

Nshala, R., 1999. Granting Hunting Blocks in Tanzania: the Need for Reform. Lawyers' Environmental Action Team. <http://www.leat.or.tz/publications/hunting.blocks> (last accessed April, 2006).

Nuding, M.A., 2002. Wildlife Management in Namibia: the Conservancy Approach. In: O'Riordan, T., Stoll-Kleemann, S. (Eds.), Biodiversity, Sustainability and Human Communities: Protecting beyond the Protected. Cambridge University Press, pp. 189–209.

Packer, C., 2005. Savannas forever: a certification program for lion trophy hunting. African Indaba 3, 7–8.

Patterson, C., Khosa, P., 2005. Background Research Paper: A Status Quo Study on the Professional and Recreational Hunting Industry in South Africa. <http://www.wag.co.za/Canned%20lion/final_draft.htm> (last accessed February, 2006).

Peake, D., 2004a. Botswana. In: Wieland, T. (Ed.), African Hunting Guide 2005/2006. Future Publishing, South Africa.

Peake, D., 2004b. Botswana 2004: a review. African Indaba 3, 7–12.

PHASA, 2006. General hunting information. Professional Hunters Association of South Africa, Centurion, South Africa. Available from: <http://www.phasa.co.za>.

Reilly, T., Reilly, M., Emslie, R., 2004. Transfer of Swaziland's southern white rhino from CITES Appendix I to Appendix II. Pachyderm 37, 102–105.

Renaud, P.C., 2005. Les Zones Cynégétiques Villageoises, analyse Technique et Financière des saisons 2003/2004 et 2004/2005. Agreco/PDZCV, 30 pp.

Rouamba, P., 2002. Bilan de la saison de chasse, Campagne 2001–2002. MECV/DGEF/DPNRFC/RGN, Burkina Faso, 16pp.

Rouget, R., 2004. West-Central Africa: hunting from Benin to Senegal. In: Wieland, T. (Ed.), African Hunting Guide 2005/2006. Future Publishing, South Africa.

Roulet, P.A., 2004a. Chasseur blanc, cœur noir?" La chasse sportive en Afrique centrale. Une analyse de son rôle dans la conservation de la faune sauvage et le développement rural au travers des programmes de gestion de la chasse communautaire. Ph.D. Thesis, Orleans University.

Roulet, P.A., 2004b. Chasse sportive et gestion communautaire de la faune sauvage en Afrique Centrale. Game and Wildlife Science 21, 615–632.

South African Department of Environmental Affairs and Tourism, 2005. Panel of Experts on Professional and Recreational Hunting in South Africa: A Report to the Minister of Environmental Affairs and Tourism. <www.environment.gov.za/Documents/Documents/2005Jun20_1/TORs_for_Research.pdf> (accessed March, 2006).

Tanzanian Development Partners Group, 2006. The wildlife sector with emphasis on hunting. African Indaba 4, 5–8.

Tanzanian Embassy, 2006. Hunting and Wildlife Utilization. <www.tanemb.se/hunting_and_wildlife_utilisation.htm> (accessed August, 2006).

Taylor, R., 2001. Participatory natural resource monitoring and management: implications for conservation. In: Hulme, D., Murphree, M. (Eds.), African Wildlife and Livelihoods. Heinemann, London, pp. 267–279.

Thirgood, S., Mlingwa, Gereta, E., Runyoro, V., Borner, M., Laurenson, K., 2004. Financing conservation in the Serengeti ecosystem. In: Sinclair, A.R. (Ed.), Serengeti III: Biodiversity and Biocomplexity in a Human-Influenced Ecosystem. Chicago University Press, Chicago.

Van der Merwe, C., 2002. Professional hunters and game ranching. In: Penzhorn, B (Ed.), Proceedings of a Symposium on Game Ranch Planning and Management, 1–2 November, 2002. Onderstepoort, South Africa, pp. 83–84.

Walpole, M.J., Thouless, C.R., 2005. Increasing the value of wildlife through non-consumptive use? Deconstructing the myths of ecotourism and community-based tourism in the tropics. In: Woodroffe, R., Thirgood, S.J., Rabinowitz, A. (Eds.), People and Wildlife: Conflict or Coexistence. Cambridge University Press, Cambridge, pp. 122–139.

Weaver, C.L., Skyer, P., 2003. Conservancies: integrating wildlife land-use options into the livelihood, development, and conservation strategies of Namibian communities. In: Paper Presented at the 5th World Parks Congress, September 8–17, Durban, South Africa.

Wilkie, D.S., Carpenter, J.F., 1999. The potential role of safari hunting as a source of revenue for protected areas in the Congo Basin. Oryx 33, 339–345.

ZAWA, 1999. Future Directions for the Safari Hunting Industry of Zambia: at a Crossroad of Opportunity. A Working Group Document to Promote Dialogue and Consensus Among the Key Stakeholders in the Safari Industry of Zambia, in conjunction with WCS.