**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 14-cv-00670-RCL; |
| | ) | 15-cv-01026-RCL (consolidated) |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**SAFARI CLUB INTERNATIONAL AND NATIONAL RIFLE ASSOCIATION OF
AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and L.Cv.R. 7, plaintiffs Safari Club

International and the National Rifle Association of America ("SCI/NRA"), by and through their

counsel, move for summary judgment on all their claims related to the importation ban on sport-

hunted elephants from Zimbabwe (Case No. 14-670, Counts I-V and IX, Third Amended

Complaint, Dkt. 82; Case No. 15-1026, Counts I-V, Complaint, Dkt. 1).  SCI/NRA submit the

following memorandum and attached declarations in support of their motion.  SCI/NRA are

filing a Statement of Material Facts related to their factual assertions on standing, which do not

reference facts in the administrative record.  *See* L.Cv.R. 7(h).  SCI/NRA are also filing a

proposed order.

For the reasons stated in the attached Memorandum, SCI/NRA respectfully request that

this Court grant their Motion for Summary Judgment and deny any cross-motion for summary

judgment filed by any other party.

SCI/NRA request a hearing on this motion.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iv

GLOSSARY ....................................................................................................................... vi

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ..................... 1

I.     INTRODUCTION .................................................................................................... 1

II.    LEGAL BACKGROUND ......................................................................................... 2

III.   FACTUAL BACKGROUND ..................................................................................... 8

IV.    ARGUMENT .......................................................................................................... 14

       A.     For the April 2014 and July 2014 Enhancement Findings, the Service Violated Its
              Own Binding Commitments Concerning Its Process for Changing Enhancement
              Findings and Erred in Its Decision-making ......................................................... 14

              1.     The Service Violated Its Commitments in Adopting the April 2014
                     Importation Ban ................................................................................... 14

              2.     The Service "Lacked" Information Only Because the Service Failed to
                     Request Information from Reliable Sources, Ignored or Misinterpreted
                     Available Information, and Chose to Rely on Erroneous and
                     Unsubstantiated Information in Order to Justify a Foregone Conclusion  18

              3.     The Service Cannot Retroactively Remedy the Illegalities of the April 4,
                     2014 Importation Ban ........................................................................... 25

              4.     The Service's Adoption of the July 2014 Continuation of the Importation
                     Ban Also Was Arbitrary and Capricious ................................................. 27

       B.     In the March 2015 Enhancement Finding, the Service Arbitrarily Determined that
              the Importation of Sport-hunted Elephants from Zimbabwe Did Not Enhance the
              Survival of the Species .................................................................................... 32

       C.     In All Three Decisions, the Service Violated the ESA and APA by Applying
              Prohibited Guidelines and Requiring That Sport-hunting of Elephants Must
              Ensure the Survival of the Species Instead of Simply Enhance It ....................... 39

              1.     The Service Used Illegal Guidelines in Making the Three Enhancement
                     Findings ............................................................................................. 43

              2.     The Service Illegally Required That Sport-hunting of Elephants Ensure the
                     Survival of the Species Instead of Enhance It ......................................... 45

       D.     In All Three Decisions, the Service Violated the APA Requirements for
              Rulemaking that Apply to These Decisions .......................................................... 49

       E.     The Service Illegally Failed to Provide an Adequate Explanation for Maintaining
              an Enhancement of Survival Finding Requirement in the Special Rule Pertaining
              to Trophy Importation of African Elephants on CITES Appendix II .................. 51

F.      The Service Failed to Rebut the Section 9(c)(2) Presumption that Imports of
        Sport-hunted Elephants from Zimbabwe Comply with All ESA Statutory and
        Regulatory Requirements, Including Enhancement ............................................... 55

G.      SCI/NRA Have Standing to Bring These Claims ................................................. 62

V.      CONCLUSION ................................................................................................................ 64

# TABLE OF AUTHORITIES

## Cases

Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037 (D.C. Cir. 1987) ..................................................... 50

Appalachian Power Co. v. EPA, 208 F.3d 1015 (D.C. Cir. 2000) ........................................ 16, 50

Arkema Inc. v. EPA, 618 F.3d 1 (D.C. Cir. 2010) ........................................................................ 26

Bilski v. Kappos, 561 U.S. 593 (2010) ......................................................................................... 58

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) ............................................................ 26

Burlington Truck Lines v. United States, 371 U.S. 156 (1962) .................................................... 53

Chamber of Commerce v. U.S. Dep't of Labor, 174 F.3d 206 (D.C. Cir. 1999) ......................... 16

Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837 (1984) ..................... 56

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) ........................................... 6, 7

Conservation Force v. Salazar, 915 F. Supp. 2d 1 (D.D.C. 2013) ............................................... 60

Defenders of Wildlife v. Norton, 239 F. Supp. 2d 9 (D.D.C. 2002) ............................................... 7

Doe v. Hampton, 566 F.2d 265 (D.C. Cir. 1977) ......................................................................... 16

Elec. Priv. Inf. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d 1 (D.C. Cir. 2011) .................... 16

F.T.C. v. Tarriff, 584 F.3d 1088 (D.C. Cir. 2009) ....................................................................... 45

FCC v. Fox Television Stations Inc., 556 U.S. 502 (2009) .......................................................... 53

Fund for Animals v. Norton, 512 F. Supp. 2d 49 (D.D.C. 2007) ................................................... 7

Gen. Elec. Co. v. EPA, 290 F.3d 377 (D.C. Cir. 2002) ............................................................... 16

Greater Boston Television Corp., v. FCC, 444 F.2d 841 (D.C. Cir. 1970) ................................. 53

Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977) .............................. 64

ITT World Commc'ns Inc., v. FCC, 725 F.2d 732 (D.C. Cir. 1984) .............................................. 7

Lamie v. U.S. Tr., 540 U.S. 526 (2004) ....................................................................................... 56

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .................................................................. 62

Manufactured Hous. Inst. v. EPA, 467 F.3d 391 (4th Cir. 2006) ................................................ 17

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29
    (1983) ............................................................................................................................ 7, 24, 53

N. States Power Co., v. Rural Electrification Admin., 248 F. Supp. 616 (D. Minn. 1965) .......... 17

Padula v. Webster, 822 F.2d 97 (D.C. Cir. 1987) ....................................................................... 16

Peyton v. Reynolds Assocs., 955 F.2d 247 (4th Cir. 1992) .......................................................... 58

Pub. Emps. Ret. Sys. of Ohio v. Betts, 492 U.S. 158 (1989) ....................................................... 58

Safari Club Int'l v. Babbitt, 1993 WL 13932673 (W.D. Tx. 1993) .............................................. 61

Safari Club Int'l v. Babbitt, Civ. No. 91-2523 (D.D.C., filed Oct. 8, 1991) .................... 40, 41, 42

Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506 (D.C. Cir. 1983) ................. 7

Sorenson Comm'ns Inc. v. FCC, 755 F.3d 702 (D.C. Cir. 2014) ................................................... 7

Sw. Power Pool Inc. v. F.E.R.C., 736 F.3d 994, 995 (D.C. Cir. 2013) ....................................... 53

Syncor Int'l Corp. v. Shalala, 127 F.3d 90 (D.C. Cir. 1997) ....................................................... 54

U.S. v. One Etched Ivory Tusk of African Elephant, 871 F.Supp.2d 128 (E.D.N.Y. 2012) ........ 61

United States v. Nixon, 418 U.S. 683 (1974) ............................................................................... 53

Vitarelli v. Seaton, 359 U.S. 535 (1959) ..................................................................................... 16

Williams v. Taylor, 529 U.S. 420 (2000) ..................................................................................... 45

## Statutes

5 U.S.C. §551(4) ....................................................................................................................... 6, 26

5 U.S.C. §553 ............................................................................................................... 6, 49, 53, 55

5 U.S.C. §702 ................................................................................................................................... 6

5 U.S.C. §706 ................................................................................................ 6, 55
16 U.S.C. §1533(a)(1) ........................................................................................ 2
16 U.S.C. §1533(d) .............................................................................. 2, 26, 52
16 U.S.C. §1538(a)(1)(A) ................................................................................... 2
16 U.S.C. §1538(a)(1)(G) ................................................................................... 2
*16 U.S.C. §1538(c)(2) ....................................................................... 3, 4, 56, 58
16 U.S.C. §1538(c)(2)(A) ................................................................................. 60
16 U.S.C. §4202(9) .............................................................................................. 2

**Treatises**

27 U.S.T. 1087; T.I.A.S. 8249, Mar. 3, 1973 ..................................................... 3
CITES text, Article III ........................................................................................ 5
CITES text, Article IV ........................................................................................ 3
*Res. Conf. 2.11 ....................................................... 5, 40, 41, 42, 43, 45, 51

**Regulations**

50 C.F.R. §17.11 ................................................................................................ 4
50 C.F.R. §17.31 .............................................................................................. 60
50 C.F.R. §17.31(a) .......................................................................................... 60
50 C.F.R. §17.32 ........................................................................................ 40, 59
50 C.F.R. §17.40(e)(3)(iii) ..................................................................... 4, 26, 51
50 C.F.R. §17.40(e)(3)(iii)(C) .......................................................................... 40
50 C.F.R. §17.8(b) ...................................................................................... 4, 58
50 C.F.R. §23.1 ................................................................................................. 3
50 C.F.R. §23.4 ................................................................................................. 3

**Federal Register Notices**

43 Fed. Reg. 20499 (May 12, 1978) ...................................................... 4, 57, 59
46 Fed. Reg. 37059, 37060 (July 17, 1981) ................................................... 40
47 Fed. Reg. 31384 (July 20, 1982) ............................................................ 4, 57
55 Fed. Reg. 5847 (Feb. 20, 1990) ...................................................... 5, 39, 57
56 Fed. Reg. 11392 (Mar. 18, 1991) ............................................................... 55
*57 Fed. Reg. 35473 (Aug. 10, 1992) ............................... 4, 5, 46, 49, 51, 57
58 Fed. Reg. 7813 (Feb. 9, 1993) .................................................. 8, 40, 41, 43
60 Fed. Reg. 12969 (Mar. 9, 1995) ...................................... 40, 41, 42, 46
*62 Fed. Reg. 44627 (Aug. 22, 1997) ...................................................... 6, 8, 14
66 Fed. Reg. 27601, 27609 (May 18, 2001) ..................................................... 8
73 Fed. Reg. 28212, 28242 (May 15, 2008) ................................................... 60
79 Fed. Reg. 26986 (May 12, 2014) .......................................................... 11, 15
79 Fed. Reg. 44459 (July 31, 2014) ................................................................ 12
80 Fed. Reg. 42524 (July 17, 2015) ................................................................ 64
80 Fed. Reg. 47418, 47424 (Aug. 7, 2015) .................................................... 54

**Other Authorities**

http://www.merriam-webster.com/dictionary/enhance ................................... 45
http://www.merriam-webster.com/dictionary/supersede?show=0&t=1409851627 .................... 27

* Authorities chiefly relied on.

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| April 2014 Enhancement Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (dated April 17, 2014) |
| AR | Administrative Record in the district court for the Zimbabwe importation ban decisions |
| CAMPFIRE | Zimbabwe's Communal Areas Management Programme for Indigenous Resources |
| CITES | Convention on International Trade in Endangered Species of Wild Fauna and Flora |
| COP | CITES Conference of the Parties |
| Decl. | Declaration |
| Dkt. | Docket |
| Elephant Survey | Pan African Aerial Elephant Survey |
| ESA | Endangered Species Act |
| Federal Defendants | Federal Defendants Secretary of the Interior, Sally Jewell *et al*. |
| Internal guidelines | Guidelines that the Service previously used to evaluate importation applications for sport-hunted elephants. They were withdrawn in 60 Fed. Reg. 12969 (Mar. 9, 1995) |
| IUCN | International Union for Conservation of Nature |
| IUCN Report | Report from the African Elephant Database entitled "Zimbabwe, 2012 ('2013 Africa' analysis)" |

| | |
|---|---|
| July 2014 Enhancement Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (dated July 22, 2014) |
| March 2015 Enhancement Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015 |
| MIKE | Monitoring the Illegal Killing of Elephants |
| PIKE | Proportion of Illegally Killed Elephants |
| SCI/NRA | Safari Club International and the National Rifle Association of America |
| Service | United States Fish and Wildlife Service |
| Special Rule | Regulation that provides criteria for the importation of legally hunted African elephants into the United States.  50 C.F.R. §17.40(e). |
| ZPWMA | Zimbabwe Parks & Wildlife Management Authority |
| ZPWMA Response | April 17, 2014 Response to Questions Raised by the United States Fish and Wildlife Service to Address the USA Endangered Species Act |
| 1997 Enhancement Finding | 1997 Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe, July 2, 1997 |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

After decades of allowing the importation of sport-hunted African elephants from Zimbabwe, on April 4, 2014, defendant U.S. Fish and Wildlife Service ("Service") abruptly and without warning suspended such imports.  The Service's purported reasoning was that it believed it could not make a finding that the sport hunting of African elephants in Zimbabwe enhances the survival of the species.  The Service subsequently continued this finding in July 2014, and made a new negative decision in March 2015 for 2015 and beyond.  In doing so, the Service and other Federal Defendants violated the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA") by (1) relying initially on the absence of data, not complying with their own binding commitments concerning the making of such findings, making implausible scientific conclusions, and failing to consider all relevant factors related to these decisions; (2) applying illegal guidelines and standards that the hunting associated with the importation had to ensure the survival of the species instead of simply enhance it; (3) violating APA notice and comment requirements for such decision-making; (4) failing to explain why the enhancement finding in the rule governing elephant importation is necessary and advisable, especially when the treaty regulation after which the elephant rule was modeled no longer required enhancement; and (5) failing to rebut the statutory presumption that imports of elephants from Zimbabwe complied with all statutory and regulatory requirements, including enhancement.

Assuming such an assessment was necessary to allow imports, a proper examination of all relevant factors and adherence to proper procedures would have revealed that sport hunting of elephants in Zimbabwe enhances the survival of the species by providing resources for conservation, deterring poaching, financing habitat management, bringing resources into local

1

communities, and increasing social tolerance for elephants.  The Service arbitrarily and capriciously failed to reach these conclusions.

## II.      LEGAL BACKGROUND

### A.      The ESA and CITES

The ESA provides the Service with the authority to classify African elephants as a threatened species.  16 U.S.C. §1533(a)(1).  The ESA does not prohibit the importation of sport-hunted animals designated as threatened.  16 U.S.C. §1538(a)(1)(A) (prohibitions apply to endangered species).  Instead, the ESA authorizes the Service to promulgate regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

Section 4(d) of the ESA authorizes the Service to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the Service may not issue regulations without specifically determining that they are "necessary and advisable" for conservation.

In the African Elephant Conservation Act of 1989, Congress adopted legislation focused on the conservation of the species.  Congress singled out the hunting and importation of African elephants as acts that benefit the survival of the species.  Congress specifically found that "there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."  16 U.S.C. §4202(9).

