# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 14-cv-00670-RCL; |
| | ) | 15-cv-01026-RCL (consolidated) |
| v. | ) | |
| | ) | |
| SALLY M. R. JEWELL, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

# SAFARI CLUB INTERNATIONAL AND NATIONAL RIFLE ASSOCIATION OF AMERICA'S (1) OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND (2) REPLY TO OPPOSITIONS TO MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

GLOSSARY ........................................................................................................................ vi

I.   INTRODUCTION ..................................................................................................... 1

II.  ARGUMENT ............................................................................................................ 2

    A. The April 2014 and July 2014 Findings Are Arbitrary and Contrary to Law .............. 2

      **1.**     Federal Defendants Have No Defense To the Fact That the Service Breached the Commitments It Published in the Federal Register ............................................... 2

      2.     The Service Failed to Ask For Information Reached a Foregone Conclusion ....... 5

      3.     Numerous Factual Errors Add Up to Arbitrary Decisions.................................... 6

    B. The March 2015 Enhancement Finding Arbitrarily Ignored or Misapplied Relevant Information ............................................................................... 15

    C. The Service Applied an Illegal Enhancement Standard and Used Prohibited Guidelines ....................................................................................................... 22

  D. The Service Failed to Conduct Required Rulemaking and Cannot Retroactively Apply the July 2014 Finding to Correct Errors in the April 2014 Finding ................................. 24

    1.     The Enhancement Findings are Rulemakings, Not Adjudications ...................... 24

      2.   The Failure to Conduct Rulemaking Was Not Harmless Error ........................... 27

    3.     The Service Cannot Retroactively Apply the July 2014 Finding to Correct Errors in the April 2014 Finding........................................................... 29

    E. The Service Illegally Failed to Comply with Rulemaking Requirements When It Modified the Special Rule's Enhancement Finding Requirements........................ 33

    F. The Service Never Overcame the Section 9(c)(2) Presumption that Sport Hunting Enhances the Survival of Elephants in Zimbabwe ....................................... 36

    G. SCI/NRA Properly Seek Vacatur of the Three Enhancement Findings .................... 44

  III. CONCLUSION …………………………………………………………………………45

# TABLE OF AUTHORITIES

## Cases

Abenaki Nation of Mississquoi v. Hughes, 805 F. Supp. 234 (D. Vt. 1992) ............................... 27

AFL-CIO v. Chao, 496 F. Supp. 2d 76 (D.D.C. 2007)................................................................. 46

Am. Min. Cong. v. E.P.A., 907 F.2d 1179 (D.C. Cir. 1990) ........................................................ 36

Arkema Inc. v. EPA, 618 F.3d 1 (D.C. Cir. 2010) ...................................................................... 32

Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988) ........................................................... 32

Brock v. Cathedral Bluffs Shale Oil Co., 796 F.2d 533 (D.C. Cir.1986) .................................... 42

Bruner v. Off. of Personnel Mgt., 996 F.2d 290 (Fed. Cir. 1993) ............................................... 44

City of Arlington, Tex. v. F.C.C., 668 F.3d 229 (5th Cir. 2012).................................................. 26

City of St. Paul v. FAA, 865 F.2d 1329 (table), 1989 WL 3871 (D.C. Cir. 1989)....................... 28

Coleman v. Pension Benefit Guaranty Corp., 94 F. Supp. 2d 18 (D.D.C. 2000) ......................... 24

Dixon v. U.S., 381 U.S. 68 (1965)............................................................................................... 33

Ecology Ctr., Inc. v. U.S. Forest Serv., 451 F.3d 1183 (10th Cir. 2006) ...................................... 8

Empresa Cuban Exportadora v. U.S. Dep't of Treas., 516 F. Supp. 2d 43 (D.D.C. 2007) ........... 3

Forester v. Consumer Prod. Safety Comm., 559 F.2d 774 (D.C. Cir. 1977)............................... 47

Franks v. Salazar, 816 F. Supp. 2d 49 (D.D.C. 2011) ........................................................... 26, 27

Heartwood Inc. v. U.S. Forest Serv., 380 F.3d 428 (8th Cir. 2004) .............................................. 8

HSUS v. Pritzker, 75 F. Supp. 3d 1 (D.D.C. 2014) ...................................................................... 7

Jicarilla Apache Nation v. U.S. Dept. of Int., 613 F.3d 1112 (D.C. Cir. 2010)........................... 46

Kern Cnty. Farm Bureau, 450 F.3d 1072 (9th Cir. 2006)............................................................. 7

Marcum v. Salazar, 810 F.Supp.2d 56 (D.D.C. 2011)............................................................ 25, 26

Milk Indus. Found. v. Glickman, 949 F. Supp. 882 (D.D.C. 1996) ............................................ 37

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto Ins. Co.,
    463 U.S. 29 (1983).............................................................................................................. 37, 45

Nat'l Wildlife Fed'n v. Marsh, 568 F. Supp. 985 (D.D.C. 1983) .................................................. 27

Nevada v. Dept. of Energy, 457 F.3d 78 (D.C. Cir. 2006) ........................................................ 46

Safari Club Int'l v. Babbitt, 1993 WL 13932673 (W.D. Tx. 1993)........................................ 40, 44

Safe Extensions Inc. v. FAA, 509 F.3d 593 (D.C. Cir. 2007) ........................................................ 28

Serono Laboratories Inc. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998)........................................... 6

Steenholdt v. FAA, 314 F.3d 633, 638 (D.C. Cir. 2003) .......................................................... 3

Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58 (D.C. Cir. 2000)................................ 7

The Wilderness Soc. v. Norton, 434 F.3d 584 (D.C. Cir. 2006) .................................................. 41

U.S. v. Jones, 2010 WL 7697509 (W.D. Pa. Oct. 18, 2010) ........................................................ 33

U.S. v. Lavi, 2004 WL 2482323 (E.D. N.Y.  Sept. 23, 2004) ...................................................... 33

U.S. v. One Etched Ivory Tusk of African Elephant, 871 F.Supp.2d 128
     (E.D.N.Y. 2012)....................................................................................................... 40, 41

Yesler Terrace Cmty. Council v. Cisneros, 37 F.3d 442 (9th Cir. 1994) .................................. 26

**Statutes**

5 U.S.C. § 551(4) ....................................................................................................... 25, 30

5 U.S.C. § 553....................................................................................................................... 4

5 U.S.C. § 553(b) ................................................................................................................ 28

16 U.S.C. § 1533(d) ....................................................................................................30, 34, 37

*16 U.S.C. § 1538(c)(2)......................................................................................................37, 38

**Rules**

L.Cv.R 7(h) ............................................................................................................................ 2

**Regulations**

50 C.F.R. §17.8(b) ................................................................................................................ 43

54 Fed. Reg. 19146 (May 5, 1989) ........................................................................................ 38

*57 Fed. Reg. 35473 (Aug. 10, 1992).................................................................... 22, 34, 38, 39

60 Fed. Reg. 12969 (Mar. 9, 1995) ............................................................................................. 23

*62 Fed. Reg. 44627 (August 22, 1997) ....................................................................... 2, 33, 34, 36

66 Fed. Reg. 27601 (May 18, 2001) .............................................................................................. 3

79 Fed. Reg. 26986 (May 12, 2014) ............................................................................................... 3

80 Fed. Reg. 45165 (July 29, 2015) ............................................................................................. 29

* Authorities chiefly relied on.

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| April 2014 Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (dated April 17, 2014) |
| AR | Administrative Record in the district court for the Zimbabwe importation ban decisions |
| CAMPFIRE | Zimbabwe's Communal Areas Management Programme for Indigenous Resources |
| CITES | Convention on International Trade in Endangered Species of Wild Fauna and Flora |
| Decl. | Declaration |
| D-I Opp. | Defendant-Intervenors' Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment |
| Dkt. | Docket |
| Elephant Survey | Pan African Aerial Elephant Survey |
| ESA | Endangered Species Act |
| Federal Defendants | Federal Defendants Secretary of the Interior, Sally Jewell *et al*. |
| Internal guidelines | Guidelines that the U.S. Fish and Wildlife Service previously used to evaluate importation applications for sport-hunted elephants.  They were withdrawn in 60 Fed. Reg. 12969 (Mar. 9, 1995) |
| IUCN | International Union for Conservation of Nature |

| | |
|---|---|
| IUCN Report | Report from the African Elephant Database entitled "Zimbabwe, 2012 ('2013 Africa' analysis)" |
| July 2014 Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (dated July 22, 2014) |
| March 2015 Finding | Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe On or After January 1, 2015 |
| MIKE | Monitoring the Illegal Killing of Elephants |
| Motion or MSJ | Safari Club International and National Rifle Association of America's Motion for Summary Judgment and Memorandum in Support |
| Opposition or Opp. | Memorandum in Support of Federal Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment |
| PIKE | Proportion of Illegally Killed Elephants |
| SCI/NRA | Safari Club International and the National Rifle Association of America |
| Service | United States Fish and Wildlife Service |
| Special Rule | Regulation that provides criteria for the importation of legally hunted African elephants into the United States.  50 C.F.R. §17.40(e). |
| ZPWMA | Zimbabwe Parks & Wildlife Management Authority |
| 1997 Finding | 1997 Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe, July 2, 1997 |

## I.       INTRODUCTION

Defendant U.S. Fish and Wildlife Service ("Service") seems bent on using its import

authority to force Zimbabwe to modify its management of elephants.  Hunters and elephants are

suffering the costs of the Service's illegal conduct.  In a Motion for Summary Judgment

("Motion" or "MSJ") and in this Opposition and Reply brief, plaintiffs Safari Club International

and the National Rifle Association of America ("SCI/NRA") explain how the Service relied on

inadequate information, misapplied relevant information, and twisted the law, all in an attempt to

justify its decision not to allow hunters to import sport-hunted elephants from Zimbabwe.  In

reviewing SCI/NRA's claims, the Court should determine whether the Service has exceeded the

narrow task the law authorizes the Service to perform – to determine whether sport-hunting

enhances the survival of Zimbabwe's elephants, rather than whether Zimbabwe's management of

elephants is flawless.  This Court must examine whether the Service misapplied the law by not

conducting rulemaking, requiring an enhancement finding, or failing to correctly apply the

statutory presumption that sport-hunting does enhance the survival of the species. In their

Motion, SCI/NRA demonstrated that the Service's three enhancement findings, and other actions

taken by the Service, were arbitrary and capricious and otherwise contrary to law under the

Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").  MSJ at 14-

64.[1]

In their Cross-Motion for Summary Judgment/Opposition ("Opposition" or "Opp."),

Federal Defendants fail to refute these arguments.  Other than agreeing with SCI/NRA that

enhancement findings must be adopted through rulemaking and asserting that SCI/NRA are not

---

[1] SCI/NRA refer to the three enhancement findings as the "April 2014 Finding," "July 2014
Finding," and "March 2015 Finding."  Likewise, the July 2, 1997 enhancement finding is "1997
Finding."