The Service's regulation of the importation of African elephants relies on decisions made by both Congress, through the authority given to the Service in the ESA, and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") parties, through

resolutions and other decisions.  50 C.F.R. §23.1.  CITES is an international agreement between

182 different governments, including the United States and Zimbabwe.  27 U.S.T. 1087; T.I.A.S.

8249, Mar. 3, 1973.  During conferences held between the party members to the treaty, the parties

agree upon decisions and adopt resolutions designed to ensure that international trade in

specimens of wild animals and plants does not threaten the survival of those species.

CITES lists species in three appendices according to the degree of protection they need.

African elephants from Zimbabwe are on CITES Appendix II.  This Appendix includes species

that the parties to CITES have determined are not presently threatened with extinction, but may

become so if their trade is not regulated.  Appendix II also includes species that the parties to

CITES consider in need of being regulated so that trade in certain other Appendix I or II species

may be effectively controlled.  50 C.F.R. §23.4.

The ESA and CITES direct the Service to treat species classified as threatened under the

ESA differently depending on whether the species are listed on CITES Appendix I or II.  CITES

requires that exporting countries make findings that the proposed trade of species on CITES

Appendix II will not be detrimental to the survival of the species (called a non-detriment

finding).  CITES does not require that the importing country make a non-detriment finding for

species listed on Appendix II, such as elephants from Zimbabwe.  CITES text, Article IV.

For species classified as threatened that are also listed on CITES Appendix II, where the

take and exportation of the species comply with all CITES provisions and requirements, a

presumption exists that the importation of the species for non-commercial purposes does not

violate the ESA or any regulation adopted pursuant to the ESA.  Section 9(c)(2), 16 U.S.C.

§1538(c)(2).  The Service's regulation that implements Section 9(c)(2) allows imports of

threatened species if, among other things, "[t]he species is listed in Appendix II of the

3

Convention." 50 C.F.R. §17.8(b).  The provision, however, is purportedly subject to exception "as provided in a special rule" (such as the elephant Special Rule described below).  *Id.*  This regulation does not explain why the conditions of any special rule are not ***also*** subject to the presumption, as Section 9(c)(2) expressly applies the presumption also to "any regulation issued pursuant to the [ESA]."  16 U.S.C. §1538(c)(2).

 In 1978, the Service listed all African elephants as threatened under the ESA and adopted a rule that regulated the importation and interstate commerce of African elephants ("Special Rule").  43 Fed. Reg. 20499 (May 12, 1978); 50 C.F.R. §17.11.  The Service amended the Special Rule in 1982 and again in 1992.  47 Fed. Reg. 31384 (July 20, 1982); 57 Fed. Reg. 35473 (Aug. 10, 1992).  The Service's current Special Rule for elephants establishes conditions for the importation of sport-hunted elephants.  50 C.F.R. §17.40(e)(3)(iii).

> Sport-hunted trophies may be imported into the United States provided:
>
> (A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;
>
> (B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;
>
> (C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and
>
> (D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

When the Service initially listed the African elephant as threatened, all African elephants were listed on CITES Appendix II.  At the seventh CITES Conference of the Parties ("COP") in

1989, CITES transferred all African elephants to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved."  CITES text, Article III(3)(a).  In 1992, when the Service amended the Special Rule, it included provisions to continue to allow the importation of sport-hunted elephants as long as CITES Appendix I requirements were fulfilled, including that the take of the elephant to be imported must enhance the survival of the species.  57 Fed. Reg. at 35485.  At the time, the CITES resolution regarding the trade of sport-hunted trophies of Appendix I specimens, Res. Conf. 2.11, recommended that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  *See* AR249 at 5561 (Annex 1).[1]  The Service made sure that the Special Rule matched the CITES enhancement of survival requirement.

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final revised special rule for the import of sport-hunted trophies from threatened populations that are on CITES appendix I.

57 Fed. Reg. at 35485.[2]  Thus, the Service's apparent sole reason for including the enhancement of survival requirement was the parallel CITES obligation.

At the ninth CITES COP in 1994, the parties to CITES amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement *entirely* from the resolution.  *See* AR249 at 5559-63.  As a result, from that point forward, CITES no longer required an

---

[1] Because Res. Conf. 2.11 was later amended, the original text is not available as a stand-alone document.  CITES Doc. 9.50 – the document that introduced the proposed amendment to the resolution – is in the Administrative Record and contains the language of the original resolution in Annex 1.

[2] The Federal Register notice accompanying the special rule noted that sport-hunting "provide[s] important revenues for elephant conservation to range states."  *Id*.

enhancement of survival determination for the importation of sport-hunted species listed on either Appendix I or Appendix II and, therefore, did not require this finding for elephants from Zimbabwe. In addition, in 1997, CITES changed the listing status of African elephants from Zimbabwe from Appendix I to Appendix II. *See* Chart in 62 Fed. Reg. 44627 (Aug. 22, 1997). For both these reasons, CITES no longer imposed an enhancement of survival requirement to import elephants from Zimbabwe.

### B.      The Administrative Procedure Act

The APA provides for judicial review of final agency action by persons "aggrieved" by the action. 5 U.S.C. §702. It also provides standards applicable when a federal agency proposes and adopts final rules and regulations. Those standards include formal notice of the proposed rulemaking and an opportunity to participate in the rulemaking by providing comments through the submission of data, views and/or arguments. 5 U.S.C. §553; *id.* §551(4). The APA authorizes a reviewing court to:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. §706.

### C.      Standard of Review

The APA standard of review requires a thorough, probing, in-depth review of the challenged decisions. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971) (*abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977)). An agency decision is arbitrary and capricious and must be vacated where the agency (1) relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect

of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* 5 U.S.C. §706(2)(a); *Overton Park*, 401 U.S. at 824 (agency acts in an arbitrary and capricious manner by making a choice without considering the relevant factors); *Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 707-08 (D.C. Cir. 2014) (court vacated rule because it was "mystifying" and deserved no deference because "judgement[s] must be based on some logic and evidence, not sheer speculation.") (citation omitted).

Further, the "agency's reasons and policy choices" must "conform to 'certain minimal standards of rationality.'" *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 17 (D.D.C. 2002) (quoting *Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506, 521 (D.C. Cir. 1983) (citation omitted)).  To survive an "arbitrary and capricious" challenge, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Fund for Animals v. Norton*, 512 F. Supp. 2d 49, 53 (D.D.C. 2007) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  Even if some kind of deferential review applies, a court cannot uphold a decision if the agency did not consider all the relevant concerns in reaching that decision.  *ITT World Commc'ns Inc., v. FCC,* 725 F.2d 732, 741–42, 755 (D.C. Cir. 1984).

### III.     FACTUAL BACKGROUND[3]

African elephants (*loxodonta Africana*) are found throughout much of Africa, but the majority live in southern and eastern Africa, including Zimbabwe.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  62 Fed. Reg. at 44633; 66 Fed. Reg. 27601, 27609 (May 18, 2001).  All other African elephants are listed on Appendix I of CITES.  62 Fed. Reg. at 44633.

At least as early as 1990, the Service has made findings that have allowed the importation of sport-hunted elephants from Zimbabwe.  *See* 58 Fed. Reg. 7813 (Feb. 9, 1993).  In 1997, the Service perceived a need to make an enhancement finding and made a positive one for African elephants from Zimbabwe.  62 Fed. Reg. at 44633; AR22 ("1997 Enhancement Finding").  Until April 4, 2014, the Service continued to allow the importation of legally sport-hunted elephants from Zimbabwe based on the 1997 Enhancement Finding.  The Service never changed or showed any signs of changing its long-held position that the sport-hunting of elephants in Zimbabwe enhanced the survival of the species.

On April 4, 2014, the Service announced, in a press release posted on the U.S. Fish and Wildlife Service website, an immediate suspension of the importation of sport-hunted African elephants taken in Zimbabwe during the 2014 calendar year.  April 2014 AR196 at 3021.  The Service gave no prior notice of this decision to the public, did not publish notice of the suspension in the Federal Register and did not provide a comment opportunity.  Neither the press

---

[3] Additional factual statements based on the Administrative Record ("AR") and other sources are found throughout the Argument section of this brief.  In addition, facts establishing SCI/NRA's standing are alleged in the standing section and in the accompanying Statement of Material Facts.  Unless otherwise noted, the AR citations are to the March 2015 Enhancement Finding Administrative Record, which incorporates most of the documents contained in the Administrative Records from the April and July 2014 decisions.  The page numbers refer to the AR page numbers, not the original pagination of each document.

release nor the Questions and Answers page the Service posted on its website, both of which were published on April 4, 2014, analyzed the role that hunting plays in the conservation of Zimbabwe's elephants. *Id.*; April 2014 AR195. Neither indicated that the Service had sought or obtained any data or evidence from the Scientific or Management Authorities of Zimbabwe to support the importation ban.[4]

The Service based its importation ban decision on the "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014" ("April 2014 Enhancement Finding") prepared by the Service's Management Authority (Branch of Permits). AR102. The April 2014 Enhancement Finding's bibliography listed only two anonymous 2009 publications. *Id.* at 3823. The only other source of information cited was an International Union for Conservation of Nature, Species Survival Commission report from the African Elephant Database entitled "Zimbabwe, 2012 ('2013 Africa' analysis)" ("IUCN Report"). *Id.* at 3820.

The Service claimed that it had been unable to make a positive enhancement finding for Zimbabwe elephant importation due to a "lack of information" about the status of elephants and the management of elephants in Zimbabwe. AR74 at 3604. In actuality, the Service's purported lack of information resulted from the fact that the Service had not made any type of formal request for information from Zimbabwe Parks and Wildlife Management Authority ("ZPWMA") since March 21, 2007. AR102 at 3819. Instead of asking ZPWMA for information with which to make its finding, the Service waited until after imposing the importation ban on April 4, 2014 to request "the most current information on African elephants" from the ZPWMA. AR74.

---

[4] By April 17, 2014, the Service had already found need to correct its April 4th decision. After discovering that it had erroneously assumed that Zimbabwe's hunting season started on May 1st and that instead the season had actually commenced on January 1st, the Service was forced to correct its April 4, 2014 Enhancement Finding to reflect, among other changes, that the importation ban did not apply retroactively to elephants taken prior to April 4th. AR102 at 3818.

ZPWMA responded promptly on April 17, 2014 with a 32-page report entitled "Response to Questions Raised by the United States Fish and Wildlife Service to Address the USA Endangered Species Act" ("ZPWMA Response"). AR7. The ZPWMA Response referenced multiple attachments, including recent aerial surveys, management plans, statutes and regulations.

To make its April 2014 Enhancement Finding, the Service chose not to seek data from the most reliable source – the country whose elephants were at issue – and instead based its finding almost exclusively on the IUCN Report. AR102 at 3820-21. The Service also cited a 2013 poaching incident in Hwange National Park as a major reason for its decision to ban importation. *Id.* at 3819. After imposing the ban, the Service learned from the ZPWMA Response that the unsubstantiated reports on which the Service had relied had greatly exaggerated the numbers of elephants involved in the Hwange incident. AR7 at 1936.

The ZPWMA Response also addressed the major role that the hunting community had played in the apprehension of the poachers involved in the Hwange National Park incident. ZPWMA explained that a hunting outfitter first discovered evidence of the poachers and the outfitter helped fund the effort that resulted in the capture of the poachers:

> The Government of Zimbabwe reacted swiftly to the unprecedented elephant poisoning incident in Hwange National Park in 2013. *A private sector driven fund raising initiative was set up* which has to date managed to mobilize 21 vehicles, communication and field equipment for enhanced law enforcement. The ZPWMA has increased manpower level for Hwange and other protected areas through a massive recruitment drive. The police and the judiciary also actively collaborated with the ZPWMA in apprehending all 35 poachers that were involved in the elephant poisoning.

AR7 at 1937 (emphasis added).

On May 12, 2014, the Service published a Federal Register notice that announced the April 2014 decision to ban the importation of sport-hunted elephants from Zimbabwe. 79 Fed.

10

Reg. 26986 (May 12, 2014).  The Service admitted that its April 2014 decision for Zimbabwe was based on limited data and anecdotal evidence.  *Id.* at 26987.  The Service further implicitly admitted that it had failed its obligation (1) to base any change in its enhancement finding for Zimbabwe and decision on importation on "new information" and (2) to publish that change in the Federal Register.  *Id.* at 26986.

In the May 12, 2014 Federal Register notice, the Service characterized the April 4, 2014 importation ban decision and April 17, 2014 corrected decision for Zimbabwe as "temporary" and "interim" and promised to expeditiously issue a new decision about whether to lift the importation ban for Zimbabwe.  *Id.* at 26987.  The Service did not identify the decision as temporary when it first announced and implemented it on April 4, 2014.  The Service also did not offer any authority for issuing and implementing a so-called "temporary" determination or withdraw its illegal importation ban pending its forthcoming decision.  The Service also failed to announce a formal public comment period to give the interested public their legally mandated opportunity to provide meaningful input into the decision-making.

On July 23, 2014, the Service announced its new decision not to lift the importation ban for Zimbabwe on its website.  http://www.fws.gov/news/ShowNews.cfm?ref=service-confirms-suspension-of-the-import-of-elephant-trophies-from-zimbabw&_ID=34433, *last visited* Feb. 15, 2016.  The Service released a new "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014" ("July 2014 Enhancement Finding") and claimed that the new finding "supercede[d]" the April 4, 2014 Enhancement Finding.  AR206 at 4505.  The July 2014 Enhancement Finding stated that the Service was unable to make a finding that the importation of sport-hunted elephants from Zimbabwe enhances the survival of the species.  AR206.

On July 31, 2014, the Service published a notice in the Federal Register of the July 2014 Enhancement Finding and its decision to continue the importation ban. 79 Fed. Reg. 44459 (July 31, 2014). Although the Service had solicited and received data from Zimbabwe and had accepted it from other sources for the purpose of making its July 2014 decision, the Service again made its negative finding based on a "lack of information" rather than on "new data" as its 1997 commitment required. AR206 at 4509-11. Instead of fully acknowledging the information provided by ZPWMA and others, the Service largely ignored, rejected or discounted it. *Id.* at 4510.

The July 2104 Enhancement Finding included no discussion about how the loss of revenue attributable to the ban's impact on U.S. hunters coming to Zimbabwe would affect ZPWMA's and other stakeholders' available resources and ability to manage elephant populations or fight against poaching. *Id.* at 4511. Instead of acknowledging evidence of the benefits provided by hunters and hunting businesses, the Service concluded that it had received no evidence to "support[] the belief that without hunters, specifically U.S. elephant hunters, that poaching in Zimbabwe would become rampant." *Id.* at 4513.