1

entitled to meaningful relief if they prevail, Defendant-Intervenors Friends of Animals *et al.*'s

opposition brief ("D-I Opp.") adds little to the defense of this case.  In essence, Defendants ask

the Court to ignore a host of factual and legal errors, and afford unwarranted deference to the

Service's decision-making.[2]

## II.     ARGUMENT

### A.     The April 2014 and July 2014 Findings Are Arbitrary and Contrary to Law

#### 1.     Federal Defendants Have No Defense To the Fact That the Service Breached the Commitments It Published in the Federal Register

The only defense that Federal Defendants offer to dispute the fact that the Service made

commitments in the Federal Register regarding what it would do if and when it planned to alter

the 1997 Finding is – ***the Service said it but didn't really mean it***.  Federal Defendants do not

dispute that the Service stated, in a Federal Register Notice dated August 22, 1997, that

> The enhancement findings for importation of sport-hunted elephant trophies from Botswana, Namibia, and Zimbabwe are on file in the Office of Management Authority and ***remain in effect*** until the Service finds, ***based on new information***, that the conditions of the special rule are no longer met ***and has published a notice of any change in the Federal Register***.

62 Fed. Reg. 44627, 44633 (emphasis added).  Despite committing to these terms, the Service

reversed the 1997 Finding based on a lack of, rather than new, information and without first

publishing the change in the Federal Register.

Federal Defendants claim that the August 22, 1997 commitments cannot be binding

because the Service did not incorporate the promises into a regulation.  They argue that the only

way the Court can hold the Service to its commitment is if the Court can find "extrinsic

---

[2] SCI/NRA demonstrated their standing to bring these claims.  Motion for Summary Judgment ("MSJ") at 62-64.  No party disputes their standing.  SCI/NRA filed a Statement of Material Facts because, as explained in that Statement, L.Cv.R 7(h) is unclear whether one is needed in an administrative record case to demonstrate the facts relevant to standing.

evidence" demonstrating that the agency intended to be bound.  Opp. at 31.  The extrinsic

evidence shows that the Service did intend to be bound.

Evidence of the Service's intent comes from a second Federal Register notice in which

the Service repeated the exact same commitment concerning an enhancement finding for the

importation of elephants from another African country:

> The enhancement findings for the importation of sport-hunted elephant trophies
> from South Africa are on file in the Division of Management Authority and
> remain in effect until the Service finds, based on new information, that the
> conditions of the special rule are no longer met and has published a notice of any
> change in the Federal Register.

66 Fed. Reg. 27601, 27609 (May 18, 2001).  Statements of intent need not be part of regulatory

language to commit the agency to carry out specific promises.  As this Court acknowledged in

*Empresa Cuban Exportadora v. U.S. Dep't of Treas.*, "[c]ourts may glean such standards not

only from statutes and regulations but also from formal and informal policy statements that

create binding norms by imposing rights or obligations on the respective parties.'" 516 F. Supp.

2d 43, 58 (D.D.C. 2007) (quoting *Steenholdt v. FAA,* 314 F.3d 633, 638 (D.C. Cir. 2003)).[3]

The Service's own statement in May 2014 provides further compelling extrinsic

evidence.  The Service characterized the April 4, 2014 importation ban as an "interim

suspension" and restated the binding commitment the Service had published in the 1997 Federal

Register.  "If, based on new information, the conditions of the special rule are no longer met, the

Service explained that it would publish a notice in the Federal Register of any change."  79 Fed.

Reg. 26986 (May 12, 2014).  Implicitly acknowledging that it could not make a final

---

[3] The fact that, during the almost two decades between August 22, 1997 and April 4, 2014, the
Service had never breached its commitments concerning the enhancement findings for the
elephants of Zimbabwe, Namibia, Botswana or South Africa, undermines rather than supports
Federal Defendants' argument that the Service did not intend to be bound by the commitments or
that the term of the Service's commitment had expired.

3

enhancement determination unless that decision was based on new information and published in

the Federal Register, the Service reiterated its commitment for future enhancement findings:

> The Service has requested the information necessary to make a final decision
> from the Government of Zimbabwe. After the Service has an opportunity to
> review **new information** and obtain additional information, if necessary, we will
> make a final decision. If the Service finds that sport hunting of African elephants
> in Zimbabwe enhances the survival of the species, the suspension will be lifted. If,
> after reviewing the **new information**, the Service finds that sport hunting of
> African elephants in Zimbabwe does not enhance the survival of the species, the
> suspension will continue until the Service receives new information in the future
> that would allow it to make a positive enhancement finding. Either way, the final
> finding **will be published in the Federal Register** and made available on the
> Service's Web page.

*Id*. at 26987 (emphasis added).  The May 12, 2014 notice demonstrates two things:  (1) on April

4, 2014, the Service had violated its own commitments by not collecting, reviewing and

ultimately relying on new information from Zimbabwe to change its pre-existing enhancement

finding; and (2) the Service was aware that it could not make a final change to the 1997 Finding

until it published the finding in the Federal Register.

Federal Defendants' alternative argument that the Service kept its promises also fails.

First, they contend that the Service met its publication promise because the "advent" of the

Internet obviated the need to publish decisions in "official publications."  Opp. at 32.  While the

internet is effective for the purposes of communication, the Federal Register remains the

statutorily required site for the Service's publication of rules and other decision-making affecting

the public.  5 U.S.C. § 553.  The internet does not relieve the Service of its own commitment to

publish in the Federal Register.

Federal Defendants also argue that the Service's April 2014 Finding was based on "new

information," inappropriately asserting that "new information" is the equivalent of a "lack of

information."  Opp. at 31.  While Federal Defendants may argue that a lack of sufficient

information could qualify as a "new" situation, that situation did not exist on April 4, 2014.  In fact, the Service sent Zimbabwe a questionnaire in 2007 seeking information about Zimbabwe's elephants and received a set of answers from Zimbabwe on May 31, 2007.  Administrative Record ("AR") 35b; AR35c.  Federal Defendants admit that, after receiving Zimbabwe's response, the Service received no new information from Zimbabwe before issuing the April 2014 Finding.  Federal Defendants also concede, by omission, that the Service never directly asked Zimbabwe to supplement the information provided in May 2007.[4]  Consequently, the Service's alleged "lack of sufficient information" (1) was not a new situation, but had been the status quo since 2007, and (2) was the result of the Service's own failure to request information and/or to inform Zimbabwe that unless it provided additional information, the Service would ban elephant importation from the country.

### 2. The Service Failed to Ask For New Information and Reached a Foregone Conclusion

The Service was aware of information available from Zimbabwe but purposely chose not to seek that information until *after* making the decision to ban importation.  MSJ at 18-20.  Although Federal Defendants try to defend the Service's failure to ask for relevant information, they present no persuasive explanation for why the Service made its decision first and asked for information later.  Opp. at 33-34.

Federal Defendants unsuccessfully dispute SCI/NRA's argument that the Service's April 4, 2014 actions amounted to a foregone conclusion.  MSJ at 23-24; Opp. at 17.  Federal

---

[4] Although the April 2014 and July 2014 Findings both make vague references about Service personnel meeting in person with Zimbabwean officials at meetings and conventions, these accounts never state that Service personnel actually requested new elephant data from Zimbabwe during these meetings, or that the Service communicated to Zimbabwe the possibility that a negative enhancement finding would result if Zimbabwe provided no new data.  AR102 at 2819; AR206 at 4507.

Defendants rely on a single inapposite case that discusses whether a court should defer to the opinion of a specific agency employee over the position of the final agency decision-maker. *Serono Laboratories Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998). SCI/NRA do not ask the Court to defer to Service employee Pamela Scruggs's position, but offer her statement solely to demonstrate that the Service decided to ban importation first and obtain the reasons to justify that decision second. In any event Ms. Scruggs's statements merely supplemented other proof that the importation ban was a foregone conclusion. The Service's decision not to seek scientific information from Zimbabwe until after banning the importation of Zimbabwe's elephants solidly establishes this fact.

### 3.      Numerous Factual Errors Add Up to Arbitrary Decisions

Numerous factual errors made by the Service in both the 2014 Findings demonstrate arbitrary and capricious conduct. Federal Defendants would have the Court believe that SCI/NRA argue that each error alone resulted in the arbitrary decisions. While some of the more impactful factual errors could alone demonstrate arbitrary determinations, SCI/NRA point to the numerous errors, both in this brief and SCI/NRA's Motion, as a collective demonstration of inaccurate and illegal findings and arbitrary and capricious action.

Federal Defendants incorrectly assume that this Court should afford deference to the Service's decision-making, because enhancement findings should be based on science within the Service's expertise. Opp. at 9. Although a Court must afford an agency deference in its review of the science required for decision-making, that deference does not apply when the agency misconstrues the science, ignores obvious findings, relies on evidence of an inferior nature, or fails to seek out the best available science. "While the Court is required to defer to the agency's technical expertise in areas of scientific specialization, the Court is not required to ignore simple

probability." *HSUS v. Pritzker*, 75 F. Supp. 3d 1, *12 (D.D.C. 2014) (Court rejected NMFS 90-day finding because agency ignored evidence of decline in the Northwest Atlantic porbeagle population).

Even in cases where courts must defer to an agency's choice as to what qualifies as "best available scientific data," courts do not allow agencies to ignore data of a higher quality than the information upon which the agency relied. *Kern Cnty. Farm Bureau,* 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt,* 215 F.3d 58, 60 (D.C. Cir. 2000)) ("The best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'"). "'All that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand. They cannot ignore existing data.'" *Ecology Ctr., Inc. v. U.S. Forest Serv*., 451 F.3d 1183, 1194 (10th Cir. 2006) (quoting *Heartwood Inc. v. U.S. Forest Serv.,* 380 F.3d 428, 436 (8th Cir. 2004)).

In making the April 2014 Finding, the Service ignored the fact that better data was available from Zimbabwe and did not seek superior scientific data until after issuing its decision. In addition, the Service ignored studies more recent than the ones upon which it relied, and grossly misconstrued the data upon which it did rely.  Consequently, the Service's consideration of the scientific data deserves no special deference.

Emblematic of the Service's careless treatment of the facts is a statement in the April 2014 Finding that, "[t]he 2013 CITES Panel of Experts raised concerns as to the status of the ZimParks relating to its weak financial base, lack of management skills, inadequate and old equipment, and poor infrastructure."  AR102 at 3822.  This statement is false.  No 2013 CITES

Panel of Experts regarding elephants existed to raise such concerns in 2013.[5]  After the Service

published the April 2014 Finding, it was alerted to its error.  AR171 at 4313-14 (email from

CITES Secretariat; "There was no Panel of Experts *sensu* Resolution Conf. 10.9 in 2013 [], and

the most recent one in 2010 looked at the situation of African elephants in the United Republic

of Tanzania and Zambia, not Zimbabwe. So the reference must be wrong.").

The Service then modified the statement in the July 2014 Finding, arbitrarily choosing

2002 for the Panel year.  *See* AR206 at 4511-12.  The Service merely parroted the same

statement but attributed it to a Panel of Experts from 2002, ignoring the fact that there never was

a 2002 CITES Panel of Experts for Zimbabwe.