When addressing the role that sport-hunters and sport-hunting businesses play in elephant conservation in Zimbabwe, the July 2014 Enhancement Finding acknowledged that "it is clear that outstanding conservation work is being carried out in some areas that is funded solely or in major portions by private individuals or companies" and that these "pockets of conservation are greatly needed." *Id.* at 4516. The Service summarized its position on whether the harvest of elephants in Zimbabwe enhances the survival of the species as follows:

> There are clearly "bright spots" of elephant conservation efforts, carried out by non-governmental entities, scattered around Zimbabwe that are providing a benefit to elephants. However, there are not enough of these "bright sports" to

> overcome the problems currently facing Zimbabwe elephant populations and to
> support a finding that sport hunting is enhancing the survival of the species.

*Id.* at 4517.  In this summary, the Service acknowledged that hunters and hunting were providing

some "enhancement" to the survival of Zimbabwe's elephants.  Nevertheless, the July 2014

Enhancement Finding stated that, based on the Service's view of "enhancement," the importation

of sport-hunted elephants does not do enough to enhance the survival of the species.

In December 2014, Zimbabwe provided the Service with a substantial amount of

additional factual materials concerning elephants in that country, including information about

sport-hunting, anti-poaching, and conservation efforts.  AR275-77.  Throughout 2014 and the

first few months of 2015, groups and individuals provided the Service with substantial additional

factual materials concerning elephants in Zimbabwe.  For example, Safari Club International sent

a letter on January 23, 2015, detailing why the Service should make a positive enhancement

finding, and included documents relevant to Zimbabwe's Communal Areas Management

Programme for Indigenous Resources ("CAMPFIRE") and anti-poaching efforts in Zimbabwe.

AR325.  Another hunting/conservation group submitted several comments opposing the negative

enhancement finding, with extensive supporting documentation.  AR247-49 (Comments with

863 pages of attachments at AR248-249).[5]

On March 26, 2015, the Service adopted and issued the "Enhancement Finding for

African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015."

("March 2015 Enhancement Finding").  Despite its receipt of significant information addressing

all of its concerns, the Service determined that "it is unable to make a finding that the killing of

elephants in Zimbabwe, on or after January 1, 2015, whose trophies are intended for importation

into the United States, would enhance the survival of the African elephant in the wild."  AR344

---

[5] The voluminous attachments to these comments will not be included in the Appendix.

at 7246.  In making this finding, the Service ignored and/or misinterpreted information that directly undermined the Service's conclusions about the status of Zimbabwe's elephant populations and about the Service's inability to make a positive enhancement finding.  The Service indefinitely continued the ban on the importation of these elephants.

## IV.   ARGUMENT

### A.   For the April 2014 and July 2014 Enhancement Findings, the Service Violated Its Own Binding Commitments Concerning Its Process for Changing Enhancement Findings and Erred in Its Decision-making

#### 1.   The Service Violated Its Commitments in Adopting the April 2014 Importation Ban

When the Service announced its decision to end the importation of elephants from Zimbabwe on April 4, 2014, it violated its own binding commitments about how such decisions would be made, announced, and implemented.  The Service violated those commitments by (1) failing to publish in the Federal Register its change in position on importation; (2) implementing the importation ban on the very day it announced the ban; and (3) basing its decision to impose the ban on the alleged absence of data, rather than on the existence of new data.

On August 22, 1997, the Service published a Federal Register notice, explaining that it had made a finding that the harvest of elephants from Zimbabwe enhances the survival of the species and that its finding would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register."  62 Fed. Reg. at 44633.  In it, the Service made three commitments to the public: (1) to base any change to the 1997 Enhancement Finding and/or compliance with the conditions of the Special Rule on "new information;" (2) to keep the 1997 Enhancement Finding and importation authorization in effect until the Service published notice of a change in the Federal Register; and (3) to use the Federal Register to announce any change.

14

When it adopted the April 4, 2014 importation ban, the Service completely ignored the obligations required by the commitments it made in 1997.  Instead of changing its position on enhancement due to "new information," the Service reversed its position based on an asserted "lack of information" about the status of elephants or the management of elephants in Zimbabwe.  AR74 at 3604.

Instead of keeping the 1997 Enhancement Finding in effect until it "published a notice of any change in the Federal Register," the Service did not publish the decision in the Federal Register and instead simply announced the ban on its website and implemented it on the day of that announcement.  April 2014 AR196 at 3021.  And instead of publishing a Federal Register notice of its change in position, the Service planned only to utilize its website, letters and phone calls to announce the ban.  The Service's "Full Communication Strategy" for the importation ban reveals that it had no intention of preparing a Federal Register notice to announce the ban.  AR90.  The Service did not publish a Federal Register notice until SCI/NRA filed the original complaint in Case No. 14-670 and specifically challenged the Service's failure to meet its commitments.  On May 12, 2014, the Service finally published a Federal Register announcement of its changed position on enhancement and its decision to impose the ban.  79 Fed. Reg. 26986.

Despite acknowledging, in the May 12th notice, its commitment to publish in the Federal Register, the Service did not simultaneously acknowledge its 1997 promise not to ***implement*** changes to its enhancement position until it published the change in the Federal Register.  Consequently, the Service did not revise the implementation date of the importation ban to May 12, 2014 to coincide with the Federal Register publication date.

These failures violated the binding agency commitments in the 1997 Federal Register notice.  "It is well settled that an agency, even one that enjoys broad discretion, must adhere to

voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) (citing *Vitarelli v. Seaton,* 359 U.S. 535, 539 (1959)).  Whether an agency pronouncement constitutes a binding agency commitment is "ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Id.* (quoting *Doe v. Hampton,* 566 F.2d 265, 281 (D.C. Cir. 1977)).

Often, the very language of the pronouncement informs the court's decision as to whether the commitment is "binding."  This Circuit's cases "make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA,* 290 F.3d 377, 383 (D.C. Cir. 2002) (internal citation omitted); *see also Chamber of Commerce v. U.S. Dep't of Labor,* 174 F.3d 206, 212-13 (D.C. Cir. 1999).  It is enough for the agency's statement to "purport to bind" those subject to it, that is, to be cast in "mandatory language" so "the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *Gen. Elec.,* 290 F.3d at 383–84; *see also Elec. Priv. Inf. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) (imposition of new TSA screening technology that would project unclothed image of airline passengers had sufficiently binding impact on privacy interests of public to invoke APA requirements).

> If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000).

The Service's decision to publish in the Federal Register its promises to the public about future conduct concerning changes to the 1997 Enhancement Finding demonstrates the binding

nature of those promises.  Nothing in the 1997 Federal Register notice suggests that the Service

made such promises without the intent to abide by them:

> Publication in the Federal Register naturally implies to plaintiffs and the public in
> general something more than a mere statement of internal agency affairs not
> affecting the public. If the burden is on anyone to communicate clearly some
> other intent in the publication of a statement in the Federal Register, it must be
> with those making the publication.

*N. States Power Co., v. Rural Electrification Admin.*, 248 F. Supp. 616, 623 (D. Minn. 1965).

Courts have recognized the binding nature of commitments published by an agency in the

Federal Register, whether or not the agency codifies its commitments in the Code of Federal

Regulations.  *Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 399 (4th Cir. 2006).

The 1997 Federal Register notice used mandatory language as opposed to discretionary

terms.  It contained no options or alternatives.  The Service imposed upon itself commitments to

inform the public of changes in its decision-making in a very specific way.  In doing so, it

established the regulated public's expectation that the 1997 Enhancement Finding would be in

effect until the Service complied with its own established process for changing that status.  The

language the Service used in 1997, the implications of its promises, the prominent publication of

the commitments in the Federal Register, and the reliance of the regulated public on those

pronouncements confirm that the Service created binding agency obligations.

Consequently, the 1997 Federal Register notice provided the only published source of

information on which the public could reasonably rely for making plans to travel to Zimbabwe

for elephant hunting.  Until the Service fully implemented the process to which it had bound

itself in the 1997 Federal Register notice, hunters could expect to legally import their elephants.

For these reasons, the Service's failure to comply with its own binding commitments concerning

making, announcing and implementing decisions to reverse its 1997 Enhancement Finding for

the importation of Zimbabwe elephants renders the April 2014 Enhancement Finding invalid.

> **2.    The Service "Lacked" Information Only Because the Service Failed to Request Information from Reliable Sources, Ignored or Misinterpreted Available Information, and Chose to Rely on Erroneous and Unsubstantiated Information in Order to Justify a Foregone Conclusion**

One of the Service's three 1997 commitments was to base any change in its position on

"new information."  Not only did the Service not comply with this commitment when it made the

April 2014 Enhancement Finding, but the Service took actions that prevented it from obtaining

the new information.  The Service's rationale for its April 2014 decision was that it lacked

sufficient information to make a finding that sport hunting of elephants enhances the survival of

the species.  AR74 at 3604.  In a draft set of talking points, the Service summarized its position

as: "we have very little substantive information.  For the most part, we are starting from ground

zero."  AR61 at 3559; *see also* AR110 ("For Zimbabwe, we just had no information, so a broad

request was necessary.")

The Service asserted this justification despite being well aware of the source and

availability of that information – the government of Zimbabwe.  In fact, it was not until April 4,

2014 – the very day that it suspended importation from Zimbabwe – that the Service first notified

Zimbabwe's wildlife management authority of its need for information and of its decision to ban

importation based on a lack of information.  The Administrative Record shows that the Service

very consciously planned not to inform and/or request information from Zimbabwe until the date

it intended to implement the ban, when it was too late for Zimbabwe to provide the information

to prevent the ban.  The Service's "Full Communications Strategy" identified April 4th as the

date on which the Service intended to first write to the Zimbabwean government about the

importation ban decision.  AR90 at 3662.  In accordance with that plan, on April 4, 2014, the

Service sent a letter to ZPWMA, notifying it of the implementation of the ban and requesting

data about the status of Zimbabwe's elephants.  AR74.[6]

The April 2014 Enhancement Finding insinuated that Zimbabwe was to blame for the

Service's professed lack of information by accusing Zimbabwe of failing to provide any new

data since 2007:

> Service representatives have met in person with Zimbabwe representatives at
> various times in the past 6 years, usually in the context of conventions of hunting
> organizations in the United States.  No new or additional information has been
> provided during those meetings.

AR102 at 3819.  In truth it was ***the Service*** that never asked for new or additional data

and never gave Zimbabwe any inkling that there was any need for such data.  Nothing in

the Administrative Record even suggests that the Service had ever informed Zimbabwe

that continued elephant importation would be jeopardized in the absence of such

information.  Similarly, nothing in the Administrative Record suggests that Zimbabwe

would have any reason to believe that the Service would change its position without at

least notifying Zimbabwe of a problem and asking for data.

In fact, in the April 2014 Enhancement Finding, the Service admitted that the last time it

had asked Zimbabwe for information was on March 21, 2007 and that Zimbabwe ***had*** provided

_____

[6] Not surprisingly, ZPWMA criticized the Service's failure to communicate its intentions:

> Just recently the USFWS had an opportunity to present their case at the Safari
> Club International Convention held in February 2014 where there was
> engagement between the representatives of the Zimbabwe and USA Governments
> but this issue was never brought to the table.  So this decision by the USA
> Government not only surprises the Government of Zimbabwe but comes as a
> shock.

AR98 at 3805 (Letter from ZPWMA to Service, April 14, 2014).

information.  *Id.*; AR35a, 35b, 35c.[7]  The Administrative Record contains no communication

from the Service to Zimbabwe between March 21, 2007 and April 4, 2014, concerning the

Service's need for new or updated data, and no expressions of concern about the information that

Zimbabwe provided in 2007.  The Service first expressed concern to Zimbabwe about the 2007

data on April 4, 2014.

Several months before implementing the ban, the Service had already determined to

impose a ban,[8] but made no effort to request data from Zimbabwe that would potentially satisfy

the Service's purported need for information.  Its own personnel expressed reservations about

this approach, explaining that "[t]he Annual Safari Club International Convention will be held in

Las Vegas, NV from February 5-8 and provides an opportunity to discuss this issue with high

level government officials from Tanzania and Zimbabwe."  April 2014 AR84 at 1480.  The

Service never followed through or acted on this recommendation, sought no information and told

no one of its plans.

Instead of requesting verifiable information, the Service chose to rely on rumor and

inaccurate data to support its decision-making.  As a result, the Service made mistakes that it

later needed to correct.  For example, the Service chose to rely on unsubstantiated rumors that

---

[7] In the April 2014 Enhancement Finding, the Service, for what appears to be the first time,
impugned the quality of the information it received from Zimbabwe in 2007, claiming to have
received "three undated and unsigned papers which seemed to rely on somewhat dated
information."  AR102 at 3819.  The Service's inaccurate description of this data failed to
mention Zimbabwe's 25 page document that answered the Service's questions.  AR35b.  The
Service also appears to have erroneously ignored that document's multiple references to studies
and surveys conducted as recently as the year that ZPWMA provided their responses (2007) or
the year before (2006) (*e.g.,* AR35b at 3192-7, 3192-9, 3192-11 and AR35c throughout).

[8] The AR demonstrates that the Service began contemplating imposing the ban approximately
three months prior to April 4, 2014.  AR59.

"around 300 elephants had died from cyanide poisoning in Hwange" National Park.  AR50.[9]

The April 2014 Enhancement Finding, the Questions and Answers page, and the April 4, 2014

Press Release all cited the 300 elephants as one of the reasons for the Service's decision.  April

2014 AR195 at 3019; AR102 at 3819; April 2014 AR196 at 3021.

Had the Service verified the reports, it would have learned that the number of elephants

involved had been greatly exaggerated.  In the July 2014 Enhancement Finding, the Service

corrected itself, noting that only 105 elephants had been poisoned in Hwange National Park and

admitting that its April 2014 Enhancement Finding had "incorrectly stated" the number to be

over 300.  AR206 at 4513.[10]

The Service's conclusion that there was a "lack of information" on the status of

Zimbabwe's elephants was based in great part on the supposition that no population surveys of

Zimbabwe's elephants had been conducted since 2010.  The Service based this conclusion on the

IUCN Report, which was compiled in 2012.  AR80.  Had the Service bothered to consult with

ZPWMA for current data, it would have learned that the IUCN Report did not include data from

three aerial surveys conducted in 2013 on Zimbabwe elephant populations.  These surveys

---

[9] Even the article reporting the erroneous 300 elephant estimate, upon which the Service relied, admitted that government officials had not confirmed the figure.  AR50.