The Service apparently was once again alerted to the error.  In the March 2015 Finding,

the Service corrected itself, stating, "[t]he 1997 CITES Panel of Experts raised concerns as to the

status of ZPWMA relating to its weak financial base, lack of management skills, inadequate and

old equipment, and poor infrastructure."  AR344 at 7264.  On its third try, the Service finally

accurately reflected that it was a 1997 CITES Panel of Experts that expressed concerns.  The

Service does not explain why concerns from the 1997 Panel did not defeat a positive

determination of enhancement from 1997 to 2013, but were sufficient to help justify the

Service's decision as of April 2014 that it was unable to make a positive enhancement finding.

Not realizing that the Service's stroke of a pen had invented the 2013 CITES Panel of

Experts, Federal Defendants claim that the same 2013 Panel raised concerns regarding

Zimbabwean government officials' involvement in wildlife trafficking and that the Service

partially based the April 2014 Finding on that information.  Opp. at 14.  Of course, because no

---

[5] In the April 2014 Finding, the Service simply added the year "2013" to a statement made in the
1997 Finding.  *See* AR20 at 2559.  Much of the language in the April 2014 Finding is simply
copied from the 1997 Finding.  *Compare* AR102 *with* AR20.

such panel existed, this argument is inaccurate.  TRAFFIC, a non-governmental organization that monitors wildlife trade, not CITES, did publish such a report in 2009, not 2013.  AR38a at 3236-1.  The TRAFFIC report cited two news articles that discussed Zimbabwean officials who were implicated in illegal rhino horn trafficking and a subsequent cover-up.  *Id.* at 3236-20-21; AR37; AR38.  It is unclear why the Service relied on a five-year-old rhino horn trafficking incident to raise concerns in 2014 over potential government involvement with elephant poaching.

Federal Defendants then argue that, in making the April 2014 Finding, the Service also relied on (1) a 2013 poaching incident in Hwange National Park; (2) a finding that poaching rates increased in Zimbabwe; and (3) a determination that the IUCN Report data were stale.  Opp. at 14-15.  The Service's failure to fully investigate and analyze all of these factual matters undermines the rationality of its decision.

In their Motion, SCI/NRA provided a detailed discussion of the Service's reliance on inaccurate reporting regarding the 2013 poaching incident.  MSJ at 20-21.  Not only did the Service fail to verify the accuracy of the information used in the finding, it did not address the fact that the hunting community played a pivotal role in apprehending the poachers.  MSJ at 10.

Regarding the increase in poaching rates in Zimbabwe, the Service over-extrapolated the data.  *See* MSJ at 30, 35; *infra* at Argument Section B (complete discussion of the MIKE/PIKE data).  Moreover, elephant poaching is not a new concern for Zimbabwe or for Africa generally. In the 1997 Finding, the Service noted that certain "elephant populations have been affected by increased human populations and by drought. There were also high levels of poaching and management offtake which took place in these areas in the late 1980's."  AR20 at 2558; *see also* April 2014 AR4 at 183-84 (discussion in 2007 of poaching concerns).  Despite emphasizing poaching as a primary reason for its 2014 findings, the Service offered nothing, other than the

incorrectly reported 2013 Hwange poaching incident and the over-extrapolated MIKE/PIKE data, to demonstrate how and why hunting enhanced the survival of the species from 1997 to 2013, but not in 2014 or 2015.

For both 2014 findings, Federal Defendants argue that the Service did not rely on the IUCN Report population data, but "simply noted" that many of the surveys were outdated.  Opp. at 12, 15, 16.  Federal Defendants argue that SCI/NRA put too much weight on the Service's use of the IUCN Report.  The Service's actions and the three enhancement findings prove otherwise.

The Service's reliance on the IUCN Report (subsequently admitted by the Service in the March 2015 Finding) and its misinterpretation of the data affected the Service's analysis of all the factors considered for the April 2014 Finding.  Owing to the fact that the IUCN Report was one of only three new sources of data that the Service consulted – the Report, CITES documents, and inaccurate news articles of the 2013 Hwange poaching incident – the Service's reliance on the data is obvious.  By starting with the conclusion that "the elephant population in Zimbabwe has declined from 84,416 elephants in 2007 to 47,366 elephants in 2012," the Service may have been justified in questioning the management plans, quota setting system, poaching levels, etc. *Id.* at 3822.[6]  But, because the Service grossly misinterpreted that data, the starting point of its analysis was drastically different from reality.  This, combined with the Service's other multiple errors, resulted in an analysis that was arbitrary and capricious.  Thus, while not the only source of information on which the Service relied – an argument that SCI/NRA do not make – the

---

[6] If Zimbabwe's elephant population had plummeted nearly 50% in 5 years, the Service's concern might have been justified.  However, Zimbabwe's 2013 population estimates, that the Service summarily rejected, were far more accurate than the Service's assumptions based on the IUCN data.  Zimbabwe's elephant population is well above carrying capacity at 82,000 – 83,000, according to the most recent national survey.  AR274 at 5854.

Service did rely significantly on the IUCN data.  Federal Defendants are incorrect in arguing that the Service merely "noted that the IUCN's estimates were based on stale data."  Opp. at 16.

In fact, in the March 2015 Finding, the Service itself confirmed that it did more than merely note the age of the IUCN data.  "At the time the Service made its April and July 2014 findings, we *relied heavily on population information* in the [IUCN Report]."  AR344 at 7262. Federal Defendants attempt to distance themselves from the Service's errors regarding the IUCN Report, but they cannot escape the Service's own words.  The Service's inaccurate reliance on IUCN Report data contributed to arbitrary and capricious findings.

Federal Defendants incorrectly defend the Service's criticism of methodologies used for many of the IUCN Report surveys.  In response to SCI/NRA's argument concerning the Service's incorrect statements regarding the survey methodologies, Federal Defendants argue that in the July 2014 Finding, "the Service explained its view that properly conducted aerial surveys (like the Hwange survey, AR 35), are more accurate than dung or sample counts . . ." and that the Service was simply describing the IUCN data.  Opp. at 13 n.4; *see* MSJ at 29.  While the Service did make statements to that effect in the finding, the Service was wrong.

Specifically, the Service stated in the July 2014 Finding that "[o]nly 304 'definite' animals were counted by aerial or ground counts, while the remaining 41,840 'definite' animals were counted through sample counts or dung counts, a less accurate methodology than properly conducted aerial surveys, and the remainder were what the IUCN report called 'other guess.'" AR206 at 4510.  The Service then stated, "[t]he summary in the IUCN report indicates that, of recent surveys, only about 1% of the country has been covered by more reliable aerial or ground surveys for population estimates, while about 50% was covered by sample counts or dung

counts, a less robust methodology." *Id.*[7]  First, as SCI/NRA previously explained, these statements are inaccurate.  MSJ at 29.  The point of classifying the surveys into the four different categories is to determine "the level of certainly that can be placed on a given estimate" regardless of methodology used.  April 2014 AR4 at 37.  Thus, the sample counts and dung counts listed as "definite" are not less reliable than the aerial total or ground total counts also classified as "definite."  Even "other guesses" listed as "definite" constitute "the number [of elephants] actually seen." *Id.* at 38.

Second, the Service appears to misunderstand that sample counts are, in fact, a form of aerial and ground counts.  Aerial and ground counts can be either direct counts or sample counts.  Of the 41 total surveys included in the IUCN Report, 27 were conducted using an aerial sampling methodology.  AR80.  It is unclear how, according to the Service's statements, aerial and ground surveys are "more reliable" than sample counts, when sample counts are aerial and ground counts.  Of course, dung counts must be conducted on the ground, and thus cannot be less reliable than ground counts, as the Service states.  *See* April 2014 AR4 at 35 ("dung-counting techniques can provide estimates that are at least as accurate as those from direct methods, and more precise than those of aerial sample counts").[8]  The Service apparently does not know how sample and dung counts are conducted.  Nevertheless, in the Opposition, Federal Defendants again wrongly rely on the Service's inaccurate conclusions.

---

[7] The Service made similar statements in the March 2015 Finding, even after Dr. Dublin specifically explained that the Service made the statements in error.  AR344 at 7262; AR256 at 5741-42.  SCI/NRA's arguments apply to the 2015 statements as well.

[8] Additionally, in the 2007 IUCN Report, the number of elephants counted via direct aerial or ground counts was 236, lower than the 304 elephants counted in the 2013 IUCN Report.  April 2014 AR4 at 185.  The Service was untroubled in 2007 that such low numbers were counted by direct aerial or ground counts, but arbitrarily found the numbers unacceptable in 2014.

12

Third, Federal Defendants may attempt to justify the Service's conclusions by arguing that direct aerial and ground counts are more "proper" than sampling methodologies, and therefore should be used in Zimbabwe. *See* AR206 at 4510 (Service comparing "properly conducted aerial surveys" to the other "definite" surveys). This conclusion is betrayed by the fact that the 2007 **Service-sponsored** survey in Hwange National Park was conducted using a sample aerial methodology – a point that Federal Defendants completely confuse in their argument. *See* AR35 at 3117; Opp. at 13 n.4. SCI/NRA can only assume that the Service would not fund a survey that used a methodology that was less than proper, robust, and reliable.

Federal Defendants also argue that the Service's methodology-related statements were nothing more than the Service's effort to describe the IUCN Report. Opp. at 13 n.4. However, the Service's statements had only one purpose – to improperly cast doubt on the surveys that did not use aerial or ground total counts. Otherwise, the statements had no value to the Finding. Regardless, the Service inaccurately described the methodologies used in the IUCN Report.

Even if the Service only referenced the IUCN Report to note that most of its data was old, the record shows that the Service was wrong. In all three findings, the Service expressed concern about the age of many of the surveys. AR102 at 3821; AR206 at 4510; AR344 at 7262. The IUCN Report does indicate that "[h]alf of the estimates . . . are now older than 10 years . . . ." AR80 at 3627. As the chart reflects, from data gathered in 2012, 21 of 41 surveys were from 2002 or older; 20 of 41 were from 2003 or newer. The Service erroneously stated that "23 of 40 population estimates included in 2012 are older than 10 years." AR344 at 7262. Had the Service included the 2007 Hwange survey in its analysis, the balance would have tipped such that a majority of surveys were less than 10 years old. AR35. Replacing the 2001 Bubi Valley Conservancy survey with the 2013 survey would have provided more recent data. MSJ at 21-22.

The Service also improperly failed to assess the significance of the individual surveys. For example, had the Service bothered to look in its own files and included the 2007 Hwange survey in its analysis, it would have concluded that the actual number of elephants surveyed within the last 10 years greatly outnumbered the number cited from surveys a decade or older. The 20 surveys ten years or older counted a total of 6,105 elephants.  Including the 2007 Hwange survey at 39,765 elephants, the elephants counted in the 21 surveys newer than ten years amounted to 85,684.  AR80.[9]  With the record analyzed as a whole, far more elephants had been counted within the last decade and should have been classified to exist "definitely" than the number inaccurately chosen by the Service.