[10] The April 2014 Enhancement Finding relied heavily on the 300 elephant incident as a basis for imposing the importation ban.  Curiously, the Enhancement Finding never mentioned information the Service had obtained from the U.S. Embassy that the Hwange National Park elephant population far exceeded the area's elephant carrying capacity.  AR49 at 3410 ("Managers of Hwange National Park, for example, face the challenges associated with managing a 14,000 square kilometer area, where wildlife transit great distances to neighboring areas (including areas in Botswana), and the resident population of 45,000 elephants far exceeds the park's carrying capacity of 20,000 elephants.")  In the documents it prepared relating to the importation ban, the Service never addressed why the removal of even 300 elephants from a population that exceeds its carrying capacity by 25,000 would have any detrimental impact on the survival of the species.  (In making these points, SCI/NRA do not suggest that the poaching of 105 elephants is insignificant.  SCI/NRA only wish to make clear that the Service's decision to impose the importation ban was based, in significant part, on the Service's willingness to accept an unsubstantiated rumor that overestimated the elephants involved by three times.)

demonstrated increases in each of the surveyed populations.  For example, the IUCN Report did

not include a recent population estimate for the Save Valley Conservancy of 1,538 based on a

2013 aerial survey – a number three times the outdated estimate reported by the IUCN Report –

or a 2013 aerial survey for the Bubye Valley Conservancy showing an elephant population ten

times the number reported in the IUCN Report's outdated 2001 data.  AR80 at 3626; April 2014

AR46 at 1040.  The IUCN Report also had data from 2009 for its population estimate for

Gonarezhou National Park (AR80 at 3626), but data from a 2013 aerial survey demonstrated a

population increase and an estimate of 10,151 elephants.  April 2014 AR46 at 1040.  Zimbabwe

included information about these surveys in the response to the Service's April 4, 2014 request

for information.  *Id.*[11]

 The Service also operated under another false conclusion regarding the elephant

population due to its misinterpretation of the IUCN Report.  The Service stated, "the elephant

population in Zimbabwe in 2007 was 84,416, but as of 2013 that population had been reduced to

47,366 . . . ."  AR102 at 3820.  The Service relied on the IUCN Report, but grossly

misinterpreted the Report's data table.  The errors described below were the start of a series of

errors in each of the enhancement findings regarding the IUCN Report and other population data.

 The IUCN Report divides elephant population surveys, for all range states, into four

categories – Definite, Probable, Possible, and Speculative.  AR80.  These categories reflect the

level of certainty of each survey, impacted by methodology and how current each survey is.

April 2014 AR4 at 37-39.  The Service ignored all but the "definite" category and wrongly

concluded that Zimbabwe's total elephant population constituted only the 47,366 listed in that

---

[11] The Service committed another error in assuming that Zimbabwe's harvest season did not start
until May 1st.  After originally announcing a ban that would apply back to January 1, 2014, the
Service had to revise the date of implementation to avoid imposing a retroactive ban on
individuals who had hunted elephants prior April 4, 2014.  AR102 at 3818

"definite" column of the chart.  The Service completely ignored the elephants listed in the other three columns.

The Service took no notice of the fact that elephants listed in the Probable, Possible, and Speculative columns must still be included in the determination of Zimbabwe's elephant numbers.  Data about elephants in these three categories may not be as current or statistically certain as the data about elephants reported in surveys classified as "definite," but it does not mean that the elephants reported in the other columns do not exist.  *See id.*  Because the Service ignored this important part of the analysis, it vastly underestimated the total population of elephants in Zimbabwe and attributed the wrongly perceived decline from 2007 to 2013 to poaching and human-elephant conflict.  AR102 at 3821.  In reality, Zimbabwe's estimation of 100,000 elephants was far more accurate than the Service's stated population of 47,366.  *See* AR80 (total of four categories is 100,291).[12]  The Service's reliance on its misinterpretation of the IUCN Report constitutes an egregious error that resulted in an arbitrary decision.

The Service made so many errors and ignored and rejected valuable sources of information because its decision to ban importation was a foregone conclusion, reached before the Service had even searched for the justification to make it.  The Administrative Record includes comments from Service personnel that demonstrated discomfort with this approach.  For example, Pamela Scruggs, Chief, Branch of Consultation and Monitoring, expressed concerns that the Service's decision lacked sufficient factual support.  Ms. Scruggs wrote: "We could use more robust information about the situation in ZW.  We may want to further consider

---

[12] SCI/NRA note that this is a simplistic way of interpreting the IUCN data.  SCI/NRA do not argue that Zimbabwe's elephant population is precisely 100,291 elephants; rather, only argue that the Service's determination of 47,366 elephants is much further from the true number than Zimbabwe's estimate of 100,000.

correspondence."  April 2014 AR84 at 1479 (Editorial comments on a January 6, 2014

Information Memorandum for the Director).  In a December 30, 2013 e-mail, Ms. Scruggs wrote:

> The biggest gap that needs filled is about the situation in ZW and how we
> characterize it is in light of the Special Rule criteria.  I don't think we need to say
> a whole lot about it in the [Briefing Paper]. But we need some substance behind
> our recommendation.

AR58.  The next day, she succinctly characterized the problem regarding the Zimbabwe issues as

"already too much cart before horse."  April 2014 AR99 at 1510.

Here, the choice made dictated the facts to be found.  A court asked to determine whether

an agency has acted in an arbitrary and capricious manner reviews whether the agency examined

the relevant data and offered a satisfactory explanation for its action including a "rational

connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S.

at 43 (citation omitted).  Here, the Service did not.

The evidence reveals that the Service made its decision before considering all the

relevant evidence and implications of the importation ban.  The Service acted in an arbitrary and

capricious manner by purposely not seeking data from Zimbabwe before making its decision, by

failing to properly evaluate the data upon which it did rely, and by refusing to analyze important

implications of its decision-making.  As the Service violated the decision-making requirements

of the APA and case law, this Court should invalidate the April 4, 2014 importation ban and all

the decisions upon which it was based.

### 3.   The Service Cannot Retroactively Remedy the Illegalities of the April 4, 2014 Importation Ban

In an attempt to cure the myriad flaws in the April 2014 Enhancement Finding, the Service finalized a new enhancement finding for Zimbabwe on July 17, 2014 (AR189, incorrectly date-stamped Jun 17, 2014), amended it on July 22, 2014 (AR206), and then published notice of the new finding in the Federal Register on July 31, 2014.  AR212.  As with the April 2014 determination, the Service stated that it "remain[ed] unable to make a positive finding under the ESA special rule" "due to the lack of current information."  AR196 at 4443. Claiming that the April 2014 importation ban had been only an "interim" decision, the Service sought to apply its July 2014 decision as if it had been the one announced and implemented on April 4th.  AR212 at 4546.  The Service declared that the July decision "superseded" the April 2014 Enhancement Finding and claimed, without any legal basis, that the July decision had retroactive impact and applied to the importation of elephants sport-hunted between April 4 and July 31.

The Service's attempt to use the July 31, 2014 Federal Register notice as a means of implementing the ban as of April 4, 2014 violated the Service's 1997 commitment not to change the status of elephant importation from Zimbabwe until publishing notice of the change in the Federal Register.  Consequently, the July 31, 2014 notice could not commence the ban before the date of publication in the Federal Register on July 31, 2014.

More importantly, the July 31, 2014 Federal Register notice cannot work backward. Regardless of whether the Service would like to apply the July 2014 decision retroactively to replace the earlier, even more flawed version, it has no legal basis for doing so.  Rules like the July 2014 Enhancement Finding can have only prospective rather than retrospective effect.  The APA explains that Congress intends agency rulemaking to regulate future conduct:

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and **future** effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ;

5 U.S.C. §551(4) (emphasis added).  An agency can only regulate retroactively where Congress has expressly given the agency such authority.

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988) (internal citations omitted); *see also Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).

The Service regulates the importation of threatened species under authority of Section 4(d) of the ESA, 16 U.S.C. §1533(d).  That provision authorizes the Secretary of the Interior to issue regulations deemed necessary and advisable for the conservation of species.  Nothing in the language of Section 4(d) expressly grants the Secretary authority to promulgate retroactive regulations.  Similarly, the language of the Special Rule includes no express grant of retroactive authority.  50 C.F.R. §17.40(e)(3)(iii).

The Service's characterization of the July 2014 Enhancement Finding as "superseding" the April 2014 Enhancement Finding does not mean that it retroactively replaces the earlier finding.  The dictionary definition of "supersede" does not suggest that the superseding item works in reverse.  All of the possible uses of the term suggest only that a superseding item replaces another, starting at the point in time of the replacement:  "to cause to be set aside," "to force out of use as inferior," "to take the place or position of," and "to displace in favor of

another." http://www.merriam-webster.com/dictionary/supersede?show=0&t=1409851627, *last visited* Feb. 15, 2016.

In its briefing in the appeal of the denial of preliminary injunctive relief in this case, and in its conduct subsequent to April 4, 2014, Federal Defendants belatedly acknowledged "concerns" about their authority to retroactively ban the importation of Zimbabwe's elephants. In the brief that they filed in the appeal, Federal Defendants admitted that they changed the April 4 ban to prospective application in order to "avoid retroactivity concerns." Case No. 14-5152 (D.C. Cir.), Federal Appellees' Answering Brief (Dkt. 1508081) at 10 n.8. The April 4, 2014 importation ban violated the ESA and the APA. Federal Defendants cannot illegally overreach in their attempt to rectify errors in the April 4, 2014 importation ban decision by making the July 2014 decision retroactive.

### 4. The Service's Adoption of the July 2014 Continuation of the Importation Ban Also Was Arbitrary and Capricious

Although the Service had solicited data from Zimbabwe and had accepted information from other sources for the purpose of making its July 2014 Enhancement Finding, it did not change its decision. Once again, the Service violated its 1997 commitments not to change its previous position on enhancement unless the change was based on "new information." In July, the Service continued to base its decision on a "lack of information." AR196. Although the July 2014 Enhancement Finding was the product of a greater number of documents than the April Finding, the Service still attributed its importation ban decision to the absence of new population data, rather than the existence of new information about the status of Zimbabwe's elephant populations. AR206 at 4509-11.[13]

---

[13]The Service's inconsistent conduct provides further evidence of its arbitrary and capricious behavior. Based on the reasoning discussed in the 1997 Enhancement Finding, the Service

Instead of properly considering the information provided by ZPWMA and others, the Service ignored, rejected or discounted it.  The July 2014 Enhancement Finding did mention the three 2013 population surveys, as well as the fact that the surveys demonstrated elephant population increases in the surveyed areas.  Nevertheless, the Service rejected the significance of the recent population data and questioned the validity of the survey methods by offering unsubstantiated allegations that some of the population data may have resulted from "double counting" and that carcass ratios in the study area seemed "unrealistically low."  *Id*. at 4510.

Most importantly, after publishing its April 2014 Enhancement Finding, the Service was alerted to its gross errors in interpreting the IUCN Report's population figures.  Correspondence from Holly Dublin, IUCN Senior Adviser and Chair of the African Elephant Specialist Group, AR151.  Rather than admitting the mistakes it had made in April, the Service attempted to justify its earlier enhancement finding by focusing on an alleged lack of recent surveys and questioning the methodologies of some surveys.  AR206 at 4510.  The Service again missed the mark in its interpretation of the data and analysis of the total population of Zimbabwe.

First, the Service erred by not analyzing and including in its population estimate the results of a 2007 survey that the Service itself funded in the Hwange National Park area.  In the IUCN Report, the most recent survey noted for Hwange was from 2001.  AR80.  Relying on the IUCN Report, the Service stated, "[e]ven areas within Zimbabwe that had expressed higher levels of poaching or human-elephant conflicts, such as Hwange National Park, do not appear to have been surveyed since 2001."  AR206 at 4510.  However, a study, partially funded by the

---

consistently found that Zimbabwe's elephant conservation and management laws, plans, and strategies provided sufficient proof of enhancement and continued to be sufficient proof until April 4, 2014.  AR22.  These laws, plans, and strategies, that were sufficient until April 3, 2014, abruptly became insufficient as of April 4, 2014.

Service, had been conducted in the Hwange area in 2007.  AR35.[14]  In the 2007 survey, the estimated population of elephants in the survey area was 39,765.  *Id.* at 3113.  Had the Service included this survey in the totals, the total "definite" population number for Zimbabwe would have increased by 39,765 elephants to 87,131 elephants – greater than the 84,416 number of definite elephants identified by the IUCN in 2007.  *See* AR80.

Second, in the July 2014 Enhancement Finding, the Service wrongly criticized the fact that a majority of elephants classified by the IUCN as "definite" were counted via sample counts or dung counts.  The Service characterized these survey methods as "a less robust methodology" compared to direct counts.  AR206 at 4510.  It apparently even wanted to cast doubt on the "definite" total of 47,366.  This weak effort to justify its earlier mistakes again shows that the Service failed to comprehend the IUCN Report and how population surveys are conducted.

As mentioned above, each survey is classified into four distinct categories, depending on the reliability of the survey.  "[S]urvey reliability gives an indication of the level of certainty that can be placed on a given estimate, as determined by the type of method employed."  April 2014 AR4 at 37.  IUCN employs a series of algorithms to classify each survey.  *Id.*  Thus, all surveys classified in each individual category have the same (or very similar) reliability.  In the "definite" category, all surveys, whether conducted by direct counts, sample counts, or dung surveys, have the same amount of reliability.  *Id.* at 38.  Any suggestion by the Service that the survey methodologies used to estimate Zimbabwe's elephant population are inadequate has no merit.[15]

---

[14] Even though this document was included in the July 2014 AR, it seems that the Service did not fully analyze it; otherwise, the Service would not have made the statement quoted above.  SCI/NRA do not know why the Service failed to consider the study and include it in the April 2014 AR, even though it was published in 2007.

[15] Ironically, the survey that the Service partially funded for the Hwange National Park area in 2007 was conducted using a sample survey methodology.  AR35 at 3117.  The survey authors

Third, Holly Dublin's letter criticizing the April 2014 Enhancement Finding also questioned the Service's misuse of data regarding poaching, specifically the MIKE and PIKE figures.[16] Ms. Dublin questioned the Service's attempt to use poaching data retrieved from two limited sample sites for estimating the level of poaching throughout Zimbabwe. "I would like to point out that I believe the extrapolation of the MIKE PIKE figures to the national level based on the data from one or two MIKE sites, used in the ZW enhancement finding, probably also deserve closer scrutiny." AR151 at 4167. Even though Ms. Dublin warned the Service that it was over-extrapolating the MIKE and PIKE data from Zimbabwe, the Service's analysis of that data did not change in the July 2014 Enhancement Finding. The Service's flawed approach resulted in an arbitrary determination that in 2011 the percentage of poached elephants in Zimbabwe was 67% of all elephant mortality in the country. AR206 at 4511.