Federal Defendants try to justify the Service's failure to include and analyze the 2007 Hwange survey in the July 2014 Finding (not to mention the April 2014 Finding), by arguing that it was "inadvertently omitted" from analysis because it was not in the IUCN Report.  Opp. at 12.  Federal Defendants do not explain why the Service failed to include the 2007 Hwange survey even though it was in the July 2014 AR.  Unfortunately for Federal Defendants, they cannot hide behind the IUCN's error.  The IUCN is not required to meet ESA and APA decision-making standards, but the Service is.  The Service's omission of the 2007 Hwange survey from its analysis contributed to its arbitrary and capricious finding in July 2014.

Finally, in both 2014 Findings, the Service stated that "[s]everal areas that were covered in the current surveys (2006 – 2010) indicate that there has been a substantial decline in the population . . . ."  This statement is not reflected in the IUCN Report.  Directly compared to the

---

[9] Note that the total amounts in the summary table "are derived by pooling the variances of individual estimates . . . .  As a result, totals do not necessarily match the simple sum of the entries within a given category."  AR80 at 3627.

2007 IUCN Report,[10] five surveys that reflect a change were conducted between 2006 and 2010 and included in the 2012 IUCN Report. *Compare* April 2014 AR4 at 186 *with* AR80.[11] Of the five surveys, two showed an increase of a combined 4,358 elephants and three showed a decrease of a combined 536 elephants. *Id.* The Service incorrectly asserts the 2006-2010 surveys reflect a ***substantial*** decline.[12]

Misinterpretations, failure to properly analyze data, incorrect assessments of survey methodologies, and improper reliance on inaccurate data combined to collectively result in arbitrary and capricious findings. The Service's inappropriate use and analysis of the scientific data deprives it of any deference afforded to such decision-making. The Court should set aside the 2014 enhancement findings as in violation of the ESA and APA.

**B.      The March 2015 Enhancement Finding Arbitrarily Ignored or Misapplied Relevant Information**

Despite obtaining much of the information it claimed it lacked for earlier findings – about the elephant population, benefits of sport-hunting, anti-poaching efforts – the Service continued to look for reasons to justify its decision not to make a positive enhancement finding. MSJ at 32-39. One of the most significant examples involves new population data from the Elephant Survey and correspondence from the chief decision-maker for the enhancement finding – Tim Van Norman – in which he stated that removing 500 elephants from a population of 100,000 is

---

[10] The 2007 version was the previous IUCN elephant database report prior to the 2012 IUCN Report.

[11] These surveys occurred in Gonarezhou National Park in 2009 (which has since been re-surveyed in 2013 at an increase), Chewore 4 in 2010, Malapati Safari Area in 2009, Sengwe Communal Land in 2009, and Sentinel & Nottingham in 2010.

[12] After receiving Dr. Dublin's second letter that explained the Service's incorrect claim, including discussion of other areas that have shown increases – those that cannot be compared directly from the two IUCN Reports – the Service removed this statement altogether from the March 2015 Finding. AR256 at 5740-41.

"not a problem."  MSJ at 35-36.  Federal Defendants argue that the document was really focused on the quality of the data and the impact of a lower population number, and that, by implication, Mr. Van Norman's statement was meaningless.  Opp. at 20.  Federal Defendants cannot overcome the context of the statement.  In that correspondence, Mr. Van Norman responded to a question from a representative of the Assistant Director of International Affairs asking "what **specifically** ZPWMA would need to show us in order for us to **lift the suspension.**"  MSJ at 35, quoting AR228 at 4640 (emphasis added).  The numbers Mr. Van Norman discusses respond to that question.  Federal Defendants' post hoc rationalization that Mr. Van Norman was expressing concern over the lower population number and data quality does **not** respond to the request.

SCI/NRA appropriately argued that, in light of Mr. Van Norman's statement, the 82,000-83,000 population numbers from the Elephant Survey would "strongly support a positive enhancement finding."  MSJ at 35.  In response, Federal Defendants attempt to deflect attention from the substance of Mr. Van Norman's statement by claiming that SCI/NRA are trying to "extrapolate" from the statement a "hard-and-fast rule."  Opp. at 20.  This attempt fails because, as evidenced by Mr. Van Norman's correspondence, the Service wanted census data.  The Service then failed to look at the data it received in the way Mr. Van Norman said was necessary.

Mr. Van Norman's statement is even more significant if the offtake and quota were lower than 500, as SCI/NRA asserted.  MSJ at 36.  Federal Defendants did not even respond to SCI/NRA's point that the actual hunting offtake is much less than the quota (possibly as low as 160 elephants a year).  MSJ at 36 & n.17.  As SCI/NRA previously explained, by analyzing the numbers based on a population of 82,000 elephants, an offtake of up to 380 elephants would be "not a problem" and would be grounds for "lift[ing] the suspension."  MSJ at 36.

16

Federal Defendants cited the quota reported by the CITES website to respond to SCI/NRA's argument that the 2015 quota was 380, not 500.  Opp. at 21.  Federal Defendants' supporting citation, AR7 at 1944, simply says that the 2014 quota is limited by the CITES limit of 500 elephants.  While the document SCI/NRA cited does establish a proposed quota of 380 (reduced based on on-the-ground research and data), the Service offered no justification for its assumption that the actual quota would be 500.  Once again, the Service failed to seek out critical information.  Instead, the Service assumed that the quota would remain at 500 despite evidence of Zimbabwe's proposal to lower it.  AR344 at 7266.   Federal Defendants attempted to excuse this error but did not reference anything in the AR to support the Service's reliance on the current CITES website.  Opp. at 21.  This Court should disregard Federal Defendants' post hoc rationalization of the Service's disregard of the evidence of a possible reduction in the quota.

Another example of the Service disregarding relevant information to reach the desired conclusion involves the carrying capacity of elephants in Zimbabwe and possible lower-than-expected population numbers.  The Service used the Pan African Aerial Elephant Survey ("Elephant Survey") to conclude that the 6% decline from 2001 to 2014 represented in the survey is "troubling."  The Service suggested that the elephant population should have been above 139,000 in 2014.  AR344 at 7263.  The Service gave no explanation for why it is troubling to have a 6% decline over the course of 13 years or why a 5% per annum growth is necessary.  The Service also completely disregarded the fact that the carrying capacity for elephants in Zimbabwe is only 43,000 – nearly 100,000 less than what the Service hoped the population would be in 2014.  *See* AR11 at 2078 (1989 Elephant Management Plan stated that 43,000 elephants is the desired level – "a compromise between conservation of habitats and biological diversity and the tourist industry."); AR325 at 7127 (2002 email from Service employee stated

17

that the "carrying capacity of the elephant range is thought to be in the 42,000-45,000 range.");

AR165 at 4246 ("'Zimbabwe can support at most 50 000 elephants on the land available in the

country.  The effects of exceeding the ecological carrying capacity for elephants are glaringly

evident – habitats are being destroyed, carrying capacity for wildlife in general is being reduced

and elephants are dying of poverty. An ecological disaster is imminent.'").  The Service

apparently based its findings on the premise that Zimbabwe should support an overpopulation of

elephants to the detriment of the elephants, other wildlife, and their habitat.

Federal Defendants misrepresent SCI/NRA's argument regarding the Service's

interpretation of the MIKE/PIKE data.  *See* Opp. at 12-13, 20.  SCI/NRA do not argue that the

Service used that data as an exclusive "basis" for the July 2014 Finding, or any of the findings.

Rather, like other flaws committed by the Service in its decision-making process, the Service's

over-extrapolation of the data contributed to the arbitrary determinations.  MSJ at 30.  The two

MIKE sites study elephant take in only a small portion of Zimbabwe.  Even though Dr. Dublin

warned the Service after the April 2014 Finding that applying the PIKE data across Zimbabwe

constituted bad science, the Service repeated the misuse of the data in the July 2014 Finding.  *Id.*

The impact of the Service's error is further exacerbated by the fact that the jump from 24% to

67% occurred in only one of the two MIKE sites in Zimbabwe.  AR42a at 3334-14.  For the

other MIKE site, the proportion of illegally killed elephants decreased by 19% and was the

lowest it had been in 4 years.  *Id.*  The Service ignored the fact that in 50% of Zimbabwe's

MIKE sites, evidence of poaching decreased and instead extrapolated the poaching rate from one

small area to the entire country, reaching the conclusion of a nationwide increase in poaching.

Federal Defendants cannot explain away the Service's errors.  In both 2014 findings, the

Service stated, "the percentage of illegally killed elephants (PIKE) *in Zimbabwe* was circa 24%,

whereas in 2011 that number jumped to 67%." AR102 at 3821; AR206 at 4511.  Nowhere in either finding did the Service explain that the PIKE data came from one small area of Zimbabwe or that the nationwide proportion of illegally killed elephants in Zimbabwe could have been drastically different from the numbers collected at the single MIKE site.  Citing a January 2014 Briefing Paper, Federal Defendants argue that the Service "clearly understood that the data came from particular MIKE sites, not from a nationwide survey."  Opp. at 13 *citing* AR79 at 3624. The Briefing Paper primarily demonstrates one of two scenarios occurred:  (1) the Briefing Paper authors knew the relevance of the PIKE data, but the 2014 findings author did not; or (2) the Service purposefully over-extrapolated the PIKE data when justifying its two 2014 findings.

Federal Defendants also cannot defend the Service's failure to correct mistakes identified by Dr. Holly Dublin.  Federal Defendants argued that the Service promised it "would look into" Dr. Dublin's concerns regarding its use of the PIKE data after the April 2014 Finding.  Opp. at 13.  In response to Dr. Dublin's first letter, a Service employee did write that the Service would look into her concern.  AR151.  As discussed above, however, the July 2014 Finding repeated, word-for-word, the same incorrect application of the PIKE data that was in the April 2014 Finding – the only difference being that the Service added a citation to indicate the source of its information.  *Compare* AR102 at 3821 *with* AR206 at 4511.  The Service did not address the concerns raised by Dr. Dublin.

It was not until Dr. Dublin expressed her concerns about this data in a second letter, which she also sent to the government of Zimbabwe, that the Service attempted to fix its errors. AR256 at 5742-43.  As it had done for other errors, the Service then attempted to back away from its use of the MIKE/PIKE data in the March 2015 Finding.  The Service cited the data with confidence when it appeared useful for the Service's purposes as a clear indication of increased

19

poaching and a population in decline across Zimbabwe.  AR102 at 3821; AR206 at 4511.  Upon finding that the data did not necessarily demonstrate an increase in poaching, the Service conditioned its reliance on the data with skepticism in the March 2015 Finding:  "it appears that there was an increase in elephant poaching in 2012, but the poaching level ***might have*** declined in 2013 to below the 2011 level."  AR344 at 7263.  As the record indicates, poaching levels had certainly declined in the MIKE sites.  *See* SC65 Inf.1, p.3.[13]  For one MIKE site, the PIKE declined from 79% in 2012 to 40% in 2013; for the other MIKE site, the PIKE declined from 27% in 2012 to 22% in 2013.  *Id.*

In the March 2015 Finding, the Service stated that the "PIKE numbers . . . showed an increase in 2012 to 0.79 . . . and 0.27."  AR344 at 7263.  This statement is incorrect.  In the Nyaminyami district, PIKE numbers decreased significantly from 0.81 in 2011 to 0.27 in 2012, the lowest PIKE number for the site since at least 2003 (data in chart only dates back to 2004).  SC65 Inf.1, p.3.  The AR offers no explanation for the Service's incorrect statement.