The July 2014 Enhancement Finding focused significantly on poaching as a threat to elephant survival yet failed to analyze how the importation ban would affect Zimbabwe's ability to fight against poaching. The July 2014 Enhancement Finding noted that ZPWMA's operational budget for managing and conserving species like elephants is funded exclusively from "revenues generated through sport-hunting conducted on state and private lands." *Id.* The Service also acknowledged that U.S. hunters "appear to make up the vast majority of sport hunters in Zimbabwe." *Id.* at 4512. Nevertheless, the July 2014 Enhancement Finding included no discussion about how the loss of revenue attributable to the ban's impact on U.S. hunters coming to Zimbabwe would affect ZPWMA's resources to manage elephants or fight against

noted that "[t]he procedures used followed those well established for aerial surveys of African large herbivores and utilised during earlier surveys of large herbivores in Zimbabwe." *Id.*

[16] Monitoring the Illegal Killing of Elephants (MIKE) and Proportion of Illegally Killed Elephants (PIKE) are two parts of a CITES program designed to calculate poaching levels in select study sites across Africa. Two sites are in Zimbabwe.

poaching.  *Id.* at 4511.  The Service did note that ZPWMA received $1.5 million from the Zimbabwe Treasury in 2013 to use primarily for anti-poaching efforts.  *Id.* at 4512.  The July 2014 Enhancement Finding also referenced an article that noted that the $1.5 million, ***along with the revenue ZPWMA receives from hunting licenses***, "is not sufficient to provide the needed level of protection for land under ZPWMA authority."  *Id.*  In spite of these facts, the July 2014 Enhancement Finding included no analysis of how the loss of funds resulting from the importation ban's discouragement of U.S. hunters traveling to and hunting in Zimbabwe would further diminish ZPWMA's ability to fight poaching.

The Service specifically rejected concrete data presented by ZPWMA and others that hunters and hunting concessions provide a major deterrent to poaching.  Instead of acknowledging the benefits provided by hunters and hunting businesses, the Service concluded that it had received no evidence to "support[] the belief that without hunters, specifically U.S. elephant hunters, that poaching in Zimbabwe would become rampant."  *Id.* at 4513.  In essence, the Service imposed upon Zimbabwe and hunters an unsavory, if not impossible task.  To prove that the reduction in U.S. hunters would have a detrimental impact on Zimbabwe's elephants, ZPWMA and the hunting community would have to wait and allow more elephants to be poached – unnecessarily allowing further damage to a species that the Service, ZPWMA and the hunting community want to conserve.

In ignoring the data that Zimbabwe and the public submitted, the Service adopted decisions in July 2014 that, like the decision made in April 2014, failed to consider relevant factors to the decision-making.  Rejecting and neutralizing the impact of new data that demonstrated population increases in certain areas, ignoring the role played by hunters and hunting, and imposing standards of proof that are either insurmountable or would involve

unnecessary harm to the species to be conserved, all qualify as relevant factors that the Service consciously and purposely ignored.  The Service's July 2014 decision is arbitrary and capricious and should be vacated.

**B.      In the March 2015 Enhancement Finding, the Service Arbitrarily Determined that the Importation of Sport-hunted Elephants from Zimbabwe Did Not Enhance the Survival of the Species**

The March 2015 Enhancement Finding demonstrates that the Service is seeking far more than evidence of enhancement and that it is instead looking for something close to perfection in Zimbabwe's efforts to conserve its elephants and manage its hunting program.  The Service's approach to the data it received from ZPWMA and other sources shows that the Service sought reasons *not* to make a positive enhancement finding, rather than the opposite.

The March 2015 Enhancement Finding did not fully analyze or properly consider (1) the data received from ZPWMA and from other sources about the status of the elephant population in Zimbabwe; (2) information received about anti-poaching efforts and the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe; and (3) the role that U.S. hunters play in providing Zimbabwe with the financial resources to support conservation and combat poaching.  In the March 2015 Enhancement Finding, the Service did not sufficiently consider the harm to elephant conservation that will result from the absence of U.S. hunters in the field and the loss of revenue from U.S. hunters. The Service also failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters reduces the number of elephants illegally killed in Zimbabwe.

The Service's most profound errors involved its analysis and treatment of scientific data. When addressing one of the most important topics in the March 2015 Enhancement Finding –

the population status of elephants in Zimbabwe – the Service mistakenly asserted a lack of "current population data" and "adequate population data." AR344 at 7261-62. Later in the Finding, in discussing whether elephant hunting in Zimbabwe is sustainable, the Service claimed that "[w]ithout more definite population data, … there is no way to determine whether these numbers [of elephants poached], combined with other offtake, are sustainable." *Id.* at 7267. But the Service *had* received more than sufficient population data to make the required findings. Not only did it receive more recent data from various areas in Zimbabwe, *id.* at 7262-63, the Service in fact received "preliminary results," from the highly regarded Pan African Aerial Elephant Survey ("Elephant Survey"). *Id.* at 7263. The Service itself stated that these survey results would allow it to better assess Zimbabwe's management, such as the elephant hunting quota. AR252 at 5728 (Information Memorandum for the Associate Director (Oct. 28, 2014).

The Elephant Survey reported "a provisional estimate for elephant abundance in Zimbabwe to be between 82,000-83,000 individuals." AR344 at 7263. Instead of comparing these figures to the population relied on in the positive 1997 Enhancement Finding, AR22 at 2637 (estimated population was 66,000), or the less certain numbers from the IUCN Report relied on in the April 2014 Enhancement Finding and July 2014 Enhancement Finding, the Service compared the Elephant Survey numbers to a 2001 survey and projections based on hypothetical growth. AR344 at 7263. Not surprisingly, the Service labeled the comparison "disappointing."

The Service never explained why the Elephant Survey results, which are at least consistent with other estimates provided by Zimbabwe, are neither sufficiently "current" nor "adequate." In an extremely contradictory approach, the Service, elsewhere in the March 2015

33

Enhancement finding, did find the Elephant Survey data reliable enough to express concern over trends in two elephant areas. *Id.* at 7270-71.

After the July 2014 Enhancement Finding was published, Holly Dublin, the same person who had criticized the April 2014 Enhancement Finding, again alerted the Service (and ZPWMA) to errors that remained following the July Finding. AR256. The errors related to (1) the missing 2007 survey of the Hwange National Park area, (2) incorrect statements from the Service regarding surveys conducted between 2006-2010 and 2012-2013, (3) the Service's incorrect analysis regarding the carcass ratio, (4) the Service's incorrect implications regarding the reliability of many of the surveys, (5) the Service's misplaced skepticism of the Pan African Elephant Aerial Survey methodology, and (6) the Service's misuse of the MIKE/PIKE data. *Id.*

In its March 2015 Enhancement Finding, the Service addressed some of the previous flaws. Other errors it simply removed from the finding. But the Service continued to question the reliability of the surveys and found that "hunting should not continue without adequate population data." AR344 at 7262. Interestingly, the Service initially cited the IUCN Report as a valuable and reliable source of information (although the Service misinterpreted the Report to conclude that the elephant population in Zimbabwe had dwindled). When the IUCN Report, properly interpreted, no longer fit the Service's needs, the Service tried to discredit it. *Id.*

Once the Service was forced to admit the validity of the Elephant Survey, the Service changed its approach so that it could find some other way to justify its negative enhancement position. When the Service had to acknowledge its misplaced skepticism of the Elephant Survey's counting process and could no longer fault the methodology, it shifted its focus to the survey's results. The Service's new approach was to target the small population decline. It

34

decided that a mere 6% population decline in 13 years – was not sufficient stability to justify an enhancement finding.  *Id.* at 7263.

The Service also found a new rationale for denying enhancement based on poaching data. After being corrected, for the second time, regarding its misuse of the MIKE and PIKE data, the Service qualified the weight of the data – which showed that poaching had declined in Zimbabwe's MIKE areas in 2013 – by stating, "it appears that there was an increase in elephant poaching in 2012, but the poaching level *might have* declined in 2013 to below the 2011 level. *Id.*  By conditioning this statement, the Service ignored reports that poaching in the two MIKE areas in Zimbabwe "have decreased substantially."  *See* AR177a at 4335-17 (Nyaminyami district; from 2011 to 2013); AR339 at 7229 (Chewore area; from 2011 to 2014).  Overall, in the March 2015 Enhancement Finding, the Service arbitrarily continued to twist the population data to fit its needs.

The population numbers from the Elephant Survey of 82,000 to 83,000 elephants, to which the Service had access for the March 2015 Enhancement Finding, help demonstrate that the conservation benefits delivered by elephant hunting are sufficient to qualify as "enhancement."  A discussion by the Service decision-makers in September 2014 reveals that having a population of 82,000-83,000 elephants would strongly support a positive enhancement finding.  The Chief of the Branch of Permits, Division of Management Authority (who had signed the March 2015 Enhancement Finding, AR344 at 7256), was asked by a representative of the Assistant Director for International Affairs, to respond to the question "what specifically ZPWMA would need to show us in order for us to lift the suspension."  AR228 at 4640.  The Chief responded:

> So, if Zimbabwe were able to respond to the other missing information, we would be in better shape. ***Without the census data***, they would not be able to justify the

> current quota of 1000 tusks[,] *however assuming that the population is close to*
> *what they claim (100,000 elephants), removal of 500 elephants is not a problem.*
> The big concern is if they are completely off on the numbers (e.g., the population
> is actually 50,000 removing 500 elephants may have a bigger impact).

*Id.* (emphasis added).  The Elephant Survey, and other survey information, demonstrates that the

population is at least relatively close to 100,000, so even a removal of 500 elephants through

hunting "is not a problem," as demonstrated below with actual numbers.

Two other examples demonstrate that the Service refused to make a positive

enhancement finding despite facts in support of such a finding that the Service ignored.  The

March 2015 Enhancement Finding showed that the Service did not even properly examine or

assess the data it received.  First, the Service was incorrect in stating that Zimbabwe maintained

a hunting quota of 500 elephants (1,000 tusks) for 2015.  *Id.*; *see also* AR344 at 7266 (for 2015

hunt season Zimbabwe "has established annual export quota of 500 elephants (1000 tusks).").

The Service apparently ignored information from the ZPWMA that Zimbabwe had reduced the

elephant quota from 500 to 380 in 2015.  AR276 at 5882-83.  Second, the Service had in its

possession, but ignored, information that the actual offtake through hunting is much lower than

even the 380 elephant quota.  In the Finding, the Service admits receiving some evidence from

outfitters that the actual hunting offtake is more like 160 elephants per year, much less than the

500 or 380 elephant quota.  AR344 at 7266.[17]  The Service has asserted a 500 elephant offtake

out of a population of 100,000 (.5%) is not a problem.  *See* AR228 at 4640.  For that same

reason, an offtake of 160 out of 82,000 (.2%) or even 380 out of 82,000 (.46%) would not be a

problem.

---

[17] The Service claims that it received no documentation – other than the outfitters assertions –
about this number.  AR344 at 7266; *but see* AR235 at 4678 (Comments to Service from expert
on elephant issues:  "Moreover, (Martin 2014b) makes it clear that the numbers of trophy hunted
elephants are so low that the quota will have no effect whatsoever on facilitating population
management goals.").

While refusing to admit that hunting is not a problem for elephants, the Service also failed to adequately acknowledge the extent to which hunting is a solution to elephant conservation problems.  The Service did at least note the receipt of operator-provided information about the benefits of sport hunting.  AR344 at 7271; *see also* AR252 (Information Memorandum for the Associate Director (Oct. 28, 2014)) at 5727-28 (information provided by organizations, outfitters, and professional hunting organizations "did indicate that hunting in Zimbabwe was providing some benefit to elephants ….").  Nevertheless, the Service gave this information inadequate weight and consideration.

In fact, the Service received a great deal of information from Zimbabwe and operators in the country.  For example, the Safari Operators Association of Zimbabwe provided a report that details the estimated contributions that U.S. hunters and safari operators make toward anti-poaching efforts.  The report estimated that U.S. hunters, via elephant hunting alone, assist in funding of $1,388,872.35 each year toward anti-poaching efforts that employ 355 anti-poaching personnel.  AR8 at 1960.  The report also describes the negative impact the 2014 importation ban had on the safari operators' businesses and local communities.  *Id.* at 1959.  Charlton McCallum Safaris (CMS), a Zimbabwe outfitter, detailed the community support for conservation and anti-poaching efforts provided by their business.  CMS explained to the Service how those conservation and anti-poaching efforts are funded in significant part by U.S. elephant hunters. CMS stated "[o]ur company uses the monies generated from the elephant hunting to operate a very successful antipoaching unit …."  AR239 at 4734-36 (Oct. 10, 2014 letter to Service). Similarly Desfountain & Jones, outfitters with 40 years of experience, detailed how the decrease in U.S. hunters affects meat donated to local communities and their company's ability to fund anti-poaching rangers in the area. AR249 at 5704-05 (Oct. 9, 2014 email to Service).

The CAMPFIRE program, which directs revenues from hunting to the local communities who must co-exist with the elephants, also provides conservation benefits.  For example, the Service received a set of comments describing the extensive contributions two outfitters made to the CAMPFIRE program and local communities.  AR312 at 6657-60; *see also* AR239 at 4734-35.  In an Information Memorandum for the Associate Director dated Oct. 28, 2014, the Service credited the CAMPFIRE program with delivering conservation benefits.  AR252 at 5729 (the CAMPFIRE program has helped create "bright spots" of conservation).  In the March 2015 Enhancement Finding, however, the Service largely disregarded information from the CAMPFIRE program, choosing instead to focus on perceived flaws in the accounting of the revenue handled by CAMPFIRE.  AR344 at 7271.  For many years prior to the April 2014 enhancement finding, the Service did not require such perfection in CAMPFIRE's efforts.  The Service's March 2015 approach suggests that it would rather see no benefits at all from CAMPFIRE, than recognize the advantages of a possibly less than perfect community-based conservation approach that is the model for others throughout Africa.  AR344 at 7269.

In the March 2015 Enhancement Finding, the Service made numerous other material, factual mistakes and inaccurate assumptions.  These errors further undermine the basis for its decision that it could not make an enhancement finding for the import of sport-hunted elephants from Zimbabwe for 2015 and beyond.  The additional mistakes and inaccurate assumptions found in the March 2015 Enhancement Finding include, but are not limited to:

| Service's Claim | Why Wrong |
|---|---|
| The Service claimed that it received no information on the number of poaching crimes that are prosecuted or the average sentence or penalty.  AR344 at 7263. | The government of Zimbabwe provided information to the Service that in 2013, 45 individuals were arrested and convicted for elephant poaching and trade in ivory/horn and that each person received between nine and sixteen years in jail (mandatory nine-year |

| Service's Claim | Why Wrong |
|---|---|
|  | minimum sentence).  AR276 at 5871-72, 5874. |
| The Service relied on a CITES report that noted that 65% of ivory trade between 2006 and 2011 occurred since 2009, "indicating that illegal ivory trade is increasing."  This report only showed that more poaching occurred between 2009 and 2011 than the previous three years.  AR344 at 7265. | The report offered no data about poaching during the period from 2012 to 2013 – just prior to the commencement of the importation ban, during which poaching may have leveled off or decreased. |
| The Service contended that "the number of problem animals may equal or exceed the number of elephants taken through sport-hunting."  AR344 at 7267. | The government of Zimbabwe provided information to the Service that specifically addressed and denied this assertion.  AR276 at 5880-81. |

By repeatedly identifying perceived shortfalls in Zimbabwe's actions or the available information, the Service demanded from this foreign nation far more than the ESA or the Special Rule allows.  Even with a less than perfectly managed hunting program, hunting enhances the survival of the species.  As explained further in the next section, the Service is essentially requiring that the effects of hunting "ensure" the survival of the species, when the question they are authorized to ask is whether the hunting "enhances" the survival of the species.  The Service arbitrarily concluded that the information in its possession was not sufficient to make a positive enhancement finding, despite the fact that it had consistently made such a finding based on far less information for 20 years.