In an attempt to direct the Court's attention away from these mistakes, Federal Defendants suggest that the PIKE numbers undermine SCI/NRA's argument regarding the benefits of hunting to anti-poaching efforts.  Opp. at 20.  Instead, the PIKE data undermine the credibility and quality of the Service's findings.  Federal Defendants provide no support for an argument that the importation bans caused a decrease in poaching in one of the MIKE sites, nor does the record indicate that elephant hunting occurs at the site.  *Id.*  Federal Defendants grasp at straws in an attempt to hide the Service's numerous errors regarding the MIKE/PIKE data.

---

[13] Although directly cited in the March 2015 Finding, SCI/NRA are unable to find this document in the AR.  The document is available at https://cites.org/sites/default/files/eng/com/sc/65/Inf/E-SC65-Inf-01.pdf.

The Service also inaccurately addressed information concerning the benefits from hunting and Federal Defendants fail to explain away these errors.  For example, SCI/NRA referenced the benefits delivered by the communal CAMPFIRE program, even if this program cannot address all lands in Zimbabwe.  MSJ at 38.  Federal Defendants rationalized that "recent estimates from the Pan African Aerial Elephant Survey show significant population declines in areas with communal lands."  Opp. at 21.  Federal Defendants cannot mask the fact that the March Finding stated something different: that the Survey results "appear to confirm that elephant populations in [two areas] have decreased significantly.  These areas include communal lands."  AR344 at 7270-71.  The Finding provided no specificity about whether the amount of communal lands in the two referenced areas was significant enough that it would be expected to offset whatever is causing the declines.  Federal Defendants could not provide the specificity that the Finding lacked.  Neither the Service nor Federal Defendants offered any argument to refute the fact that the CAMPFIRE program and other conservation benefits of sport-hunting do provide a source of "enhancement" to the survival of Zimbabwe's elephants, especially in light of the newly-confirmed, strong population numbers.

Federal Defendants simply cannot defend the rationality of the Service's decisions.  The strong population numbers and limited offtake, the benefits of U.S. hunters for conservation programs and their on-the-ground presence that deters poaching, the existence of which the Service does not dispute (AR344 at 7271), all strongly support a positive enhancement finding. In other words, weighing these benefits with the lack of a "problem" with the hunting offtake (*e.g.,* something less than 500) in light of the 82,000 population number shows that the Service was arbitrary in determining that it was unable to make a positive enhancement finding.

**C.      The Service Applied an Illegal Enhancement Standard and Used Prohibited Guidelines**

As discussed in SCI/NRA's Motion, the Service violated the ESA and APA by applying illegal standards in all three enhancement findings.  MSJ at 39-49.  The Service arbitrarily required that it find that sport hunting meets a higher standard – ensure the survival of the species – instead of enhance it, which is all the law requires.  MSJ at 45-49.  In response, Federal Defendants mostly argue that the factors the Service reviewed did not change from 1997 to 2014-15.  Opp. at 23-24.  This point is irrelevant.  SCI/NRA's argument focuses not on what the Service *reviewed* but instead on the nature of the 2014-2015 *standard*, which was to require that sport-hunting essentially ensure the survival of the elephants in Zimbabwe.  Enhance and ensure are very different standards.  Enhancement, properly understood, requires an improvement in the survival of the species.  MSJ at 45.  The Service's illegal and arbitrary "ensure" standard is the crux of the matter, not the factors considered (*e.g.,* population, management plans), as Federal Defendants argue.

SCI/NRA cited statements that confirmed the meaning of enhance in the 1997 Finding. MSJ at 46.  Federal Defendants argue that a statement in the preamble of a 1992 Federal Register notice, finalizing an amendment of the elephant Special Rule, referred to a CITES requirement, not an ESA requirement.  Opp. at 23.  But that preamble demonstrates that the Service specifically intended to include the CITES requirement in the amendment of the Special Rule, making that requirement relevant to the meaning of the current enhancement requirement:

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. ***This requirement is retained in the final revised special rule*** for the import of sport-hunted trophies from threatened populations that are on CITES appendix I.

57 Fed. Reg. 35473, 35485 (Aug. 10, 1992) (emphasis added).

SCI/NRA acknowledges that the 1995 Federal Register notice SCI/NRA referenced did involve guidelines concerning non-detriment findings.  Opp. at 23.  The 1995 notice is still relevant because part of its analysis involved "whether the killing of the animals whose trophies are intended for import would ***enhance the survival of the species***."  60 Fed. Reg. 12969, 12970 (Mar. 9, 1995) (emphasis added).  Moreover, Federal Defendants did not respond to SCI/NRA's point about the Service's own statement, in a 2010 letter denying an elephant import permit, about the meaning of "enhancement."  MSJ at 46.

SCI/NRA also explained that the Service improperly used withdrawn internal guidelines. *Id.* at 41-45.  Federal Defendants incorrectly contend that SCI/NRA did not include this claim in their Complaint.  Opp. at 24.  SCI/NRA made several allegations in their Complaint regarding the illegal enhancement standards applied by the Service, including in Count II.  3rd Am. Compl., Dkt. 82, ¶¶ 100-106; *see also*, *id.,* ¶ 57.  SCI/NRA are not attempting to amend their complaint through their brief.  Instead, SCI/NRA's Motion simply explains and clarifies one of their claims.  *See Coleman v. Pension Benefit Guaranty Corp.*, 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000) (Court held that plaintiffs could argue a different theory for claim in opposition brief because the complaint identified the prohibited transaction and general nature of the violation).

All three enhancement findings show that the Service used the withdrawn guidelines as a basis for its determinations.  While this Court has held that the Service did not use the guidelines in other circumstances, the findings at issue in this case show more than "some overlap" between the requirements imposed by the Service and the illegal guidelines.  *See Marcum v. Salazar*, 810 F.Supp.2d 56, 72 n.3 (D.D.C. 2011), *vacated on other grounds* 694 F.3d 123 (D.C. Cir. 2012). In all three findings, the Service evaluated the same factors that it promised and were ordered not to use when it withdrew the internal guidelines.

**D.     The Service Failed to Conduct Required Rulemaking and Cannot Retroactively Apply the July 2014 Finding to Correct Earlier Errors**

**1.     The Enhancement Findings Are Rulemakings, Not Adjudications**

SCI/NRA explained that the Service needed to conduct rulemaking in adopting the enhancement findings.  MSJ at 49-50.  Federal Defendants erroneously argue that the enhancement findings qualify as informal adjudications because they are the equivalent of licensing or permit approvals.  In doing so, Federal Defendants fail to acknowledge the major differences between the approval of licenses/permits and the enhancement decisions at issue in this litigation.  First, a license or permit is applied for by and granted to a single entity, based on a specific application previously submitted by that entity.  If granted, the permission authorized by the license or permit has no binding impact on license/permit applications submitted by entities other than the original applicant.  In contrast, the enhancement findings did not respond to a specific request made by any identifiable individual or entity.  Instead, those findings applied generally to all who sought to import elephants from Zimbabwe from the date that the findings were announced and into the future.

> Two principal characteristics distinguish rulemaking from adjudication.  First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. *See United States v. Florida E. Coast Ry.,* 410 U.S. 224, 244–45, 93 S.Ct. 810, 820–21, 35 L.Ed.2d 223 (1973); *Ford Motor Co. v. FTC.,* 673 F.2d 1008, 1010 (9th Cir.1981), *cert. denied* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982).  Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute).  Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.

*Yesler Terrace Cmty. Council v. Cisneros,* 37 F.3d 442, 449 (9th Cir. 1994) ("The sole effect of HUD's decision was to deprive a broad category of people of the right to an informal grievance hearing prior to eviction, and this effect had legal consequences for yet-to-be-identified

24

individuals only prospectively. These are the effects of a rule, not of an adjudication."); *see also Marcum*, 810 F. Supp. 2d at 72; *City of Arlington, Tex. v. F.C.C.,* 668 F.3d 229 (5th Cir. 2012). The enhancement findings require rulemaking because they impact the general ability of all individuals to import legally hunted elephants from Zimbabwe into the United States from the date the importation ban decision is published and into the future.

Federal Defendants wrongly cite *Franks v. Salazar* to support their inaccurate characterization of the enhancement findings as adjudications. Opp. at 26. Federal Defendants' reliance on *Franks* fails because that case involved the Service's denial of specific importation permit applications. 816 F. Supp. 2d 49, 59 (D.D.C. 2011). In *Franks*, this Court concluded that the permit application denials were adjudications because they affected no other applications. "These decisions do not bind future permit applicants and do not even bar the specific plaintiffs in this case from filing new applications. Thus, they simply are not "rules" under the APA, since they are not intended to have "future effect." *Id.* quoting 5 U.S.C. § 551(4). In contrast, the enhancement findings at issue in this case affect every hunter seeking to import an elephant.

Based on its own analysis in *Franks,* this Court should not find the general importation decisions at issue here to qualify as adjudications.[14] In contrast to the individual permit application decisions addressed in *Franks*, the importation ban decisions that SCI/NRA challenge in this case apply to all individuals who would, after April 4, 2014 (or July 30, 2014, or March 26 2015), seek to import legally-hunted elephants from Zimbabwe. The enhancement

---

[14] The Service does not currently require permits for hunters to import elephants from CITES Appendix II countries, including Zimbabwe. Consequently, the Service has no opportunity to consider individual applications and makes only a general, broad decision governing the importation by everyone seeking to import such an elephant. As a consequence, none of the requirements for adjudication are present.

findings and importation ban decisions have significant "future effect" that disqualify them as adjudications.

Federal Defendants cite inapposite cases to support their argument.  With one exception, their cases expressly apply to permit and licensing decisions affecting individual entities.  Opp. at 26 (citing *Nat'l Wildlife Fed'n v. Marsh,* 568 F. Supp. 985, 988 (D.D.C. 1983)) (permit issued by the Secretary of the Army to a company for permission to build an oil refinery); *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234 (D. Vt. 1992), *aff'd* 990 F.2d 729 (2nd Cir. 1993) (permit granted by the Army Corps of Engineers to a village to raise the spillway elevation of a generating station); *City of St. Paul v. FAA*, 865 F.2d 1329 (table), 1989 WL 3871 (D.C. Cir. 1989) (order by the FAA authorizing a six-month test involving an airport runway).