**C.      In All Three Decisions, the Service Violated the ESA and APA by Applying Prohibited Guidelines and Requiring That Sport-hunting of Elephants Must Ensure the Survival of the Species Instead of Simply Enhance It**

In all three enhancement findings, the Service erred in applying an illegal and arbitrary standard for determining "enhancement."  The origin and history of the "enhancement" requirement is critical to understanding these errors.  At the seventh CITES COP in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg.

5847.  As a result, parties to CITES implemented provisions from CITES resolutions related to

the international trade of Appendix I species, including Res. Conf. 2.11 entitled "Trade in

hunting trophies of species listed in Appendix I."  At the time, Res. Conf. 2.11 recommended

> that in order to achieve the envisaged double control (also in the scientific field) by the importing and exporting country of the trade in Appendix-I specimens, the Scientific Authority have the possibility of comprehensive examination concerning the question of whether the importation is serving a purpose which is not detrimental to the survival of the species. ***This examination should, if possible, also cover the question of whether the killing of the animals whose trophies are intended for import would enhance the survival of the species***.

AR249 at 5561 (emphasis added).  As a party to CITES, the United States sought to apply the

provisions of Res. Conf. 2.11 to the trade of sport-hunted African elephants.  In doing so, the

Service developed internal guidelines for reviewing applications for the importation of sport-

hunted African elephants ("internal guidelines").  *See* 60 Fed. Reg. 12969 (Mar. 9, 1995)

(describing history and reason for internal guidelines).  As explained in the Legal and Regulatory

Background section above, the Service also added the enhancement of survival requirement to

the Special Rule in 1992 to effectuate the enhancement of survival requirement from Res. Conf.

2.11.  *Supra* Section II.A; *compare* 50 C.F.R. §17.40(e)(3)(iii)(C) *with* AR249 at 5561 (Annex I)

*and* 50 C.F.R. §17.32.[18]

Meanwhile, in 1991, Safari Club International filed suit in this Court to challenge the

procedural and substantive adequacy of the internal guidelines.  *Safari Club Int'l v. Babbitt*, Civ.

No. 91-2523 (D.D.C., filed Oct. 8, 1991).  In response to SCI's challenge, the Service published

in the Federal Register and took comment on the internal guidelines.  58 Fed. Reg. 7813.  The

---

[18] When the Service added a marking requirement to the Special Rule in 1982, it did so because CITES adopted a resolution that implemented the marking requirement for international trade. The Service explained that "any action it takes to regulate trade in the African elephant should conform to the action by the CITES Parties, because regulation of trade requires international cooperation, and CITES is the only existing mechanism that provides it."  46 Fed. Reg. 37059, 37060 (July 17, 1981).

internal guidelines described the Service's interpretation of what was required according to Res. Conf. 2.11.  According to the internal guidelines, the Service required three primary determinations necessary to find enhancement – evidence that sport hunting enhances the survival of the species, an increasing or stable population, and an effective management program.  To determine effectiveness of the management program, the Service required review of the country's national laws, infrastructure for management of wildlife, management goal for elephants, anti-poaching capabilities, habitat management capabilities, and elephant population monitoring capabilities.  58 Fed. Reg. at 7814.

While the Service was still deciding whether to continue to utilize the internal guidelines, in 1994, the parties to CITES amended Res. Conf. 2.11 to eliminate the enhancement of survival requirement for the importation of sport-hunted species on Appendix I.  *See* AR249 at 5559-61, 5563.  During the ninth COP, a drafting committee made up of three countries, including the United States, worked to amend the language of Res. Conf. 2.11.  The language in the current resolution reflects the language proposed by the drafting committee.  *See* Com.II 9.7 (establishment of the drafting committee); Com.II 9.8 (Rev.) (proposal from the drafting committee); Plen. 9.7 (Rev.) (adoption of the amended text by CITES parties).[19]

After the amendment to Res. Conf. 2.11, the Service withdrew the internal guidelines and entered into a joint stipulation with SCI for the dismissal of SCI's challenge to the guidelines.  60 Fed. Reg. 12969, 12970 (Mar. 9, 1995); *Safari Club Int'l*, Civ. No. 91-2523, Dkt. 64 and 65 (Mar. 31, 1995).  In its notice of withdrawal, the Service stated that it was withdrawing the internal guidelines "[b]ecause of the revision of paragraph c of CITES resolution Conf. 2.11" and

---

[19] Com.II 9.7 and Com.II 9.8 (Rev.) are available at
https://cites.org/sites/default/files/eng/cop/09/E9-ComII.pdf; and Plen. 9.7 (Rev.) is available at
https://cites.org/sites/default/files/eng/cop/09/E9-Plenary.pdf, *last visited* Feb. 15, 2016.

that "[i]n evaluating applications to import African elephant trophies, *the Service will follow the guidance set forth in Conf. 2.11*, as revised, as well as other appropriate authorities."  60 Fed. Reg. at 12970 (emphasis added).  Likewise, in the order of dismissal of SCI's challenge, the Service stipulated that all outstanding applications for the import of sport-hunted elephants would be "reconsidered for issuance in accordance with the letter and intent of the amendment to Resolution 2.11(c). . . ."  *Safari Club Int'l*, Civ. No. 91-2523, Dkt. 64.  Additionally, this Court ordered that "the defendant is no longer to use the elephant trophy import guidelines that have been in issue and proposed for adoption."  *Id.*

In the withdrawal notice, the Service provided further insight into how it would review importation applications.  The Service wrote that "[a]lthough the guidelines are being withdrawn, the Service agrees that dialogue with the exporting states is important, and will endeavor to increase such dialogue when implementing the new CITES resolution Conf. 2.11 provisions."  60 Fed. Reg. at 12970.  Similarly, the Service stated:

> Consistent with revised Conf. 2.11(c), the U.S. Scientific Authority will accept a "not detrimental" finding of the exporting country for that year, unless there are scientific or management data to indicate otherwise. If the scientific or management data indicate a concern about the reasonableness of an exporting country's "not detrimental" finding, the Service will consult with that country's Scientific and Management Authorities.

*Id.* at 12971.  Although the Service agreed to follow the "letter and intent" of amended Res. Conf. 2.11 and this Court ordered it not to use the internal guidelines, the three Enhancement Findings show that the Service is not meeting these obligations.  Additionally, the Service's failure to consult Zimbabwe before the April 2014 Enhancement Finding betrays its commitment to do so.

SCI/NRA recognize that Zimbabwe's elephants are listed on CITES Appendix II and that Res. Conf. 2.11 applies to Appendix I listed species.  However, at the time the Service

implemented the enhancement of survival requirement into the Special Rule and subsequently committed itself to dealing with elephant importation applications according to amended Res. Conf. 2.11, all African elephants were listed on Appendix I.  Unfortunately for elephant conservation efforts, when Zimbabwe's elephants were transferred from Appendix I to Appendix II in 1997, the Service continued to apply the requirements of the Special Rule, effectively treating Zimbabwe's elephants as though they were still listed on Appendix I.  The Service's application of the Special Rule requirements to Zimbabwe's elephants should be analyzed in light of the fact that these requirements originated as CITES Appendix I requirements.  Any changes to CITES Appendix I requirements should, logically, be reflected in the Special Rule requirements.  The Service failed to make such changes.  Instead, when making the three Enhancement Findings, the Service imposed requirements that contradicted its own previous commitments and followed the internal guidelines that this Court previously ordered the Service to no longer use.

### 1.    The Service Used Illegal Guidelines in Making the Three Enhancement Findings

The internal guidelines previously used by the Service listed many of the exact same factors that the Service used to determine if the sport hunting of Zimbabwe's elephants enhanced the survival of the species.  58 Fed. Reg. at 7814.  Even though the Service has not explicitly admitted that it used the internal guidelines to make the three enhancement findings, as the following chart shows, enough similarities exist between the factors the Service used and the withdrawn guidelines that that the Service has effectively reinitiated the use of the guidelines.

| Withdrawn Internal Guidelines Factors (58 Fed. Reg. at 7814) | Enhancement Findings |
|---|---|
| "Information establishing that the population is increasing or stable and sufficient to allow a | In all three findings, the Service focused on Zimbabwe's total elephant population, |

| limited harvest." | population trends, and whether harvest could be allowed according to the Service's standards. *See* AR102 at 3818-19, 3820-21; AR206 at 4506, 4509-11; AR344 at 7257, 7261-63. |
|---|---|
| "Existence of an effective management program" that includes "national laws" to protect "the African elephant and its habitat" and control "all forms of legal harvest." | In all three findings, the Service scrutinized Zimbabwe's management plans, national laws, and enforcement of those laws.  *See* AR102 at 3818, 3820, 3821-22; AR206 at 4506-09, 4511-13; AR344 at 7256-61, 7263-66. |
| Management goal "that describes the size and sex-age composition" of the elephant population. | In all three findings, the Service stated that it was particularly interested in "sex and age-class distribution."  AR102 at 3818; AR206 at 4506; AR344 at 7257. |
| "A demonstrated capability to control poaching." | Poaching was a focus in all three findings.  *See* AR102 at 3819, 3821, 3823; AR206 at 4511-14, 4516; AR344 at 7263, 7265-67, 7272-73. |
| "Routine biological surveys." | The Service was highly critical of the lack of recent surveys and/or the quality of the surveys in all three enhancement findings.  *See* AR102 at 3821; AR206 at 4510-11; AR344 at 7262-63. |
| An ability to "preserve and manage habitats." | "The amount of protected area set aside for elephants or managed for elephant populations" was "important" to the Service in all three findings.  *See* AR102 at 3819, 3820; AR206 at 4506; AR344 at 7257. |
| "Harvest management strategies to allow the range state to attain and maintain designated numbers of elephants." | All three enhancement findings critiqued the sustainable use strategies used in Zimbabwe. *See* AR102 at 3822; AR206 at 4513-15; AR344 at 7266-69. |
| A control system "in full compliance with CITES" requirements. | In the April 2014 Enhancement Finding, the Service recognized that all exports of sport-hunted elephants from Zimbabwe conform with CITES requirements. AR102 at 3822. The issue was not discussed in the subsequent findings. |

In the three enhancement findings, the Service evaluated the same factors as it promised

not to use when it withdrew the internal guidelines and the same factors this Court expressly

ordered the Service not to use.  Because the Enhancement Findings and associated importation

bans rely on the reincarnation of these prohibited guidelines, this Court should vacate the enhancement findings and the bans against the importation of Zimbabwe's elephants.

### 2. The Service Illegally Required That Sport-hunting of Elephants Ensure the Survival of the Species Instead of Enhance It

Regardless of whether the Service improperly used the internal guidelines, the Service still imposed a standard greater than "enhancement." In violation of the ESA and APA, the Service imposed a requirement that sport hunting "ensure" the survival of the species rather than "enhance" it.

The term "enhance" (or "enhancement") is not defined in the ESA, Service regulations related to the ESA, Res. Conf. 2.11, or anywhere else in CITES documents. "It is fixed law that words of statutes or regulations must be given their 'ordinary, contemporary, common meaning.'" *F.T.C. v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009) quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000). The dictionary defines "enhance" as "heighten, increase; especially: to increase or improve in value, quality, desirability, or attractiveness." http://www.merriam-webster.com/dictionary/enhance, *last visited* Feb. 14, 2016.

Prior to April 4, 2014, the Service had seemingly applied a common meaning of the term enhancement. In the 1997 Enhancement Finding, even though the Service noted many of the same concerns that it believes still exist (*e.g.,* lack of government funding, increase in human-elephant conflicts, criticism of the CAMPFIRE district councils, and poor infrastructure), it "believe[d] that Zimbabwe [was] effectively conserving and managing the elephant population throughout the country and [found] that the import of sport-hunted elephant trophies from Zimbabwe enhances the survival of the species." AR20 at 2557; *see also* AR20 (generally for noted concerns). Focusing primarily on the benefits that sport hunting provides via the CAMPFIRE program, the Service noted that:

45

> [u]nder the Campfire program, rural communities benefit from revenue generated by sport-hunting. With increased human-elephant conflicts on Communal lands, sport-hunting is an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource.

*Id.* at 2560.  Despite its concerns, the Service recognized that sport hunting enhanced the survival of the species because it resulted in an improved situation for Zimbabwe's elephants.

The Service's 1997 finding was consistent with its statements, at the time, regarding the standard for enhancement.  In 1992, the Service noted that importation of a sport-hunted elephant required "a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation."  57 Fed. Reg. at 35485.  In 1995, the Service stated that it "believes that when revenues are directed to management or enforcement activities or when there is long-term benefit to individuals or groups with proprietary interest in ensuring a viable elephant population, there is benefit to the survival of the elephant."  60 Fed. Reg. at 12970.  Even in 2010, in an importation permit denial letter, the Service stated:

> To enhance the survival of the species, the importation must be associated with activities that provide a direct benefit to the species being hunted.  Such benefits could include the use of revenue generated by the hunt to support conservation projects or to manage the species.  Other benefits could result from activities that enhance the survival of the species include improving human-wildlife conflicts, anti-poaching efforts, or habitat conservation.

*Marcum v. Salazar*, Civ. No. 09-01912, Dkt. 42-7, p.21.

The Service's requirement for enhancement seemingly changed sometime between 2010 and 2014.  In the three recent Enhancement Findings, the Service did not apply a standard that reflects an ordinary or common meaning of the term enhance.  Instead, the Service illegally required that sport hunting essentially ensure the survival of the species in light of other forms of offtake.

In the April 2014 Enhancement Finding, the Service focused on a lack of recently updated elephant data, an incorrectly perceived drastic decline in population, and incorrect anecdotal evidence of an increase in poaching.  AR102.  The Service discounted any enhancement that sport hunting creates and instead focused on the perceived negative impacts of a possible population decline and poaching.  In the Service's only attempt to actually analyze the enhancement that sport hunting causes, it stated,

> [u]nder the Campfire program, rural communities **should** benefit from revenue generated by sport-hunting. With increased human-elephant conflicts on Communal lands, sport-hunting **may** be an important tool which gives these communities a stake in sustainable management of the elephant as a natural and economic resource.

AR102 at 3822 (emphasis added).[20]  Rather than determining whether those benefits to the communities enhance the survival of the species, the Service relied on an alleged lack of data regarding other issues to conclude that it was unable to determine if sport hunting increases the survival of the species.  *Id.* at 3823.