Only one of Federal Defendants' cases even remotely resembles the facts of this case. A closer examination of that case, however, demonstrates differences.  In that case, the D.C. Circuit considered whether FAA advisory circulars that established testing requirements and product specifications for items used at airports qualified as informal adjudications.  *Safe Extensions Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007).  Despite the general applicability of the circulars, the FAA did not treat these documents as orders addressing the conduct of the general public. Instead, the FAA e-mailed the draft version of the challenged circular to a few select companies that made or installed a product covered by the circular, solicited comment only from these select businesses, and communicated their comment responses only to these few entities.  *Id.* at 596-97. The FAA's focus on very specific companies, rather than on the general public, made the advisory circular much more like an individual permit or license than a general rulemaking decision.  For that reason, the D.C. Circuit's decision to classify the advisory circular as an

adjudication offers this Court little guidance about how to classify the Zimbabwe enhancement findings.

Contrary to Federal Defendants' arguments, SCI/NRA's challenge to the enhancement findings does not involve "licensing," "the grant of a license," "a permit," or to a decision "to issue permits."  Federal Defendants incorrectly try to fit a square peg in a round hole by suggesting that enhancement findings "are designed to adjudicate disputed facts in particular cases."  Opp. at 27.  Enhancement findings are determinations of a general nature because they address the legality of importation of all members of a species from a country, regardless of the circumstances behind the importation.  The Service does not individually consider variation in the status of the particular species' populations from which the hunted animal was taken, specific hunting conditions in different locations, qualifications of the specific importer, etc.  Enhancement findings for elephants in Zimbabwe are broad-based decisions that extend to the general hunting public – not to any specific applicant, permittee or licensee.

This case involves the Service's decision to impose a blanket ban on the importation of all sport-hunted elephants from Zimbabwe from the publication date into the future.  The nature and impact of these decisions do not fit the judicial criteria for adjudications.  Instead, the general and future application of enhancement findings qualify them as rulemakings.  As a result, the Service was obligated to comply with APA procedural requirements and to provide notice and an opportunity for meaningful comment.  Based on the Service's failure to meet these requirements, the Court should set aside the enhancement findings.

### 2.     The Failure to Conduct Rulemaking Was Not Harmless Error

The Service's failure to conduct notice and comment rulemaking for the three enhancement findings was not harmless error, as Defendant-Intervenors contend.  Had the

Service complied with their APA requirements, SCI/NRA and their members would have been spared some of the harms they suffered as the result of the Service's illegal actions. Defendant-Intervenors, in suggesting that SCI/NRA "in all likelihood" "had actual notice" of the Service's final decisions to ban importation of elephants (D-I Opp. at 3, 6-7), misstate the facts and fail to address the significance of the APA notice and comment requirements. 5 U.S.C. § 553(b).

Defendant-Intervenors argue that SCI/NRA "had actual notice of both the April 4 and July 22, 2014 Findings." D-I Opp. at 3.[15] SCI/NRA had no notice of the April 2014 Finding until receiving a call from the Director of the Service on the afternoon of April 3, 2014, the day before the Service implemented the ban. AR90 at 3661. Any so-called "notice" SCI/NRA had of the July 2014 and March 2015 findings was based solely on the information contained in the preceding findings (*i.e.*, the April 2014 and July 2014 findings, respectfully). In contrast to proper rulemaking procedures, the Service did not publish any decision-making documents for the public to analyze and upon which to respond. Instead, SCI/NRA had no notice of, or opportunity to meaningfully comment on, any proposed findings, as would be required under notice and comment rulemaking. The Service's failure to follow these procedures deprived SCI/NRA of their statutorily mandated opportunity to argue against the Service's proposed findings, including all of the Service's numerous scientific and analytical errors.

In addition, the Service would have published the proposed finding well before publication of any final version. Under such circumstances, SCI/NRA members would have utilized their knowledge of a potential ban in making their decisions about whether to book and/or proceed with elephant hunts. The Service was well aware that several hunting

---

[15] Contradictorily, Defendant-Intervenors later in their opposition assert that they were deprived of the same notice and comment opportunities they assert SCI/NRA had. D-I Opp. at 9-10.

organizations held their annual conventions during January and February of each year, at which many hunts are booked.  Despite recommendations from some Service personnel that advance notice of the importation bans be announced prior to these conventions, the Service chose to wait to announce their final decision until the afternoon before the importation ban went into effect – less than two months after the hunting conventions had been held.  AR90 at 3661; MSJ at 20.

In fact, several SCI/NRA members traveled to Zimbabwe prior to the imposition of the ban only to find that by the date of their return to the U.S., they could no longer bring home the elephants that had been importable when they left.  Grieb Decl., ¶7, Dkt. 87-6; Rhyne Decl., ¶7, Dkt. 87-8; Whaley Decl., ¶10, Dkt. 87-10; MSJ at 62.  For those individuals alone, the Service's compliance with APA requirements for the publication of proposed rules would have at least given them the opportunity to make informed decisions about their hunting plans.  This failure to comply with those requirements caused them, and SCI/NRA, significant harm.

### 3.   The Service Cannot Retroactively Apply the July 2014 Finding to Correct Errors in the April 2014 Finding

Federal Defendants defend both the April 2014 and the July 2014 findings with unsupported assumptions about the Service's ability to engage in retroactive decision-making in order to correct previous rulemaking errors.  Based on the erroneous premise that enhancement findings are adjudications, Federal Defendants argue that such findings can be applied retroactively.  Opp. at 28-30.[16]

---

[16] Federal Defendant's attempt to invoke the "foreign affairs" exception to notice and comment rulemaking provided in 5 U.S.C. §553(a) makes no sense.  Opp. at 28 n. 9.  The Service has not applied this exception when adopting other rules relevant to the importation of elephants.  For example, the Service complied with rulemaking procedures by seeking public comment when proposing a rule to require permits for the importation of all African elephants listed on CITES Appendix II.  *See* 80 Fed. Reg. 45165 (July 29, 2015).  This rule has not been finalized.

As explained above, the enhancement findings do not qualify as adjudications.  For this reason, Federal Defendants must demonstrate some other authority for the Service's attempt to retroactively apply the July 2014 Finding to remedy the legal errors of the April 2014 Finding.

Federal Defendants contend that, to give the July 2014 decisions retroactive impact, all the Service needed to do was to state that the July 2014 decision "superseded" the April 2014 decision.  *Id.* at 29.  Federal Defendants incorrectly suggest that SCI/NRA have taken the position that a superseding regulation can *never* apply retroactively.  *Id*. at 28.  Instead, SCI/NRA argue that labeling alone cannot authorize retroactive effect.  An agency may retroactively apply a regulation if a statute or regulation gives the agency that authority:

> Retroactivity is not favored in the law.  Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.  … By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. … Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988) (citations omitted); *see also Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010).

SCI/NRA previously explained that the enhancement findings should have been adopted through APA rulemaking and therefore cannot be applied retroactively.  MSJ at 25-26. SCI/NRA explained that Section 4(d) of the ESA (16 U.S.C. § 1533(d)) and the elephant Special Rule do not expressly grant the Service the authority to promulgate retroactive regulations and that APA rulemaking authority (5 U.S.C. § 551(4)) only allows adoption of rules with "future effect."  Federal Defendants have not cited any statutory or regulatory language to provide the Service with the authority to regulate with retroactive impact.

The three cases that Federal Defendants cite in support of the Service's ability to impose

retroactive importation further undermine their claim that the Service can retroactively ban the importation of elephants.  These cases all demonstrate that statutory or regulatory authority to retroactively regulate is a prerequisite to such action.  In two of the cases, the courts cited the express retroactive authority granted to the IRS by the Internal Revenue Code.  *See Dixon v. U.S.*, 381 U.S. 68, 71 (1965); *see also U.S. v. Lavi,* 2004 WL 2482323 *5 (E.D. N.Y.  Sept. 23, 2004).  In the third case, a district court, in reviewing a request for retroactive application of a new criminal sentencing statute, explained, "[W]here a newly enacted statute is silent regarding its own retroactivity, the statute only applies prospectively to conduct occurring on or after the date of its enactment."  *U.S. v. Jones,* 2010 WL 7697509 *1 (W.D. Pa. Oct. 18, 2010).

Because nothing in the ESA, its regulations, or the APA expressly affords the Service the authority to retroactively regulate the importation of elephants, the Service could not take action to affect past conduct and could not apply the July 2014 Finding retroactively, much less to cure the illegalities of the April 2014 Finding.

Even if this Court were to assume, as Federal Defendants appear to suggest, that in the absence of statutory or regulatory authority, past agency conduct influences whether the Service has the authority to regulate retroactively, nothing in the Service's previous actions supports a retroactive application of the July 2014 Finding.  Each of the six decision documents that Federal Defendants cite are ***non-detriment findings***, applicable to species listed on CITES Appendix I. Opp. at 27, citing April 2014 ARs 49, 50, 51, 57, 62, and 67 (Tanzania non-detriment findings for years 2008-2013).  The importation of Appendix I elephants cannot be carried out without individual import permits issued by the Service.  As indicated above, the permit application process for CITES Appendix I species is quite different than the process for importing CITES Appendix II species for which no permit is required.  The Service's process for deciding on

permit applications more closely resembles the criteria for adjudications, while importation decisions where no permits are required bear none of the characteristics of adjudications. As elephants in Zimbabwe are listed on CITES Appendix II, these examples offer nothing to inform this Court as to whether the Service had authority to make determinations concerning CITES Appendix II species retroactively.[17]

If it has any persuasive value for the Court's determination, the Service's own conduct immediately following the April 4, 2014 announcement of the importation ban demonstrates that the Service itself recognizes that enhancement findings should not be given retroactive effect. The April 2014 AR shows that the Service never intended for the Zimbabwe enhancement finding to be applied retroactively. E-mails to and from Service personnel in the weeks after the Service announced the April 4, 2014 importation ban show that the Service imposed the ban without first verifying the date upon which Zimbabwe's elephant hunting season commenced. These e-mails revealed that Service personnel had questions about whether Zimbabwe's hunting season did not begin until May 2014. April 2014 AR227 at 3144-3145. Upon confirming that Zimbabwe's hunting season started on January 1, 2014 and that, as a result, their decisions would prohibit the importation of elephants legally taken prior to announcement of the ban, the Service revised the April 2014 Finding to apply prospectively only – from April 4, 2014 into the future. AR102 at 3818. Presented with the opportunity to give the April 4, 2014 decision a retroactive effect, the Service purposely chose not to do so.

---

[17] In addition, although the Service may not announce their non-detriment findings for Tanzania until after January 1st of the applicable year, these decisions do not supersede any previous decisions as each non-detriment finding expires on December 31st of the year in which it is made. See, e.g. April 2014 AR67 at 1412. For this reason, when the Service makes its non-detriment decision for any particular year, there is no existing non-detriment finding in effect.

The Service lacked the authority and justification to use the July 2014 Finding to retroactively replace the April 2014 Finding.  For these reasons, the Service should not be permitted to use the July 2014 Finding to remedy errors that it made in the April 2014 Finding.