In the July 2014 Enhancement Finding, the Service continued to focus on the negative implications of issues other than sport hunting.  Similar to the 1997 Enhancement Finding, the Service discussed a lack of government funding for wildlife management (AR206 at 4511-13), expressed concern over human-elephant conflict (*Id.* at 4514), and was critical of the CAMPFIRE program (*Id.* at 4515).  The Service also introduced a new requirement for showing enhancement – that overall male elephant offtake from all sources be less than 0.75% per year.  *Id.* at 4509.  And while the Service obtained this figure from Zimbabwe's 1997 elephant

---

[20] Compare this conclusion with the same sentence quoted above from the 1997 Enhancement Finding.  The Service merely added the emphasized conditional words.  This conclusion and conditional language is also found in the July 2014 Enhancement Finding.  AR206 at 4515.

management plan, it was not until July 2014 that the Service decided to pay the comment any heed.[21]

The Service admitted that sport hunting contributed to "bright spots" of conservation efforts in Zimbabwe, and that "[s]ome of the information did indicate that hunting in Zimbabwe was providing a benefit to elephants," and that "[i]t is clear that outstanding conservation work is being carried out in some areas that is funded solely or in major portions by private individuals or companies." *Id.* at 4516-17. Nevertheless, the Service concluded, "there are not enough of these 'bright spots' *to overcome the problems currently facing Zimbabwe elephant populations* and to support a finding that sport hunting is enhancing the survival of the species." *Id.* at 4517 (emphasis added). In 2014, the Service decided that to enhance the survival of the species, hunting would have to overcome all of the species' other perceived problems.

More of the same occurred in the March 2015 Enhancement Finding. The Service focused on its concerns regarding issues other than whether sport hunting enhances the survival of the species. Some of these concerns have been repeated in each enhancement finding since 1997. *See*, *e.g.*, AR344 at 7264-66 (concern regarding lack of direct government funding); *id.* at 7266 (increase in human-elephant conflict); *id.* at 7269-71 (criticisms of CAMPFIRE).

The Service, as it did in the July 2014 Enhancement Finding, stated that there was some evidence that sport hunting enhances the survival of the species, but concluded that it was not enough. *See id.* at 7271-73. The Service's March 2015 conclusions again demonstrate how the Service is requiring sport hunting to ensure the survival of the species – to make up for the

---

[21] Curiously, even though the Service rejected the 1997 management plan as outdated, it continued to impose the requirement found in the plan that all male elephant offtake be limited to 0.75% per year. Because the Service did not have enough information to determine if that requirement was being met, it concluded that hunting should not continue. *Id.* at 4509. Two experts in elephant management in Zimbabwe, Rowan Martin and Kevin Dunham, criticized the Service's reliance on the 0.75% figure. AR235 at 4675, AR248 at 5499.

negative impacts of all the Service's identified inadequacies – rather than enhance the survival of the species – to improve the chances of survival above what they would be without hunting.

For all three enhancement findings, the Service failed to adhere to the purpose for which the enhancement of survival requirement was included in the Special Rule – to determine whether the sport hunting "enhances the survival of the species by providing financial support programs for elephant conservation." 57 Fed. Reg. at 35485. Instead of focusing on whether sport hunting enhances the survival of the species, the Service based its decisions on *how much* sport hunting enhances elephant survival, and it determined that the degree to which sport hunting enhances the survival was inadequate. Because the unreasonable and unexplained change in the standard by which enhancement is measured qualifies as arbitrary and capricious conduct, this Court should vacate the three enhancement findings and corresponding importation bans.

**D.      In All Three Decisions, the Service Violated the APA Requirements for Rulemaking that Apply to These Decisions**

Each time the Service issued an Enhancement Finding for Zimbabwe's elephants and used that Finding to ban the importation of elephants from Zimbabwe, the Service promulgated a substantive, or legislative, rule that deprived SCI/NRA members of their ability to import elephants from Zimbabwe and to participate in elephant conservation. The Service should have, but did not, follow APA rulemaking procedures, including notice and public comment opportunities. 5 U.S.C. §553.

The Enhancement Findings and associated importation ban decisions constitute legislative rules because they determine whether the Service allows U.S. hunters to import their legally harvested elephants. At present, the Service does not require hunters to apply for a permit to import elephants from Zimbabwe because these elephants are listed on CITES

Appendix II.  The enhancement finding is a broad-based, country-wide action that dictates whether or not a hunter can import an elephant into the United States.

The determinations that dictate whether or not U.S. hunters will be able to import their elephants into the U.S. are substantive rules.  "Substantive rules are ones which grant rights, impose obligations, or produce other significant effects on private interests."  *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987).  Each of the three Enhancement Findings and the Service's application of them produced and continue to produce significant effects on the hunting community's private interests as hunters are not be able to import elephants from Zimbabwe as a result of the these decisions.

The Enhancement Findings and importation ban decisions are substantive rules regardless of the fact that Service promulgated them without following proper APA rulemaking procedures. The Service's improper choice of how to adopt a rule does not determine the kind of rule it is. *Appalachian Power Co.*, 208 F.3d at 1020 n.11.  The crucial factor is how the agency ***applies*** the rule:

> If an agency ... treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

*Id*. at 1021.  Because the Enhancement Findings and importation ban decisions were legislative rules, the Service should have followed APA rulemaking.  Because the Service did not, each decision violates the APA and must be invalidated.

E.     **The Service Illegally Failed to Provide an Adequate Explanation for
       Maintaining an Enhancement of Survival Finding Requirement in the
       Special Rule Pertaining to Trophy Importation of African Elephants on
       CITES Appendix II**

The Service has never explained why the Special Rule for the importation of sport-hunted

African elephants on Appendix II continues to require a finding that the harvest of the elephants

intended for U.S. import enhances the survival of the species.  50 C.F.R. §17.40(e)(3)(iii).  The

Service's reason for imposing this requirement disappeared in 1997, yet the Service retained the

mandate and in doing so, passively modified the rule.  Despite adopting this change, the Service

never gave the public their statutorily mandated opportunity to comment on the requirement.  By

never explaining the reasoning behind the modification of the rule, the Service acted in an

arbitrary and capricious manner in violation of the APA.  By failing to promulgate a rule that is

"necessary and advisable" for elephant conservation, the Service has violated Section 4(d) of the

ESA.

The Service instituted the enhancement of survival finding requirement into the Special

Rule for elephants on August 10, 1992.  The Service intended the rule to match a CITES

resolution in effect at the time that imposed the same obligation.  *See supra* Section II.A; 57 Fed.

Reg. at 35485.  The Service offered no other reason for including the enhancement of survival

requirement.

In 1992, all African elephants, including Zimbabwe's, were listed on CITES Appendix I.

The version of CITES Res. Conf. 2.11 that was in effect at the time required an enhancement

finding for the importation of Appendix I species.  AR249 at 5561 (Annex 1).

In 1994, CITES revised its resolution and removed the enhancement of survival finding

requirement for Appendix I species.  AR249 at 5563.  Consequently, CITES no longer required

an enhancement finding for Zimbabwe's elephants.  Had the Service made the appropriate

parallel change to the Special Rule, it would have deleted the requirement because its reason for mandating an enhancement finding no longer existed.  Without explanation, the Service passively modified the Special Rule by requiring an enhancement finding for some reason other than complying with CITES requirements.  The Service made this change without explanation and without giving the public the opportunity to comment.

 In 1997, CITES transferred Zimbabwe's elephants from Appendix I to Appendix II, further erasing the Service's original reason for requiring enhancement findings for Zimbabwe's elephants.  As CITES had ***never*** imposed an enhancement requirement for Appendix II species, the Service had no reason whatsoever to continue to impose the finding requirement for Zimbabwe's elephants.  Again, the Service retained the requirement without explanation and passively changed the Special Rule by maintaining a mandate for which its reason no longer existed.  And again, the Service failed to give the public its statutorily required opportunity to comment on the rule change.

The ESA authorizes the Service to issue threatened species regulations only that are deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Such rules are generally referred to as 4(d) rules.  By retaining the enhancement of survival requirement for Appendix II elephants after the reason for the requirement disappeared, the Service implicitly codified a 4(d) rule based on some new conclusion that the enhancement finding remains necessary and advisable for the conservation of elephants.  The Service has violated the ESA by never conducting rulemaking to demonstrate why the enhancement finding is "necessary and advisable."

The Service has also violated the APA by changing a regulation without going through a proper rulemaking process.  To modify a regulation such as the Special Rule, the Service must

follow APA rulemaking requirements, including the provisions requiring notice and an

opportunity for the public to provide meaningful comment.  5 U.S.C. §553(b) and (c).  The

Service has also acted in an arbitrary and capricious manner in violation of the APA, by failing

to explain any new purpose of the enhancement of survival requirement.  Inadequately explained

agency action qualifies as arbitrary and capricious conduct.  *Sw. Power Pool Inc. v. F.E.R.C.*,

736 F.3d 994, 995 (D.C. Cir. 2013).  An agency that engages in rulemaking must "articulate a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'"  *Motor Vehicles Mfrs. Ass'n. of the U.S.*, 463 U.S. at 43 (quoting

*Burlington Truck Lines v. United St*ates, 371 U.S. 156, 168 (1962)).  The same standard applies

when the agency changes an existing rule.

> To be sure, the requirement that an agency provide reasoned explanation for its
> action would ordinarily demand that it display awareness that it *is* changing
> position. An agency may not, for example, depart from a prior policy *sub silentio*
> or simply disregard rules that are still on the books.

*FCC v. Fox Television Stations Inc*., 556 U.S. 502, 515 (2009) (discussing nature of the

explanation needed for new agency policy) (citing *United States v. Nixon,* 418 U.S. 683, 696

(1974)).  The agency may not, by its silence, deprive the public of its right to an explanation of

an agency's shift in position, or to the opportunity to comment on the reasons for that shift.

> [A]n agency changing its course must supply a reasoned analysis indicating that
> prior policies and standards are being deliberately changed, not casually ignored,
> and if an agency glosses over or swerves from prior precedents without discussion
> it may cross the line from tolerably terse to intolerably mute.

*Greater Boston Television Corp., v. FCC,* 444 F.2d 841, 852 (D.C. Cir. 1970).

The Service's unexplained change in rationale for the enhancement of survival

requirement constitutes a modification of a 4(d) rule.  The 4(d) Special Rule for elephants

purports to dictate the criteria under which individuals are able to import legally sport-hunted

elephants.  The Special Rule directly impacts the interests and rights of the community of

individuals who hunt in Africa and seek to import legally harvested elephants into the U.S.  The

Special Rule therefore constitutes a substantive or legislative rule that cannot be adopted or

changed without APA rulemaking.

> [A] substantive rule modifies or adds to a legal norm based on the agency's own
> authority. That authority flows from a congressional delegation to promulgate
> substantive rules, to engage in supplementary lawmaking. And, it is because the
> agency is engaged in lawmaking that the APA requires it to comply with notice
> and comment.

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997).  Congress authorized the Service

to issue 4(d) rules like the Special Rule when the Service deems such regulation "necessary and

advisable" for a species' conservation.  When the Service promulgates such a rule it uses the

authority Congress delegated to it to establish or change legal norms applicable to the

importation of members of the species.

Even if the Special Rule did not constitute legislative or substantive rulemaking, the

Service has resolved the matter by generally treating 4(d) rules as legislative rules and

acknowledging its obligation to follow APA rulemaking procedures for the promulgation and

modification of 4(d) rules.  In a recent example, the Service responded to a public comment

concerning the public process for amending a 4(d) rule for the Georgetown Salamander:  "Future

changes to the content of this 4(d) rule require a public notice and comment period."  80 Fed.

Reg. 47418, 47424 (Aug. 7, 2015).

The Service has never published a public notice explaining its new reasons for the

enhancement of survival requirement for African elephants listed on Appendix II or offered the

public the opportunity to comment on why the requirement is or is not "necessary and

advisable."[22]  When it originally proposed to promulgate the Special Rule, the Service provided

notice in the Federal Register and an opportunity for public comment.  56 Fed. Reg. 11392 (Mar.

18, 1991).  If the original rule required adherence to the APA notice and comment requirements,

an amendment of the rule requires the same.  By failing to follow such procedures, and/or failing

to explain the new reason for the rule, the Service violated 5 U.S.C. §§553 and 706.  By failing

to demonstrate why the Special Rule's enhancement of survival requirement remains necessary

and advisable for African elephant conservation, the Service violated Section 4(d) of the ESA.

This Court should invalidate the Special Rule and remand it to the Service for compliance with

statutory requirements.

**F.     The Service Failed to Rebut the Section 9(c)(2) Presumption that Imports of Sport-hunted Elephants from Zimbabwe Comply with All ESA Statutory and Regulatory Requirements, Including Enhancement**

To this day, the Service has never considered, much less affirmatively overcome, the

presumption found in Section 9(c)(2) of the ESA that importation of elephants (which are listed

as threatened under the ESA) from Appendix II countries, such as Zimbabwe, are legal under the

ESA and any implementing regulations.  Because the Service never rebutted the presumption,

this Court should find that the requirements of the Special Rule have been met and that the

importation of elephants from Zimbabwe enhances the survival of the species.  Consequently,

the Service has acted illegally in banning their importation.

For threatened species on Appendix II of CITES, the ESA states:

(2) Any importation into the United States of fish or wildlife shall, if--

(A) such fish or wildlife is ***not an endangered species*** listed pursuant to section 1533 of this title but is listed in ***Appendix II*** to the Convention,

---

[22] Although the August 22, 1997 Federal Register notice was a proposed rule on which the Service solicited public comment, the comment opportunity applied to whether the Service should submit reservations regarding changes to the Appendix listing for species and not to the Service's retention of the enhancement of survival finding requirements of the special rule.

(B) the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,

(C) the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and

(D) such importation is not made in the course of a commercial activity,

be presumed to be an importation not in violation of any provision of this chapter *or any regulation issued pursuant to this chapter*.

16 U.S.C. §1538(c)(2) (emphasis added).  Due to this plain language, the Service must presume that any importation of sport-hunted elephants from Zimbabwe (Appendix II, ESA-threatened species) does not violate the ESA and the Special Rule (a regulation adopted pursuant to the ESA).  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (citations omitted).  Because the statutory language is unambiguous, the Court need not defer to any interpretation of the meaning of the statute proffered by the Service.  *Chevron, U.S.A., Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

As discussed above, in all three enhancement findings, the Service based its importation ban on an inability to make a positive finding.  In contrast to these findings, the plain meaning of the Section 9(c)(2) establishes, among other things, that the Service must presume for all imports of elephants from Zimbabwe that all the conditions of the Special Rule are met, including a finding that the "killing of the animal whose trophy is intended for import would enhance survival of the species."  The Special Rule itself cannot overcome the presumption of validity because it is a "regulation" to which the presumption applies.  The Service must independently

rebut the presumption of validity with an affirmative finding based on the facts available at the time of the importation.  It cannot rely on a purported inability to make a positive enhancement finding to bar imports.