>    **E.    The Service Illegally Failed to Comply with Rulemaking Requirements When It Modified the Special Rule's Enhancement Finding Requirements**

SCI/NRA's Motion explained that the Service failed to conduct proper APA rulemaking when it modified the Elephant Special Rule by choosing to retain the enhancement requirement after the purpose behind imposing the requirement disappeared.  Specifically, the Service failed to adequately explain its decision to maintain the enhancement requirement after it was eliminated from CITES in 1994, never gave proper notice of the rule modification, and failed to give the public an opportunity to comment on the change.  MSJ at 51-55.

Federal Defendants offered little response to these arguments.  They claimed that 1997 Federal Register Notice *did* adequately explain why the Service retained the enhancement requirement.  Opp. at 34.  But a review of the Federal Register notice reveals that Federal Defendants' account is inaccurate.  The 1997 Federal Register notice explained ***what*** the Service intended to accomplish in making enhancement findings, but not ***why*** the Service found it necessary to retain an enhancement requirement in spite of the fact that CITES had withdrawn it:

> All these conditions will continue to apply after the Appendix II listing for the elephant populations of Botswana, Namibia, and Zimbabwe enters into effect on September 18, 1997.  In making the required enhancement findings, the Service reviews the status of the population and the total management program for the elephant in each country to ensure the program is promoting the conservation of the species.

62 Fed. Reg. 44,627, 44,633 (Aug. 22, 1997).

As explained in SCI/NRA's Motion, the Service included the enhancement of survival requirement in the Special Rule for elephants on August 10, 1992, for the sole purpose of

matching a CITES resolution that imposed the same obligation.  MSJ at 51, citing 57 Fed. Reg. 35473, 35485**Error! Bookmark not defined.**.  In 1994, CITES withdrew the enhancement finding requirement, which eliminated the Service's rationale for imposing an enhancement requirement.  The Service's 1997 affirmative decision to continue to impose the requirement constituted a change in the requirement and thereby a change in the rule.  *Id.* at 51-52; *see also* 62 Fed. Reg. 44,627, 44,633 (Aug. 22, 1997).  The Service had the obligation to explain that change but never did.

Even if the Court determines that the language in the 1997 Federal Register notice describing the Service's retention of the enhancement requirement qualifies as an "explanation," that language is not an "adequate" explanation.  Courts routinely find that mere conclusory statements do not satisfy the APA's adequate explanation requirement.  *Am. Min. Cong. v. E.P.A.*, 907 F.2d 1179, 1188-89 (D.C. Cir. 1990) (remanding rule because the conclusory statements provided by the EPA did not articulate a rational connection between the data it relied on and its final rule); *see also Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 894 (D.D.C. 1996) ("[A]n agency must articulate why it has exercised its discretion in a particular way and provide an adequate explanation for its action.  Mere conclusory statements are not enough.") (citing *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 48–49 (1983)). The Service's broad statement that enhancement findings ensure that the country of export "is promoting the conservation of the species" is conclusory, and therefore inadequate.

At the very least, the Service's explanation should satisfy the requirements for rulemaking included in Section 4(d) of the ESA. 16 U.S.C. § 1533(d).  In accordance with this section, the Service may only promulgate rules for species listed as "threatened" that are necessary and advisable to the conservation of the species.  *Id.*  Nothing in the Service's 1997

alleged "explanation" demonstrated why the enhancement requirement is "necessary" or "advisable" for African elephants listed on CITES Appendix II.

Federal Defendants also claim that the enhancement requirement should be upheld because CITES allows countries to enact "measures that are more protective of wildlife than the specific provisions of CITES." Opp. at 35. Whether or not this permission would be relevant to elephant importation, the provisions of CITES do not relieve the Service of its obligations under the ESA and APA to provide an adequate, rational explanation of why maintaining the enhancement requirement is necessary and advisable for the conservation of the species.

Ignoring the obvious impact of the changes occasioned by the August 1997 Federal Register Notice, Federal Defendants claim that SCI/NRA failed to demonstrate how the Service passively modified the Special Rule. Opp. at 35. The Service imposed a requirement for those who seek to import elephants and then later purposely modified the rationale behind that requirement. If a regulation requires an adequate explanation for its requirements and the agency revises that explanation, the requirement – and therefore the rule – has been changed and that change must adhere to APA requirements.

In addition to failing to provide an adequate explanation for the change in the Special Rule, the Service deprived the public of proper notice and an opportunity to comment on the rule change. The notice that included the revision of the enhancement finding was in a Federal Register notice, but did not announce to the public that they could comment on changes to the importation requirements for elephants, nor did it solicit comments on those importation requirement changes. The notice's title "Changes in List of Species in Appendices to the Convention on International Trade in Endangered Species of Wild Fauna and Flora" gave no

indication of changes in importation requirements.  The request for comments in the notice very

specifically focused only on the change to CITES Appendix listings for specific species:

> This document announces decisions by the Conference of the Parties to CITES on
> amendments to Appendices I and II, and repeats a previous request (62 FR 31054)
> for comment on whether the United States should enter reservations on any of the
> amendments.

62 Fed. Reg. 44627 (Aug. 22, 1997).  The Federal Register notice did not fulfill the Service's

notice and comment obligations for the change in enhancement requirements.  Due to these

errors, the Court should set aside the Special Rule and the three enhancement findings.

**F.     The Service Never Overcame the Section 9(c)(2) Presumption that Sport
           Hunting Enhances the Survival of Elephants in Zimbabwe**

As explained in the Motion, SCI/NRA's argument that the Service failed to apply the

Section 9(c)(2) presumption is straightforward.  MSJ at 55-61.  Section 9(c)(2) creates a

presumption that the non-commercial import of a species that is on Appendix II of CITES and is

not listed as endangered (such as Zimbabwe's elephants) satisfies any statutory and regulatory

condition on that import.  SCI/NRA is not arguing, as Federal Defendants seem to believe, that

Section 9(c)(2) prevents the Service from imposing any conditions on the import of such

wildlife.  Instead, the argument is premised on the presumption, under the plain language of the

statute, applying to "any regulation issued pursuant to this chapter [*i.e.,* the ESA]."  As the

elephant Special Rule is a regulation issued under the ESA (adopted after notice and comment

rulemaking, codified in the Code of Federal Regulations, set out the public's rights and

obligations, etc.), the presumption applies to the Special Rule.  It follows that the same

regulation that creates the condition and invokes the presumption cannot rebut the presumption.

Federal Defendants' attempts to excuse their failure to rebut the presumption all fail.

Without explaining why the plain meaning of the statute should not apply, Federal Defendants first claim that they have "interpreted" Section 9(c)(2) to create a presumption that a regulation such as a special rule can overcome.  Opp. at 36-37.  This so-called "interpretation" ignores that the presumption applies to the statute and "any *regulation* issued pursuant to [the ESA]." 16 U.S.C. § 1538(c)(2) (emphasis added).  *See* MSJ at 56.  Federal Defendants' Opposition acknowledges that the Special Rule is a regulation, explaining that the Service can rebut the presumption through "the promulgation of a special protective *regulation* pursuant to § 4(d) of the Act, 16 U.S.C. § 1533(d)."  Opp. at 36 (emphasis added).

The cases that Federal Defendants cite do not support this interpretation, except in unpersuasive dicta, and address claims different than those SCI/NRA raise here.  See MSJ at 61 n.25.  In one case, the plaintiff asserted a different legal argument than SCI/NRA assert here – that Section 9(c)(2) "*requires* argali trophies be allowed to be imported into the United States … [and that] the CITES rules governing trade in Appendix II species preempt the applicable [E]SA prohibitions and requirements with regard to threatened species …."  *Safari Club Int'l v. Babbitt,* 1993 WL 13932673, *12 (W.D. Tx. 1993) ("*Babbitt*") (emphasis in original); *see id.* at *14 (plaintiff's argument was that Section 9(c)(2) "establishes a conclusive presumption").  This argument differs from SCI/NRA's position here.  Consistent with SCI/NRA's claim here, the court in *Babbitt* noted that the "effect of this presumption is to shift the burden of producing evidence regarding the import to the [Service] …."  *Id.* at *14.

Another district court, in a civil *in rem* action regarding the forfeiture of an etched elephant tusk, addressed in dictum arguments similar to the Service's flawed reasoning here. *U.S. v. One Etched Ivory Tusk of African Elephant*, 871 F.Supp.2d 128 (E.D.N.Y. 2012).  The main issue in that case was whether the tusk constituted a legally importable "sports-hunted

trophy." *Id.* at 135; *see id.* at 139 (finding that the tusk was not a sport-hunted trophy).  But the court also addressed the claimant's additional argument that the Service must allow the importation under Section 9(c)(2).  The court rejected this argument because it had already determined that the tusk was not an Appendix II species because any part of an animal that is not a hunting trophy is treated under Appendix I of CITES.  *Id.* at 139-140 ("the statutory presumption is simply inapplicable to the Tusk.").  Thus, the court's discussion regarding rebutting the Section 9(c)(2) presumption is dictum.  In any event, the court wrongly concluded that the mere adoption of the elephant Special Rule rebutted the presumption for all the same reasons Federal Defendants' arguments here are wrong.

Federal Defendants next argue that either (1) a special rule "is clearly not a 'regulation issued pursuant to this chapter' to which the presumption applies; or (2) "the statute is silent or ambiguous on the issue of whether a special rule is a 'regulation issued pursuant to this chapter' to which the 9(c)(2) presumption applies …."  Opp. at 38.  Federal Defendants have provided no reason to read the plain language of Section 9(c)(2) to support either of these theories.  Section 9(c)(2) applies the presumption to regulations issued "pursuant to this Chapter." 16 U.S.C. §1538(c)(2).  "This Chapter" encompasses Sections 1531-1544 and includes Section 1533(d), under which authority the Service promulgated the Special Rule.  *See* 54 Fed. Reg. 19146, 19417 (May 5, 1989) (earlier amendment to the Special Rule).

The Service adopted the Special Rule after notice and comment rulemaking, published it in the Federal Register, and codified it in the Code of Federal Regulations.  57 Fed. Reg. 35473, 35475, 35486 (Aug. 10, 1992).  These are all signs of a regulation.  *See, e.g., The Wilderness Soc. v. Norton,* 434 F.3d 584, 596 (D.C. Cir. 2006) ("The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the

statute authorizes to contain only documents 'having general applicability *and legal effect,*' and which the governing regulations provide shall contain only 'each Federal *regulation* of general applicability and current or future effect.'") (quoting *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 538–39 (D.C. Cir.1986)) (emphasis in original).  Consistent with its actions, the Service itself classified the 1992 Special Rule regarding elephant importation as a "regulation" adopted under the ESA.  57 Fed. Reg. at 35485 (discussing why Service did not need to prepare an environmental assessment "in connection with regulations adopted pursuant to section 4(a) of the Endangered Species Act, as amended.").