The Service has never overcome this presumption while it applied.  The Service first adopted the elephant Special Rule in 1978 and amended it in 1982 and 1992.  43 Fed. Reg. 20499; 47 Fed. Reg. 31384 (July 20, 1982); 57 Fed. Reg. 35473.  The initial Special Rule, adopted in 1978, when the Service first listed the elephant as threatened under the ESA, allowed the importation of elephants from countries that were parties to CITES.  The preamble to the Special Rule, with its lenient importation requirements, itself did not address, much less rebut, Section 9(c)(2) or its presumption, although the African elephant was on Appendix II at the time. 43 Fed. Reg. at 20502.  When amending the Special Rule in 1982, the Service indicated that the Section 9(c)(2) presumption generally applied to "African elephant hunting trophies," but the 1982 revisions to the Special Rule only related to ivory and the Service did not in any way seek to overcome or otherwise address the presumption for the import of sport-hunted elephants.  47 Fed. Reg. 31384.

The same is also true for the 1992 amendment of the Special Rule – neither the rule amendment nor the preamble discussed Section 9(c)(2).  *See* 57 Fed. Reg. 35473.  In fact, in 1992, the Service had no reason to even consider whether the presumption was rebutted.  In 1989, the CITES parties moved all African elephants to Appendix I.  *See* 55 Fed. Reg. 5847 ("[P]roposal to transfer the African elephant (Loxodonta africana) from Appendix II to Appendix I … was subsequently approved …..").  Assuming that a Special Rule *could* rebut the presumption, at the time of the amendment of the Special Rule, the Service had no reason to determine that the presumption found in Section 9(c)(2) was rebutted, as this presumption only

applies to Appendix II species.  In any event, the Special Rule, including as amended, has never rebutted the presumption.

In addition, the Service cannot categorically determine that any time it issues a Section 4(d) special rule, that special rule rebuts the statutory presumption.  As noted in the Legal Background section and above, the Section 9(c)(2) presumption also applies to "any regulation issued pursuant to [the ESA]."  16 U.S.C. §1538(c)(2).  Thus, the Service's regulation that purports to implement Section 9(c)(2) goes too far in claiming that the mere issuance of a special rule means that the statutory presumption does not apply.  *See* 50 C.F.R. §17.8(b).  A regulation that is in conflict with the statutory scheme it implements must give way to the statute.  *See Pub. Emps. Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989), *superseded by statute on other grounds* (agency's interpretation found in regulation; "[e]ven contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language."); *Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation.") (citing *Pub Emps. Ret. Sys. of Ohio*, 492 U.S. at 171).  In addition, finding that a special rule (a regulation under the ESA) rebuts the presumption that applies to regulations under the ESA would make the statutory presumption a nullity, which the law disfavors.  *See Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010) (interpretation of statute "would violate the canon against interpreting any statutory provision in a manner that would render another provision superfluous.").

When the CITES parties transferred African elephants in Zimbabwe to Appendix II in 1997, the presumption again applied to this Appendix II species.  At this time, the Service did not make an independent or new determination that the Section 9(c)(2) presumption was rebutted

or, in particular, that any factual finding in the Special Rule applied to overcome this presumption.  In fact, shortly after the transfer of these elephants to Appendix II, the Service determined that the sport-hunting of African elephants in Zimbabwe for the purposes of importation into the United States enhanced the survival of the species.  AR22.  This determination establishes that the Service found conditions to be in place showing that the imports and hunting *did enhance* the survival of the species.  Those same conditions could not show the opposite, that the imports and hunting *did not enhance* the survival of the species such that a presumption of enhancement was overcome.  This conclusion undermines any argument that the Special Rule or any other information in the Service's possession since 1997 rebutted the presumption that elephant imports from Zimbabwe did not violate the ESA or implementing regulations, including the Special Rule's enhancement requirement.

The Service's position that the Special Rule automatically rebuts the statutory presumption creates a non-sensible situation.  As explained below, a threatened species for which the Service has not adopted a special rule generally is more heavily regulated than a threatened species for which the Service has adopted a special rule that allows at least some otherwise prohibited acts to occur.[23]  But, the Service's position is that a threatened species for which the Service has not adopted a special rule can be imported without restrictions pursuant to the Section 9(c)(2) presumption, but the importation of a species for which the Service has adopted a special rule is restricted.

---

[23] For example, in issuing the Special Rule in 1978, the Service recognized that the rule reduced the showing necessary to import an elephant.  43 Fed. Reg. at 20502 (requiring only a showing that elephant was harvested in the wild from a country that is a party to CITES).  In contrast, without the Special Rule, imports would be subject to 50 C.F.R. §17.32, which requires a more onerous showing of enhancement.  43 Fed. Reg. at 20503.

The Service has taken the position that in the absence of a Section 4(d) rule, the importation of a threatened, Appendix II species is allowed because of Section 9(c)(2). Determination of Threatened Status for the Polar Bear, 73 Fed. Reg. 28212, 28242 (May 15, 2008) ("Section 9(c)(2) of the Act provides that the non-commercial import of threatened and Appendix-II species, including their parts, that were taken in compliance with CITES is not presumed to be in violation of the Act."); *see also Conservation Force v. Salazar*, 915 F. Supp. 2d 1, 4 (D.D.C. 2013) (Federal Defendants stated "that plaintiffs would not need to obtain these enhancement permits because plaintiffs' trophies will be eligible for importation under the ESA's exemption for species listed in CITES Appendix II, 16 U.S.C. §1538(c)(2)(A)."). The Service also has, by regulation, applied to threatened species almost all of the Section 9 prohibitions applicable to endangered species and retained the authority to exempt some or all of the prohibitions by regulation applicable to a particular threatened species (*i.e.,* by special rule under Section 4(d)). 50 C.F.R. §17.31(a) (generally all of the prohibitions applicable to endangered species, such as "take," import, etc., shall apply to threatened wildlife).[24]

For this more heavily regulated species (*i.e.,* a threatened species without a special rule), however, imports are allowed under Section 9(c)(2) because, under the Service's theory, no special rule exists to rebut the presumption. On the other hand, with a special rule in place, under the Service's interpretation, imports are not allowed or are only allowed with conditions for this less-heavily regulated species. In the actions and decisions challenged in this case, the

---

[24] To reach its conclusion that Section 9(c)(2) allows the importation of Appendix II, threatened species for which there is no special rule, the Service would have to conclude that the Section 9(c)(2) presumption applies to and overcomes 50 C.F.R. §17.31, which applies the prohibition on importation (and other prohibitions) to threatened species. The Service, however, fails to explain why the Section 9(c)(2) presumption would not equally apply to any conditions found in a regulatory special rule.

Service has applied this flawed interpretation to the importation of African elephants from Zimbabwe and illegally banned imports without specifically rebutting the statutory presumption.

None of the three enhancement findings or importation ban decisions challenged in these cases rebutted the presumption that noncommercial imports of sport-hunted elephants from Zimbabwe comply with the ESA and the Special Rule. Because of the presumption, the starting point for the Service's analysis must be that the importation (and associated hunting) enhances the survival of the species. The Service did not do this. Instead, all the decisions merely purport to be unable to find that the sport-hunting of the species enhances the survival of the species and places the burden on the hunter/importer to overcome the finding. *See, e.g.,* April 2014 Enhancement Finding, AR89 at 3656 (Service asserts that it is taking a "precautionary approach" and finding no enhancement based on a lack of information); July 2014 Enhancement Finding, AR206 at 4505 ("the Service has determined that it is unable to make a finding that the killing of elephants in Zimbabwe, after April 4, 2014, whose trophies are intended for importation into the United States, would enhance the survival of the African elephant in the wild."); March 2015 Enhancement Finding, AR344 at 7256 (Service "unable to make a finding" that hunting enhances survival of species). The Service failed to overcome the presumption that the importation enhances the survival of the species by affirmatively finding that it does not.[25]

---

[25] The two district court cases that substantively addressed Section 9(c)(2) are not contrary to SCI/NRA's argument that the Service has not rebutted the Section 9(c)(2) presumption. In one case, the plaintiff brought different legal claims. *Safari Club Int'l v. Babbitt,* 1993 WL 13932673, *12, 14 (W.D. Tx. 1993). In the other case, the court addressed the issue in dictum and made numerous legal errors. *U.S. v. One Etched Ivory Tusk of African Elephant*, 871 F.Supp.2d 128 (E.D.N.Y. 2012). If any defendants raise these cases, SCI/NRA will address them further in their opposition/reply brief.

### G.      SCI/NRA Have Standing to Bring These Claims

Based on injuries to the interests of their members and their own interests caused by the Zimbabwe importation ban, SCI/NRA have standing to bring these claims. Federal Defendants challenged SCI/NRA's standing to bring their separate claims related to Tanzania, but did not challenge SCI/NRA's standing to bring the Zimbabwe claims. Dkt. 11, at 1 (filed May 13, 2014); *see also* Dkt. 23, at 1 (June 5, 2014) (same); Dkt. 37, at 3 (Aug. 8, 2014) (same).

SCI/NRA have established all the elements of standing. Standing requires demonstration of injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In short, Federal Defendants' import ban determinations harmed and continue to harm the interests of members of SCI/NRA who hunt elephants in Zimbabwe and whose businesses rely on elephant hunting. The importation ban prevents SCI/NRA members who harvested an elephant in Zimbabwe in 2014 and 2015 from importing their harvested elephant.

Numerous SCI/NRA members harvested an elephant in Zimbabwe in 2014 or 2015.[26] Three individuals harvested their elephants within days after the April 4, 2014 ban went into effect.[27] Some of these declarants are spending money to store their elephant parts (*e.g.,* hide, tusks) in the hopes that they will someday be allowed to import them.[28] Other SCI/NRA

---

[26] Bonander Decl., ¶5, Ex. 1 (harvested elephant in 2015); Cheek Decl., ¶13, Ex. 2 (harvested elephant in 2014); John Cox Decl., ¶4, Ex. 3 (harvested elephant in 2015); Grieb Decl., ¶7, Ex. 4 (harvested elephant on April 7, 2014); Jines Decl., ¶3, Ex. 5 (harvested elephant in 2015); Rhyne Decl., ¶7, Ex. 6 (harvested elephant in early April 2014); Vick Decl., ¶9, Ex. 7 (harvested elephant in April 2014); Whaley Decl., ¶10, Ex. 8 (harvested elephant in early April 2014). All these facts are also reflected in the Statement of Material Facts.

[27] Grieb Decl., ¶7, Ex. 4; Rhyne Decl., ¶7, Ex. 6; Whaley Decl., ¶10, Ex. 8. The abrupt and unannounced ban is particularly egregious for them. When they left the United States it was legal to import an elephant from Zimbabwe, but it became illegal while they were in the field hunting.

[28] Bonander Decl., ¶6, Ex. 1; Cheek Decl., ¶13, Ex. 2; Cox Decl., ¶5, Ex. 3; Grieb Decl., ¶12, Ex. 1; Jines Decl., ¶4, Ex. 5; Rhyne Decl., ¶7, Ex. 6; Vick Decl., ¶15, Ex. 7; Whaley Decl., ¶15, Ex. 8; McCallum Decl., ¶15, Ex. 13.

members cancelled hunts and some did not book elephant hunts they would have booked but for the importation ban, harming SCI/NRA member outfitters and guides.[29]  Charlton McCallum Safaris, which has provided elephant guiding services to many SCI/NRA members in Zimbabwe, has lost and expects to continue to lose revenue due to the U.S. importation ban.[30]  In addition, their ability to conserve elephants and fight poaching has suffered greatly.[31]

An order reversing the 2014 and 2015 importation bans would restore the 1997 Enhancement Finding, which allowed the importation of elephants.  Setting aside the challenged decisions would also encourage more U.S. hunters to hunt elephants in Zimbabwe, which would benefit guide and outfitter members of SCI/NRA, and would benefit SCI/NRA's and their members' conservation interests.  Such a ruling would remedy the harms to SCI/NRA members described above.  For all these reasons, SCI/NRA have established their members' standing to bring these claims.

Since SCI/NRA members have standing, SCI/NRA have organizational standing.  A plaintiff establishes associational standing by showing:

> (a) its members would otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane to the organization's purpose; and
> (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

---

[29] Konieczny Decl., ¶¶8-9, Ex. 9 (converted elephant hunt to hunt for another species; would like to but will not book elephant hunt); Zulim Decl., ¶¶3-4, Ex. 10 (cancelled 2015 hunt and lost deposit; rebooked for 2016 but will not go if ban in place, will lose deposit); Kopecky Decl., ¶¶5-7, Ex. 11 (cancelled 2014 hunt; did not receive a refund); Capozza Decl., ¶¶10, 19, Ex. 12. The Kopecky, Capozza, and Goodenow (cited below) declarations are those that SCI filed in the preliminary injunction proceeding in case no. 10-670.  As there was no need to revise or supplement these declarations, SCI/NRA is using them here.

[30] McCallum Decl., Ex. 13, ¶¶ 6-8, 15 ("Our company's gross sales dropped from $1,430,461.00 in 2013, to $1,289,205 in 2014 to $1,068,999 in 2015. That represents a $361,462 drop in income or 25%.").

[31] *Id.* ¶14 (they "will be unable to fund community projects and the DAPU [anti-poaching] program, at least not at the same levels.").

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).  In this lawsuit,

SCI/NRA seek to protect hunting and sustainable use conservation, which are germane to their

interests.[32]  Finally, nothing about this challenge to federal administrative action, based primarily

on an administrative record, requires the participation of SCI/NRA members in this lawsuit.  For

all these reasons, SCI/NRA have standing to bring these claims.

## V.       CONCLUSION

For all these reasons, SCI/NRA ask the Court to set aside the April 2014, July 2014, and

March 2015 negative enhancement findings for any of the reasons that apply to all three findings.

This will reinstate the positive 1997 Enhancement Finding and allow those hunters who

harvested an elephant from Zimbabwe after April 4, 2014 to import their elephant, and will allow

future importations.  Alternatively, SCI/NRA ask the Court to (1) set aside the April 2014

Enhancement Finding or declare it was not in effect until May 12, 2014 (date of publication in

Federal Register) for any reason that applies only to that finding; (2) set aside the July 2014

Enhancement Finding or declare it was not in effect until July 31, 2014 (date of publication in

Federal Register) for any reason that applies only to that finding; and/or (3) set aside the March

2015 Enhancement Finding or declare it was not in effect until July 17, 2015 (date of publication

in Federal Register, 80 Fed. Reg. 42524) for any reason that applies only to that finding.

Dated:  February 18, 2016.

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Douglas Burdin
D.C. Bar No. 434107

---

[32] *See* Goodenow Decl., ¶¶5-8, Ex. 14; Chris Cox Decl. ¶¶ 3, 5-6, Ex. 15.

Jeremy Clare
D.C. Bar No. 1015688
501 2nd Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff*
*Safari Club International*

Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff*
*National Rifle Association of America*