Instead of following the plain meaning of the statute, Federal Defendants try to create ambiguity and accuse SCI/NRA of "fail[ing] to read Section 9(c)(2) in context."  Opp. at 37.  But Federal Defendants fail to provide any meaningful "context" that establishes that the plain meaning of the statute should not govern.  SCI/NRA do not dispute the so-called "context" Federal Defendants provide – that a special rule can establish conditions for importation.  *Id.* SCI/NRA do dispute, however, that Section 9(c)(2) allows the Service in the same regulation to simultaneously create a condition and rebut the presumption that the condition is met.

Further, as SCI/NRA previously explained, when the Service originally adopted and amended the Special Rule, the Service had no reason to overcome the presumption.  MSJ at 57-58.  The presumption did not apply at that time (all African elephants, including Zimbabwe's, were on Appendix I).  Later, in 1997, when Zimbabwe's elephants were moved to Appendix II, the Service made, based on the facts at the time, a positive finding that sport hunting of elephants enhanced the survival of the species.  *Id.* at 58-59.  The Service never explains why it makes sense that in 1997 it could simultaneously (1) find as a matter of law that the mere adoption of the elephant Special Rule rebutted the factual presumption that the sport hunting of elephants in

Zimbabwe enhanced the survival of the species (*i.e.,* establish that sport hunting did ***not*** enhance the survival of the species), and (2) make a positive finding, based on the facts, that it did.

Federal Defendants also claim that SCI/NRA "fail to identify what other means the Service has at its disposal to rebut the presumption, if not a regulation." Opp. at 37. The answer is straightforward. The Service must make an affirmative finding to overcome the presumed fact that sport-hunting of elephants enhances the survival of the species. The Service could memorialize this finding in an official agency document. Despite claiming no other "means" could serve to rebut the presumption if a special rule cannot, Federal Defendants later argue that the three negative enhancement findings rebut the presumption. Opp. at 39-40.

Federal Defendants' brief and the findings themselves betray this fallback argument that the Service affirmatively rebutted the presumption in the three findings. Federal Defendants argue that "[i]n all three of its findings, the Service determined that ***it was unable to find*** that the killing of elephants from Zimbabwe whose trophies are intended for import would enhance the survival of the species." *Id.* at 39-40 (emphasis added); *see also id.* at 10 (in describing the three enhancement findings, Federal Defendants state that the Service was "unable to find" that sport-hunting enhances the survival of the species). Because the presumption establishes that sport-hunting does enhance the survival of Zimbabwe's elephants, the Service was required to affirmatively find, based on the information before it, that the sport-hunting of those elephants did not enhance the survival of the species (*i.e.,* overcome the presumption), and not simply announce that they are "unable" to make that finding. The Service did not make this type of affirmative determination in the April 2014, July 2014, and March 2015 findings.

Nor has the Service overcome the presumption at any other time. SCI/NRA has already explained that in the adoption and amendment of the Special Rule, the Service never rebutted the

presumption and never had occasion to do so.  MSJ at 57.  In response, Federal Defendants argue

that in 1997, when Zimbabwe's elephants were transferred to Appendix II, the Service retained

the enhancement requirement.  Opp. at 38-39.  This point misses the mark.  SCI/NRA

acknowledge that, although illegally maintained (*see supra.* Section E), the enhancement

requirement and other conditions for importation apply, but SCI/NRA also have established that

the Section 9(c)(2) presumption applies to fulfill those conditions unless the Service

affirmatively overcomes the presumption, as explained above.  In addition, from 1997 until April

4, 2014, the Service concluded that the sport hunting of elephants in Zimbabwe enhanced the

survival of the species.  In 2014-15, the Service had the burden to overcome this factual finding

with an explicit factual finding to the contrary.

       This decision-making requirement – applying the presumption – can be determinative,

just as which party bears the burden of proof can determine the outcome of a case.  *See, e.g.,*

*Bruner v. Off. of Personnel Mgt.,* 996 F.2d 290, 292 (Fed. Cir. 1993) ("Because the proper

allocation of the burden of proof is an important procedural right that may have substantive

consequences," court reviewed assignment of burden of proof in proceeding); *see Babbitt,* 1993

WL 13932673, *14 (Section 9(c)(2) has effect of shifting burden of persuasion).  For example, as

discussed above, in the April 2014 Finding, the Service never sought information from

Zimbabwe that would inform the Service about whether the presumption could be overcome.

This failure should have consequences on the Service, not the hunter/importer.

       Similarly, Federal Defendants misconstrue SCI/NRA's 9(c)(2) claim when Federal

Defendants argue that "where Congress wanted to provide a complete exemption from the

prohibitions in Section 9(a)(1)[,] such as the prohibition on importation[,] it did so without

providing for a rebuttable presumption."  Opp. at 37-38.  As made clear in their Motion,

SCI/NRA are not arguing for a "complete exemption."  Instead, SCI/NRA acknowledge that

Congress created a presumption that *can* be overcome.  Nevertheless, the plain meaning of the

statute establishes that the presumption cannot be overcome in a regulation to which the

presumption applies and that, importantly, it has not been overcome in this case.

In a footnote, Federal Defendants assert that language in a 2016 proposed amendment to

the elephant Special Rule reiterates that the Service has rebutted the presumption, so "any

suggestion that the Service must explicitly rebut the presumption is harmless error."  Opp. at 39

n.15.  Referencing a 2016 proposed amendment to the special rule represents a post hoc

rationalization involving non-finalized statements made by the Service one to two years after the

challenged actions in this case.  The Court cannot accept this tardy explanation for illegal

behavior.  *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50

(1983) ("the courts may not accept appellate counsel's *post hoc* rationalizations for agency

action.").  If anything, the attempt to rebut the presumption through reference to the 2016

proposed amendment to the Special Rule is an acknowledgement both that the Service should

have attempted to rebut the presumption earlier and that the Service does have a vehicle other

than the Special Rule itself to rebut the presumption (contrary to the Service's assertion earlier in

its Opposition).

In addition, Federal Defendants' attempt to invoke the "rule of prejudicial error" or

harmless error is misplaced.  "Neither a showing of actual prejudice nor proof that the agency

would have reached a different result is required to establish prejudicial error."  *AFL-CIO v.*

*Chao,* 496 F. Supp. 2d 76, 89 (D.D.C. 2007).  In addition, the D.C. Circuit has explained that

"the harmless error rule is 'not ... a particularly onerous requirement' .... If prejudice is obvious

to the court, the party challenging agency action need not demonstrate anything further."

*Jicarilla Apache Nation v. U.S. Dept. of Int.*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (citations omitted; first ellipsis in original).  Federal Defendants cite in support a case in which a federal agency engaged in significant environmental analysis before reaching a decision but failed to comply precisely with NEPA procedures.  *Nevada v. Dept. of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).  Here, in contrast, the Service did not merely fail to comply with procedures that had no bearing on the substantive decision; the Service committed a fundamental error in how it must assess the facts before it.  As the Service admits it was "unable" to make the determination required of it based on the facts before it, disregarding a presumption that would work against the Service is prejudicial to SCI/NRA and its members.

Finally, as part of their claim, SCI/NRA challenged that (1) a Service regulation, 50 C.F.R. §17.8(b), "goes too far in claiming that the mere issuance of a special rule means that the statutory presumption does not apply"; (2) the regulation "must give way to the statute" it purports to implement; and (3) the Service's reading would render the presumption a disfavored nullity.  MSJ at 58.  In response, Federal Defendants claim that Section 17.8(b) embodies the Service's interpretation and SCI/NRA have not challenged it.  Opp. at 38 n.14.  In fact, SCI/NRA have done exactly what the case Federal Defendants cite requires: "A regulation is presumed to be valid unless ***it is shown by those attacking it to be contrary to law***." *Id.* (quoting *Forester v. Consumer Prod. Safety Comm.*, 559 F.2d 774, 783 (D.C. Cir. 1977)) (emphasis added).  Like the Service's interpretation, this regulation is contrary to the plain meaning of the statute and cannot rescue the Service's failure to affirmatively overcome the presumption by means other than a regulation.[18]

---

[18] SCI/NRA explained that the Service's so-called interpretation that a special rule automatically rebuts the Section 9(c)(2) presumption creates a nonsensical situation in contrast to a more heavily regulated Appendix II, threatened species without a special rule (to which all the

### G.      SCI/NRA Properly Seek Vacatur of the Three Enhancement Findings

SCI/NRA are not asking the Court to do anything other than set aside the three findings, which would have the effect of reinstating the 1997 finding.  The 1997 Finding governed until April 4, 2014 and included no internal expiration date.  The Service's protestation that it is too stale is belied by this fact.  In fact, the Service continue to apply findings made on the same date to elephant importation from Namibia and South Africa.

Vacating the three findings (and consequential reinstatement of the 1997 Finding) will have the effect of allowing U.S. hunters who harvested an elephant in Zimbabwe in 2014 or 2015 to import their elephant, much as hunters could through April 3, 2014.  These hunters include some who were in Zimbabwe hunting when the Service abruptly announced the ban on importation.  *See, e.g.,* Decl. of Rhyne, ¶7, Dkt. 87-8 (Feb. 18, 2016).

Defendant-Intervenors suggest what Federal Defendants have not asked for – a remand to the agency without vacatur of the three enhancement findings.  D-I Opp. at 8-9.  A remand in this case is not necessary at all, as the 1997 Finding will continue to apply until the Service adopts a new, legal enhancement finding, which would apply only prospectively.  Nor are the errors alleged here of a kind that the Court should keep three illegal findings in place while the Service takes further action.

For the period following any Court order, if it chooses, the Service can follow proper APA procedures to amend the illegally adopted Special Rule, in any future enhancement finding correct the procedural errors identified by SCI/NRA, apply the correct standards based on the

---

prohibitions of Section 9 apply).  MSJ at 59-60.  The Service did not even to attempt to respond to this point.  The Court should disregard any attempt by Federal Defendants to respond to this point for the first time in their final reply brief.

information available at that time, and issue properly adopted rules and legally supportable

decisions.  Defendant-Intervenors would be free at that time to participate in any rulemaking or

otherwise submit to the Service the information they claim to have.  The Court should vacate the

Special Rule and the three enhancement findings and let the Service take action to address the

future of importation of sport hunted elephants from Zimbabwe.

## III.    CONCLUSION

For all these reasons, SCI/NRA moves the Court to grant them summary judgment on

their claims and deny the Federal Defendants' motion for summary judgment.

Dated:  April 29, 2016.

Respectfully submitted,

/s/Anna M. Seidman
Anna M. Seidman
D.C. Bar No. 417091
Douglas Burdin
D.C. Bar No. 434107
Jeremy Clare
D.C. Bar No. 1015688
501 2nd Street NE
Washington, D.C.
Tel: 202-543-8733
Fax: 202-543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff*
*Safari Club International*

Christopher A. Conte
D.C. Bar No. 43048
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Tel.: (703) 267-1166
Fax: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff*
*National Rifle Association of America*